**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **CHARLES CURTIS,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civ. No. 3:06-cv-448** |
| | ) | **Judge Phillips** |
| **v.** | ) | |
| | ) | **Hearing Requested** |
| **ALCOA INC., Individually and as Fiduciary of the** | ) | |
| **Employees' Group Benefits Plan of Alcoa Inc., Plan** | ) | |
| **II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, through counsel, pursuant to Fed. R. Civ. P. 65(a) and E.D.TN. LR 7.1, hereby

submit their brief in support of motion for entry of a preliminary injunction reinstating Plaintiffs'

retiree health care benefits to their prior levels before reduction on or about January 1, 2007.

## I.   NATURE OF MATTER BEFORE THE COURT

Plaintiffs in this ERISA[1] and LMRA[2] action are retirees from Alcoa Inc. (formerly known

as the Aluminum Company of America and hereinafter also referred to as "Alcoa") and

Reynolds Metals Company (purchased by Alcoa in 2000 and hereinafter also referred to as

"RMC") who retired between June 1, 1993 and June 30, 2006, their eligible spouses and

dependants, and surviving spouses of such retirees.  All of the retiree Plaintiffs (and the retirees

from whom the surviving spouse Plaintiffs derive their entitlement to health care benefits in this

matter) worked at least five years each for Alcoa and/or its subsidiaries or companies which have

merged with or been purchased by Alcoa (such as RMC). Almost all retiree Plaintiffs worked

well in excess of five years for Alcoa, many having worked in excess of thirty years.

---

[1] The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").

[2] The National Labor Management Relations Act of 1947, 29 U.S.C. § 141, *et seq.* ("LMRA").

Plaintiff retirees were repeatedly told over the years that if they retired under an immediate pension, Alcoa would provide to Plaintiffs, at no cost, the same retiree health care benefits with which they retired until they attained Medicare eligibility at age 65, when the benefits would be reduced only by the amount Plaintiffs then received from Medicare. The retiree Plaintiffs (and the former employees from whom the surviving spouse Plaintiffs derive their benefits) retired under various Summary Plan Descriptions ("SPDs") and Collective Bargaining Agreements ("CBAs") promising them these benefits. Many Plaintiffs specifically asked Alcoa or RMC representatives if their retiree health care benefits could be reduced after they retired and were told that their benefits could not be changed. The Plaintiffs relied on these representations in making personal financial decisions throughout their employment.

Effective June 1, 1993, the Plaintiffs' Unions and Alcoa reached a collective bargaining agreement that included a FAS-106 letter attached to the agreement which, contrary to all other provisions of the agreement, purportedly capped Alcoa's contribution to the retiree health care plan. Alcoa's representatives however assured the Plaintiffs' Unions that any cap language included in the letter would not be enforced and was merely for accounting purposes due to a new accounting requirement, FAS-106, issued by the Federal Accounting Standard Board ("FASB"). Each subsequent collective bargaining agreement until 2006 included a similar letter along with similar assurances from Alcoa regarding its non-enforcement.

However, on or about June 30, 2006, the Unions of which Plaintiffs were members while active employees reached an agreement with Alcoa to reduce Plaintiffs' retiree health care benefits, despite the fact that Plaintiffs were already in retirement, had no vote on whether or not their benefits would be reduced, and had given no authority to the Unions to agree to such a

reduction on their behalf. This purported reduction became effective on or about January 1, 2007.

Plaintiffs, now typically without a job and in their late 50s to mid-70s, many with serious medical conditions or without spouses, are left without medical benefits at all or with medical benefits that they can maintain only at the risk of financial ruin. Plaintiffs are facing large increases in the payments they must make, including, without limitation, large deductibles they must reach before their health insurance covers treatments, larger co-payments for medical treatment they receive, enormous co-payments for the prescription drugs upon which they rely, and the imposition of significant monthly premiums which were previously covered entirely by Alcoa. Alcoa's conduct is not only unlawful under ERISA and the LMRA as discussed in detail below, but also unconscionable in light of the sacrifices in active employee pay that retirees made to receive these benefits when they retired, and the specific and repeated commitments Alcoa made to the Plaintiffs that their medical benefits could not be changed after retirement. Had Plaintiffs known that Alcoa would alter their health care benefits, they would have sought alternate employment or have made alternative arrangements for their medical benefits before it was too late and would not have sacrificed active employee pay for these benefits.

Plaintiffs bring two claims for relief under ERISA: (1) a claim that they vested in the retiree health care benefits under the terms of the plan, and an alternative claim that, (2) if they did not vest, then Alcoa breached its fiduciary duties by misrepresenting that the benefits were vested. Plaintiffs further bring a breach of labor contract claim under the LMRA. Plaintiffs further allege claims for injunctive and declaratory relief. These Plaintiffs, who are former hourly paid workers of limited financial means, face serious (in some cases catastrophic) financial, emotional and physical harm as a result of the cutback in their benefits, clearly meeting

the irreparable harm requirement for the issuance of a preliminary injunction. On the other hand, Alcoa, the largest aluminum product manufacturer in the world with well over one billion dollars in annual profits, faces minimal hardship in maintaining the pre-reduction level of retiree health care benefits. The balance of hardships overwhelmingly favors Plaintiffs; they can show a significant likelihood of succeeding on the merits of one or more of their claims; and the public interest favors issuance of an injunction. Accordingly, the Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction reinstating their subsidized retiree medical benefits at levels existing prior to their reduction effective on or about January 1, 2007 pending an ultimate determination of the merits of their claims, and that the Court also order any withdrawal of this injunctive relief to apply prospectively only.

## II.    FACTS

The facts are set forth in detail in the accompanying Declarations of a number of retiree Plaintiffs who participated in the CBA negotiations, several of whom were signatories to relevant CBAs, and of a sampling of retiree Plaintiffs who have incurred hardships from the new, unconsented-to reductions in their vested retiree health care benefits. Certain documentary evidence is referenced in the accompanying Declaration of Robert S. Catapano-Friedman, Esq. ("RSC Dec."), which contains additional relevant language from the below-referenced CBAs and SPDs beyond the language referenced herein. The facts may be summarized as follows:

### A.    The Plaintiffs.

Plaintiffs are several thousand retirees (and surviving spouses[3] who derive their rights from former employees of Alcoa) most of whom worked for most or all of their adult lives at

---

[3] As an example, *see* Brenda L. Loveday Dec. ¶¶ 4-11 (husband worked at Alcoa through his death, she is on eleven medications, she has had to postpone mammogram and stop taking vitamins due to hardship).

plants owned by Alcoa, employed with the company upwards of 30 to even 40 years. (*E.g.,* Timothy A. Garner Dec. ¶ 3 (40 ½ years), Lawrence Fountaine Dec. ¶ 3 (38 years), Stephen Barse Dec. ¶ 3 (30-plus years), Robert H. Gates Dec. ¶ 3 (30 years), Billy D. Jones Dec. ¶ 3 (36 years), Jimmy Don Bolt Dec. ¶ 3 (30-plus years), Donnie Cope Dec. ¶ 3 (35 years), Jimmy J. Holloway Dec. ¶ 11 (37 years)). Plaintiffs retired between June 1, 1993 and June 30, 2006 and were part of a Union[4] which entered into a series of CBAs with Alcoa promising Plaintiffs health care benefits under the Employees' Group Benefits Plan of Alcoa Inc., Plan II and/or predecessor plans (hereinafter collectively referred to as the "Alcoa Retiree Health Care Plan" or the "Plan").

