**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | | |
|---|---|---|
| CHARLES CURTIS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No: 3:06cv448 |
| | ) | |
| ALCOA INC., Individually and as | ) | |
| Fiduciary of the Employees' Group | ) | |
| Benefits Plan of Alcoa Inc., Plan II | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF ALCOA, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I. PRELIMINARY STATEMENT

In 1993, Alcoa Inc. ("Alcoa" or "the Company") and its Unions negotiated a Master Collective Bargaining Agreement that, among other things, explicitly allowed Alcoa to "cap" its liability for retiree medical expenses by requiring future retirees to contribute to the cost of their health care. This "Cap Agreement" has been part of every subsequent collective bargaining agreement. The United Steelworkers Union (the "Union") was able to defer Alcoa's actual implementation ("engagement") of the Cap in each of the 1993, 1996 and 2001 Master CBAs. However, with health care costs continuing to rise, Alcoa and the Union agreed in the 2006 Master CBA that the Cap would be engaged on January 1, 2007. As of that date, bargaining unit employees who retired from Alcoa on or after June 1, 1993, have been required to contribute to the cost of their health care expenses. In engaging the Cap, Alcoa has done no more than exercise its clear contractual rights.

Although Plaintiffs' papers suggest that the Cap imposes an unbearable hardship on Alcoa retirees, the reality is that each participant's contributions remain modest, and Alcoa

1

continues to pay the vast majority of its retirees' health care costs. Indeed, the Union has indicated that it agreed to the engagement of the Cap precisely because it knew that the retirees "could afford" these amounts. Yet, in this lawsuit, Plaintiffs seek to overturn the Master CBAs negotiated by Alcoa and the Union -- and that the Plaintiffs ratified before they retired. Plaintiffs now seek a preliminary injunction that would force Alcoa to lift the Cap during the pendency of the lawsuit.

Plaintiffs' motion is fundamentally flawed for several reasons. ***First***, Plaintiffs have no "vested" right to free medical care for life, as they contend. Rather, the relevant labor agreements are clear on their face that Alcoa had the right to engage the Cap. Indeed, several of the Plaintiffs have conceded in their depositions that the terms of the Cap Agreement, which has been part of the every Master CBA since 1993, were clear. Every Plaintiff in this case was an active member of the collective bargaining unit that voted on and ratified those Master CBAs. Thus, Plaintiffs knew, ***while they were still active employees***, that the Cap Agreement was in effect and that their out-of-pocket retiree medical costs were subject to change once the Cap was engaged.

***Second***, the Union expressly made the Cap Agreement a mandatory subject of collective bargaining in every labor negotiation with Alcoa since 1993. The Plaintiffs approved this continued representation when they ratified each Master CBA. Accordingly, Plaintiffs knew and agreed that the Union retained the legal right to represent them on retiree benefit costs and to agree to the engagement of the Cap.

***Third***, unlike the cases cited by Plaintiffs, Alcoa did not unilaterally implement any changes to its retiree health care plan without the Union's approval. Instead, Alcoa and the

2

Union ***collectively bargained and agreed on*** the precise changes Plaintiffs now challenge. Moreover, the Union agreed that the Cap applies to all post-June 1, 1993 retirees.

***Fourth***, because the Cap Agreement is clear and unambiguous on its face, the Court need not consider (indeed cannot consider) extrinsic evidence of the parties' intent. Moreover, even if the Cap language were ambiguous, Alcoa and the Union (the parties to the CBAs) agree on its meaning and effect, as evidenced by numerous public statements by the Union. When both parties to a labor agreement agree on the meaning and effect of its terms, that is the end of the inquiry. This case is essentially the same as the <u>Miles</u> case, in which the pleadings filed by the Union and the settlement agreement agreed to by the Union confirmed that the Cap Agreement applies to all post-May 31, 1993 retirees.

***Fifth***, the motion must fail as a matter of law because Plaintiffs have not even attempted to meet their heavy burden of demonstrating irreparable harm. 3,056 of the 3,086 Plaintiffs have not put forward any evidence and thus have not even attempted to show irreparable harm. And the 30 Plaintiffs who have submitted declarations have utterly failed to demonstrate the type of harm that would support a preliminary injunction. Indeed, several of those Plaintiffs conceded in their deposition testimony that they have not experienced irreparable harm and do not expect to experience such harm.

As demonstrated below, for these and other reasons Plaintiffs have no chance of success on the merits, cannot show irreparable harm and cannot show that the public interest or balance of harms supports the issuance of a preliminary injunction. Accordingly, Plaintiffs' Motion should be denied and this matter should be resolved expeditiously on the merits.

## II.  STATEMENT OF FACTS [1]

### A.  Background:  The Master CBAs

For a number of years, Alcoa and the former Reynolds Metals Company ("RMC") negotiated their master collective bargaining agreements ("Master CBAs") in joint bargaining with the United Steelworkers Union ("USW") and the Aluminum, Brick and Glass Workers International Union ("ABG") (collectively referred to as "the Union").[2]  The Master CBA specifically covered a number of Alcoa and RMC production facilities.  At other production facilities,  the parties adopted many of the key terms of the Master CBA.  This was the case with the retiree health care Cap Agreement ("the Cap Agreement" or "the Cap") that capped Alcoa and RMC contributions to post-May 31, 1993 retiree health benefits costs.  Declaration of Russell Porter ("Porter Decl.") ¶ 3.

### B.  The June 1, 1993 Master CBA And The Retiree Health Care Cap Agreement

For many years, Alcoa has provided health care benefits to retired bargaining-unit employees.  The program provides a full range of medical, prescription and hospitalization benefits until these retirees become eligible for Medicare.  Thereafter, the program functions as a Medicare supplement.  Although the program has always been expensive, by 1992 it had become one of Alcoa's biggest health care expenses.  Porter Decl. ¶ 6.

---

[1]  Plaintiffs' attempt to characterize documents such as the CBAs and the SPDs through a declaration of one of their counsel.  Plaintiffs' self-serving characterizations are incorrect, and those documents speak for themselves.  Accordingly, Alcoa will be moving separately to strike the declaration.

[2]  The USW merged with the ABG in early 1997, after which the USW absorbed the former ABG locals and the ABG ceased separate participation in Alcoa labor negotiations. Alcoa acquired RMC in 2000, so the 1996 Master CBA was the last one negotiated through joint bargaining.  Porter Decl. ¶ 4.

4

The Master CBA expired on May 31, 1993. One of Alcoa's top bargaining objectives for the 1993 Master CBA negotiations was to control its ever-increasing health care costs. In the September 1992 negotiations between the parties, Alcoa proposed two major health care cost containment initiatives: moving active and retired employees to a managed care program and imposing a cap on Alcoa's annual contribution for health care for employees who retired after May 31, 1993. Under the Cap proposal, Alcoa would pay the costs for post-May 31, 1993 retirees up to the amount of the cap, but after the cap was reached, additional costs would be the participant's responsibility. Both of these proposals were critical to Alcoa's goal of controlling health care costs: the managed care proposal would yield immediate savings and the Cap would provide protection against inflation and continued cost increases in the future. The 1992 negotiations were unsuccessful, primarily because the parties could not agree on Alcoa's health care proposals. Id. ¶¶ 7-10.

Master CBA negotiations resumed in early 1993. At that time, Alcoa renewed its two health care benefits proposals and insisted that any deal include both. The negotiations were protracted and difficult. The parties did not reach a tentative agreement until the early hours of June 1, 1993, just after the prior CBA had expired. Although it had resisted throughout the negotiations, the Union finally agreed to Alcoa's health care benefits proposals, including the Cap Agreement. The Union did not agree, however, to immediate engagement of the Cap. Instead, the Union proposed that the Cap's engagement be deferred until 2000. Ultimately, to avoid a strike and obtain an agreement, the parties compromised. They agreed that the Cap Agreement would immediately become part of the Master CBA, but its engagement would be deferred until January 1997, after the expiration of the 1993 Master CBA. Id. ¶¶ 9-10.

During the 1993 negotiations, Alcoa explained to the Union that one reason for the proposed Cap Agreement was the Financial Accounting Standards Board's Statement No. 106 ("FAS-106"), which was issued in December 1990 and which applied to fiscal years beginning on or after December 15, 1992.[3] Contrary to Plaintiffs' assertions, Alcoa never told the Union or anyone else that the Cap Agreement was some sort of "accounting gimmick" or that the Company had no serious interest in engaging it. The facts indicate that precisely the opposite was true: the parties bargained intensely over immediate engagement of the Cap. Indeed, at about the same time, Alcoa imposed a similar spending cap on health care for all salaried retirees, which it engaged in early 1994. Id. ¶¶ 12-13.