On January 1, 2007, the benefits to Plaintiffs under the Plan were reduced dramatically, totaling hundreds and in many cases thousands of dollars per year per person. The result has been to create extreme hardship among this older and vulnerable group of individuals. Since January 1, 2007, the Plaintiffs have been put in dire financial straits due to the increased costs of their health care plan, at a time later in life when they are most vulnerable to medical problems. (*See, e.g.,* Fountaine Dec. ¶ 15, Barse Dec. ¶ 16, Gates Dec. ¶¶ 7-10, Jones Dec. ¶¶ 7-10, Bolt Dec. ¶¶ 7-10 (Mr. Bolt has asbestosis, chronic COPD, emphysema and is on oxygen; his wife has a thyroid tumor), Garner Dec. ¶ 7 (wife recovering from breast cancer; Mr. Garner has diabetes, two knee replacements secondary to arthritis), Jones Dec. ¶ 7 (he takes 8 prescriptions to treat a stroke; wife has diabetes), Cope Dec. ¶ 7 (multiple sclerosis and bouts of dementia, five

---

[4] The vast majority of the Plaintiffs (or the former employees from whom surviving spouse Plaintiffs derive their entitlement to health care benefits) while employed by Alcoa were part of the United Steelworkers of America Union ("USWA") or the Aluminum, Brick and Glass Workers International Union ("ABG") (which merged with and became part of the USWA). A handful of Plaintiffs were part of other related Unions who Plaintiffs believe negotiated substantially similar (for the purposes of this lawsuit) CBAs with Alcoa and Plaintiffs believe were covered by the same retiree health care plans and SPDs published by Alcoa for the USWA retiree Plaintiffs. These Unions are referred to collectively herein as the "Union."

5

prescriptions per month), Joe Mark Bradley Dec. ¶ 7 (Mr. Bradley is confined to a wheelchair and quadriplegic), Holloway Dec. ¶ 7 (Lou Gehrig's disease, on a ventilator, wife has diabetes and arthritis)).

They are now being forced to pay monthly premiums and high co-pays and deductibles on doctor and hospital visits and prescription drugs which exponentially increase the cost of their health care. (*E.g.,* Gates Dec. ¶¶ 7-10, Bolt Dec. ¶¶ 7-10, Garner Dec. ¶ 10). The Plaintiffs are on fixed incomes as a result of Social Security benefits or Alcoa pensions that are now dramatically reduced by the amounts paid for their health care plan. (Garner Dec. ¶ 9). In many cases, Plaintiffs are reaching a point of being forced to choose between food and prescription medications. (*E.g.,* Bolt Dec. ¶ 10 ("[I]t looks like we will have to decide whether we eat or take our medicine"), Frank Cramer Dec. ¶ 10 ("If my wife didn't work, we would be destitute."), Cope ¶¶ 9-10 (wife had to go back to work; she had not worked previously to care for husband who has multiple sclerosis), Bradley Dec. ¶ 9 (it takes his wife's entire salary for them to survive), Chester Gentry Dec. ¶ (may be forced to quit taking necessary medications), John Delbert Baud Dec. ¶ 10 (he and his wife both had to go back to work), William R. Roberts Dec. ¶ 9 (facing bankruptcy)). Some are in jeopardy of losing their homes. (James Edward Wilson Dec. ¶ 10). They are avoiding attending necessary hospital and doctor appointments out of fear of the cost. Some are suffering hardship because of the strain of paying for medical care for medical conditions that arose out of their very work at Alcoa. (Cramer Dec. ¶ 7 (disabled from effects of forklift accident), Roberts Dec. ¶ 10, Donald Lynn Ricketts Dec. ¶ 7 (asbestos)).

Alcoa gave Plaintiffs no warning that a reduction in benefits could occur while Plaintiffs were active employees. To the contrary, Alcoa consistently assured workers who were retiring that they had health care benefits for life. (Dennis Macy Dec. ¶ 8, Leroy G. Threlkeld Dec. ¶ 5).

As such, Plaintiffs have not planned any alternate forms of insurance or income to cover their reduction in health care benefits by Alcoa. (Threlkeld Dec. ¶ 5, Garner Dec. ¶ 5, Jones Dec. ¶ 5, Cramer Dec. ¶ 5, Bradley Dec. ¶ 5). Plaintiffs had given up benefits such as raises, vacation time and personal leave while active employees in return for the promise of vested benefits. (Barse Dec. ¶ 7, Cramer Dec. ¶ 5). Alcoa has billions of dollars of current revenues which reached an all-time record high in 2006[5] and could easily afford their benefits.

### B. The Pension Plan.

All Plaintiffs and the former employees from whom surviving spouse Plaintiffs derive their health care benefits retired under an immediate pension offered by Alcoa or RMC or at the time of their deaths were active employees who were vested under both the Alcoa or RMC retiree health care plan and pension plan for which they were also eligible. During the pertinent times, vesting under the Alcoa pension plan required five years of service. It previously had required ten years of service, but was changed to requiring only five years of service before June 1, 1993. (Terry Best Dec. ¶ 6, Macy Dec. ¶ 10, RSC Dec. ¶ 4). A vested employee could retire immediately for purposes of both the pension and retiree health care plans on or after age 65 with at least five years of Alcoa service, at age 60 with at least ten years of service, if disabled at any age with at least ten years of service, at any age with at least 30 years of service, as well as under certain other special circumstances specified in the pension plan. (Best Dec. ¶ 8, Fountaine Dec. ¶ 9, Macy Dec. ¶ 11).

---

[5] In a press release dated January 9, 2007, Alcoa announced that in 2006 it had the highest income and revenue in the company's history with revenues of over $30.4 billion. See Alcoa Press Release entitled "Alcoa Announces Highest Income and Revenue in Company's History," dated January 7, 2007 (describing "the best full year result's in the company's 118-year history"). A copy of this press release is included in the exhibit binder. The court may take judicial notice of this document. *See, e.g., Massachusetts Nurses Ass'n v. North Adams Regional Hosp.*, 396 F.Supp.2d 30, 35 & n.4 (D. Mass. 2005) (judicial notice of newspaper article and press release).

Most of the Plaintiff retirees left Alcoa after thirty years of service with entitlement to an immediate pension under Alcoa's pension plan. (*E.g.,* Fountaine Dec. ¶ 3, Barse Dec. ¶ 3, Gates Dec. ¶ 3, Jones Dec. ¶ 3, Bolt Dec. ¶ 3). Employees were told that they were vested not only in the pension plan but in their health care benefits after they reached the needed years of service. (Best Dec. ¶ 6, Macy Dec. ¶ 10). They were told when they retired that they would receive both pension and health care benefits for life. (Best Dec. ¶ 7, Macy Dec. ¶ 8).

### C. The CBAs.

The Unions of which Plaintiffs were members while employed by Alcoa entered into a series of CBAs with Alcoa, including, without limitation, CBAs effective in 1977, 1983, 1986, 1988, 1992, 1993, 1996, 2001, and 2006.[6] (*See* RSC Dec. ¶ 5). Plaintiffs' submissions in connection with their motion include Declarations regarding the negotiation, intent and meaning of relevant provisions in the applicable CBAs from leading members of the USWA who participated in and, in some cases, were signatories of, the CBAs under which (in connection with the relevant SPDs and plan documents) the Alcoa Retiree Health Care Plan benefits were conferred. (Fountaine Dec. ¶¶ 4-6, Barse Dec. ¶¶ 4-7, Best Dec. ¶¶ 4-6, Macy Dec. ¶¶ 3-6, Pruitt Dec. ¶¶ 4-10, Dan Henry Dec. ¶¶ 4-7). According to the union leaders, the CBAs and SPDs were intended to provide Plaintiffs vested health care benefits paid entirely by Alcoa until their death.