A few of the Plaintiffs assert in declarations that they have some knowledge of what happened at the 1993 Master CBA negotiations. In fact, however, these Plaintiffs have no personal knowledge because the 1993 Cap Agreement was negotiated by a small group of top-level negotiators for Alcoa, RMC and the Union. None of the Plaintiffs was part of that group. Accordingly, none were present for the actual negotiations. Id. ¶ 5.

As a further condition of the 1993 Master CBA, the Union insisted that Cap Agreement issues (including the engagement date) remain a mandatory subject of bargaining in the 1996 contract negotiations. This gave the Union the legal right to continue to represent and bargain about Cap issues on behalf of employees who retired under the 1993 or later CBAs. The Union also gained the right to bargain to impasse and call a strike if the parties could not reach agreement on Cap issues during negotiations. Id. ¶ 11. Senior USW officials explained the

---

[3] Prior to FAS-106, employers accounted for post-retirement benefits on a pay-as-you-go basis. Under FAS-106, employers were required to treat post-retirement benefits as a form of deferred compensation. Because the obligation for deferred compensation arises when employees are currently employed, FAS-106 required that employers recognize the costs of providing post-retirement benefits over the employees' service period.

6

meaning and effect of these terms to local Union officials shortly after reaching the tentative agreement. Joseph Quaglia Declaration ("Quaglia Decl.") Exh. K. The Union also distributed a summary of the tentative 1993 Master CBA to its locals for use in ratification meetings. The summary described the Cap Agreement. The Alcoa and RMC bargaining unit members (including Plaintiffs) ratified the 1993 Master CBA. Id. ¶ 10.

The 1993 Cap Agreement states as follows:

> Until ratification of the next Labor Agreement, the Company shall maintain its program of medical benefits for future retirees and surviving spouses, ***provided that the annual cost of benefits paid for by the Company under this program shall be limited to an amount determined by multiplying the per capita costs of such benefits during calendar year 1997 by the number of retirees and surviving spouses ("covered persons") during a calendar year***. In the event that the average per capita company contribution exceeds the amount established above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rata basis. Notwithstanding the foregoing, no covered person shall be required, solely by reason of this limitation, to make additional contribution toward the costs of this program coverage until January 1, 1998. Furthermore, the parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations between the parties occurring subsequent to May 31, 1993, and prior to December 31, 1996.

Alcoa Master CBA May 31, 1993 p. 196 (emphasis added).[4] This language makes clear that at the conclusion of the 1993 Master CBA, all post-May 31, 1993 retirees would have to pay health care costs in excess of the Cap amount unless Alcoa and the Union agreed to a further postponement of the Cap's engagement date.

Except for changes to the Cap's engagement date and the dates for continued mandatory bargaining, the 1993 Cap Agreement was adopted verbatim in the 1996 and 2001 Master CBAs.

---

[4] Relevant extracts from the 1993, 1996, and 2001 CBAs are attached as Exhibit B to the Quaglia Declaration.

The 1993 and each subsequent Master CBA also specified that retiree health benefits would be provided without cost to retirees "***except as otherwise provided***." CBA May 31, 1993 Art. XXII (emphasis added).

## C.      Cap Agreements In The 1996 And 2001 Master CBAs

In the 1996 and 2001 labor negotiations, Alcoa and the Union again bargained over the question of immediate engagement of the Cap. As in 1993, the Union continued to seek deferral. As in 1993, Alcoa ultimately agreed to delay engagement of the Cap until the expiration of each Master CBA. Accordingly, the 2001 Cap Agreement made clear that Alcoa would engage the Cap on January 1, 2007, unless the parties once again agreed to delay its engagement. Quaglia Decl. ¶¶ 3-5. The Union distributed summaries of the 1996 and 2001 Master CBAs to its local Unions. Id. Exh. L, M. These summaries again noted the Cap Agreement and the 1996 summary provided a verbatim copy of its terms. Id. ¶ 10. The bargaining units duly ratified the 1996 and 2001 Master CBAs. Id.

## D.      Engagement Of The Cap: The 2006 Master CBA

During the 2005 re-opener negotiations, Alcoa again insisted that the Cap be engaged. The re-opener negotiations stalled over the Company's proposal. In early 2006 the negotiations resumed, with Alcoa continuing to insist that the Cap be engaged. Quaglia Decl. ¶ 6.

Meanwhile, in 2005 the Company took the position that the 2001 Master CBA (which delayed engagement of the Cap until 2007) did not apply to its closed or sold facilities formerly covered by the Master CBA. On January 1, 2006, the Company began seeking monthly premiums and other contributions from former employees at these facilities who retired under the 1993 and later Master CBAs. The USW promptly filed a class action lawsuit challenging Alcoa's actions on behalf of the affected retirees. See Miles v. Alcoa, Inc., No. 3:06-cv-131

(E.D. Tenn. 2006) (Phillips, J.). The USW argued that Alcoa had "jumped the gun" by unilaterally engaging the Cap before the end of the 2001 Master CBA without first bargaining with the Union. Notably, in contrast to the position taken by Plaintiffs here, the Union did not dispute that the Cap Agreement applied to every employee who retired under the 1993, 1996 or 2001 Master CBAs. See Miles Complaint.

The parties agreed to settle the Miles lawsuit as part of the 2006 Master CBA negotiations. The settlement provided that, effective January 1, 2007, *all* post-May 31, 1993 retirees who had been employed at closed or sold facilities would be required to pay monthly premiums, as well as increased co-payments and deductibles. Quaglia Decl. ¶ 10.

As the Union's pre-ratification summary reflects, the 2006 Master CBA negotiations were difficult and at times tense. One of the most contentious issues was Alcoa's insistence on engaging the Cap Agreement. Just before the strike deadline, the parties reached a tentative agreement. The Union agreed that the Cap on Alcoa's contribution toward post-May 31, 1993 retiree health care would be engaged as of January 1, 2007; Alcoa agreed that monthly premiums and certain other amounts would be credited to a special account to reduce participant costs below those called for by strict application of the 2001 Cap Agreement. Id. ¶ 6 & Exh. B.

The Union's pre-ratification summary clearly acknowledged Alcoa's right to engage the Cap for all post-May 31, 1993 retirees: "The May 31, 1993 Labor Agreement placed a cap on the Company's retiree health care costs for employees who retired after May 31, 1993." USW, "Proposed Agreement Between Alcoa and the United Steelworkers," June 1, 2006, at 7 (hereafter "USW 2006 Master CBA Summary"), Exh. N to Quaglia Decl. The USW 2006 Master CBA Summary also confirms that the Cap's engagement applies to all post-May 31, 1993 retirees: "[Effective] January 1, 2007, retirees and surviving spouses and their dependents who retired

9

after May 31, 1993 will be required to pay monthly premiums for Alcoa retiree medical and prescription drug coverage." Id. at p. 8. This summary is consistent with the ratification packages the Union distributed following the 1993, 1996, and 2001 negotiations. Exh. K, L, M to Quaglia Decl.

Although a few Plaintiffs purport, in their declarations, to have personal knowledge of the negotiations, the explanation provided by the USW is directly contrary to the claims that Alcoa told the Union (or anyone else) that the Cap Agreement was merely an accounting device. This is not surprising. None of these declarants was present at these negotiations, which involved only a few, top-level negotiators.[5] Porter Decl. ¶ 5; Quaglia Decl. ¶ 3; Thomas Mordowanec Declaration (Mordowanec Decl.") ¶¶ 2-3.

### E. Cap Agreement And Other Disclosures In Summary Plan Descriptions

The Alcoa and RMC Summary Plan Descriptions (SPDs) contain further information about the Cap Agreement and its effects. For example, the 1995 Alcoa SPD, which was the first SPD issued following the 1993 Master CBA, specifically explained that Alcoa's retiree health benefit costs had been capped and that retirees were obligated to pay the difference:

> **How Retiree Medical Works**
>
> [ . . . .]
>
> *In 1997, Alcoa will cap the amount that the company pays for your retiree medical coverage. In future years, if medical costs

---

[5]   Plaintiff-declarants specifically allege that Tom Mordowanec, Alcoa's Director of Benefits, made such statements (or confirmed that some other Alcoa representative had made them). Mordowanec flatly denies Plaintiffs' assertions. As Mordowanec's attached declaration demonstrates, he never told these declarants -- or anyone else -- that the Cap Agreement would never be implemented or that the Cap was simply an accounting gimmick. Mordowanec also confirms that neither he nor these local Union officials were present for the actual negotiation of the Cap's engagement in the 2005-06 negotiations. Mordowanec Decl. ¶¶ 2-5.

increase above the 1997 level, you will be required to pay the difference.