The May 31, 1993, 1996, and 2001[7] CBAs for former RMC employees who were part of the USWA or ABG each contain Article XXIX referencing "insurance" as follows: "There is

---

[6] Various former RMC employees were subject to CBAs with RMC effective June 1, 1993 and June 1, 1996. Some were subject to a CBA with Alcoa effective June 1, 2001. The Union for Alcoa retirees who never worked for RMC negotiated CBAs with Alcoa in, without limitation, 1983, 1988, 1992, 1993, 1996, 2001, and 2006.

[7] The 2001 CBA was between the Union and Alcoa. The 1993 and 1996 CBAs cited here were between the Union and RMC.

attached hereto as an exhibit an Insurance Plan that shall become effective as provided therein. The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions." Article XXX covers "Term of Agreement" and has the same non-fixed date for an ending date as in the CBAs for the Alcoa employees' CBAs, discussed below, requiring written notice to terminate. (*See* RSC Dec. ¶ 5).

CBAs applicable to Alcoa USWA and ABG Union employees became effective in 1983, 1986, 1988, 1992, 1993, 1996, 2001,[8] and 2006. These Alcoa employee CBAs contained language entitling Plaintiffs to health care benefits and Alcoa issued SPDs relating to these benefits. The language of these CBAs in 1986, 1996 and 2001 reads in Article XXIII:

> The Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Plan Agreement: (1) for persons not eligible for Medicare-Hospital Expense, and Extended Medical Expense Program. (2) for persons eligible for Medicare-Supplemental Hospital Expense, Supplemental Surgical-Medical Expense, and Supplemental Extended Medical Expense, and Prescription Drug Program. All of the above benefits will be provided without cost to employees and retirees except as otherwise provided. . . .

(*See* RSC Dec. ¶ 5, emphases added).

In all the Alcoa CBAs, Article XXV reads, "Nothing in this Agreement shall be construed as waiving any right or protection granted to the Company, the Union, or any employee under any applicable federal or state law." (*Id.* ¶ 5, Best Dec. ¶ 9, Henry Dec. ¶ 14, Pruitt Dec. ¶ 10). Employees understood this to mean that employees who had reached vesting of their retiree health care benefits could not have them waived or changed without consent. (Best Dec. ¶ 9, Henry Dec. ¶ 14, Fountaine Dec. ¶ 10).

---

[8] In 2001, a CBA was negotiated between the Union and Alcoa for employees who had not worked for RMC, to go along with one for employees who were former RMC employees.

The May 31, 2001 Alcoa CBA states that it is an amendment and extension of the prior agreement dated June 1, 1996. Article XXXI is entitled "Period of Agreement" and does not give a fixed ending date. It states: "Except as otherwise provided below, this Agreement shall terminate 60 days after either party shall give written notice of termination to the other party, but in any event shall not terminate earlier than 12:00 noon, or at the end of the shift starting before noon, whichever is later, May 31, 2006, subject to a reopener in 2005." (RCF Dec. ¶ 5).

The May 31, 1996 Alcoa CBA states that it amends and restates the June 1, 1993 Alcoa CBA. Its Article XXXI is identical to that of the 2001 Alcoa CBA except that the dates are May 31, 2002 rather than May 31, 2006 and the reopener is in 2001, not 2005. Similar language exists in previous CBAs. (RCF Dec. ¶ 5).

### D.    The FAS-106 Letter.

In 1990, the FASB issued FAS-106,[9] which became effective in 1993 and required that companies represent future liabilities for post-retirement plans to its shareholders. As a result, during negotiations for the Alcoa CBAs stated above, Alcoa represented to the Union and Plaintiffs that it was necessary to add a letter at the end of the CBAs for accounting purposes. This letter was from Alcoa to the Unions and was included towards the back of all Alcoa CBAs between the Unions and Alcoa from 1993 through 2006. (*See* RCF Dec. ¶ 6).

Alcoa represented to Plaintiffs that this "cap" was never to be instituted, was for accounting purposes only, and that retiree health care benefits would continue until their death at no cost to them. (Barse Dec. ¶ 6 (told cap was for accounting purposes only), Macy Dec. ¶¶ 4-7,

---

[9] *See* FASB "Employers' Accounting for Postretirement Benefits Other Than Pensions, Statement of Financial Accounting Standards No. 106" (Dec. 1990). FAS 106 requires that employers report postretirement benefits on an accrual basis. The FASB is a private professional organization which establishes standards for financial accounting and reporting.

Henry Dec. ¶ 7, Fountaine Dec. ¶ 6 (told cap language was to accommodate accounting only), Pruitt Dec. ¶ 10, Best Dec. ¶ 5, Macy Dec. ¶ 6 (same)).

Based on Alcoa's assurances, the Union agreed to the FAS-106 letter at the end of CBAs. In further evidence of the FAS-106 letter merely being an accounting matter, it was, indeed, never enforced from 1993 through 2006, across a period of time spanning more than a decade, during which time many Plaintiffs relied and retired. (Fountaine Dec. ¶ 7, Pruitt Dec. ¶ 9). Before the June 31, 2006 CBA was ratified, retirees such as former Union President Mr. Pruitt held the belief that the change would only apply to active workers who retire in the future, not to those who had already been vested and retired, after which their consent was required to enact any reduction in their benefits. (Pruitt Dec. ¶ 9).

> **E.      The Summary Plan Descriptions.**

Alcoa also issued several SPDs over the years describing retiree and surviving spouse health care benefits. All of these SPDs provide administrative procedures under which plan benefits may be claimed. Alcoa is named as the Plan Administrator under the plan by the SPDs.

> ### i.      1979 and 1981 Alcoa SPDs.

These SPDs issued to USWA/ABG Alcoa employees state, in relevant part, regarding pre-Medicare health benefits for retirees:

> coverage under this Part 1 for a person shall cease when such person becomes eligible for coverage under Part II hereof [regarding Medicare supplemental health coverage]. . . . [C]overage shall be transferred automatically from Part 1 to Part II when a person covered under Part I becomes eligible for Medicare.

(*See* RCF Dec. ¶ 8). These SPDs link the receipt of health care benefits to receipt of a pension. There is no cessation of coverage for retirees anywhere in these SPDs except for "death." These SPDs do not reserve the right to amend or terminate the benefits in any way. There is no language limiting the duration of the benefits to the term of any CBA. They also state: "All

benefits described in this booklet are provided directly by Alcoa. No contributions by participants are required to provide the benefits under the Plan." (RCF Dec. ¶ 8).

There is no language in these SPDs limiting the duration of any benefits to the term of any CBA, and no cap language in the SPDs. Nor is there any reservation of rights to amend or terminate the benefits in any way. (RCF Dec. ¶ 8). As of the dates of these SPDs, it is Plaintiffs' understanding that the majority of them had already vested both in the pension plan and in the retiree health care benefits.

### ii. 1993 Alcoa SPD.

Alcoa published a 1993 SPD and plan document for USWA/ABG employees after the 1993 Alcoa CBA to which was affixed the Memorandum of Understanding. (*See* RCF Dec. ¶ 9). This SPD covers both active and retired employee health care coverage.[10] This SPD states in relevant part: "The benefits contained in this booklet are included in the Employees Group Benefits Plan of Aluminum Company of America, Plan II. The Health Care Agreement governs your rights and obligations in accordance with the Labor Agreement."