Total Compensation - Health Care Agreement - SPD for Active Hourly Employees Pursuant to Agreement with United Steelworkers of America (A10-15684), p. 28 (Oct. 1995).[6] Alcoa's June 1, 1996 summary of changes to employee and retiree benefits, its December 1996 Retiree Medical Update, as well as its April 1, 2002 SPD all contained explicit notices that retiree health benefit costs were subject to the Cap Agreement. For example, the June 1, 1996 Summary of Changes provided as follows:

> Retiree Medical Coverage Cap -- ***Alcoa will cap*** the amount it pays for ***retiree medical coverage on January 1, 2003***, unless the parties reach an agreement before this date, exclusive of interest arbitration. This replaces the footnote on page 28 of your "Health Care" booklet under "Medical Benefits After You Retire," stating that Alcoa's contribution towards retiree medical coverage would be capped in 1997.

Total Compensation -- Summary of Changes to Your Benefits Plans, USW Amended Plan Features A10-15684, p. 15 (June 1, 1996) (emphasis in original). Alcoa's April 1, 2002 Health Benefits Agreement (the first SPD issued to both Alcoa and former RMC employees after the 2001 CBA) stated that "on January 1, 2007, Alcoa will cap the amount it pays for retiree health care benefits unless the parties reach an agreement before this date. . . ." Health Care Benefits Agreement – Master Agreement Plan (A10-HC-Master), p. 40 (April 1, 2002).

The RMC SPDs for retiree health benefits contained similar notices on the Cap Agreement. For example, RMC's November 1995 SPD employee and retiree benefits handbook advised retirees as follows:

> "Retiree Premiums"— Currently the Company pays your health care costs after you retire. Retirees do not pay a Working Spouse

---

[6] Relevant extracts from the various SPDs are Exhibits C-J to the Quaglia Declaration.

Premium, but you may be required to share in the cost of coverage through a Company Cap Premium if the cost of retiree coverage exceeds the limits established under the applicable collective bargaining agreement. (p. 8)

"Company Cap Premium"— There is a limit on future plan costs that will be paid by the Company. The limit is set at the level needed to fund the 1997 average cost for retirees. Once this limit is reached you will be responsible for the full amount over the cap. (p. 8)

"Retiree Health Care Plan Facts"--"Plan Funding"-- HMO plans are fully insured. All other Health Care Plans are self-insured plans. Retirees might pay a portion of the cost through the Company Cap Premiums. The Company pays the remainder of the cost. Company costs may be capped at the limits established under the applicable collective bargaining agreement. (p. 29)

"Retiree Health Care Plan Facts"--"Future of the Plan"-- It is hoped that the Retiree Group Benefit Plan will be continued indefinitely. However, the Plan may be changed or terminated in the future, subject to the provisions of any collective bargaining agreement then in effect. (p. 29)

"Retiree Health Care Definitions"—"Company Cap Premium"-- An amount you may be required to pay each month for retiree health care coverage if the cost of retiree coverage exceeds the limits established under the applicable collective bargaining agreement. (p. 31)

Your Retiree Health Care Plan, Handbook 3 Retiree Health (AB) 11/95 (Nov. 1995). RMC's April 1998 retiree health benefits SPD (the last SPD RMC issued before the merger with Alcoa) contains substantially the same Cap notices. Your Retiree Health Care Plan, Handbook 3 Retiree Health (AB) 4/98 (Apr. 1998).

## III.  **ARGUMENT**

### A.  **Plaintiffs Must Meet A High Burden To Obtain A Preliminary Injunction**

Each of the more than 3000 Plaintiffs has the burden of persuasion on this Motion. In the Sixth Circuit, that burden is high. Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000).

> We note that the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a motion for summary judgment, for example. . . . This is because the preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it."

Id. (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991)) (alteration in original) (other citations omitted).

Each Plaintiff must convince the Court that, on balance: (1) he/she is likely to succeed on the merits of the claim; (2) he/she will suffer irreparable harm in the absence of preliminary injunctive relief; (3) Alcoa will not suffer substantial harm from being forced suddenly to incur hundreds of millions of dollars of extra liability for health benefits, contrary to the terms of the 1993-2006 Master CBAs; and (4) the public interest would be served by abrogating a key provision of the 2006 Master CBA. See Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 579 (6th Cir. 2006) (discussing the four factors to consider on a preliminary injunction motion) (citations omitted). The individual Plaintiffs cannot meet their burden, and the evidence they have presented on these factors does not support entry of a preliminary injunction.

**B.    Because The Master CBAs Unambiguously Allows Alcoa To Engage The Cap, Plaintiffs Have No Likelihood Of Success On The Merits**

> **1.    Plain Language Of The CBAs, As Well As Extrinsic Evidence, Demonstrates That Both Parties To The CBA Reject Plaintiffs' Untenable Interpretation That They Are Entitled To Free Lifetime Health Care Benefits**

As Plaintiffs concede, welfare benefit plans, such as the retiree medical plan at issue here, are not subject to mandatory vesting under ERISA. 29 U.S.C. § 1051. "In contrast to employee pension plans, employee welfare benefit plans generally are not vested and an employer can amend or terminate a welfare plan at any time." Bittinger v. Tecumseh Prods. Co., 83 F. Supp. 2d 851, 862 (E.D. Mich. 1998), aff'd, 201 F.3d 440 (6th Cir. 1999). Accordingly, Plaintiffs must

demonstrate that Alcoa and the Union intended to confer a lifetime right to free medical care for future retirees when they negotiated the 1993, 1996, 2001, and 2006 Master CBAs. However, because each of those CBAs included the Cap on Alcoa's contributions toward post-May, 1993, retiree medical costs, and because **both** contracting parties -- Alcoa and the Union -- agree that the CBAs unambiguously allow Alcoa to engage the cap as it did, Plaintiffs cannot make that showing. <u>See Golden v. Kelsey-Hayes Co.</u>, 73 F.3d 648, 653 (6th Cir. 1996) (to prove a "vested" right to lifetime health benefits, a plaintiff "must show that the defendant and the union intended to include a right to lifetime benefits when they negotiated the CBAs at issue").

The basic rules for interpreting collective bargaining agreements apply to this inquiry. The key question is to determine the parties' intent. The court may consider extrinsic evidence only if the relevant contract terms are ambiguous. <u>Yolton</u>, 435 F.3d at 579. The Court "'should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent.'" <u>Id.</u> at 578-79 (quoting <u>International Union, UAW v. Yard-Man, Inc.</u>, 716 F.2d 1476, 1479 (6th Cir. 1983). As the Sixth Circuit explained in <u>Yolton,</u>

> Shortly after <u>Yard-Man</u>, this Court stated that "there is no legal presumption based on the status of retired employees." <u>Int'l Union, United Auto. Workers v. Cadillac Malleable Iron Co.</u>, 728 F.2d 807, 808 (6th Cir. 1984). Moreover, "<u>Yard-Man</u> does not shift the burden of proof to the employer, ***nor does it require specific anti-vesting language before a court can find that the parties did not intend benefits to vest***. Rather, the <u>Yard-Man</u> inference, and the other teachings of the opinion regarding contract interpretation and the consideration of extrinsic evidence, simply guide courts faced with the task of discerning the intent of the parties from ***vague or ambiguous*** CBAs." <u>Golden</u>, 73 F.3d at 656. [ . . . . ] This Court has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent.

<u>Id.</u> at 579-80 (emphasis added).