Page 28 of the 1993 SPD states in the section "Who is eligible:"

You are eligible to participate in the Hourly Retiree Medical program if you are a[n]: Hourly employee* who retires on or after January 1, 1994, and were on the U.S. payroll of Alcoa or participating subsidiaries; spouse of an hourly employee who was married prior to retirement; surviving spouse of an hourly retiree, who was married prior to retirement and at least one year prior to your retired spouse's death and is covered by the surviving spouse pension option under the Retirement plan; or surviving spouse of an active, fully vested employee who dies on or after January 1, 1994….

(RCF Dec. ¶ 9, emphasis added.) The Plaintiff retirees understood the language referring to active vested employees to reflect their understanding that all employees became vested in their

---

[10] The Retiree Medical Benefits portion of the SPD is described on pages 28 and 29 of this SPD.

retiree health care plan benefits when they became vested in their company pensions.  (Fountaine

Dec. ¶ 8).

### iii.  1997 and 2001 Alcoa SPDs.

These SPDs include language stating:

> You are eligible to participate in the plan if you are: an employee who is receiving a pension and was covered as an active employee (except a deferred vested retirement): the spouse of an eligible retiree as long as you were married prior to retirement; the surviving spouse of a retiree as long as you were married prior to retirement and at least one year prior to your retired spouse's death and are covered by the surviving spouse pension option under the Alcoa Retirement Plan; or the surviving spouse of an <u>active vested employee</u> who died while eligible for the Alcoa Retirement Plan . . . . <u>Generally, Alcoa pays the cost of the Alcoa Health Care Plan for you and your eligible dependents</u>.  However, if you choose an available HMO that costs more than the Alcoa plan, you are required to pay the difference.  Alcoa reimburses you and your eligible dependents for Medicare Part B premiums whether you participate in the Alcoa Retiree Health Care Plan or a Medicare HMO [unless you are a deferred vested retiree–only in 1997 SPD] [(except a Medicare-risk HMO)-only in 2001 SPD].  The reimbursement amount is determined by your retirement date . . . .When you retire, you and your eligible dependents automatically are enrolled in the Alcoa Retiree Health Care Plan (unless you are a deferred vested retiree). Retiree medical coverage changes when an individual becomes eligible for Medicare . . . . Alcoa Retiree Health Care Plan Coverage for you and your eligible dependants starts on your retirement date.  <u>Your health care coverage ends on the date of your death.   However, coverage for your eligible dependants may continue.</u>

(RCF Dec. ¶ 10, emphases added.)   Again, the language refers to active vested employees,

indicating that all employees became vested in their retiree health care plan benefits when they

became vested in their company pensions.

### iv.  2002 Alcoa SPD.

In 2002, Alcoa issued a combined SPD and plan document entitled "Health Care Benefits

Agreement -- Master Agreement Plan."  (RCF Dec. ¶ 15 and see excerpts attached as part of

**Exhibit A** thereto.)   This SPD once again contains language referring to "active vested

employee[s]."   (*Id.* Ex. p. 39).   This language reflected Plaintiffs' understanding that all

employees became vested in their retiree health care plan benefits at the same time they became vested in their Alcoa pension plan benefits. (Pruitt Dec. ¶ 11, Macy Dec. ¶ 10, Fountaine Dec. ¶ 8, Henry Dec. ¶ 12). Plaintiffs also understood this clause to mean that if an employee died after becoming vested that his surviving spouse was vested and would be entitled to health care plan benefits for the remainder of his or her life. (Macy Dec. ¶ 10).

### v.   SPDs For Prior RMC Employees.

In 2000 RMC was bought by Alcoa, which assumed RMC's liabilities for its health care plans. The former RMC employees were issued SPDs by RMC for retiree health care benefits prior to the merger and shared the 2001 and 2002 Alcoa SPDs after the merger when the RMC retiree health care plan was merged into and became a part of the Alcoa retiree health care plan. (*See* RCF Dec. ¶¶ 11-14).

### F.   Alcoa's Oral Representations Regarding Retiree Medical Benefits.

Alcoa consistently represented to Plaintiffs that their retiree health care benefits became vested at the same time that they became vested under the Alcoa pension plan. (Fountaine Dec. ¶ 8, Barse Dec. ¶ 9). As all of the Plaintiffs became vested under the pension plan, they also became vested under the retiree health care benefits plan. Alcoa further represented that Plaintiffs' vested retiree medical benefits could not be changed after a vested employee retired. (Fountaine Dec. ¶ 12, Barse Dec. ¶ 9).

Alcoa consistently represented to Plaintiffs and to Union negotiators that any cap language was for accounting purposes only, since Alcoa was newly required in 1993 by FAS-106 to account for its future retiree health care liabilities in financial statements. (Fountaine Dec. ¶ 6, Barse Dec. ¶ 6). Alcoa held pre-retirement meetings so that workers planning retirement could ask about their benefits. In these meetings, management told Plaintiffs that they would

have the same benefits they had when they retired for life. Moreover, retiring employees were told that the benefits they had could not be reduced. (Best Dec. ¶ 7, Macy Dec. ¶ 8, Stotlar Dec. ¶ 5). The Union representatives present at the 1993 negotiations introducing the FAS-106 Letter testify that they were uniformly told it was to be for accounting purposes only, that retiree health care benefits were vested, and it would never change Plaintiffs' health care benefits after they retired. (Macy Dec. ¶¶ 4-7, Henry Dec. ¶¶ 5-9, Best Dec. ¶ 5, Pruitt Dec. ¶ 7-10).

During CBA negotiations for 2001 contracts, Tom Mordawanec, negotiating representative for Alcoa, told the Union that Alcoa was thinking of instituting a "cap" on health care benefits based on the FAS-106 Letter. (Barse Dec. ¶ 7, Henry Dec. ¶ 9 ). However, the Union objected to this, stating that they had always been told and had always understood that it was merely for accounting purposes. (Barse Dec. 7, Henry Dec.¶ 9). After discussion with other representatives of Alcoa, Tom Mordawanec stated that he was mistaken and agreed that the FAS-106 Letter had merely been for accounting purposes and no "cap" was instituted in 2001. (Barse Dec. ¶7 (averring that Mr. Mordawanec "assured us we were correct" that cap language was "for an accounting purpose" only), Henry Dec. ¶ 9).

During negotiations in 2005, Tom Mordawanec, after acknowledging his past position, now stated that Alcoa was going to implement the cap language regardless. (Barse Dec. ¶ 8, Henry Dec. ¶ 10).

Retired Union workers were not allowed to vote on the benefit reduction. (Garner Dec. ¶ 5, Cramer Dec. ¶ 10, Henry Dec. ¶11).

### III.    ISSUE

Whether a preliminary injunction is proper pending further litigation, where Plaintiffs are suffering irreparable harm, the relative burden on Alcoa is low, Plaintiffs show a likelihood of success on the merits of one or more of their claims and the public interest favors issuance.

### IV.    ARGUMENT

**A.    Preliminary Injunction Standard.**

A preliminary injunction may issue upon satisfaction of a four-part test weighing 1) the likelihood of irreparable harm to plaintiffs if the relief is denied, 2) the likelihood of harm to Alcoa if the injunction issues, 3) the likelihood plaintiffs will succeed on the merits, and 4) the public interest. *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 421 (6th Cir. 2004).