**First**, it is clear from the explicit language of all Master CBAs since 1993 that Alcoa and the Union both intended that all post-May 31, 1993 retirees would be subject to a cap on the Company's contribution toward retiree medical benefits. The Cap Agreement contained in the CBAs is unambiguous. It explains that "the Company shall maintain its program of medical benefits for future retirees and surviving spouses, ***provided that the annual cost of benefits paid for by the Company under this program shall be limited to an amount determined by*** [the formula] . . . ." It clearly states the date when the Cap may be engaged, and it provides notice that the engagement of the Cap is a mandatory subject of collective bargaining in any negotiations between the parties prior to the end of the 1993 and later Master CBAs. Master CBA May 31, 1993 p. 196 (emphasis added). In fact, several Plaintiffs testified in deposition that the language of the CBA was perfectly clear. See, e.g., Macy Dep. p. 47; Barse Dep. p. 44.[7]

The Cap Agreement also contains express durational language, providing that the Company's pledge to defer the engagement of the Cap extended only "[u]ntil ratification of the next Labor Agreement . . . ." This durational language alone confirms that Plaintiffs' rights to free retiree health care did not extend beyond the duration of the CBA. For example, in Bittinger, a succession of CBAs provided that the health insurance benefits provided thereunder would continue for the term of the agreement. 83 F. Supp. 2d at 855 ("[t]he Company will continue during the term of the new Contract the . . . benefits . . . . These benefits will continue unchanged during the term of the new Contract"). The plan document stated the plan was coextensive in duration with the CBA and subject to change through the collective bargaining process. Id. at 856.

---

[7]  The official transcripts from the Macy, Barse, Fountaine, and Best depositions have not yet been prepared. Once they have been, Alcoa will submit to the Court the pages from those depositions cited herein.

The Bittinger court distinguished this express durational language from the language at issue in Golden, Yard-Man, and other cases relied upon by the Plaintiffs here.

> The aforementioned clauses all unequivocally set forth the Company's intention to link its obligation to provide benefits to the retirees to the duration of the CBA. The company's obligation to provide retirement benefits ended upon the expiration of the 1988-1991 CBA. Following its termination, representatives of defendants and the union began the collective bargaining process, the outcome of which resulted in the termination of the retirees' benefits. The Court believes that such a result, while unfortunate for the retirees, is sanctioned by the language of the CBA. In this Court's opinion, the clauses upon which defendants rely, are sufficient to unambiguously express defendants' intent that the duration of defendants' obligation to provide fully funded benefits is coextensive with the CBA.

Id. at 861. The court likewise rejected the plaintiffs' contention that the SPDs and plan documents were ambiguous because they "reserve to the employer an unfettered right to terminate benefits, but also provide that the employer's termination right can only be exercised through the collective bargaining process . . . ." Id. at 862.

> [T]he Court does not believe that resolving that perceived ambiguity will entitle plaintiff to anything less than that which he bargained for and received in the 1988-1991 CBA. Under Yard-Man, supra, any benefit which survives the termination of the CBA, "must find its genesis in the collective bargaining agreement;" accordingly, plaintiff must pass the insurmountable hurdle of uncovering a promise in the 1988-1991 CBA to provide a benefit which survives the termination of that agreement. To hold otherwise would afford plaintiff a benefit not contemplated by the terms of the CBA.

Id.; see also International Union, UAW v. Cleveland Gear Corp., No. C83-947, 1983 WL 2174 (S.D. Ohio Oct. 20, 1983) (holding that the phrase "The Insurance Agreement and Insurance Plan . . . shall remain in full force and effect during the term of this collective bargaining agreement" clearly demonstrated the parties' intent to limit retiree health benefits to the term of the CBA).

While the parties agreed that the Cap would not actually be engaged until at least January 1, 1997, the Cap clearly provided that it applied to all future retirees as of the effective date of the 1993 Master CBA -- June 1, 1993.  The Cap did not apply to retirees who retired before that date and Alcoa has not engaged a Cap as to those employees.  The Cap is also consistent with other language in the CBA that retiree health benefits would be provided without cost to retirees "except as otherwise provided."  CBA May 31, 1993 Art. XXII, p. 118 (Exh. A to Quaglia Decl.).

Further, the Cap Agreement made engagement of the Cap at the conclusion of the 1993 CBA a mandatory subject of collective bargaining.  In other words, the Union negotiated for and obtained the right to force Alcoa to the bargaining table over the continued postponement of the Cap's engagement.  By making the issue a mandatory subject of collective bargaining, the Union preserved its right and obligation to bargain on behalf of post-May 31, 1993 retirees in subsequent contract negotiations.  Indeed, in successive negotiations in 1996 and 2001, Alcoa and the Union agreed, as they had in 1993, to postpone the engagement of the Cap until the next contract negotiation.[8]

By ratifying the Master CBA, Plaintiffs -- who were then active Alcoa employees -- designated the Union as their bargaining representative for purposes of retiree benefits.  They are thus bound by the Union's agreement.  See Seborowski v. Pittsburgh Press Co., 188 F.3d 163, 168 (3d Cir. 1999) (citation omitted) ("[i]t is clearly established that all terms of a collective

---

[8]  The changes to the health plan effective January 1, 2007 apply equally to all active employees and pre-Medicare eligible retirees; retirees were not shortchanged in the negotiation. USW Summary of the Retiree Health Care Provisions of the Agreement Between Alcoa and the United Steelworkers, p. 1 (June 1, 2006) (filed with the Court as Exh. 1 to the Stipulation of Dismissal in Miles v. Alcoa, Inc., No. 3:06-cv-131 (E.D. Tenn. Aug. 31, 2006).  Similarly, Alcoa's non-union retirees have been subject to caps on Alcoa's contributions for health benefits since early 1994.  Porter Decl. ¶ 13.

bargaining agreement . . . are binding on the individual employees represented by the union");

Kellogg Co. v. N.L.R.B., 457 F.2d 519, 523 (6th Cir. 1972) ("all members of the bargaining unit are bound by the terms of the contract"). In other words, Plaintiffs consented in 1993, 1996, 2001 and 2006 to the Union's right to agree to engagement of the Cap.

> Collective bargaining under the Railway Labor Act and the other federal labor statutes illustrates representative rather than participatory democracy. The union conducts the negotiations. The workers vote on whether to be represented and by which union, and on whether to ratify the agreement negotiated by their representative, and on other proposals by the representative such as a strike call; but once an agreement is in force they have no right to change it until it expires.

Air Wisconsin Pilots Protection Comm. v. Sanderson, 909 F.2d 213, 219 (7th Cir. 1990).

*Second*, even were the Cap language ambiguous -- which it is not -- the Plaintiffs cannot demonstrate any likelihood of success on the merits because they cannot demonstrate "that *the defendant and the union* intended" in the 1993, 1996, and 2001 CBAs that Alcoa would provide free lifetime health benefits to post May 31, 1993 retirees. Yolton, 435 F.3d at 578 (quoting Golden, 73 F.3d at 653) (emphasis added)). Plaintiffs' motion fails for the fundamental reason that *both* parties to the Master CBAs agree that current employees who retired after May 31, 1993 had no vested right to free lifetime health care. This simple fact distinguishes this case from the cases cited in Plaintiffs' brief.

Tellingly, Plaintiffs offer no evidence of the Union's intent. Yet the undisputed evidence before the Court is that the Union knew of, bargained over and ultimately agreed to the engagement of the Cap on Alcoa's contribution to future health benefits for employees who retired after May 31, 1993. For example, in Miles v. Alcoa, Inc, No. 3:06-cv-131 (E.D. Tenn. 2006.), this Court presided over a lawsuit filed by the Union and a purported class of retirees from closed Alcoa and former RMC plants. In its complaint in that case, the Union specifically

acknowledged that, subject to collective bargaining, the parties *intended* to allow Alcoa to engage the Cap:

> [A] June 1, 2001 Letter Agreement between the Union and Alcoa states that while ***Alcoa's share of the cost of the program is capped at a specified cost***, retirees and their surviving spouses with retirement dates after May 31, 1993, would not be liable for any contributions prior to January 1, 2007, and that any imposition of contributions on retirees and spouses would not occur until after bargaining took place. . . .
> [. . . . ]
> ***[T]he intent of the June 1, 2001 Letter Agreement was to protect all "post May 31, 1993 retirees and surviving spouses" from increases through at least January 1, 2007***.

Miles Complaint ¶¶ 25, 29 (emphasis added).[9]  Alcoa's engagement of the Cap as of January 1, 2007 was thus precisely in accordance with the procedure the Union -- in a pleading filed with this very Court -- stated was appropriate.[10]

Accordingly, the evidence demonstrates that in 1993, Alcoa and the Union ***fully intended*** that the Cap would apply to all employees who retired under the 1993 CBA and later.  Plaintiffs' conclusory and self-interested assertions cannot overcome this unequivocal evidence.