**B.    Plaintiffs Are Suffering Irreparable Harm and Alcoa Would Not Suffer If The Injunction Were Issued.**

Alcoa's conduct, by forcing Plaintiffs to pay medical benefit plan costs for which Alcoa has always been responsible, has devastated their lives and retirement plans. Plaintiffs have had to pay the drastically increased costs at great personal expense, despite in most instances having very limited financial resources, and in some cases they have been forced to end their retirement and go back to work, despite ailments that might prevent them from working. Plaintiffs are from a retired class of people, mostly over age 55. They worked at Alcoa much of their adult lives and Plaintiffs have always relied upon the health care benefits they received when they retired and assurances by Alcoa that Plaintiffs' benefits would not be reduced. Many Plaintiffs have urgent and expensive medical needs, making Alcoa's insistence on their payment of premiums, deductibles, and higher co-pays an extreme burden. Plaintiffs will be irreparably harmed by the

reduction in their health care benefits, will be ill able to afford the contributions now sought by Alcoa of them, and as a result, will suffer financially, emotionally and medically.[11]

In contrast to the plaintiffs, Alcoa will not suffer any significant harm from a preliminary injunction. Alcoa is the largest producer of aluminum in the world. Alcoa admitted in its Answer that it had an operating income of $1.23 billion in 2005 and its 2005 revenues were approximately $26.2 billion. (Amended Complaint ¶ 23 [Docket No. 3] and Answer ¶ 23 [Docket No. 11]). Alcoa can well afford to pay the costs of Plaintiffs' health care benefits, which it paid until January 1, 2007.

### C. Plaintiffs Are Likely to Prevail on the Merits of Their Claim for Vesting of Retiree Medical Benefits.

Because the likelihood of harm to Plaintiffs clearly outweighs the likelihood of any harm to Alcoa and the public interest is clearly best served by issuance of the injunction, Plaintiffs need only show "some likelihood of success on the merits" to prevail on their request for a preliminary injunction. *Wood, supra* at *8 (finding that plaintiffs had some likelihood of success on the merits adequate to support injunction). As shown below, Plaintiffs are likely to prevail on one or more of their claims, entitling them to the preliminary injunctive relief they seek.

#### i. *Plaintiffs' Health Care Plan is an ERISA Welfare Benefit Plan.*

An employer-sponsored benefit is an ERISA plan if a reasonable person can identify from the surrounding circumstances 1) the intended plan benefits, 2) a class of beneficiaries, 3) a source of financing, and 4) a procedure to claim benefits. *Williams v. WCI Steel Co.,* 170 F.3d 598, 602 (6th Cir. 1999) (*citing Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982)).

---

[11] Harm similar to that described in the affidavits has been held sufficient in other cases. "[A] detailed showing of irreparable harm is not necessarily prerequisite to preliminary injunctive relief." *Wood v. Detroit Diesel Corp.,* 2007 WL 128772, at *9 (6th Cir. Jan. 17, 2007) (affirming preliminary injunction barring efforts by company to require retirees to make premium contributions toward health care coverage).

Here, the intended plan benefits are health care benefits giving Plaintiffs lifetime benefits under the Plan. It designates a class of beneficiaries: retirees who retire under an immediate pension from Alcoa, their spouses, dependants, and surviving spouses. In addition, it designates as recipients surviving spouses of active employees who were vested prior to their death, stating that these employees were "active vested employee[s]." (*See* RCF Dec. Ex. A p. 39.) The source of funds is the assets of Alcoa. In order to claim benefits, individual retirees had to retire under an immediate pension or be a qualified surviving spouse. In most cases retirees and surviving spouses were automatically covered by the retiree health care plan after retirement and obtained their benefits by following administrative claims procedures set forth in the plan.

ERISA allows a participant to bring a lawsuit to recover benefits due under the terms of his plan, to enforce rights under the terms of a plan, and/or to clarify rights to future benefits. 29 U.S.C. § 1132(a)(1)(B). If Plaintiffs establish that the benefits promised them under the plan vested, so that Alcoa could not withdraw them, the benefits are due without reduction until their death. *Deboard v. Sunshine Min. & Refining Co.*, 208 F.3d 1228, 1238 (10th Cir. 2000).

ERISA divides benefits into two categories, pension plans and welfare plans. 29 U.S.C. § 1002(1) & (2). Plans which provide medical benefits, such as the one covering Plaintiffs, are welfare benefits plans under § 1002(1). Welfare benefit plans, unlike pension plans, do not automatically become vested. *Maurer v. Joy Tech., Inc.,* 212 F.3d 907, 915 (6th Cir. 2000). The rule is similar under the LMRA § 301, 29 U.S.C. § 185. *See Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991).

However, under the LMRA and ERISA, a promise or agreement by an employer for vested benefits will be enforced. *See Maurer,* 212 F.3d at 918 ("If the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a

LMRA violation"); *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 n.8 (6th Cir. 1983) (noting that "rights, once vested upon the employee's retirement, are interminable and the employer's failure to provide them actionable under § 301 by the retiree"), *cert. denied*, 465 U.S. 1007 (1984).

Further, once benefits are vested, they cannot be reduced without consent. Consent to reduce vested benefits cannot be given by a union on behalf of retirees. *Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass*, 404 U.S. 157, 181 n.20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (noting that vested retirement benefits cannot be bargained away by union without consent); *Yard-Man*, 716 F.2d at 1482 n.8 (a "union . . . may not . . . bargain away retiree benefits which have already vested in particular individuals"); *Maurer,* 212 F.3d at 918 (accord); *In re Ormet,* 324 B.R. 646, 651-55 (S.D. Ohio 2005) ("If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees.").

> **ii.     The Plaintiffs Are Entitled to Rely on the "Yard-Man" Inference**.

The court in *International Union v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), provided a framework for interpreting the provisions of a CBA. The court noted that whether benefits survive the termination of a CBA depends on the intent of the parties. *Yard-Man,* 716 F.2d at 1479. To discern the intent of the parties, a court should apply the basic rules of contract interpretation. *Id.*

"For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent . . . . The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." *Id.* In addition, the "terms must be construed so as to render none nugatory and avoid

illusory promises." *Id.* at 1480. Finally, a court should consider extrinsic evidence when the terms of the contract are ambiguous. *See id.*

The *Yard-Man* court stated that "retiree benefits are in a sense 'status' benefits which, as such, carry with them <u>an inference . . . . that the parties likely intended those benefits to continue</u> as long as the beneficiary remains a retiree." *Id.* at 1482 (emphasis added). The "*Yard-Man* inference" remains good law in the Sixth Circuit to this day, and guides courts faced with the task of discerning the intent of the parties in these types of cases. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996); *UAW v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999); *In re Ormet,* 324 B.R. at 652-65 (noting "there is an inference that parties to a CBA intended for retiree benefits to vest"); *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 580 (6th Cir. 2006) ("There is no need to revise, reconsider, or overrule *Yard-Man*.").

The "Yard-Man inference" is particularly appropriate in the context of unionized workers, as the Sixth Circuit noted in *Yolton*, 435 F.3d at 581 n.6. This is because "[r]etirees, who have left their bargaining unit, and can no longer rely on their union to maintain their benefits, are not likely to leave their benefits alterable based on the changing whims and relative bargaining power of their former union and employer." *Id.*

### iii.    *The Plaintiffs' Health Care Plan Provides Vested Benefits Without Ambiguity.*

If a document explicitly indicates that retiree medical benefits are vested that the document's language will be enforced. *Yard-Man*, 716 F.2d at 1479. The court is to consider the text and language in question in light of the overall context of the document as a whole:

> Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the CBA for clear manifestations of intent . . . The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.

*Id.* at 1480*; Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 & n.4 (6th Cir. 1996) (*quoting Yard-Man*).

In this case, the intent to vest at the level prior to January 1, 2007 is evidenced in the following documents, without limitation:

- All Alcoa SPDs from 1979 through 2006 state that benefits are provided by Alcoa at no cost to Plaintiffs and that benefits end at death.[12]

- Receipt of retiree and surviving spouse welfare benefits is tied to eligibility for the pension plan, indicative of an intent to vest the welfare benefits.[13]

- All Alcoa CBAs and the 1979, 1981, 1997, 2001, and 2002 Alcoa SPDs indicate that the full welfare benefits plan costs will be paid by Alcoa.[14]

- All Alcoa SPDs refer to the eligibility of "active vested employee[s]" who are also eligible under the pension plan, expressly indicating vesting.