***Third***, even were the Union's intent not plain from its own documents and pleadings, the fact that the Cap Agreement was a subject of negotiation in every CBA from 1993 forward itself indicates that the parties did not view free lifetime health benefits as a vested right for post-May

---

[9]  The Master CBA Summary further indicates the Union's understanding of the clear, unambiguous intent of the 1993 and subsequent Master CBAs with respect to the Cap language: "The May 31, 1993 Labor Agreement places a cap on the Company's retiree health care costs for employees who retired after May 31, 2007."  USW 2006 Master CBA Summary at 7.

[10]  If the USW had not agreed to the engagement of the Cap, it would have been obligated to file a grievance.  Maurer v. Joy Techs., Inc., 212 F.3d 907, 919 (6th Cir. 2000).  It has not done so for the simple reason that it agreed through the collective bargaining process that (a) a Cap was permitted under the CBA, and (b) engagement of the Cap is appropriate.  Further, if the Union felt that Alcoa had breached its obligations under the 1993, 1996, or 2001 CBAs by applying the Cap to all post-May 31, 1993 retirees, it would likewise have been obligated to file a grievance.  See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 207-08 (1991).

31, 1993 retirees.  See Cincinnati Typographical Union No. 3 v. Gannett Satellite Info. Network, Inc., 17 F.3d 906, 911 (6th Cir. 1994) (narrowing the protections of employees in successive CBAs "indicate[s] that the parties have viewed the right as a creature of a particular contract and not as a right vested and thus guaranteed for the future").

In short, the unambiguous language of the CBA and the extrinsic evidence of the parties' intent clearly demonstrates that Alcoa's engagement of the Cap was both permitted under the relevant agreements and explicitly contemplated by both parties to those agreements.  For that reason alone, Plaintiffs cannot demonstrate a likelihood of success on the merits.

## 2. The Cases Cited By Plaintiffs Do Not Support Their Contention That The Court Should Ignore The Unambiguous Terms Of The CBA

The cases cited by the individual Plaintiffs offer them no support as each lacks the material facts present here: Plaintiffs' Union agreed to the Cap; Plaintiffs as active employees ratified the CBAs that included the Cap; and each CBA contains express durational language limiting the delay on engaging the Cap to the term of the CBA.  Moreover, Plaintiffs have not cited a single case that prevents the parties to a collective bargaining agreement from capping prospective benefits for current employees.

For example, Plaintiffs rely heavily on Yolton, in which the plaintiffs contended that they should not be subject to a cap agreement that was executed for the first time *after* they retired. Yolton, 435 F.3d at 575.  Yolton is thus inapplicable here because Alcoa has only engaged the Cap as to individuals who were active employees at the time the Cap was first included in the CBA.  As in Yolton, employees who retired after a cap agreement is negotiated are clearly subject to its terms.  Id. at 581; see also Maurer, 212 F.3d at 918 (LMRA and ERISA claims of retirees failed as to all retirees who retired after the date "when reservation of rights language applicable to retirees was distributed to plaintiffs").

Likewise, <u>Wood v. Detroit Diesel Corp.</u>, No. 06-1157, 2007 WL 128772 (6th Cir. Jan. 17, 2007), does not help Plaintiffs. There, the court framed the central issue this way: "Whether [Detroit Diesel] is within its rights to ***unilaterally*** impose its preference [for retiree contributions] on the retirees . . . ." <u>Id.</u> at *7 (emphasis added). Here, the evidence is uncontroverted that the Union negotiated over and agreed to the Cap in every CBA in which it appears and both parties believe the Cap is valid. Further, despite plaintiffs' characterization of <u>Wood</u> as containing "similar facts," the Cap Agreement at issue in <u>Wood</u> contained explicit language acknowledging that the plaintiff retirees had a right and would continue to have a right to fully-funded health care benefits for life. <u>Id.</u> at *4. In contrast, the Cap Agreements between the Union and Alcoa contain no such language and explicitly limit Alcoa's contributions to retiree health care costs.

In <u>Bailey v. AK Steel Corp.</u>, No. 1:06cv468, 2006 WL 2727732 (S.D. Ohio Sept. 22, 2006), another case cited by Plaintiffs, the CBA did not have a cap agreement for future retiree health benefits and did not expressly refer to the duration of retiree benefits. By contrast, here the Cap Agreement was negotiated into every CBA and it specifically limits the amount and duration of benefits.

Finally, cases such as <u>UAW v. Yard-Man, Inc.</u>, 716 F.2d 1476 (6th Cir. 1983) and <u>UAW v. BVR Liquidating, Inc.</u>, 190 F.3d 768 (6th Cir. 1999), involved situations where the Union was a plaintiff and alleged a unilateral modification of vested benefits by the employer. Further, in <u>BVR Liquidating</u>, no discussions occurred regarding changes to retiree health benefits at negotiating sessions between the employer and the union and there was no cap agreement. <u>Id.</u> at 768. "[T]here is no question of fact as to the absence of negotiations on this issue. . . . Indeed, it defies common sense that the union would give up vested benefits for retirees to get unvested

benefits for the spouse of retirees." Id. at 774. In this case, by contrast, the Union is not a party. Instead, the Union negotiated and consented to both the initial Cap Agreement and its engagement as of January 1, 2007. The Union has not alleged that Alcoa violated the terms of those Agreements or the CBAs of which they are a part.

Rather, the Union has publicly asserted just the opposite. See pp. 8-10, supra. Thus. unlike the UAW in Yard-Man, which "owe[d] no obligation to bargain for continued benefits for retirees," 716 F.2d at 1482, the Union here negotiated for and obtained the right to force Alcoa to bargain over engagement of the Cap. Further, unlike here, the CBA in Yard-Man lacked any specific durational language applicable to funding of future retiree health benefits. Id. at 1481-82.

Plaintiffs here seek to receive benefits as if they had retired before June 1, 1993. By definition, however, they did not. Employees have no right to the benefits under a CBA that expired prior to the date of their retirement. See McCoy v. Meridian Auto. Sys., 390 F.3d 417, 425 (6th Cir. 2004) (noting that "nor do the retirees (equally correctly) contest the fact that the [agreement] language would allow Meridian to terminate current-employee benefits after the collective bargaining agreement expired . . . as the agreement does not provide current-employee benefits into perpetuity but only during the period of the agreement"); Prater v. Ohio Educ. Ass'n, No. 2:04CV1077, 2006 WL 2815142, at *9 (S.D. Ohio Sept. 28, 2006) ("the Sixth Circuit's decision in Maurer makes clear that the provisions in effect at the time of retirement control the issue of whether there was an intent to vest").

## C. The SPDs Are Consistent With The Master CBA

As explained above, the Cap Agreement and other key terms of the retiree health benefit program were collectively bargained as part of each Master CBA since 1993. Thus, as Yard-

Man and other Sixth Circuit cases emphasize, the Cap Agreement's clear and unambiguous language means the Court's inquiry must begin and end with the Master CBAs. Those documents demonstrate that Plaintiffs (all of whom retired under the 1993 or later Master CBAs) never had a vested right to free lifetime health care benefits.

In an effort to avoid the plain language of the CBAs, Plaintiffs contend that the numerous SPDs applicable to the more than 3,000 Plaintiffs uniformly promised free lifetime health care.[11] But the SPDs do no such thing. Rather, they are consistent with the CBA's, which clearly provide that the cost of health care benefits for post-May 31, 1993 retirees is subject to a Cap. Indeed, as the Sixth Circuit explained in Sprague v. General Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998), "because vesting of welfare benefit plans is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest 'must be found in the plan documents **and must be stated in clear and express language**.' It is the plaintiffs' burden to prove [the] intent to vest." (citations omitted) (emphasis added).