- All CBAs and SPDs contain language giving benefits to surviving spouses after the death of their spouse retiree, indicating an intent to continue benefits of each retiree until death and, therefore, an intent to vest.[15]

_____

[12] The 1997, 2001, and 2002 Alcoa SPDs state, "[y]our health care coverage ends on the date of your death." (RSC Dec. ¶¶ 10, 15, & Ex. thereto). The 1979 and 1981 Alcoa SPDs state that coverage ends upon death. (RSC Dec. ¶¶ 8). The 1993, 1997, 2001 and 2002 Alcoa SPDs allow for surviving spouse and dependant coverage after the death of a retiree, indicating that coverage for retirees lasts until death. (RSC Dec. ¶¶ 9, 10, 15, & Ex. thereto). *See BVR*, *supra,* 190 F.3d at 773-74 (ruling that language that benefits continued until death indicated vesting of health care benefits); *Helwig v. Kelsey-Hayes Co*., 93 F.3d 243 (6th Cir. 1996) (plan stated benefits would "be continued for the rest of your life").

[13] *Yolton, supra*, 435 F.3d at 580-81 (affirming the district court's findings that "[b]ecause the pension plan is a lifetime plan and the health insurance benefits are tied to the pension plan . . . the health insurance benefits were vested and intended to be lifetime benefits"), *cert. denied*, 127 S.Ct. 554 (2006); *Golden, supra*, 73 F.3d at 656 ("Since retirees are eligible to receive pension benefits for life, the court found that the parties intended that the company provide lifetime health benefits as well."); *Bailey v. AK Steel Co.,* 2006 WL 2727732, *6 (S.D. Ohio Sept. 22, 2006) (same).

[14] *Yolton,* 435 F.3d 571 at 575 (language indicating employer would pay the full cost of coverage indicates intent to vest welfare benefits); *Helwig*, 93 F.3d 243 (plan stated benefits would "be continued . . . without cost to you").

- The CBAs and SPDs all discuss coverage of employees after they are eligible for Medicare, which could be 5 years or more after the employee retires, and this indicates an intent to vest, otherwise such promises would be illusory.[16]

- All CBAs and SPDs give surviving spouses benefits through their own deaths, showing an intent to give them lifetime benefits.[17]

- The CBAs and the 1993 and 2002 SPD did not reserve the right to terminate or amend the health care benefits.[18]

- There is no specific durational language by which time retiree benefits would expire in the CBAs or SPDs.[19]

Moreover, the 1993, 1997, 2001, and 2002 SPDs refer to "active vested employees," explicitly indicating that retiree medical benefits intended to vest while the employees were still active and thereafter could not be reduced. Nowhere in the 1993 and 2002 SPDs did Alcoa

---

[16] *Bailey, supra,* 2006 WL 2727732, *6 (noting provision that coverage shall continue for the surviving spouse and dependents after the death of the retiree); *UAW v. Aluminum Co. of America*, 932 F.Supp. 997, 1006 (N.D. Ohio 1996) ("Plaintiffs are correct that the inclusion of surviving spouse benefits, in addition to other indicia of intent, is an indication that the parties intended to vest welfare benefits."); *Yolton v. El Paso Tenn. Pipeline Co.*, 318 F.Supp.2d at 468 (E.D. Mich. 2003) (language giving surviving spouses' benefits after the date of the retiree's death was an important factor because it "suggests that Case and UAW intended such benefits to continue indefinitely, despite Case's retention of some right to change the Group Insurance Plan."), *vacated in part on other grounds,* 2004 WL 3661450 (E.D. Mich. Mar. 9, 2004), *aff'd*, 435 F.3d 571 (6th Cir. 2006).

[16] *Bailey, supra* at *7 ("Since the payment by the Company of the Medicare Part B monthly premium could be as far away as ten years for an individual who retired at age fifty-five, this establishes an intent to vest and would be an illusory promise otherwise.").

[17] *BVR, supra*, 190 F.3d 768 at 773 ("Section 9C provides that retirees shall have health care benefits 'continued for themselves, their spouses, surviving spouses and eligible dependents.' This court has found similar language in other agreements to evidence an intent to vest benefits.").

[18] *Helwig*, 93 F.3d at 250 (noting that "unless the modification/termination provision was explicitly contained in the SPD, the benefits are not subject to such a provision").

[19] "Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Yolton*, 435 F.3d at 581 (6th Cir. 2006).

reserve any right to alter or terminate Plaintiffs' health benefits (except to make administrative changes, such as changing the health care provider network or requiring different forms to be filed). At the very least then, retiree welfare benefits for retirees, surviving spouses of retirees, and dependants of retirees who retired from Alcoa under these SPDs must be considered vested by the unambiguous language of these SPDs in combination with the CBAs.

The importance of this explicit language of "vested" employees becomes especially striking when one considers that in fact, a plan need not use the word "vest" in order to provide for vesting. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (en banc). Instead, courts have found that durational language may be sufficient by itself to vest benefits. *See, e.g., Golden, supra*, 73 F.3d at 656; *Yard Man, supra*, 716 F.2d at 1480 (employer will provide benefits equal to those of active employees); *Bland v. Fiatallis North America, Inc*., 401 F.3d 779, 784 (7th Cir. 2005); *Rossetto v. Pabst Brewing Co*., 217 F.3d 539, 544 (7th Cir. 2000) (benefits will continue until the sixth month after the retirees' death).

### iii. In The Event The Court Determines That Ambiguity Exists, The Extrinsic Evidence Favors Vested Benefits.

In *Yard-Man*, the court stated that where the language of a document is ambiguous, the court allows extrinsic evidence of intent. *Id.* at 1480. This precept was applied in *UAW v. Aluminum Co. of America*, 932 F.Supp. at 1006. The court noted the wording in the CBA:

> The Company ... <u>will provide</u> the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees ... who are receiving a pension under the Pension agreement ... all of the above benefits <u>will be provided</u> without costs to employees and retirees except as otherwise provided.

*Id.* at 1005. The court found that the CBA and other terms ambiguous and turned to extrinsic evidence. *Id.* at 1006-10. The court considered evidence including "[t]he context in which the

CBAs between Alcoa and the plaintiff unions were negotiated" and found that plaintiffs' motion for summary judgment should be granted in part. *Id.* at 1007-11.

Comparing the instant case to the above-referenced case, in the instant case, Article XXIII of the Alcoa CBAs has materially identical language that the company "will provide" the subject retirement benefits. (RCF Dec. ¶ 5.) Similarly, the extrinsic evidence in this case evidences an intent to vest Plaintiffs' welfare benefits. Among other things:

(1) Alcoa told Plaintiffs and Union officials that the cap language was for FAS-106 accounting purposes only and this is confirmed by testimony of multiple Plaintiffs who were Union officials at the 1993 negotiations and who participated in the negotiations of the relevant CBAs.[20]

(2) Alcoa represented to Plaintiffs that their retiree health care benefits became vested at the same time that they became vested under the Alcoa pension plan and that Plaintiffs' vested retiree medical benefits could not be changed after a vested employee retired.[21]

(3) Alcoa held pre-retirement meetings so that workers planning retirement could ask about their benefits and at these meetings, told Plaintiffs that they would have the same benefits they had when they retired for life and that the benefits could not be reduced. [22]

(4) During CBA negotiations for 2001, Tom Mordawanec, negotiating representative for Alcoa, told the Union the FAS-106 letter was merely for accounting purposes.[23]

(5) Alcoa never actually instituted any cap and instead purported to reduce Plaintiffs benefits by a separate June 30, 2006 agreement with the Union, indicating any cap language was for accounting purposes only.[24]

---

[20] *See, e.g.,* Henry, Barse, Macy, Pruitt and Fountaine Decs. *Cf. Yolton*, 318 F.Supp.2d at 462 & n.7 (noting fact issue as to whether FAS-106 was merely "accommodation to [company] for accounting purposes").