Plaintiffs cannot meet their burden. None of these documents state that Plaintiffs have a vested right to free lifetime health care. For example, employees of the Alcoa, Tennessee plant

---

[11] Plaintiffs also seek to conflate eligibility for retiree health benefits with a vested right to fully-funded retiree health benefits for life. The two concepts are completely distinct. See Noe v. Polyone Corp., No. 3:06-CV-170H, 2006 WL 3759601 (W.D. Ky. Dec. 19, 2006) (denying motion for preliminary injunction to prevent implementation of insurance premiums and co-payments on retirees, concluding language making retiree eligible for benefits did not address the duration of those benefits). An active employee fully vested in Alcoa's pension plan was eligible to participate in the Alcoa retiree health plan. All of the SPDs and plan documents that refer to an "active vested employee" do so in the context of eligibility. See, e.g., 1997 SPD p. 15 ("You are eligible to participate in the plan if you are . . . the surviving spouse of an active vested employee who died while eligible for the Alcoa Retirement Plan."). Furthermore, in this context, an active vested employee is an active employee who has not retired, is eligible to retire and receive a pension under the Alcoa pension plan, and dies prior to retirement. None of the declarants are within this category, and it is not clear that any of the remaining more than 3000 mass Plaintiffs are either. See Noe, 2006 WL 3759601.

have had benefits described under a series of SPDs since the May 31, 1993 CBA. All of the SPDs that address retiree health benefits refer to the Cap Agreement or disclaim any right to vesting in such benefits.[12] Each such SPD includes durational language, information on the nature of the Cap, and information on the future engagement of the Cap. Furthermore, these documents, which clearly informed participants that retiree health benefits were capped, were sent to post-May 31, 1993 retirees. See Maurer, 212 F.3d at 914 (affirming decision that retirees who retired after dissemination of SPD insert containing reservation of rights language were not vested).

Unable to point to any language in the SPDs that is inconsistent with the CBAs, Plaintiffs are forced to rely on the argument that there is an ambiguity in the SPDs because they describe retiree health benefits as being provided, in general, at no cost to the retiree. But the Sixth Circuit has squarely rejected this argument. "We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change." Sprague, 133 F.3d at 401. The Cap Agreements in every Master CBA until 2006 provided that, for the duration of that CBA, retiree health benefits were paid for by someone other than the retiree. Accordingly, the SPDs applicable during those defined periods accurately advised retirees that the cost for their health benefits was, at that time, paid for by Alcoa. There is no conflict with Alcoa's right to engage the Cap pursuant to negotiations with the USW.

---

[12] While some SPDs did not discuss retiree health benefits at all, the absence of any such discussion cannot give rise to a lifetime right to free health care benefits, especially where, as here, there are numerous documents indicating the opposite. As the Sixth Circuit has held, "an omission from the summary plan description does not, by negative implication, alter the terms of the plan itself." Sprague, 133 F.3d at 401 (citing Jensen v. SIPCO, Inc., 38 F.3d 945, 952 (8th Cir. 1994); Wise v. El Paso Nat. Gas Co., 986 F.2d 929, 938 (5th Cir. 1993)).

Plaintiffs also point to the fact that some SPDs do not contain broad reservation of rights clauses. That, of course, is irrelevant. The key terms of the SPDs were collectively bargained by the Company and the Union. Accordingly, the Company did not have the unilateral right to make material changes or terminate the collectively-bargained benefits during the life of the CBA, regardless whether the relevant SPDs contained reservation of rights clauses. The mere fact that some SPDs do not contain such clauses is unremarkable. Indeed, most of these same SPDs confirm that the collectively-bargained benefits would continue unchanged only *during the term of the applicable CBA*. The reservation of rights language makes this point clear:

> Future of the Plan--The benefits described in this booklet are provided for the term of the collective bargaining agreement between the union and Alcoa, Inc. The company reserves the right to make the administrative changes to the health care plan from time to time. However, these changes cannot diminish the benefits negotiated under the terms of the agreement.

April 1, 2002 SPD, page 53. This language makes clear that the duration of the benefits is specifically tied to the duration of the CBA. See supra Part III.B.1 (discussing the Bittinger case and the fact that Alcoa's obligation to provide benefits to retirees was linked to the duration of the CBA).

Moreover, if Alcoa's actions in engaging the Cap had been contrary to the plan's terms -- which they were not -- the Union would have been obligated to file a grievance. See Maurer, 919 F.3d at 919 (if it believed employer's modification of health benefits program was improper, Union would have been obligated to grieve or file suit over the changes when it learned of them); McCoy, 390 F.3d at 425 (holding the erroneous assertion of rights by the employer "should have prompted the union immediately to protest - and file a grievance - if it disagreed with the employer's assertion of authority"). It has not done so. By contrast, last year in Miles, the

Union did sue Alcoa when it believed the company had "jumped the gun" by engaging the Cap Agreement at closed and sold locations before the termination date of the 2001 Master CBA. Even then, however, the Union explicitly acknowledged Alcoa's right to engage the Cap at those locations after engaging in collective bargaining. Miles v. Alcoa, Inc., No. 3:06-cv-131 (E.D. Tenn. 2006).

**D.    Plaintiffs Are Unlikely To Succeed On The Fiduciary Duty Claim**

As a preliminary matter, ERISA breach of fiduciary duty claims are uniquely ill-suited to preliminary injunctive relief. Breach of fiduciary duty claims require individualized proof of material misrepresentation and detrimental reliance. Here, more than 99% of the more than 3,000 Plaintiffs have failed to offer any evidence on this topic. Moreover, the meager evidence provided by the remaining 30 Plaintiffs is insufficient to demonstrate a breach of fiduciary duty even as to them.

Plaintiffs' argument is premised on their contention that "Alcoa was a fiduciary." Pls.' Brf. p. 29. While Alcoa is undoubtedly a fiduciary with respect to the administration of the plan, Plaintiffs' lawsuit is based entirely on Alcoa's modification of benefits available under the plan, not on how Alcoa administered the plan. Plaintiffs do not allege that Alcoa mismanaged plan assets or failed to administer the plan according to its terms. Rather, they allege that Alcoa lacked the right to require post-May 31, 1993 retirees to contribute premiums, deductibles, and other expenses to the cost of the health care under that plan. Plaintiffs have ignored settled Sixth Circuit law providing that employers are not fiduciaries when they are deciding on the terms of a plan (or, as here, negotiating the terms of a plan with a labor union):

> There is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second.

[ . . . .]

> The case law . . . makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards.

Musto v. American Gen'l Corp., 861 F.2d 897, 911-12 (6th Cir. 1988) (rejecting the plaintiff's claim that the employer breached a fiduciary duty by terminating coverage only for certain retirees); see also Bittinger, 83 F. Supp. 2d 851 (rejecting union retirees' breach of fiduciary duty claim, holding that as the Sixth Circuit "succinctly stated [in Sprague], 'GM did not act as a fiduciary in deciding to change its health insurance policies'").

Even if Plaintiffs could demonstrate that Alcoa is a fiduciary, their allegations highlight the highly individual nature of their fiduciary duty claim. Although this claim is premised entirely on alleged oral misrepresentations, only four of the thirty declarants even allege that a specific Alcoa representative made any statement that was allegedly deceptive. See Declarations of Fountaine, Kanzler, Macy, & Stotlar.[13] The remaining 26 declarants, not to mention the more than 3,000 remaining Plaintiffs, offer no evidence on this subject. And none of the declarants provides any information from which the Court could find that the Alcoa benefits employee with whom they purportedly spoke was, in fact, the employer's "contact person." Cf. James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 451 (6th Cir. 2002) (describing contact person as one whom "[e]mployees were generally told to bring any questions they might have to"). See also Macy Dep. p. 73 (acknowledging that he did not believe the individual he purportedly spoke with had the authority to make policy for Alcoa). Plaintiffs do not, because they cannot, allege

---

[13] Several other declarants allege that they were told various things but do not identify by whom. Accordingly, Plaintiffs fail to carry their burden of proof on this point.

that Alcoa engaged in any systematic program of deceptive or misleading information. Cf. James, 305 F.3d at 443 (discussing a "scripted presentation" and a letter to all employees). Thus, especially given the fact that Alcoa has acted in accordance with the unambiguous terms of the Master CBA, Plaintiffs fail to carry their "stringent" burden on a motion for preliminary injunction. Leary, 228 F.3d at 739.

In addition, even if the alleged statements were made, they would not constitute misrepresentations. In Sprague, for example, the plaintiffs alleged that the employer misrepresented that their retiree health benefits would be provided at General Motors' expense for life. Sprague, 133 F.3d at 395. GM later amended the plan to include deductibles and co-payments for retirees. Id. at 395. In rejecting the plaintiffs' breach of fiduciary duty claim, the Sixth Circuit noted: "What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's then-existing plan." Id. at 405 n.14.