[21] *See* Fountaine Dec. ¶¶ 8, 12, Barse Dec. ¶ 9. *Compare BVR,* 190 F.3d at 774 (evidence that company or its representatives had made statements that benefits would continue for retirees' life indicative of vested benefits).

[22] *See* Best Dec. ¶ 7, Macy Dec. ¶ 8, Stotlar Dec. ¶ 5.

[23] *See* Barse Dec. ¶ 7 (averring that Mr. Mordawanec "assured us we were correct" that cap language was "for an accounting purpose" only), Henry Dec. ¶ 9.

[24] Despite including some vague cap language in the 1993 and 2002 SPDs and in the Memorandum of Understanding in the CBAs from 1993 through 2006, Alcoa never actually

The existence of the FAS-106 letter might also be viewed as a source of ambiguity surrounding whether the health care benefits are vested. (*See* RCF Dec. ¶ 6 and Ex. B thereto for pertinent text of the FAS letter). However, the extrinsic evidence surrounding the letter evinces an intent to vest health care benefits to the retirees without reductions. The circumstances surrounding this letter make it clear this letter was never intended to be a "cap," but rather merely an accounting measure to accommodate the new FAS-106 standard which went into effect in 1993. Alcoa told Plaintiffs and Union officials that the FAS-106 letter was for accounting purposes only and this is confirmed by testimony of Plaintiffs who participated in the negotiations in the relevant CBAs. (Barse Dec. ¶ **7,** Pruitt Dec. ¶ 7, Henry Dec. ¶¶ 7-10, Macy Dec. ¶¶ 4-7). The benefits themselves went unchanged from 1993 to 2006.

Further, in 2001, Alcoa's Tom Mordawanec confirmed that the FAS-106 letter was for accounting purposes only, and could not be enforced. Mr. Mordawanec repeated this admission in the 2005 negotiations leading up to the 2006 agreement. The circumstances surrounding the FAS-106 letter clearly show that the letter did not provide Alcoa with the authority to reduce Plaintiffs' vested retiree health care benefits.

Other courts that have looked at similar facts have concluded in favor of the Plaintiffs. For example, in *Wood v. Detroit Diesel Corp.*, 2007 WL 128772 (6th Cir. Jan. 17, 2007), a preliminary injunction was upheld on appeal. *Id.* at *5. The employer argued that a "Cap Agreement" barred the claim. However, the court noted the Plaintiffs' evidence to the contrary:

> In connection with the initial Cap Agreement, plaintiffs present several declarations attesting to the parties' understanding. James Brown and Robert King participated on behalf of the UAW in the negotiations that culminated in the

implemented the referred-to caps. Instead, Alcoa created a separate agreement with the Union to purportedly reduce Plaintiffs' benefits beginning January 1, 2007. This indicates the cap language was intended purely for FAS-106 accounting purposes and was not understood by Plaintiffs or Alcoa to affect retiree benefits.

initial Cap Agreement. In their declarations, they attest to having sought and obtained express assurances from company representatives that, despite the agreed-to contribution limits, Detroit Diesel would remain liable to provide lifetime health coverage and that retirees would never have to pay out-of-pocket for the benefits.

*Id.* The court found that "[t]he motivating purpose of the Cap Agreement was not to shift or share responsibility for health care coverage premiums between Detroit Diesel and the retirees." *Id.* Rather, "the purpose was to alter Detroit Diesel's method of funding health care coverage in order to meet the new accounting requirements of 'Financial Accounting Standard 106' while simultaneously minimizing any negative impact of such accounting disclosures on its ability to attract investors." *Id.* The court found the plaintiffs' likelihood of success was sufficient to warrant preliminary injunctive relief. *Id.* at *8.[25]

Furthermore, allowing Alcoa to cap the contributions unless the parties reached an agreement would create an illusory promise because Alcoa by that clause essentially would have retained, "the right to decide whether or not to perform the promised act," and its "indefinite nature defies legal enforcement." *Floss v. Ryan's Family Steakhouses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000). Collective bargaining agreements and SPD terms must be construed to avoid illusory promises.[26]

---

[25] An FAS letter was also addressed in *Yolton*, 318 F.Supp.2d 455 (E.D. Mich. 2003) and 435 F.3d 571 (6th Cir. 2006). The District Court granted a preliminary injunction for workers who retired before an FAS-106 letter became effective, but declined to do so for workers who retired after it became effective, though noting that there was a fact issue as to whether it was merely "accommodation to [company] for accounting purposes." 318 F.Supp.2d at 462 n.7. In this case, by contrast, there is overwhelming evidence that Alcoa itself understood and represented the FAS-106 letter to merely be an accounting accommodation. (Barse Dec. ¶ 6, Macy Dec. ¶¶ 4-7, Henry Dec. ¶ 7, Fountaine Dec. ¶ 6, Pruitt Dec. ¶ 10, Best Dec. ¶ 5, Macy Dec. ¶ 6). Accordingly, in this case, as in *Wood*, "plaintiffs' likelihood of success is sufficient, when balanced in equity with other relevant considerations, to warrant preliminary injunctive relief." *Wood*, 2007 WL 128772 at *8.

[26] *See Yard-Man,* 716 F.2d at 1480 ("As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and to avoid illusory promises."); *Bailey*

### iv.    *The Ambiguity of Reservation of Rights Favors Vested Benefits.*

The CBAs between Alcoa and the Unions did not include any reservation of rights language regarding health care benefits.  Nevertheless, without notice to Plaintiffs, Alcoa and its predecessor RMC unilaterally inserted a reservation of rights in the SPDs inconspicuously at the back of the lengthy 1997, 1998, and 2001 SPDs.  However, these clauses are not in the 1979, 1981, 1990, 1993 or 2002 Alcoa and RMC SPDs.  Moreover, any reservation of rights clause in context of the rest of the SPDs is clearly ambiguous in light of other language in the SPDs.[27]

Where Alcoa does reserve the right to terminate or amend in the 1997 and 2001 SPD and in selected RMC SPDs, such a reservation is suspect when compared to the similar reservation in the pension plan (and when compared to the rest of the language in the CBAs).  The pension plan SPDs contain expansive reservations of rights to "amend, modify, suspend, or terminate all or part of the plan at any time."  (RCF Dec. ¶ 4).  Most of the SPDs do not reserve rights to this extent (the 1993 and 2002 Alcoa SPDs limit alterations only to administrative changes), indicating that any reservations for the welfare benefits plans do not negate an intent to vest.  Further, though the 1997 and 2001 Alcoa SPDs purportedly reserve the right to change the plan, such reservation of rights' intention to affect vesting is suspect when compared to the almost identical reservation in the pension plan SPDs -- plans which <u>automatically</u> vest after a stated number of years of service.  *See Yolton*, 435 F.3d  at 581 (where CBA used the same limiting language in reference to vested pension plan benefits, which were vested by law, as with welfare

---

*v. AK Steel Co.,* 2006 WL 2727732 (S.D. Ohio Sept. 22, 2006) (same).