The same is true here. Even accepting the declarants' allegations, all of them retired after May 31, 1993 and before June 1, 2006, during which time there is no dispute that the Cap Agreements had been agreed to but not engaged. Accordingly, during that period, declarants were, in fact, not required to contribute to their health insurance costs (other than by making co-payments for doctor visits and prescription drugs, which they do not challenge). As in Sprague, the purported statements would have been undeniably true at the time. Further, there is no dispute that every CBA prior to 2006 expressly indicated that the Cap Agreement would be engaged unless otherwise agreed at the next Master CBA negotiation. Accordingly, Plaintiffs cannot demonstrate a likelihood of success on the merits on their breach of fiduciary duty claim such that a preliminary injunction should issue.

**E.**     **The Public Interest Favors The Enforcement Of CBAs And ERISA Plan Documents**

Granting a preliminary injunction here would be contrary to the public interest for two reasons.  First, Plaintiffs are seeking to abrogate the clear terms of a collective bargaining agreement, despite the fact that their Union -- their collective bargaining representative --  agrees that Alcoa has the right to engage the Cap for all employees who retired under the 1993 or later Master CBAs.  Granting a preliminary injunction would thus improperly allow Plaintiffs to rewrite the CBA that Alcoa and the Union negotiated.  See Bittinger, 83 F. Supp. 2d at 851 (denying retirees relief, stating "to hold otherwise would afford plaintiff a benefit not contemplated by the terms of the CBA"); see also Groves v. Ring Screw Works, 498 U.S. 168, 173 (1990) (noting the "strong federal policy favoring judicial enforcement of collective-bargaining agreements").

Second, Plaintiffs seek to undermine the public policy favoring the enforcement of ERISA's express provision "exempt[ing] welfare benefit plans from its stringent vesting requirements." Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co., 520 U.S. 510, 514 (1997) (interior quotations omitted).

**F.**     **Plaintiffs Have Failed To Show The Imminent, Irreparable Harm Necessary For Injunctive Relief**

Even if Plaintiffs could demonstrate some likelihood of success (they have not), their motion fails because they have not  come close to demonstrating that they would be irreparably harmed in the absence of injunctive relief.  This failure alone defeats their motion.  See, e.g., Yolton, 435 F.3d at 578 (noting that, on balance, the facts must weigh towards the moving party to justify issuance of an injunction).  Indeed, a preliminary injunction may not be granted simply to prevent monetary loss, such as that caused by increased out-of-pocket expenses for health care.  See, e.g., Adkins v. American Std., Inc., 7:03-CV-278-KKC, 2005 WL 2137740, at *17

(E.D. Ky. Sept. 2, 2005) (denying plaintiffs' motion for preliminary injunction to prevent employer from raising retiree health insurance premiums because "if Plaintiffs succeed on the merits, they can be made whole by money damages").

The question is not whether Plaintiffs seeking the extraordinary relief of a preliminary injunction have described negative effects from engagement of the Cap or whether they have worries about the future. Rather, the question is whether each of the more than 3,000 Plaintiffs have shown that they are suffering *irreparable* harm, i.e., serious detriment or injury that money cannot repair, well beyond the minor financial loss that a few of them have described. See, e.g., Sampson v. Murray, 415 U.S. 61, 90 (1974) (holding that "the key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough") (citation omitted, emphasis in original). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Id.[14]

There are 3,086 Plaintiffs in this case. 3,056 of these Plaintiffs have submitted ***no evidence*** to meet their burden of showing irreparable harm sufficient to obtain a preliminary injunction. While Plaintiffs may try to argue that the Court should rely on the evidence submitted by a handful of Plaintiffs to find irreparable harm as to the other 3,056 Plaintiffs,

---

[14]    A large percentage of Plaintiffs (1,297) are Medicare eligible. See Exh. C to Kovaloski Decl. Of course, their Medicare benefits will continue without regard to the claims in this case, and their Medicare Part B reimbursement similarly remains unaffected. Exh. A to Kovaloski Decl. For this group of Plaintiffs, their only complaint is with respect to the increased costs of their Medicare supplement.

courts have rejected such efforts.[15]  In <u>Adams v. Freedom Forge Corp.</u>, 204 F.3d 475 (3d Cir.

2000), for example, the court rejected plaintiffs' effort to obtain a preliminary injunction

requiring their former employer to continue a retiree health benefits plan where only eleven of

the 136 plaintiffs presented evidence.  <u>Id.</u> at 479-80.  The court considered whether it could

"grant a preliminary injunction to the entire group of plaintiffs if there is evidence that some, but

not all, of the plaintiffs will suffer irreparable harm."  <u>Id.</u> at 479-80.  The court said no: "[w]e

conclude that the demanding requirements for a preliminary injunction do not yield to numbers."

<u>Id.</u> at 480.  The court explained that:

> In order to obtain a preliminary injunction that would apply to each
> one of them, the plaintiffs would have had to present affidavits or
> other evidence from which one could at least infer that each of
> them was so threatened.   Instead, the plaintiffs only present
> evidence from which the court could infer that some of them were
> threatened with harm.  In holding that this is insufficient to support
> a preliminary injunction, we recognize that such orders are sought
> when an emergency threatens, and that the moving party may not
> be able to marshal extensive evidence.   That does not mean,
> however, that proof by association in a lawsuit, or proof by
> 'common sense," will suffice.

<u>Id.</u> at 488.  <u>See</u> <u>also</u> <u>National Fisheries Inst., Inc. v. United States Bureau of Customs and Border</u>

<u>Protection</u>, 465 F. Supp. 2d 1300, 1301 (Ct. Int'l Trade 2006) (refusing to infer that the same

harm would befall all plaintiffs where only eight presented evidence, and granting an injunction

only with regard to those eight plaintiffs).

To obtain a preliminary injunction, each Plaintiff must individually demonstrate that

without such relief, he or she will suffer irreparable harm.  That is especially true here, where a

determination of irreparable harm could only be made by reviewing the unique facts and

---

[15]   While there are some cases that have permitted representative proof, those cases,
unlike this case, involved class actions.  <u>See</u>, <u>e.g.</u>, <u>Golden</u>, 73 F.3d 648; <u>Schalk v. Teledyne, Inc.</u>,
751 F. Supp. 1261 (W.D. Mich. 1990), <u>aff'd</u>, 948 F.2d 1290 (6th Cir. 1991).

circumstances of each Plaintiff, including their individual medical conditions and financial resources. As the Third Circuit stated in rejecting a similar attempt:

> The difficulty with the District Court's conclusion… is that only a small percentage of the plaintiffs testified, and that even among those who did, ***many did not present any evidence (or even make an assertion) that they would have to forego medical care or other necessities if the proposed change were to take effect. There was thus no basis for inference-drawing.***

Adams, 204 F.3d at 485-486 (emphasis added). The Adams court thus denied the injunction as to all non-testifying plaintiffs. Accordingly, Plaintiffs' motion provides no basis for a preliminary injunction on behalf of at least 3,056 of the Plaintiffs in this action and their request should be summarily denied.

Nor have the 30 Plaintiffs who provided declarations met their burden of demonstrating irreparable harm. As an initial matter, many of the declarants do not even claim they are facing imminent harm by virtue of the changes to their benefits. See, e.g., Allen, Barse, Baud, Best, Henry, Holloway, Jones, Kanzler, Pruitt, Ricketts, & Sharber Decls. Of those who do allege some "harm," their definition of that term is strained. For example, several Plaintiffs suggest they will not be able to eat out in restaurants or travel. See, e.g., Bolt Decl. ¶ 10 (during the lawsuit, he will have to do without the "little extras in life," like eating out at restaurants and taking vacation); Cramer Decl. ¶ 9 (he will have to cut out "pleasures" like eating out); Garner Decl. ¶ 10 (he may not be able to travel as he had planned); Macy Decl. ¶ 17 (he may have to give up his "dreams" of traveling while the lawsuit is pending). While this may be inconvenient, it does not rise to the level of irreparable harm sufficient to obtain a preliminary injunction.[16] In

---

[16] In Adams, the Third Circuit affirmed the injunction as to only two of the 11 testifying plaintiffs. The Court rejected a preliminary injunction for several plaintiffs who testified similarly to the declarations presented here. Compare id. at 484 (rejecting preliminary injunction for plaintiff who testified he was on a fixed income and that he was worried that premiums might

fact, several of the Plaintiffs who were recently deposed have conceded that they will not suffer irreparable harm in the absence of a preliminary injunction. See, e.g., Macy Dep. p. 91 (testifying that his irreparable harm is "money that I can't ever get back"); Fountaine Dep. pp. 5-6 (testifying that he can pay the new charges and will not have to choose "between paying for health care costs and other necessities of life").