[27] *See Bailey, supra,* at *7 & n.6 (noting that one SPD had limited reservation clause ineffective to prevent vesting, while another SPD had none); *In re Ormet*, 324 B.R. 646, 653 (S.D. Ohio 2005) (reservation clauses "were not conspicuous, however, and were found toward the end of very lengthy documents"); *Yolton*, 318 F.Supp.2d at 468 (language giving surviving spouses' benefits after the date of the retiree's death was important factor in not giving weight to the reservation clause because it "suggests that Case and UAW intended such benefits to continue indefinitely, despite Case's retention of some right to change the Group Insurance Plan.").

plan benefits, this bolstered the argument of retirees that welfare plan benefits were vested). In general, federal ERISA law requires that no reduction to benefits of those already receiving a pension can be made at the time of any amendment of a pension plan. *See Pratt v. Petroleum Production Management Inc. Employee Sav. Plan & Trust*, 920 F.2d 651, 661 (10th Cir. 1990) ("Subsequent unilateral adoption of an amendment which is then used to defeat or diminish the plaintiff's fully vested rights under the governing plan document is not only ineffective, but also arbitrary and capricious.").

In *Yolton,* the court also considered whether a reservation of right clause in an SPD precluded vesting of retirement health care benefits. The Sixth Circuit affirmed the District Court's finding that where the CBA created vested lifetime benefits, the asserted reservation language in the SPDs did not have any effect. *Yolton,* 435 F.3d at 582-83. The court noted that the reservation of rights clause was "subject to the applicable provisions of the Labor Agreement" and so could not negate the CBA because the SPD containing the reservation language states that the benefits in the SPD were so subject. *Id.* at 582.

The reservation of rights in *Yolton* is similar to the language in the 1998 SPD for the former RMC employees in that the termination clause there is also "subject to the provisions of any collective bargaining agreement then in effect." In addition, the 1993 Alcoa SPD, which does not reserve anything but a right to make *administrative* changes, says that it only "governs your rights and obligations in accordance with the Labor Agreement." (RCF Dec. ¶ 9, emphasis added). In the 2002 SPD, Alcoa reserved the right to only make administrative changes, and stated that "these changes cannot diminish the benefits negotiated under the agreement." (RCF Dec. ¶ 15). The extrinsic evidence bolsters the conclusion that Plaintiffs' rights were vested by agreement in the CBAs and cannot be reduced by the reservation of any rights in the SPDs.

Thus, Plaintiffs can show that they are more likely than not to succeed on the merits of their LMRA and ERISA claims regarding the vesting of their welfare benefits.

### D. Plaintiffs' Fiduciary Duty Claims under ERISA.

ERISA requires that plan fiduciaries discharge their duties solely in the interests of participants. 29 U.S.C. § 1104(a). This duty has been characterized as "the highest known to the law." *Gregg v. Transportation Workers of America*, 343 F. 3d 833, 841 (6th Cir. 2003) (*quoting Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002)). This duty precludes not only affirmative misrepresentations, but also any incomplete, inconsistent or contradictory disclosures that mislead employees about their benefits. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 455 (6th Cir. 2002) (breach of fiduciary duty occurs if retiree asks provider about chance of plan change and receives misleading or inaccurate answer). A fiduciary is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection. *Id.* A participant may obtain an individual equitable remedy for breach of this duty under 29 U.S.C. § 1132(a)(3). *Varity Corp. v. Howe*, 516 U.S. 489, 513, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). To state a claim for breach of fiduciary duty, a plaintiff must allege that the company was a fiduciary and that its acts or omissions constituted a breach of fiduciary duty. *Pegram v. Herdrich*, 530 U.S. 211, 225-26, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

Alcoa was a fiduciary. ERISA broadly defines a fiduciary as one who "exercises any discretionary authority or discretionary control respecting management of" a plan or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21). Alcoa operated the plan as a fiduciary, exercising discretionary authority in its administration, including in preparing and distributing communications regarding benefits.

Alcoa is designated in the plan as the Plan Administrator, which by definition is a plan fiduciary. A fiduciary breaches its duty when "those employees on whom plan participants reasonably rely for important information and guidance about retirement" misinform, even if inadvertently. *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir. 1993); *see also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.*, 57 F.3d 1255, 1264 (3d Cir. 1995) (claim for breach of fiduciary duty where company informed employees that once they retired, benefits would be continued for rest of life).

Alcoa breached its fiduciary duties. If Plaintiffs did not have a likelihood of success in showing that their health care benefits were intended to vest, Plaintiffs then are more likely than not to show, in the alternate, that Alcoa breached its fiduciary duty toward Plaintiffs by falsely stating that Plaintiffs health care benefits would continue at no cost to them for the rest of their lives. Plaintiffs' evidence shows that Alcoa stated this numerous times to Plaintiffs, both verbally and in the relevant CBAs and SPDs. If Plaintiffs benefits were not indeed vested, such false statements regarding the duration of benefits substantiate a breach of fiduciary duty claim for dissemination of misleading information regarding an ERISA plan.

## V.    CONCLUSION

Wherefore, Plaintiffs respectfully request that their request for a preliminary injunction be granted.

Respectfully submitted this the 16th day of March, 2007 by:

s/Gregory F. Coleman
Gregory F. Coleman, Esq.
6204 Baum Drive
Knoxville, Tennessee 37919
BPR No. 014092
(865) 525-0505 (phone)
(865) 525-6001 (fax)
gcoleman@dmcpclaw.com

s/Robert S. Catapano-Friedman
Robert S. Catapano-Friedman, Esq.
Robert S. Catapano-Friedman, PC
744 Broadway
Albany, New York 12207
(518) 463-7501 (phone)
(518) 463-7501 (fax)
catapan@worldnet.att.net
*Admitted pro hac vice*

s/Sarah Catapano-Friedman
Sarah Catapano-Friedman, Esq.
The Catapano-Friedman Law Firm
50 Franklin Street, 4th Floor
Boston, MA 02110
(617) 542-7711
scf@cflawfirm.com
*Admitted pro hac vice*

s/Mona Lisa Wallace
Mona Lisa Wallace, Esq.
Attorney for Plaintiffs,
Wallace and Graham, P.A.
525 North Main Street
Salisbury, NC 28144
(800) 849-5291 (phone)
(704) 633-9424 (fax)
mwallace@wallacegraham.com
*Pro hac vice motion pending*

Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

I hereby certify on this 16th day of March, 2007, I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF filing system, which will electronically service on the same date the following attorneys for Defendant at the following email addresses:

Patricia Epps
Hunton & Williams
951 East Byrd Street
Riverfront Plaza East Tower
Richmond, VA 23219-4074
(804) 788-8200
(804) 788-8218 (fax)
pepps@hunton.com

Ryan Ayers Glasgow
Hunton & Williams
951 East Byrd Street
Riverfront Plaza East Tower
Richmond, VA 23219-4074
(804) 788-8200
(804) 788-8218 (fax)
rglasgow@hunton.com

Wood W. Lay
Hunton & Williams
Bank of America Plaza
101 S. Tryon Street, Suite 3500
Charlotte, NC 28280
704-378-4700
704-378-4890 (fax)
wlay@hunton.com

John T. Winemiller
Hunton & Williams
P O Box 951
Knoxville, TN 37901
865-549-7700
865-549-7704 (fax)
jwinemiller@hunton.com

Eric M.D. Zion
Hunton & Williams
Bank of America Plaza
101 S. Tryon Street, Suite 3500
Charlotte, NC 28280
704-378-4700
704-378-4890 (fax)
ezion@hunton.com


s/Gregory F. Coleman
Gregory F. Coleman