Further demonstrating the lack of irreparable harm, virtually all the declarants have significant sources of income and/or savings that they neglected to disclose in their statements. Their financial resources range from monthly pensions to six-figure 401(k) balances. Exh. A & B to Williams Decl.[17] Other assets include spousal income, spousal pensions, rental property income, Social Security benefits, disability benefits, and veterans benefits,[18] not to mention other unreported assets such as savings account balances, checking and money market accounts, IRAs, stocks and bonds.[19] Despite Plaintiffs' attempt to play fast-and-loose with their allegations of

---

increase) with Baud Decl. ¶ 10 (stating generally that he is worried about the changes to his benefits) and Jones Decl. ¶ 10 (same).

[17] For the past few weeks, the parties have been operating under an interim, oral agreement that treats specific personal financial details of the Plaintiff-Declarants (e.g., current balances in financial accounts) as confidential. Counsel for the parties will be meeting promptly to confer on a proposed confidentiality order. Once such an Order is entered, Alcoa will file promptly the Declarations of Michael Williams and Scott A. Kovaloski, under seal if necessary.

[18] See, e.g., Decls. of Allen ¶ 9, Birchfield ¶ 9, Bolt ¶ 9, Bradley ¶ 9, Cope ¶ 9, Cramer ¶ 9, Gates ¶ 9 Gentry ¶ 9, Holloway ¶ 9, Huffstetler ¶ 8, Jones ¶ 9, Kanzler ¶ 9, Martin ¶ 9, Ricketts ¶ 9, Threkeld ¶ 9 and Wilson ¶ 9.

[19] Note also that, pursuant to the 2006 Master CBA, Alcoa made lump-sum payments of $1,500 to each surviving spouse of Alcoa retirees who retired after May 31, 1993. 2006 USW Master CBA Summary p. 12. A second payment of $1,500 will be made in 2008. Id.

hardship, the logical interpretation of such evidence is that most declarants are under no hardship whatsoever.[20]

Particularly in light of the declarants' substantial undisclosed income, the low costs of their current medical benefits are patently insufficient to justify the extraordinary remedy of injunctive relief.[21]  Plaintiffs' premium costs are only $40 per month for Medicare-eligible retirees ($80 if both the retiree and spouse are covered) and $75 per month for pre-Medicare coverage ($150 for the retiree and spouse).  There is no premium for dependent children.  This is substantially less than most retirees pay for medical insurance and far less than current Alcoa employees pay.[22]  The Kaiser/Hewitt 2006 Survey on Retiree Health Benefits found the average premium paid by pre-65 retirees for retiree-only coverage is $227 per month; the average paid by retirees over age 65 is $110 per month.  Retiree Health Benefits Examined: Findings from the Kaiser/Hewitt 2006 Survey on Retiree Health Benefits p. 15, available at http://www.kff.org/ medicare/7587.cfm (published Dec. 13, 2006).  Thus, Plaintiffs are paying monthly premiums that are less than one-half of the national average, and even less than basic Medicare coverage, which has a minimum premium of $93.50 per month.  Medicare Premiums and Coinsurance

---

[20]  As an example of Plaintiffs' misrepresentation of their respective financial conditions, as well as the need for individualized proof of irreparable harm, Plaintiff Macy testified at deposition that his declaration "doesn't give a very complete picture of [his] and [his] wife's financial condition" and that it was not "important to give the court . . . a picture of [his] financial condition."  Macy Dep. p. 94.  Similarly, Plaintiff Best admitted at his deposition that he had failed to disclose a substantial IRA savings account in his sworn interrogatory answers simply because he felt it was not relevant.  Best Dep. pp. 125-6.

[21]  Indeed, Plaintiffs' Brief grossly exaggerates the costs imposed by the Cap's engagement.  Their claim that many Plaintiffs "are left without medical benefits at all" (Pls.' Br. at p. 3) is unsupported by any evidence.

[22]  The monthly premium for current Alcoa employees under Age 65 for comparable employee-only coverage would be $301.92 per month in 2007.  Kovaloski Decl. ¶ 4.  For current employees over age 65, the employee-only premium would be $191.75 per month.  Id.

34

Rates, available at http://questions.medicare.gov/cgi-bin/medicare.cfg/php/enduser/std_alp.php?p_sid=94WoiOCi) (last updated Sept. 26, 2006).

Plaintiffs' other costs are similarly low. Their current in-network deductible is only $250 with a 10% coinsurance. Exh. B to Kovaloski Decl. The average deductible for pre-65 retirees nationwide is $389 (50% higher than in Alcoa's plan). Kaiser/Hewitt Study p. 7, supra. Plaintiffs' deductibles are also less than those charged by Medicare; Medicare Part A (Hospital Insurance) requires a $992 deductible in 2007. Medicare Premiums and Coinsurance Rates, supra.

When compared to national averages, the low cost of the Alcoa retiree plan compels the conclusion that the declarants and the other Plaintiffs are not in imminent danger of losing coverage or of having to chose between health care and other necessities, especially in light of their monthly income, savings and other assets.[23] Indeed, the Union explained that it negotiated these premiums, deductibles and co-insurance levels because it knew they were amounts the retirees "could afford." 2006 USW Master CBA Summary p. 8. In light of the actual costs at issue, Plaintiffs simply cannot establish a credible showing of irreparable harm.[24]

---

[23] For instance, Theodore Martin receives a significant monthly pension and an undisclosed amount in monthly Social Security benefits, his wife is gainfully employed, and he has a substantial balance in a 401(k) account. Martin Decl. ¶¶ 7, 9; Exh. B to Williams Decl. His monthly medical expenses are only $150 in premiums and about $105.33 for prescriptions. Martin Decl. ¶ 8. The costs Plaintiffs are now paying are also significantly less than in the cases upon which they rely. See, e.g., Wood v. Detroit Diesel Corp., No. 06-1157, 2007 WL 128772 (6th Cir. Jan. 17, 2007) (premium increase varied but could involve monthly contributions "potentially as much as $834"); Yolton v. El Paso Tenn. Pipeline Co., 318 F. Supp. 2d 455 (E.D. Mich. 2003), aff'd, 435 F.3d 571 (6th Cir. 2006) (monthly premium of as much as $501); Bailey v. AK Steel Corp., No. 1:06cv468, 2006 WL 2727732 (S.D. Ohio Sept. 22, 2006) (premiums rose from $55-163 per month to $250-$503 per month).

[24] Plaintiffs' claims of irreparable harm also ring hollow in light of the fact that they waited nine months after the engagement of the Cap was announced to seek relief. See Fourth Amend. Compl. ¶ 56 (Plaintiffs had knowledge of the benefits changes since at least June 30,

# IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Respectfully Submitted,

**ALCOA INC.**

By:   _____*s/ John A. Lucas*_____
                        Counsel

John A. Lucas (Tenn. Bar No. 011198)
John T. Winemiller (Tenn. Bar No. 021084)
HUNTON & WILLIAMS LLP
2000 Riverview Tower
900 South Gay Street
P.O. Box 951
Knoxville, Tennessee 37902
865.549.7700 (telephone)
865.549.7704 (facsimile)
*jlucas@hunton.com / jwinemiller@hunton.com*

*Patricia K. Epps (Va. Bar No. 23007)
*James P. Naughton (Va. Bar. No. 25923)
*Ryan A. Glasgow (Va. Bar No. 71023)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
804.788.8200 (telephone)
804.788.8218 (facsimile)
*pepps@hunton.com / rglasgow@hunton.com*
(*Admitted *pro hac vice*)
**Counsel for Defendant Alcoa Inc.**

---

2006); Allen Decl. ¶ 5 (same).  "A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." 1A Wright & Miller, Fed. Prac. & Proc. Civ. 2d § 2948.1; see also New Dana Perfumes Corp. v. The Disney Store, Inc., 131 F. Supp. 2d 616, 627 (M.D. Pa. 2001) ("By sleeping on its rights a plaintiff demonstrates that lack of need for speedy action") (quoting GTE Corp. v. Williams, 731 F. 2d 676 (10th Cir. 1984)).

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of May, 2007, I electronically filed the foregoing document and the Declarations of Joseph Quaglia, Russell Porter, and Thomas Mordawanec with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all Plaintiffs' counsel who are registered for electronic filing before the Court.


_____ *s/ John A. Lucas*
Counsel for Defendant Alcoa Inc.