UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| **CHARLES CURTIS et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No: 3:06cv448** |
| | ) | |
| **ALCOA INC., Individually and as** | ) | . |
| **Fiduciary of the Employees' Group** | ) | |
| **Benefits Plan of Alcoa Inc., Plan II** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF JOSEPH QUAGLIA

I, Joseph Quaglia, hereby state as follows:

1.     I am over the age of eighteen, under no legal disability, and have personal knowledge of the matters stated herein.

2.     I am the Director of Human Resources for Alcoa, Inc.'s North American operations. I have been employed by Alcoa for about 30 years. Through my duties on behalf of Alcoa, I am familiar with the collective bargaining agreements negotiated between Alcoa and the unions representing Alcoa employees.

3.     I have participated in Alcoa's labor negotiations with the United Steelworkers Union (the "USW" or "the Union") and the former Aluminum, Brick and Glass Workers Union (the "ABG," which the USW absorbed in or about early 1997) since 1986. I was one of Alcoa's lead negotiators at the 2001, 2005, and 2006 contract negotiations with the USW. In that capacity, I participated in the top-level negotiations, where the lead negotiators for the parties (typically a small number for each side) negotiate economics and other key terms of the labor agreement. The actual negotiations and decisions in 2001, 2005 and 2006 on Alcoa's proposals to implement ("engage") the Cap Agreement regarding Alcoa's contributions to retiree health care benefits for those who

retired on or after June 1, 1993 occurred at the top-level negotiations. None of the Union's local-level officials (such as Stephen Barse, Larry Fountaine, Dan Henry, Jessie Sharber) were present during these top-level negotiations.

4. The 1996 Alcoa-USW and Alcoa-ABG Master Collective Bargaining Agreements included the same Cap Agreement language that was originally negotiated in the 1993 Master CBAs. The only changes were to the engagement date and the dates for continued mandatory bargaining over engagement of the Cap. In the 1996 negotiations, Alcoa and the Union ultimately agreed to delay engagement of the Cap for the term of the 1996 Agreement. At the 2001 negotiations, Alcoa proposed immediate engagement of the Cap. The USW resisted this proposal. During the last day of the 2001 negotiations, Alcoa agreed to withdrew its proposal for immediate engagement of the Cap. Alcoa's withdrawal of the proposal was one of a very few final concessions at the end of negotiations that resulted in tentative agreement that same evening on the 2001-2006 Master CBA. As in the 1993 and 1996 Master CBAs, the parties agreed that Alcoa would engage the Cap Agreement following the expiration of the CBA (in this case as of January 1, 2007) unless the parties once again agreed to delay its engagement.

5. Additionally, to obtain an agreement, the parties agreed in 2001 (as they had agreed since 1993) that the question of engagement of the Cap would continue to be a mandatory subject of bargaining in the next contract negotiations. The Union insisted on this provision. Alcoa understood and agreed that this provision gave the Union the legal right to continue to represent and bargain about Cap Agreement issues on behalf of employees who retired under the 1993 and subsequent Master CBAs, and that the Union could bargain to impasse and call a strike if the parties could not reach agreement on Cap Agreement issues at the next contract negotiations.

6. The 2001-06 Master CBA provided for "re-opener" negotiations in 2005. At these 2005 negotiations, Alcoa again proposed that the Cap be immediately engaged. Again, the Union

resisted the proposal and the parties made little or no progress toward reaching a new agreement. When negotiations resumed in 2006, Alcoa renewed its proposal for immediate engagement of the Cap, and made clear that the Union's failure to agree would be a "deal-breaker." The Cap engagement proposal was among the most contentious issues facing the parties. Shortly before the strike deadline, and after long, hard bargaining, the Union accepted the Company's proposal to engage the Cap as of January 1, 2007. Alcoa agreed that monthly retiree premiums and certain other amounts would be credited to a special account to reduce participant costs below those that would otherwise have applied under the Cap Agreement.

7.     At no time during the 2001, 2005, or 2006 negotiations did I or anyone from Alcoa in my presence ever tell the Union or anyone else that the Cap Agreement was merely an "accounting gimmick," that the Company had no serious interest in engaging the Cap Agreement, that it would "never be implemented," or any other statement to that effect. As noted above, I have participated in Master CBA negotiations for Alcoa since 1993. Throughout this period I have never made any such statement and have never heard any Alcoa representative make any such statement.

8.     Attached as Exhibit A are copies of relevant excerpts from the 1993, 1996 and 2001 Master CBAs, including the provisions on insurance and the Cap Agreement. The 2001 Cap Agreement was adopted verbatim in the 2006 Master CBA, along with a 6-page document describing the new retiree health care provisions. A true and accurate copy of the 6-page agreement is attached as Exhibit B.

9.     Attached as Exhibits C through J are true and accurate copies of selected pages from the following Summary Plan Descriptions and other benefits booklets: RMC's Your Retiree Health Care Plan, Handbook 3 Retiree Health (AB) 11/95 (Nov. 1995) Summary Plan Description ("SPD") (Exhibit C); RMC's Your Retiree Health Care Plan, Handbook 3 Retiree Health (AB) 4/98 (Apr. 1998) SPD (Exhibit D); Alcoa's Total Compensation - Health Care Agreement - SPD for Active

3

Hourly Employees Pursuant to Agreement with United Steelworkers of America, A10-15684 (Oct. 1995) (Exhibit E); Alcoa's Total Compensation -- Summary of Changes to Your Benefits Plans, USW Amended Plan Features, A10-15684 (June 1, 1996) (Exhibit F); Alcoa's Retiree Medical Update, A10-15779 (Rev. Dec. 1996) (Exhibit G); Alcoa's Your Retiree Benefits Handbook - Hourly, A10-15786 (Apr. 1997) (Exhibit H); Alcoa's Your Retiree Benefits Handbook – Hourly, A10-19000 (Sept. 2000) (Exhibit I); Alcoa's Health Care Benefits Agreement – Master Agreement Plan, A10-HC-Master (April 1, 2002) (Exhibit J).

10.    Following the 1993, 1996 and 2001 Master CBA negotiations, the Union distributed brief summaries of the Master CBA settlement to its locals. These summaries noted the continued presence of the Cap Agreement and the 1996 summary included a verbatim copy of the Cap Agreement. Attached as Exhibits K, L and M are true and correct copies of the Union's 1993, 1996 and 2001 summaries, as well as the copy of the Cap Agreement letter, which was one of the exhibits to the 1996 summary. The Union bargaining units ratified the 1993, 1996, 2001 and 2006 Master CBAs. Exhibit N is a true and correct copy of the Union's 2006 Master CBA summary, which the Union distributed to its locals in connection with the 2006 ratification vote.

11.    Alcoa and the USW negotiated a settlement to the Miles lawsuit as part of the 2006 Master CBA negotiations. The settlement provided that, effective January 1, 2007, the retiree Cap Agreement would be engaged such that all post May 31, 1993 retirees who had been employed at closed or sold facilities would be required to pay monthly health care premiums, as well as increased co-payments and deductibles. Exhibit B, containing the 2006 retiree health provisions, incorporated the settlement of the Miles case regarding retirees of closed and sold plants.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 29th, 2007.

_____
Joseph Quaglia

# EXHIBIT A
# TO DECLARATION OF
# JOSEPH QUAGLIA

DεN

AGREEMENT

BETWEEN

ALUMINUM COMPANY OF AMERICA

AND

INTERNATIONAL UNION,
UNITED STEELWORKERS OF AMERICA

*

Plants located at

ALCOA, TENNESSEE

BADIN, NORTH CAROLINA

BAUXITE, ARKANSAS

MOBILE, ALABAMA

POINT COMFORT, TEXAS

ROCKDALE, TEXAS

*

MAY 31, 1993

guaranteed rate and the Benefit Quarter Rate by the hours worked during the Benefit Quarter.

## I.M.A. PERCENTAGE TABLE

| Accumulated Departmental Seniority At End Of Benefit Quarter | Base Year Job Grade Percentage |
|---|---|
| 2 years but less than 10 | 90 |
| 10 years or more | 95 |

## Section 85. General

A. No Income Maintenance Allowance shall be payable to any individual for a Benefit Quarter during which his seniority is terminated under any of the provisions of Article VIII, Section 19 of the Labor Agreement.

B. Money paid as an Income Maintenance Allowance shall not be used in the base for calculation of overtime (except where statutorily required), premium pay, benefits or other pay additive except in those cases where benefit levels are determined by reference to annual earnings.

C. An employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement and who accepts an offer of SLTE (as defined in Appendix A of the Pension Agreement effective June 1, 1993) at an employment location listed in Group A or B for the employee's location in Table IV of the Pension Agreement effective June 1, 1993, shall be covered by the Income Maintenance Program (IMP) in effect subject to the following:

1. The employee immediately shall be deemed to be an eligible employee as defined by the IMP, irrespective of his most recent hours of work history. The waiver of hours of work eligibility requirement shall continue throughout the periods of special Income

Maintenance Allowance benefits specified in 2. below unless employment status is terminated.

2. The Base Year Job Grade to be used to calculate the special quarterly Income Maintenance Allowance for an employee accepting SLTE at other than his home location shall be the Base Year Grade in effect for that employee at his home location immediately prior to the employee's last layoff from that location. Such Base Year Job Grade shall be in effect for the benefit quarter during which he starts work at the new location, plus the following applicable period:

Group A location: The next four consecutive benefit quarters.

Group B locations: The next eight consecutive benefit quarters. Thereafter, the transferred employee's Base Year Job Grade shall be that calculated by regular procedures, based upon his work experience at the new location.

3. The Income Maintenance Allowance Base Year Job Grade percentage for an employee accepting SLTE at a Group B location shall be 100% rather than 95% for the benefit quarter during which the employee starts work at the Group B location and for the next eight consecutive benefit quarters.

4. The special Base Year Job Grades provided in 2. above will cease to be applicable should the employee, during the covered period, through "voluntary" means, become payroll classified in or retain any job grade lower than such special Base Year Job Grade.

## ARTICLE XXII — GROUP INSURANCE

The Company will provide the following coverages: Life, Surviving Spouse, and Weekly Sickness and Accident for active employees and Hospital Expense, Surgical-Medical Expense, Extended Medical Expense, Dental Expense, and

Vision Expense for active employees and eligible dependents. Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program. The Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Agreement:

(1)  For persons not eligible for Medicare-Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program. Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program.

(2)  For persons eligible for Medicare-Supplemental Hospital Expense, Supplemental Surgical-Medical Expense, and Supplemental Extended Medical Expense, and Prescription Drug Program.

The Company will also provide Life Coverage and Surviving Spouse Coverage for such retired employees.

All of the above benefits will be provided without cost to employees and retirees except as otherwise provided. Separate booklets describing these benefits are incorporated herein and made a part of this Agreement.

General Provisions Applicable to Article XXII

1.  It is agreed that if subsequent governmental legislation provides for reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or

elimination to the benefit payment for such Medicare premium for that person and such governmental action shall not require further modification or adjustment in this Article. Medicare Part B premium reimbursement shall be the monthly government charged premium to a maximum of $46.10.

2.  It is intended that the provisions for benefits in this Article shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws.  Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article and appropriate readjustment shall likewise be made in the benefits.

3.  Benefits otherwise payable under the Hospital Expense Coverage or the Managed Care Medical Benefit Program shall be reduced to the extent of the hospital benefits the employee received or could upon application receive under or pursuant to the California Unemployment Insurance Code.

4.  Unless otherwise provided in this Article, the parties will meet and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

5.  Upon the request of either the Company or the International Union, the parties will jointly study the health-care program provided by a Health Maintenance Organization Plan (HMO) in any area.  Furthermore, if desired by the International Union, the parties will also jointly study the health-care program provided by a qualified Health Maintenance Organization plan that presents to the Company an appropriate

request for inclusion in this plan. A mutual agreement will be sought as to the desirability of providing at no additional cost to the Company an individual choice between an employee's coverage under this Article and similar coverages provided by the Health Maintenance Organization plan under study. The Company and the International Union will make a mutual determination of the costs in such area of the hospital-surgical-medical benefits provided for individuals by this Article and the costs for individuals of participation in such HMO plan. In the event the parties agree to provide such an individual choice, then with respect to employees who choose participation in such HMO plan, the Company will deduct from the pay of each such employee the amount, if any, by which the cost of such employee's participation in such plan exceeds the cost in such area of the Managed Care Medical benefits theretofore provided for such employee by this Article, as above determined, and the Company will pay to such plan the cost of such employee's participation in such plan. The parties agree that they will not unreasonably withhold agreement in reaching such mutual determination.

6. Notwithstanding the provisions in 2 and 4 above, when and if, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain health care or other medical, dental, vision, or surgical benefits by reason of the enactment by the United States or any state of the United States of a Governmental System of health security or medical service program ("Governmental System") for active employees, the parties shall promptly meet and undertake to negotiate a modification of the benefits under this Article of the type and character provided or available under such Governmental System in order to achieve or to assure the following results:

(a) No employee covered by this Article shall suffer any reduction in the level of any

of the several health-care benefits of this Article.

(b) The Company shall, without cost to the employee, provide a plan of benefits supplementary to those available under such Governmental System to the extent necessary to make each benefit comparable to the corresponding benefit provided under this Article.

(c) When an employee or dependent covered by this Article is required by law to make contributions, whether in the form of direct taxes, personal premiums, levies or otherwise, specifically designated by law toward the cost of benefits under such a Governmental System, the Company, in addition to any contributions required of it by law, shall pay to or on behalf of such employee or dependent any such required contributions to the extent such contributions are for benefits covered by this Article.

(d) The Company will not be required to provide any benefits or make payment for any benefit to the extent that the employee or dependent covered hereby receives or would be able to receive such benefit as a matter of right and without means test of any kind if timely and proper steps had been taken to obtain the benefit or payment for the benefit under such Governmental System.

(e) To preclude any duplicating of benefits to employees or their dependents and to preclude any duplication of costs to the Company including the costs arising from Taxes and contributions of employees paid by the Company.

(f) To negotiate the disposition of any actual savings disregarding any increase or decrease in administrative cost which may accrue to the Company as a result of any such Governmental System.

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kikar
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kikar:

Until ratification of the next Labor Agreement, the Company shall maintain its program of medical benefits for future retirees and surviving spouses, provided that the annual cost of benefits paid for by the Company under this program shall be limited to an amount determined by multiplying the per capita cost of such benefits during calendar year 1997 by the number of retirees and surviving spouses ("Covered persons") during a calendar year.

In the event that the average per capita company contribution exceeds the amount established above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rata basis. Notwithstanding the foregoing, no covered person shall be required, solely by reason of this limitation, to make any additional contribution toward the costs of this program coverage until January 1, 1996. Furthermore, the parties agree that the subject of bargaining in any negotiations between the parties occurring subsequent to May 31, 1993, and prior to December 31, 1996.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kikar

---

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kikar
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kikar:

During our discussions of the 1993 collective bargaining agreement, the parties recognized that a National Health Care Program was under active discussion in Washington, D.C. and throughout the country. While the parties do not know what the details of such a Program might be and how it might impact bargaining-unit employees and the Company, the parties agree that should such a Program become effective, they will need to resolve any issues raised by the overlap of that Program with the insurance program for bargaining-unit employees by utilizing the following principles:

1. Duplication will be eliminated at no loss to employees.

2. Net savings, if any, realized by the Company from the implementation of the National Health Care Program shall be paid into a fund established for payment of retiree insurance costs in future years. "Net Savings realized" will be measured as the amount of reduction in the Company's cost from the amount of expense in the calendar year immediately prior to full implementation of a National Health Care Program and shall take into consideration any premiums, taxes, or other contribution paid by the Company associated with funding the National Health Care Program.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kikar

AGREEMENT

BETWEEN

ALUMINUM COMPANY OF AMERICA

AND

INTERNATIONAL UNION,
UNITED STEELWORKERS OF AMERICA

*

Plants located at

ALCOA, TENNESSEE

BADIN, NORTH CAROLINA

BAUXITE, ARKANSAS

MOBILE, ALABAMA

POINT COMFORT, TEXAS

ROCKDALE, TEXAS

*

MAY 31, 1996

**C.** An employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement and who accepts an offer of SLTE (as defined in Appendix A of the Pension Agreement effective June 1, 1996) at an employment location listed in Group A or B for the employee's location in Table IV of the Pension Agreement effective June 1, 1996, shall be covered by the Income Maintenance Program (IMP) in effect subject to the following:

**1.** The employee immediately shall be deemed to be an eligible employee as defined by the IMP, irrespective of his most recent hours of work history. The waiver of hours of work eligibility requirement shall continue throughout the periods of special Income Maintenance Allowance benefits specified in 2. below unless employment status is terminated.

**2.** The Base Year Job Grade to be used to calculate the special quarterly Income Maintenance Allowance for an employee accepting SLTE at other than his home location shall be the Base Year Grade in effect for that employee at his home location immediately prior to the employee's last layoff from that location. Such Base Year Job Grade shall be in effect for the benefit quarter during which he starts work at the new location, plus the following applicable period:

Group A location: The next four consecutive benefit quarters.

Group B locations: The next eight consecutive benefit quarters. Thereafter, the transferred employee's Base Year Job Grade shall be that calculated by regular procedures, based upon his work experience at the new location.

**3.** The Income Maintenance Allowance Base Year Job Grade percentage for an employee accepting SLTE at a Group B location shall be 100% rather than 95% for the benefit quarter during which the employee starts work at the Group B location and for the next eight consecutive benefit quarters.

**4.** The special Base Year Job Grades provided in 2. above will cease to be applicable should the employee, during the covered period, through "voluntary" means, become

106

payroll classified in or retain any job grade lower than such special Base Year Job Grade.

## ARTICLE XXII -- GROUP INSURANCE

The Company will provide the following coverages: Life, Surviving Spouse, and Weekly Sickness and Accident for active employees and Hospital Expense, Surgical-Medical Expense, Extended Medical Expense, Dental Expense, and Vision Expense for active employees and eligible dependents. Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program. The Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Agreement:

(1) For persons not eligible for Medicare-Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program. Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program.

(2) For persons eligible for Medicare- Supplemental Hospital Expense, Supplemental Surgical-Medical Expense, and Supplemental Extended Medical Expense, and Prescription Drug Program.

The Company will also provide Life Coverage and Surviving Spouse Coverage for such retired employees.

All of the above benefits will be provided without cost to employees and retirees except as otherwise provided. Separate booklets describing these benefits are incorporated herein and made a part of this Agreement.

107

## General Provisions Applicable to Article XXII

1. It is agreed that if subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or elimination to the benefit payment for such Medicare premium for that person and such governmental action shall not require further modification or adjustment in this Article. Medicare Part B premium reimbursement shall be the monthly government charged premium to a maximum of $46.10.

2. It is intended that the provisions for benefits in this Article shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws. Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article and appropriate readjustment shall likewise be made in the benefits.

3. Benefits otherwise payable under the Hospital Expense Coverage or the Managed Care Medical Benefit Program shall be reduced to the extent of the hospital benefits the employee received or could upon application receive under or pursuant to the California Unemployment Insurance Code.

4. Unless otherwise provided in this Article, the parties will meet and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

5. Upon the request of either the Company or the International Union, the parties will jointly study the health-care program provided by a Health Maintenance Organization Plan (HMO) in any area. Furthermore, if desired by the International Union, the parties will also jointly study the health-care program provided by a qualified Health Maintenance Organization plan that presents to the Company an appropriate request for inclusion in this plan. A mutual agreement will be sought as to the desirability of providing at no additional cost to the Company an individual choice between an employee's coverage under this Article and similar coverages provided by the Health Maintenance Organization plan under study. The Company and the International Union will make a mutual determination of the costs in such area of the hospital-surgical-medical benefits provided for individuals by this Article and the costs for individuals of participation in such HMO plan. In the event the parties agree to provide such an individual choice, then with respect to employees who choose participation in such HMO plan, the Company will deduct from the pay of each such employee the amount, if any, by which the cost of such employee's participation in such plan exceeds the cost in such area of the Managed Care Medical benefits theretofore provided for such employee by this Article, as above determined, and the Company will pay to such plan the cost of such employee's participation in such plan. The parties agree that they will not unreasonably withhold agreement in reaching such mutual determination.

6. Notwithstanding the provisions in 2 and 4 above, when and if, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain health care or other medical, dental, vision, or surgical benefits by reason of the enactment by the United States or any state of the United States of a Governmental System of health security or medical service program ("Governmental System") for active employees, the parties shall promptly meet and undertake to negotiate a modification of the benefits under this Article of the type and character provided or available under such Governmental System in order to achieve or to assure the following results:

(a) No employee covered by this Article shall suffer any reduction in the level of any of the several health-care benefits of this Article.

(b) The Company shall, without cost to the employee, provide a plan of benefits supplementary to those available under such Governmental System to the extent

108

109

necessary to make each benefit comparable to the corresponding benefit provided under this Article.

(c) When an employee or dependent covered by this Article is required by law to make contributions, whether in the form of direct taxes, personal premiums, levies or otherwise, specifically designated by law toward the cost of benefits under such a Governmental System, the Company, in addition to any contributions required of it by law, shall pay to or on behalf of such employee or dependent any such required contributions to the extent such contributions are for benefits covered by this Article.

(d) The Company will not be required to provide any benefits or make payment for any benefit to the extent that the employee or dependent covered hereby receives or would be able to receive such benefit as a matter of right and without means test of any kind if timely and proper steps had been taken to obtain the benefit or payment for the benefit under such Governmental System.

(e) To preclude any duplicating of benefits to employees or their dependents and to preclude any duplication of costs to the Company including the costs arising from Taxes and contributions of employees paid by the Company.

(f) To negotiate the disposition of any actual savings disregarding any increase or decrease in administrative cost which may accrue to the Company as a result of any such Governmental System.

## ARTICLE XXIII. REPORT OF PHYSICAL EXAMINATION

Upon written request of an employee, any report of his physical examination and laboratory tests made by physicians acting for the Company shall be given to the personal physician of such employee.

110

## ARTICLE XXIV. DISABLED OR HANDICAPPED EMPLOYEES

The local Union and local Management may by mutual agreement provide rules whereby disabled or handicapped employees may be assigned to jobs which they are able to perform without regard to provisions of Article VIII, Seniority, or Article IX, Job Posting and Work Assignments.

## ARTICLE XXV. CIVIL RIGHTS

A. The provisions of the Memorandum of Understanding effective April 28, 1975, are hereby made a part of the Agreement. In any case of conflict between the other provisions of the Agreement and the provisions of such Memorandum of Understanding, the Memorandum of Understanding shall control.

B. There shall be no discrimination at the time of employment against any prospective employee, nor after employment, by supervisors, superintendents, or any other person in the employ of the Company against any employee because of membership or nonmembership in the Union.

It is the continuing policy of the Company and Union that the provisions of the Agreement shall be applied to all employees without regard to race, color, religious creed, national origin, handicap, Vietnam era service, sex or age, except where sex or age is a bona fide occupational qualification. Wherever in this Agreement a masculine pronoun is used, such use is intended to apply equally to males and females.

A Joint Committee on Civil Rights shall be established at each plant. The Union shall have no more than three members of the local Union, in addition to the president and a designated representative of the Grievance Committee or Committees. The union members shall be certified to the plant manager by the president of the local Union.

The company and union members of the Joint Committee shall meet as required. The Joint Committee shall

111

The committee will seek to resolve specific benefit and administrative plan issues, review the performance of the customer service center and the Company's insurance carriers, and discuss ways to improve the delivery of benefit programs. In the unlikely event that an issue cannot be resolved by the committee, it can be referred by either party to the Co-Chairpersons of the National Negotiating Committee for resolution.

Very truly yours,

D. L. Root, Jr.
Director - Industrial Relations

DLR:er

Confirmed: _____
        Joe L. Kiker

168


ALCOA

June 1, 1996

Mr. Joe L. Kiker
Special Asst. to the President
United Steelworkers of America
Suite 152 Flintridge Bldg.
6200 E.J. Oliver Blvd.
Fairfield, Alabama 35064

Dear Mr. Kiker:

Until ratification of the next Labor Agreement, the Company shall maintain its program of medical benefits for post May 31, 1993 retirees and surviving spouses, provided that the annual cost of benefits paid for by the Company under this program shall be limited to an amount determined by multiplying the per capita cost of such benefits on June 1, 2002 ("measuring year") by the number of retirees and surviving spouses ("Covered persons") during the same period.

In the event that the average per capita Company contribution exceeds the amount established above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rata basis. Notwithstanding the foregoing, no covered person shall be required, solely by reason of this limitation, to make any additional contribution toward the costs of the program coverage ("become engaged") until January 1, 2003. Furthermore, the parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations prior to December 31, 2002 but no additional contributions shall be engaged before 2003.

In the event the parties are unable to establish a new agreement pursuant to the reopener and the special arbitration procedures are invoked in 2001, the parties agree that the measuring year and year the additional contributions become

169

engaged will be the same as defined above. The parties also agree these caps will not be a subject of the special arbitration procedures. If the special arbitration procedures are not invoked in 2001 by either party, the subject of medical caps shall be a mandatory subject of bargaining in any negotiations between the parties occurring subsequent to May 31, 1996 and prior to December 31, 2002 and only under such circumstances shall the additional contributions become engaged before 2003.

Very truly yours,

D. L. Root, Jr.
Director - Industrial Relations

DLR:er

Confirmed: _____
        Joe L. Kiker

170

---

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219



June 1, 1996

Mr. Joe L. Kiker
Special Asst. to the President
United Steelworkers of America
Suite 152 Flintridge Bldg.
6200 E.J. Oliver Blvd.
Fairfield, Alabama 35064

Dear Mr. Kiker:

During our 1996 negotiations, the parties agreed that it would be desirable for the local parties to adopt a provision guaranteeing forty (40) hours of work or pay to craftsmen laid off or on short work weeks while outside contractors perform work in the plant with craftsmen of the same craft. The local parties shall address themselves to the desirability of such a local understanding. In doing so, the local parties should consider circumstances under which it would not be practical to provide such protection, such as in relation to major new construction and reconstruction projects, or work not normally done by Bargaining-Unit employees at the plant. The following is provided as a guide for the local parties in developing a more detailed program of implementation at the plant level:

> Should outside contractors perform work in the plant with the use of craftsmen while employees in that craft are on layoff from the plant and not working at another company plant under Section 23-D of the Agreement, and who are qualified and available for work, or working on short work weeks shall be guaranteed forty (40) hours of work or pay each week to the extent of the number of craftsmen engaged in contracting out relative to that craft.

171

AGREEMENT

BETWEEN

**ALCOA INC.**

AND

UNITED STEELWORKERS OF AMERICA

*

Plants located at

ALCOA, TENNESSEE

BADIN, NORTH CAROLINA

BAUXITE, ARKANSAS

MOBILE, ALABAMA

POINT COMFORT, TEXAS

ROCKDALE, TEXAS

*

MAY 31, 2001

**Section 84. Benefit Calculation**

The Income Maintenance Allowance shall be calculated as follows: The employee's Base Year Rate during the Benefit Quarter shall be multiplied by the appropriate percentage specified in the table below. The resulting rate represents the income security guarantee provided by the program to eligible employees for the hours worked during the Benefit Quarter. If the employee's Benefit Quarter Rate equals or exceeds the guaranteed rate, no Income Maintenance Allowance is payable for the Benefit Quarter. If the employee's Benefit Quarter Rate is less than the guaranteed rate, the Income Maintenance Allowance shall be determined by multiplying the difference between the guaranteed rate and the Benefit Quarter Rate by the hours worked during the Benefit Quarter.

**I.M.A. PERCENTAGE TABLE**

| Accumulated Departmental Seniority At End Of Benefit Quarter | Base Year Job Grade Percentage |
|---|---|
| 2 years but less than 10 | 90 |
| 10 years or more | 95 |

**Section 85. General**

A. No Income Maintenance Allowance shall be payable to any individual for a Benefit Quarter during which his seniority is terminated under any of the provisions of Article VIII, Section 19 of the Labor Agreement.

B. Money paid as an Income Maintenance Allowance shall not be used in the base for calculation of overtime (except where statutorily required), premium pay, benefits or other pay additive except in those cases where benefit levels are determined by reference to annual earnings.

C. An employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement and who accepts an offer of SLTE (as defined in Appendix A of the Pension Agreement effective June 1, 1996) at an employment location listed in Group A or B for the employee's location in Table IV of the Pension Agreement effective June 1, 1996, shall be

covered by the Income Maintenance Program (IMP) in effect subject to the following:

1. The employee immediately shall be deemed to be an eligible employee as defined by the IMP, irrespective of his most recent hours of work history. The waiver of hours of work eligibility requirement shall continue throughout the periods of special Income Maintenance Allowance benefits specified in 2. below unless employment status is terminated.

2. The Base Year Job Grade to be used to calculate the special quarterly Income Maintenance Allowance for an employee accepting SLTE at other than his home location shall be the Base Year Grade in effect for that employee at his home location immediately prior to the employee's last layoff from that location. Such Base Year Job Grade shall be in effect for the benefit quarter during which he starts work at the new location, plus the following applicable period:

Group A location: The next four consecutive benefit quarters.

Group B locations: The next eight consecutive benefit quarters. Thereafter, the transferred employee's Base Year Job Grade shall be that calculated by regular procedures, based upon his work experience at the new location.

3. The Income Maintenance Allowance Base Year Job Grade percentage for an employee accepting SLTE at a Group B location shall be 100% rather than 95% for the benefit quarter during which the employee starts work at the Group B location and for the next eight consecutive benefit quarters.

4. The special Base Year Job Grades provided in 2. above will cease to be applicable should the employee, during the covered period, through "voluntary" means, become payroll classified in or retain any job grade lower than such special Base Year Job Grade.

**ARTICLE XXII – GROUP INSURANCE**

The Company will provide the following coverages: Life, Surviving Spouse, and Weekly Sickness and Accident for active employees and Hospital Expense, Surgical-Medical

100

101

premium reimbursement shall be the monthly government charged premium to a maximum of $46.10 for persons who retire during the term of this Agreement prior to April 1, 2002. For persons who retire during the term of this Agreement on or after April 1, 2002, the Medicare Part B premium reimbursement shall be the monthly government charged premium.

2. It is intended that the provisions for benefits in this Article shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws. Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article and appropriate readjustment shall likewise be made in the benefits.

3. Benefits otherwise payable under the Hospital Expense Coverage or the Managed Care Medical Benefit Program shall be reduced to the extent of the hospital benefits the employee received or could upon application receive under or pursuant to the California Unemployment Insurance Code.

4. Unless otherwise provided in this Article, the parties will meet and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

5. Upon the request of either the Company or the International Union, the parties will jointly study the health-care program provided by a Health Maintenance Organization Plan (HMO) in any area. Furthermore, if desired by the International Union, the parties will also jointly study the health-care program provided by a qualified Health Maintenance Organization plan that presents to the Company an appropriate request for inclusion in this plan. A mutual agreement will be sought as to the desirability of providing at no additional cost to the Company an individual choice between an employee's coverage under this Article and similar coverages provided by the Health Maintenance Organization plan under study. The Company and the International Union will make a mutual determination of the costs in such area of the hospital-surgical-medical benefits provided for individuals

Expense, Extended Medical Expense, Dental Expense, and Vision Expense for active employees and eligible dependents. Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program. The Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Agreement:

(1) For persons not eligible for Medicare–Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program. Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program.

(2) For persons eligible for Medicare- Supplemental Hospital Expense, Supplemental Surgical-Medical Expense, and Supplemental Extended Medical Expense, and Prescription Drug Program.

The Company will also provide Life Coverage and Surviving Spouse Coverage for such retired employees.

All of the above benefits will be provided without cost to employees and retirees except as otherwise provided. Separate booklets describing these benefits are incorporated herein and made a part of this Agreement. **Effective April 1, 2002, the agreed-upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets.**

**General Provisions Applicable to Article XXII**

1. It is agreed that if subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or elimination to the benefit payment for such Medicare premium for that person and such governmental action shall not require further modification or adjustment in this Article. Medicare Part B

Alcoa

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2001

Mr. Richard H. Davis
Vice President – Administration
United Steelworkers of America
Five Gateway Center
Pittsburgh, PA 15222-1214

Dear Mr. Davis:

Until ratification of the next Labor Agreement, the Company shall maintain its program of medical benefits for post May 31, 1993 retirees and surviving spouses, provided that the annual cost of benefits paid for by the Company under these programs shall be limited to an amount determined by multiplying the per capita cost of such benefits on June 1, 2006 ("measuring year") by the number of retirees and surviving spouses ("Covered persons") during the same period.

In the event that the average per capita Company contribution exceeds the amount established above in any calendar year, the excess shall be allocated to and paid by each covered person on a pro rata basis. Notwithstanding the foregoing, no covered person shall be required, solely by reason of this limitation, to make any additional contribution toward the costs of the program coverage ("become engaged") until January 1, 2007. Furthermore, the parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations prior to December 31, 2006, but no additional contributions shall be engaged before 2007.

In the event the parties are unable to establish a new agreement pursuant to the reopener and the special arbitration procedures are invoked in 2005, the parties agree that the measuring year and year the additional contributions become engaged will be the same as defined above. The parties also agree these caps will not be a subject of the special arbitration procedures. If the special arbitration procedures are not invoked in 2005 by either party, the subject of medical caps shall be a mandatory subject of bargaining in any negotiations between the parties occurring subsequent to May 31, 2001 and prior to December 31, 2006 and only under such circumstances shall the additional contributions become engaged before 2007.

Very truly yours.

Eugene T. Woloshyn
Director, NAIR

Confirmed: _____ Richard H. Davis

---

Alcoa

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2001

Mr. Richard H. Davis
Vice President – Administration
United Steelworkers of America
Five Gateway Center
Pittsburgh, PA 15222-1214

Dear Mr. Davis:

In the negotiations for our 2001 Agreement the Company and the Union have agreed upon the following to clarify and implement the safety language of the Labor Agreement:

1. Any attempt by an employer, or employees, to utilize the procedures of the Article for harassment, coercion, retaliation, or to achieve objectives other than health and safety, however proper those objectives might be if pursued by other means, would be abuse of this Article and contrary to the Labor Agreement itself.

2. An employee who is relieved from duty on the job above which he has complained shall not be paid for work time lost as a result of his being so relieved unless an arbitrator finds that he was justified in leaving the job because of the existence of an unsafe condition, charged from the normal hazards inherent in the operation. The period of time to which such payment is applicable will end when the unsafe condition is remedied or when, through application of proper manpower assignment or adjustment procedures, the relieved employee is either reassigned, scheduled off, or laid off.

Very truly yours,

Eugene T. Woloshyn
Director, NAIR

Confirmed: _____ Richard H. Davis

Case 3:06-cv-00448-PLR-CCS Document 64-1 Filed 05/29/07 Page 21 of 58 PageID #: &lt;pageID&gt;

# EXHIBIT B
# TO DECLARATION OF
# JOSEPH QUAGLIA



**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

## RETIREE HEALTH CARE

Effective January 1, 2007 and through December 31, 2010, the Company will maintain its program of medical and prescription drug benefits ("Program") for post May 31, 1993 retirees, spouses and surviving spouses of retirees from the "USW Locations" listed below ("Current Participants"), and "Other USW Locations" listed below ("Other Participants") (Current Participants and Other Participants are herein referred to as "Participants") subject to the modifications to the Program and required individual Participant premiums summarized on Appendix A. Notwithstanding anything to the contrary, the Current Participants and claims costs attributable to Frederick, MD (Eastalco) shall be limited to post October 1, 2001 retirees, spouses and surviving spouses of retirees, and such Participants shall be covered by the Program, effective January 1, 2007. Non-spouse eligible dependents will also continue to be eligible for coverage under the Program, but will not be treated as "Participants" for purposes of this Agreement.

### Guaranteed Company Contributions

Notwithstanding the foregoing, and disregarding the Medicare Part B premium reimbursements provided for on Appendix A, the annual per capita cost of the Company under the Program will be limited to the following amounts:  $7,767 for each pre-Medicare Current Participant, and $6,121 for each pre-Medicare Other Participant ("Pre-Medicare Caps"),  $3,389 for each post-Medicare Current Participant, and $2,334 for each post-Medicare Other Participant ("Post-Medicare Caps") (the Pre-Medicare Caps and Post-Medicare Caps together are the "Cap"). Notwithstanding the above, the annual per capita cost of the Company under the Program for the Frederick MD (Eastalco) facility will be limited to the following amounts: $6,341 for each pre-Medicare Participant, and $2,962 for each post-Medicare Participant.

### Number of Participants and Participant Categories:

For the purposes of this agreement, Participants shall be divided into the following categories:

A.  Pre-Medicare USW Locations

B.  Medicare Eligible USW Locations

C.  Pre-Medicare Other Locations

JQ 12/06/06

D.  Medicare Eligible Other Locations

## Benefit Plans

For all Participants, the Program shall be as follows:

Participants under age 65 who are not eligible for Medicare are covered under the same medical and prescription drug coverage (excluding premiums) as outlined in the June 1, 2006 Settlement Agreement between the parties covering USW Master Agreement Locations.

Participants age 65 and over or who are eligible for Medicare are covered under the same prescription drug coverage (excluding premiums) as outlined in the June 1, 2006 Settlement Agreement between the parties covering USW Master Agreement Locations. The medical coverage for such participants shall remain unchanged.

## Participant Premiums

Participant premiums, as summarized on Appendix A, and plan redesign will be used to reduce the overall cost of the Program for all Participants covered by this Program. The parties agree to discuss any increases to the premiums during the term of this agreement.

## Variable Company Contributions

### Medicare Subsidy Contribution

The Company agrees to provide an annual contribution equal to 50% of the Medicare Part D Subsidy projected to be received by the Company for the Participants covered by this agreement for the period June 1, 2006 through May 31, 2010, subject to adjustment for the actual amount received ("Medicare Subsidy Contribution"). The Medicare Part D Subsidy will be based on the Company's actual reimbursement reduced by external administrative expenses relating to the collection of the subsidy. For the term of this agreement, the Medicare Subsidy Contribution will be contributed to the Account, as described below and used to reduce the cost of this Program.

### Performance Contribution

Finally, in addition to Participant premiums, the Cap, and the Medicare Subsidy Contribution, the Company will provide a Performance Contribution ("Performance Contribution"), which shall consist of a Fixed Performance Contribution and a Variable Performance Contribution.

The Company agrees to make a fixed contribution of $30 million ("Fixed Performance Contribution").

The "Variable Performance Contribution" shall be equal to $2,375 per 3 month period ($9,500 annual equivalent) for each dollar the average 3 month price of aluminum is greater than $1,900 per metric tonne, but less than or equal to $2,500 per metric tonne, and $3,000 over 3 month period ($12,000 annual equivalent) for each dollar the average price of aluminum is greater than $2,500 per metric tonne. The average price will be determined by taking the 3 month average of the London Metal Exchange daily cash-settlement prices (i.e. daily cash offered price) for high grade aluminum for each market day during the applicable 3 month period beginning on June 1, 2006 through May 31, 2010 as published by The Wall Street Journal.

The Performance Contribution will be credited to a non-interest bearing record keeping account. The Company agrees to a minimum Variable Performance Contribution of $20 million with a maximum Variable Performance Contribution of $50 million.

Notwithstanding the foregoing, employees hired on or after June 1, 2006 will not be eligible for the Medicare Subsidy Contribution or the Performance Contribution or any Medicare Part B reimbursement.

### Retiree Health Care Account
The Company agrees to create a non-interest bearing account ("the Account") which shall be the sum of: (i) Participant Premiums, (ii) Medicare Subsidy Contributions, and (iii) Performance Contributions. The balance of the Account will apply beyond 2010, to offset costs for the Program until the account is exhausted.

### Program Costs
In the event that prior to December 31, 2010, in a given Measuring Period the average projected per capita claims cost of the Program (including administrative expenses) exceeds the sum of: (i) the amount of the Cap, and (ii) the per capita share of the Account, the excess cost will be borne by the Participants. Their participant premiums will be increased for any excess costs of the Program.

### Per Capita Claims Cost Determination
For purposes of determining the per capita claims cost of the Program, prior to June 1, 2007 and each July 1 thereafter, the Company will:

(i)     Collect medical and prescription drug claims with dates of service during the most recent consecutive twelve-month period from January 1 through December 31 ("Measurement Period") and paid through the end of February 28 of the following year. The medical claims will be adjusted to reflect changes in plan design, and claims incurred during the Measurement Period but not paid as of February 28 of the following year (prescription drug claims will be assumed fully incurred as of February 28). This adjustment will be based on a factor developed from medical claims incurred during the prior Measurement Period and paid through the end of the current measurement period, as compared to the amount paid through February 28 of the current Measurement Period.

(ii)     Determine annual costs on a per Participant basis by dividing the incurred claims by the weighted average number of Participants enrolled in the Program during the Measurement Period. While claims for other non-spouse eligible dependents will be used in the calculation, non-spouse eligible dependents will not be included in the denominator in the 'per Participant' cost calculation.

(iii)     Project the Measurement Period's incurred claims costs into the target calendar year (the year these costs will be used for contributions) using appropriate medical and prescription drug trend rates as defined by Hewitt Associate's (or its successor's) internal trend expectations and the appropriate number of months of trend.

(iv)     Add administrative costs to the incurred claims. These administrative costs will be those established by the claim and benefit outsourcing administrators and subject to review for reasonableness.

(v)     Develop the appropriate per capita claims cost per Participant. The claims data and enrollment counts should be based on all Participants enrolled in the plan during the Measurement Period. These calculations will be performed separately for pre-Medicare and post-Medicare eligible Participants.  The parties will evaluate whether it is appropriate to merge plan experience for Current Participants and Other Participants.

The foregoing information will be provided to the Union by May 1 of the prior year to which the per capita claims cost data will apply.  Within 30 days of delivering the foregoing information, the Union will inform the Company of any dispute it may have as to the data.

**Reconciliation**
In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is less than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be added to the Account.

In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is greater than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be deducted from the Account.

**Dispute Resolution**
The International Union, through the Chair of its Negotiating Committee or his/her designee, will have the right to review any information, calculation or other matters concerning this Agreement. In the event of a dispute between the parties regarding this agreement, the Chairman of the Employee Relations Council (ERC) and the President of the International Union, or his/her designee, will attempt to reach an agreement to resolve the discrepancy.  Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue by July 1 of the year in question.  In no event will a dispute delay the Company's annual enrollment process, but the dispute resolution will be applied through prospective adjustments to the Program.  The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except ones relating to this Agreement.  The costs associated with the Third Party will be borne equally by the parties.

**Deferral and Re-enrollment**
Participants may elect to defer participation in the Program based on the availability of other health care coverage. Participants who lose coverage from other sources will be allowed to enroll (or reenroll) in the Program immediately upon notice and payment of the applicable premium. Participants who elect to defer participation will be given the opportunity to enroll (or reenroll) in the Program during the next annual enrollment period.

Participants who withdraw or whose coverage is terminated for failure to make the required premium contribution, will be allowed to enroll (or reenroll) in the Program after six months without coverage under the Program.

## Communication

The parties will, in good faith, attempt to develop a joint communications strategy to notify Participants of the changes to the Program and applicable premiums by September 1, 2006.

## Litigation

Agreement pertaining to closed and sold locations is contingent upon withdrawal and settlement of pending lawsuit.

## Collective Bargaining Obligation

The parties agree that the subjects of Participant Premium, plan design, Medicare Subsidy Contribution and Performance Contributions set forth in this letter will be mandatory subjects of bargaining in any negotiations commencing prior to December 31, 2010.

| USW Locations: | Other USW locations: |
| --- | --- |
| Alcoa, TN | Listerhill, AL |
| Badin, NC | Bellwood, VA Extrusions Plant |
| Baton Rouge, LA | Bristol, VA End Plant |
| Bauxite, AR | Corpus Christi, TX |
| Davenport, IA | Fort Meade, FL |
| Gum Springs, AR | Houston, TX Can Plant |
| Hot Springs, AR | Kansas City, MO Can Plant |
| Lake Charles, LA | Longview, WA |
| Lafayette, IN | Louisville, KY Plant 3 |
| Lebanon, PA | Chicago, IL |
| Louisville, KY Plants 1 & 15 | Richmond, IN |
| Massena, NY East and West Plants | Salisbury, NC Can Plant |
| Point Comfort, TX | Seattle, WA Can Plant |
| Richmond, VA | Tampa, FL Can Plant |
| Rockdale, TX | Torrance, CA Extrusions Plant |
| Troutdale, OR | |
| Warrick, IN | |
| Wenatchee, WA | |
| Mobile, AL | |
| Frederick, MD (Eastalco) | |

Very truly yours,

Joseph Quaglia, Jr.            Confirmed:_____
Director, Industrial Relations               Jim Robinson

## APPENDIX A

## MONTHLY PREMIUM CONTRIBUTIONS THROUGH DECEMBER 31, 2010
### CURRENT PARTICIPANTS.
Pre Medicare - $75 per participant (each retiree, spouse, or surviving spouse)
Post Medicare - $40 per participant (each retiree, spouse, or surviving spouse)
### OTHER PARTICIPANTS.
Pre Medicare - $150 per participant (each retiree, spouse, or surviving spouse)
Post Medicare - $75 per participant (each retiree, spouse, or surviving spouse)

## MEDICARE PART B PREMIUM REIMBURSEMENT:

All Medicare Part B reimbursements are capped at current amounts:

| | |
|---|---|
| Participants enrolled on or after June 1, 1993 but prior to January 1, 1994 | $88.50 |
| Participants enrolled on or after January 1, 1994 but prior to April 1, 2002 | $46.10 |
| Participants (excluding new hires after June 1, 2006) enrolled on or after April 1, 2002 | $88.50 |
| New hires on or after June 1, 2006 | None |
| Participants enrolled from the Frederick MD (Eastalco) facility | $50 |

# EXHIBIT C
# TO DECLARATION OF
# JOSEPH QUAGLIA

# Your Retiree Health Care Plan

Plan Highlights ........................................................... 5

Eligibility ................................................................ 6
  Retirees ................................................................ 6
  Dependents .............................................................. 6
    Definition Of Dependent ............................................... 6
  Husband/Wife Company Employees Or Retirees ............................. 7
    Husband/Wife Company Retirees ........................................ 7
    Spouse A Company Employee ............................................ 7

Retiree Premiums ......................................................... 8
  Company Cap Premium .................................................... 8
  Medicare Part B Reimbursement .......................................... 8

Enrollment Deadlines ..................................................... 8
  Initial Enrollment ..................................................... 8
  Enrolling After Retirement ............................................. 8
  Ending Coverage ........................................................ 8
    Dependent No Longer Eligible ......................................... 9
    Voluntarily Ending Coverage .......................................... 9

Pre-Medicare Health Care Plans ........................................... 9
  Types Of Pre-Medicare Plans ............................................ 9
  Claims Administrators And Customer Service ............................. 9
  When You Move .......................................................... 9
    Keep Address Current ................................................. 9
    Request PPO Directory ................................................ 10
    Select New Primary Care Doctor ...................................... 10

Medicare ................................................................. 10
  Eligibility ............................................................ 10
  Premium Costs .......................................................... 10
  Enrollment Deadlines ................................................... 10
  How Medicare Works ..................................................... 11

1

Handbook 3

# Retiree Premiums

Currently the Company pays your health care costs after you retire. Retirees do not pay a Working Spouse Premium, but you may be required to share in the cost of coverage through a Company Cap Premium if the cost of retiree coverage exceeds the limits established under the applicable collective bargaining agreement.

## Company Cap Premium

There is a limit on future plan costs that will be paid by the Company. The limit is set at the level needed to fund the 1997 average cost for retirees. Once this limit is reached, you will be responsible for the full amount over the cap.

## Medicare Part B Reimbursement

You are responsible for paying Medicare Part B premiums for you and your Dependents, but the Company currently will reimburse you up to $46.10 per person per month.

# Enrollment Deadlines

## Initial Enrollment

Before retiring you must file a new membership form choosing or declining Health Care coverage. Your Human Resources Office will give you the form.

If no premiums are required, you and your eligible Dependents will be covered under the retiree Health Care Plans from the date of your retirement once you do file.

If premiums are required, you must file your new membership form before retiring or within 31 days of retirement for coverage to be effective from the date of your retirement. The next section explains how you enroll at a later date.

## Enrolling After Retirement

If a premium is required and you did not enroll yourself or an eligible Dependent at retirement, you may enroll within 31 days of these events, with coverage beginning on the date of the event.

- You or a Dependent are no longer eligible for coverage under your spouse's plan.
- There was a significant change in the plan offered by your spouse's employer.
- You were employed elsewhere after retiring and were covered under your employer's plan, but you lose eligibility for the plan.
- You were employed elsewhere after retiring and there was a significant change in your employer's plan.

If you enroll yourself or a Dependent at any other time, coverage may begin no earlier than the first of the month following 31 days of your membership form being received by the Health Care Membership Unit.

> **Note:** Remember that only family members eligible for your plan on the day before you retire may be enrolled after retirement. For example, if you marry after retirement, your spouse cannot be covered under your plan.

## Ending Coverage

Changes in coverage are made through the Health Care Membership Unit. The phone number and address are under the *"Plan Contacts"* tab.

# Retiree Health Care Plan Facts

| | |
|---|---|
| **Plan Name** | The Health Care Plans and the Life Insurance Plan are part of the Retiree Group Benefit Plan |
| **Employer** | Reynolds Metals Company<br>6601 West Broad Street<br>P.O. Box 27003<br>Richmond, Virginia 23261<br>Phone: (804) 281-2000 |
| **Plan Sponsor/Administrator** | Reynolds Metals Company |
| **Agent for Legal Service** | Corporate Secretary, Reynolds Metals Company |
| **Employer Identification No.** | 54-0355135 |
| **Plan Number** | 509 |
| **Type of Plan** | Group welfare plan providing health care and life insurance benefits. |
| **Collective Bargaining** | This Plan is maintained pursuant to collective bargaining agreements between the Company and various bargaining units. A copy of the applicable agreement is available for examination or a copy will be furnished to you upon request to your Human Resources Office. |
| **Plan Funding** | HMO plans are fully insured. All other Health Care Plans are self-insured plans. Retirees might pay a portion of the cost through the Company Cap Premiums. The Company pays the remainder of the cost. Company costs may be capped at the limits established under the applicable collective bargaining agreement. The Company pays benefits and administrative expenses from the Company's operating funds. |
| | Benefits under the Life Insurance Plan are provided through a Life Insurance Company (defined under the *"Life Insurance"* tab) under a group policy. Life insurance coverage is currently provided at no cost to retirees. The Company pays the administrative costs of operating the Plan. |
| **Plan Year** | January 1 through December 31 |
| **Future of The Plan** | It is hoped that the Retiree Group Benefit Plan will be continued indefinitely. However, the Plan may be changed or terminated in the future, subject to the provisions of any collective bargaining agreement then in effect. |
| **Discretion of the Plan Administrator** | Reynolds Metals Company, in its capacity as the Plan Administrator, has the discretionary authority to interpret the terms of the Plan and to decide factual and other questions relating to the Plan and Plan benefits, including without limitation questions relating to eligibility for, entitlement to and payment of benefits. |
| **Classes of Employees** | The Plans described in this handbook cover the eligible retirees noted on the title page of the handbook. |
| **Your ERISA Rights** | You are entitled to certain rights and protections under the Employee Income Security Act of 1974 (ERISA). Your ERISA rights are outlined under the *"Key Events"* tab. |

# Retiree Health Care Definitions

**Approved Out-Patient Psychiatric Facility**
The term "Approved Out-Patient Psychiatric Facility" means an administratively distinct governmental, other public, private or independent unit or part of such unit that provides out-patient mental health services and which provides for a psychiatrist who has regularly scheduled hours in the Facility and who assumes the overall responsibility for coordinating the care of adults or children of the nature of hospitals out-patient psychiatric clinics, day treatment centers, night care centers and Community Mental Health Centers as defined in the Federal Community Mental Health Centers Act of 1963. An "Approved Out-Patient Psychiatric Facility" meets standards as may be determined by the Claim Administrator from time to time.

**Basic Benefits**
Benefits covered under the Basic part of the Retiree Supplemental Plan.

**Benefit Period**
The period of time that must pass before an inpatient stay under Medicare is considered a new stay with new deductibles and day limits.

**Calendar-Year Deductible**
The amount of covered expenses you must pay each year before benefits are payable.

**Claims Administrator**
The company that pays claims under the Plan and performs other duties assigned to it by the Plan Administrator.

**Coinsurance**
The percentage of the covered expenses shared by your Plan and you. The Plan's coinsurance level is the percent of covered expenses the Plan pays. Your coinsurance level is the percent you pay.

**Company**
Reynolds Metals Company or any subsidiary this handbook applies to, as noted on the title page.

**Company Cap Premium**
An amount you may be required to pay each month for retiree health care coverage if the cost of retiree coverage exceeds the limits established under the applicable collective bargaining agreement.

**Continuous Service**
The service of an employee as determined for vacation purposes under the applicable collective bargaining agreement.

**Coordination of Benefits (COB)**
A method of considering payments made by other plans or payers when determining the benefits available under a health care plan. Coordination of Benefits prevents duplicate payments when a person may receive payment from more than one source.

**Copayment**
A flat-dollar amount that you pay for a covered service. Copayments are usually paid at the time of the service.

**Custodial Care**
Care that:

- is given mainly to help a person with personal hygiene or to perform the activities of daily living, and
- can be safely and adequately given by people who are not trained or licensed medical or nursing personnel in terms of generally accepted medical standards.

Care may be custodial regardless of who recommends, provides or directs the care and regardless of where the care is given.

# EXHIBIT D
# TO DECLARATION OF
# JOSEPH QUAGLIA

# Your Retiree Health Care Plan

Plan Highlights .................................................. 5

Eligibility ......................................................... 6
  Retirees ......................................................... 6
  Dependents .................................................... 6
    Definition Of Dependent ................................... 6
  Husband/Wife Company Employees Or Retirees ................... 7
    Husband/Wife Company Retirees ......................... 7
    Spouse A Company Employee ............................. 7

Retiree Premiums ............................................... 8
  Company Cap Premium ........................................ 8
  Medicare Part B Reimbursement ............................. 8

Enrollment Deadlines ........................................... 8
  Initial Enrollment ............................................. 8
  Enrolling After Retirement .................................... 8
  Ending Coverage .............................................. 8
    Dependent No Longer Eligible ............................. 9
    Voluntarily Ending Coverage .............................. 9

Pre-Medicare Health Care Plans ............................... 9
  Types Of Pre-Medicare Plans ................................ 9
  Claims Administrators And Customer Service ................ 9
  When You Move ............................................... 9
    Keep Address Current ..................................... 9
    Request PPO Directory .................................... 10
    Select New Primary Care Doctor ........................ 10

Medicare ........................................................ 10
  Eligibility ..................................................... 10
  Premium Costs ............................................... 10
  Enrollment Deadlines ........................................ 10
  How Medicare Works ........................................ 11
  Services Covered ............................................. 11
    Medicare Part A ........................................... 11
    Medicare Part B ........................................... 11
    Not Covered By Medicare ................................ 11

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 35 of 58   PageID #:
<pageID>

# Retiree Premiums

Currently the Company pays your health care costs after you retire. Retirees do not pay a Working Spouse Premium, but you may be required to share in the cost of coverage through a Company Cap Premium if the cost of retiree coverage exceeds the limits established under the applicable collective bargaining agreement.

## Company Cap Premium

There is a limit on future plan costs that will be paid by the Company. The limit is set at the level needed to fund the average cost for retirees as of the year 2002. Once this limit is reached, you will be responsible for the full amount over the cap.

## Medicare Part B Reimbursement

You are responsible for paying Medicare Part B premiums for you and your Dependents, but the Company currently will reimburse you up to $46.10 per person per month.

# Enrollment Deadlines

## Initial Enrollment

Before retiring you must file a new membership form choosing or declining Health Care coverage. Your Human Resources Office will give you the form.

If no premiums are required, you and your eligible Dependents will be covered under the retiree Health Care Plans from the date of your retirement once you do file.

If premiums are required, you must file your new membership form before retiring or within 31 days of retirement for coverage to be effective from the date of your retirement. The next section explains how you enroll at a later date.

## Enrolling After Retirement

If a premium is required and you did not enroll yourself or an eligible Dependent at retirement, you may enroll within 31 days of these events, with coverage beginning on the date of the event.

- You or a Dependent are no longer eligible for coverage under your spouse's plan.
- There was a significant change in the plan offered by your spouse's employer.
- You were employed elsewhere after retiring and were covered under your employer's plan, but you lose eligibility for the plan.
- You were employed elsewhere after retiring and there was a significant change in your employer's plan.

If you enroll yourself or a Dependent at any other time, coverage may begin no earlier than the first of the month following 31 days of your membership form being received by the Health Care Membership Unit.

> **Note:** Remember that only family members eligible for your plan on the day before you retire may be enrolled after retirement. For example, if you marry after retirement, your spouse cannot be covered under your plan.

## Ending Coverage

Changes in coverage are made through the Health Care Membership Unit. The phone number and address are under the *"Plan Contacts"* tab.

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 36 of 58   PageID #:
<pageID>

# Retiree Health Care Plan Facts

| | |
|---|---|
| **Plan Name** | The Health Care Plans and the Life Insurance Plan are part of the Retiree Group Benefit Plan |
| **Employer** | Reynolds Metals Company<br>6601 West Broad Street<br>P.O. Box 27003<br>Richmond, Virginia 23261<br>Phone: (804) 281-2000 |
| **Plan Sponsor/Administrator** | Reynolds Metals Company |
| **Agent for Legal Service** | Corporate Secretary, Reynolds Metals Company |
| **Employer Identification No.** | 54-0355135 |
| **Plan Number** | 509 |
| **Type of Plan** | Group welfare plan providing health care and life insurance benefits. |
| **Collective Bargaining** | This Plan is maintained pursuant to collective bargaining agreements between the Company and various bargaining units. A copy of the applicable agreement is available for examination or a copy will be furnished to you upon request to your Human Resources Office. |
| **Plan Funding** | HMO plans are fully insured. All other Health Care Plans are self-insured plans. Retirees might pay a portion of the cost through the Company Cap Premiums. The Company pays the remainder of the cost. Company costs may be capped at the limits established under the applicable collective bargaining agreement. The Company pays benefits and administrative expenses from the Company's operating funds. |
| | Benefits under the Life Insurance Plan are provided through a Life Insurance Company (defined under the *"Life Insurance"* tab) under a group policy. Life insurance coverage is currently provided at no cost to retirees. The Company pays the administrative costs of operating the Plan. |
| **Plan Year** | January 1 through December 31 |
| **Future of The Plan** | It is hoped that the Retiree Group Benefit Plan will be continued indefinitely. However, the Plan may be changed or terminated in the future, subject to the provisions of any collective bargaining agreement then in effect. |
| **Discretion of the Plan Administrator** | Reynolds Metals Company, in its capacity as the Plan Administrator, has the discretionary authority to interpret the terms of the Plan and to decide factual and other questions relating to the Plan and Plan benefits, including without limitation questions relating to eligibility for, entitlement to and payment of benefits. |
| **Classes of Employees** | The Plans described in this handbook cover the eligible retirees noted on the title page of the handbook. |
| **Your ERISA Rights** | You are entitled to certain rights and protections under the Employee Income Security Act of 1974 (ERISA). Your ERISA rights are outlined under the *"Key Events"* tab. |

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 37 of 58   PageID #: <pageID>

# Retiree Health Care Definitions

| | |
|---|---|
| **Approved Out-Patient Psychiatric Facility** | The term "Approved Out-Patient Psychiatric Facility" means an administratively distinct governmental, other public, private or independent unit or part of such unit that provides outpatient mental health services and which provides for a psychiatrist who has regularly scheduled hours in the Facility and who assumes the overall responsibility for coordinating the care of adults or children of the nature of hospitals outpatient psychiatric clinics, day treatment centers, night care centers and Community Mental Health Centers as defined in the Federal Community Mental Health Centers Act of 1963. An "Approved Out-Patient Psychiatric Facility" meets standards as may be determined by the Claim Administrator from time to time. |
| **Basic Benefits** | Benefits covered under the Basic part of the Retiree Supplemental Plan. |
| **Benefit Period** | The period of time that must pass before an inpatient stay under Medicare is considered a new stay with new deductibles and day limits. |
| **Calendar-Year Deductible** | The amount of covered expenses you must pay each year before benefits are payable. |
| **Claims Administrator** | The company that pays claims under the Plan and performs other duties assigned to it by the Plan Administrator. |
| **Coinsurance** | The percentage of the covered expenses shared by your Plan and you. The Plan's coinsurance level is the percent of covered expenses the Plan pays. Your coinsurance level is the percent you pay. |
| **Company** | Reynolds Metals Company or any subsidiary this handbook applies to, as noted on the title page. |
| **Company Cap Premium** | An amount you may be required to pay each month for retiree health care coverage if the cost of retiree coverage exceeds the limits established under the applicable collective bargaining agreement. |
| **Continuous Service** | The service of an employee as determined for vacation purposes under the applicable collective bargaining agreement. |
| **Coordination of Benefits (COB)** | A method of considering payments made by other plans or payers when determining the benefits available under a health care plan. Coordination of Benefits prevents duplicate payments when a person may receive payment from more than one source. |
| **Copayment** | A flat-dollar amount that you pay for a covered service. Copayments are usually paid at the time of the service. |
| **Custodial Care** | Care that: |
| | • is given mainly to help a person with personal hygiene or to perform the activities of daily living, and |
| | • can be safely and adequately given by people who are not trained or licensed medical or nursing personnel in terms of generally accepted medical standards. |
| | Care may be custodial regardless of who recommends, provides or directs the care and regardless of where the care is given. |
| **Day Care (Night Care) Program** | A mental health program provided for patients who spend part of a day or night in a planned treatment program in an approved therapeutic facility in a legally constituted hospital. |

30

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 38 of 58   PageID #: <pageID>

# EXHIBIT E
# TO DECLARATION OF
# JOSEPH QUAGLIA



# Total Compensation

ALCOA

# Health Care Agreement

Summary Plan Description

For active hourly emloyees pursuant to
Agreement with
United Steelworkers of America

The benefits described in this booklet are incorporated in and made a part of Article XXII-Group Insurance of the Labor Agreement between the Aluminum Company of America and the International Union, United Steelworkers of America, dated May 31, 1993. This Agreement applies to eligible hourly employees at the following plants:

- Alcoa, Tennessee;

- Badin, North Carolina;

- Bauxite, Arkansas;

- Mobile, Alabama;

- Point Comfort, Texas; and

- Rockdale, Texas.

The benefits contained in this booklet are included in the Employees Group Benefits Plan of Aluminum Company of America, Plan II. The Health Care Agreement governs your rights and obligations in accordance with the Labor Agreement.

A copy of the Employee Group Benefits Plan may be obtained by writing to the plan administrator (see *Administrative Information* for the address). You also may examine a copy of the plan during regular business hours at the Alcoa Building, Pittsburgh, PA or at your local personnel office.

When the terms "Alcoa" or "the company" are used in this booklet, they mean the Aluminum Company of America.

# Administrative Information

This section provides information about the administration of the Health Care Agreement and your rights as an eligible employee.

**Plan Administrator**

The Plan Administrator for the Health Care Agreement is:

Plan Administrator—Health Care Plan
Aluminum Company of America
Alcoa Building
425 Sixth Avenue
Pittsburgh, PA 15219–1850

**Plan Year**

January 1 through December 31

**Plan Name, Type, and Numbers**

**Plan Name**

Employees' Group Benefits Plan of Aluminum Company of America, Plan II

**Plan Type**

The Health Care Plan is a welfare plan.

**Plan Number**

503

**Employer ID Number**

25–0317820

**Plan Funding**

Health care benefits are funded by Alcoa and certain subsidiaries participating in the benefits. Benefits are not funded through insurance contracts.

**Agent for Service of Legal Process**

The Plan Administrator is the Agent for Service of Legal Process. Service of legal process also can be made upon the Administrative Committee.

**Future of the Plan**

The Health Care Agreement described in this booklet is provided for the term of the collective bargaining agreement between your union and Alcoa. The company reserves the right to make administrative changes from time to time. These changes cannot diminish the benefits negotiated under the terms of the Agreement.

**No Obligation To Continue Employment**

The plan does not create an obligation for Alcoa or a subsidiary to continue your employment. In addition, the right of Alcoa or a subsidiary to terminate your employment or to take other personnel action is not limited by the effect that the action might have on your (or your beneficiary's) eligibility for benefits under this plan.

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 42 of 58   PageID #:
<pageID>

# Medical Benefits After You Retire

Alcoa provides medical benefits for retiring hourly Alcoans.

**Overview**

Hourly retiree medical coverage currently includes:

- Managed medical, prescription drug, and behavioral health care networks; and
- Benefits paid at a higher level when network providers are used.

**Who's Eligible**

You are eligible to participate in the Hourly Retiree Medical program if you are a(n):

- Hourly employee* who retires on or after January 1, 1994, and were on the U.S. payroll of Alcoa or participating subsidiaries;
- Spouse of an hourly employee who was married prior to retirement;
- Surviving spouse of an hourly retiree, who was married prior to retirement and at least one year prior to your retired spouse's death and is covered by a surviving spouse option under the Retirement plan; or
- Surviving spouse of an active, fully vested employee who dies on or after January 1, 1994.

\* This applies to all types of retirement except Deferred Vested Retirement.

Other dependents also are eligible to participate in Hourly Retiree Medical as long as they were your dependents prior to retirement.

**How Retiree Medical Works**

One important factor determines how Retiree Medical works:

- Whether you or your spouse is eligible for Medicare when you retire.

*If you are not eligible for Medicare*—you will receive the same coverage (medical, prescription drug and behavioral health) you had as an active hourly employee.* If you retire from a location that offers an HMO to retirees, you can elect that medical coverage as long as it continues to be available.

*If you are eligible for Medicare*—Medicare coverage becomes your primary medical insurance. Alcoa's Retiree Medical, which includes behavioral health benefits, becomes the secondary plan that works in conjunction with Medicare.* Alcoa's coverage also includes the prescription drug program. Reasonable and customary limits are replaced by the Medicare-approved amounts.

You are reimbursed for your Medicare Part B premium up to $46.10 per month for you and each of your eligible dependents. You pay the Social Security Administration for Part B coverage and the company reimburses you.

\* In 1997, Alcoa will cap the amount that the company pays for your retiree medical coverage. In future years, if medical costs increase above the 1997 level, you will be required to pay the difference.

28

# EXHIBIT F
# TO DECLARATION OF
# JOSEPH QUAGLIA


**Total Compensation**

# Summary of Changes to Your Alcoa Benefit Plans

This notice contains changes to your Alcoa benefit plans as specified in the Labor Agreement, dated June 1, 1996, between the Aluminum Company of America and the United Steelworkers of America and its Locals at the following plants:

- Alcoa, Tennessee;
- Badin, North Carolina;
- Bauxite, Arkansas;
- Mobile, Alabama;
- Point Comfort, Texas; and
- Rockdale, Texas.

Please insert this notice, updated pages for your *Health Care, Sickness and Accident and Life Insurance,* and *FlexChoice and Spending Account* booklets, and your new *Retirement* booklet in your Total Compensation Binder for future reference. The new Retirement booklet replaces the one dated June 1, 1993.

| | |
|---|---|
| **Medical Benefits** | Effective June 1, 1996, the following changes apply to your Alcoa medical coverage.<br><br>• Services of a certified registered nurse anesthetist (C.R.N.A.) *are covered.*<br><br>• Expenses for radial keratotomy or any other surgery to correct refractive errors *are not covered,* unless vision is not correctable to 20/40 with eyeglasses or contact lenses. |
| **Dental Benefits** | Effective January 1, 1997, the dental plan pays 85% of the reasonable and customary charge for sealants (materials painted on the grooves and fissures of first and second permanent molars) for children under age 14 only. The plan does not cover the repair or replacement of sealant within five years of its application. This is an addition to the list of *Eligible Dental Expenses* on page 41 of your *Health Care* booklet.<br><br>Starting January 1, 1997, the lifetime **maximum benefit for orthodontia** (for dependents up to age 19) will increase to **$1,000.** The increase also applies to work-in-progress on this date. The new maximum replaces the $650 limit listed on page 40 of your *Health Care* booklet under *Dental Benefits.* |
| **Retiree Medical Coverage Cap** | Alcoa will cap the amount it pays for **retiree medical coverage on January 1, 2003,** unless the parties reach an agreement before this date, exclusive of interest arbitration. This replaces the footnote on page 28 of your *Health Care* booklet under *Medical Benefits After You Retire,* stating that Alcoa's contribution toward retiree medical coverage would be capped in 1997. |
| **Working Spouse Provision** | Effective June 1, 1996, the amount that **your spouse may earn** before you may be required to pay for his or her coverage under the Alcoa medical plan has increased to **$15,000 per year.** This replaces the $10,000 per year shown on page 4 of both the *Health Care* and the *FlexChoice and Spending Accounts* booklets. |

USW Amended Plan Features June 1, 1996

**ALCOA**

# EXHIBIT G
# TO DECLARATION OF
# JOSEPH QUAGLIA

# Medical Benefits After You Retire

Page 28A replaces page 28 in your *Health Care* booklet.

---

**Alcoa provides medical benefits for retiring hourly Alcoans.**

| | |
|---|---|
| **Overview** | Hourly retiree medical coverage currently includes: |

- Managed medical, prescription drug, and behavioral health care networks; and
- Benefits paid at a higher level when network providers are used.

---

**Who's Eligible**

You are eligible to participate in the Hourly Retiree Medical program if you are a(n):

- Hourly employee* who retires on or after January 1, 1994, and were on the U.S. payroll of Alcoa or participating subsidiaries;
- Spouse of an hourly employee who was married prior to retirement;
- Surviving spouse of an hourly retiree, who was married prior to retirement and at least one year prior to your retired spouse's death and is covered by a surviving spouse option under the Retirement plan; or
- Surviving spouse of an active, fully vested employee who dies on or after January 1, 1994.

\* This applies to all types of retirement except Deferred Vested Retirement.

Other dependents also are eligible to participate in Hourly Retiree Medical as long as they were your dependents prior to retirement.

---

**How Retiree Medical Works**

One important factor determines how Retiree Medical works:

- Whether you or your spouse is eligible for Medicare when you retire.

*If you are not eligible for Medicare*—you will receive the same coverage (medical, prescription drug and behavioral health) you had as an active hourly employee.* If you retire from a location that offers an HMO to retirees, you can elect that medical coverage as long as it continues to be available.

*If you are eligible for Medicare*–Medicare coverage becomes your primary medical insurance. Alcoa's Retiree Medical, which includes behavioral health benefits, becomes the secondary plan that works in conjunction with Medicare.* Alcoa's coverage also includes the prescription drug program. Reasonable and customary limits are replaced by the Medicare-approved amounts.

You are reimbursed for your Medicare Part B premium up to $46.10 per month for you and each of your eligible dependents. You pay the Social Security Administration for Part B coverage and the company reimburses you.

\* On January 1, 2003, Alcoa will cap the amount it pays for retiree medical coverage unless the parties reach an agreement before this date, exclusive of interest arbitration.

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 47 of 58   PageID #: &lt;pageID&gt;

# EXHIBIT H
# TO DECLARATION OF
# JOSEPH QUAGLIA



ALCOA

# Your Retiree Benefits Handbook





**Hourly**

# About This Handbook

Your benefits as an hourly Alcoa retiree continue to provide you and your family with essential services and financial security in your retirement years.

This handbook is designed to help you understand your Alcoa retiree benefits. The Life Events Guide in the front of the book is a quick and easy way to see how events in your life affect your benefits.

The handbook contains summaries of the Alcoa Retiree Medical Plan and the company-paid and optional life insurance plans available to you and your dependents. It also provides general information to help you manage your Alcoa pension benefits and Alcoa Savings Plan account (if you keep your account active after retirement). In addition, it describes how the plans are administered, how to file claims, and whom to call for help.

Your Retiree Benefits Handbook is your first resource for answers to benefits or related questions. Keep it in a convenient place for future reference.

 ## Contents

- Your Retiree Benefits at a Glance
- Life Events Guide
- Your Retiree Benefits in Detail
  - ▼ Health Care
  - ▼ Life Insurance
  - ▼ Pension Benefits
  - ▼ Savings Plan
  - ▼ General Information
  - ▼ Glossary



## Adjustment Rule

Alcoa may change the level of benefits provided under the Employees' Group Benefits Plan of the Aluminum Company of America—Plan II at any time. If a change is made, benefits for claims incurred after the date the adjustment takes effect will be paid according to the revised plan provisions. In other words, once an adjustment is made, there are no vested rights to benefits based on earlier plan provisions.

## Future of the Plan

The company expects that this plan will continue indefinitely. However, the Board of Directors or Inside Director Committee of the company can amend, modify, suspend, or terminate all or part of the plan at any time. Benefits under the plan are not vested.

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 51 of 58   PageID #: <pageID>

# EXHIBIT I
# TO DECLARATION OF
# JOSEPH QUAGLIA


ALCOA

# Your Retiree Benefits Handbook

Hourly

Case 3:06-cv-00448-PLR-CCS Document 64-1 Filed 05/29/07 Page 53 of 58 PageID #:
<pageID>

## Claims Administrators

Following is a list of claims administrators who currently handle Alcoa's benefit administration. These administrators may change from time to time. For the most updated information, call 1-888-ALCOA123.

**Medical/Behavioral Health Care**
Your medical/behavioral health care claims administrator is listed on your medical ID card.

Highmark Blue Cross Blue Shield
P.O. Box 1210
Pittsburgh, PA 15230

CNA Health Partners
P.O. Box 8070
Little Rock, AR 72203

**Prescription Drugs**
PCS Health System
9501 East Shea Boulevard
Scottsdale, AZ 85260

**Life Insurance**
Metropolitan Life Insurance Company
Group Life Claims
P.O. Box 3016
Utica, NY 13504

## Adjustment Rule

Alcoa may change the level of benefits provided under the Employees' Group Benefits Plan of Alcoa Inc., Plan II, at anytime. If a change is made, benefits for claims incurred after the date the adjustment takes effect will be paid according to the revised plan provisions. In other words, once an adjustment is made, there are no vested rights to benefits based on earlier plan provisions.

## Future of the Plan

The company expects that the plan described in this booklet will continue indefinitely. However, the Board of Directors or Inside Director Committee of the company can amend, modify, suspend, or terminate all or part of the plan at any time. In any event, all cash investments must be devoted to the purposes of the plan, including payment of expenses of the plan.

**You will be informed of any changes to the plan or how it is administered.**

# EXHIBIT J
# TO DECLARATION OF
# JOSEPH QUAGLIA

# Health Care Benefits Agreement

**Master Agreement Plan**

**Effective April 1, 2002**

Dependent children are eligible for coverage as long as they are your eligible dependents on the day before you retire and meet the eligibility requirements described under "Eligible Dependents" on pages 1-2.

If you have no eligible surviving spouse, your eligible children will be covered by the Alcoa retiree health care plan until they reach age 19.

# Medical Benefits for Pre-Medicare Retirees/Dependents

As a retiree or covered dependent under age 65 who is not eligible for Medicare, you are covered under the same medical and prescription drug coverage that you had as an active employee.* See "Medical Benefits" on pages 9-24 and "Prescription Drug Benefits" on pages 25-28 for more information.

*  On January 1, 2007, Alcoa will cap the amount it pays for retiree health care coverage unless the parties reach an agreement before this date, exclusive of interest arbitration.

# Medical Benefits for Medicare-Eligible Retirees/Dependents

Once you turn age 65 or become eligible for Medicare, your retirement health care options change. Your main medical coverage is provided through Medicare, and the Alcoa Retiree Medical Plan offers coverage to help supplement Medicare.

## How Medicare Works

Medicare benefits are divided into two parts:

Part A, hospital insurance, is provided at no cost to you.

Part B, which covers doctors' fees and other medical services, is optional and requires a monthly premium. If you enroll for this coverage, the Part B premium amount is automatically withheld from your Social Security check.

Both parts of Medicare have deductibles and copayments that are set annually by the federal government. There also are limits on the amount Medicare will pay for specific services, known as

the "Medicare-approved amount." For more information on Medicare benefits, contact your local Medicare or Social Security office.

## Your Options to Supplement Medicare

Because Medicare does not cover all of your medical expenses, the Alcoa Retiree Health Care Plan offers you several ways to supplement your Medicare coverage. When you and your spouse each becomes eligible for Medicare, you automatically are enrolled in the Alcoa Medicare Supplement Plan. Or, you may choose to enroll in a Medicare HMO, if offered in your area. Each of these options is described below. (Dependent children and surviving spouses also may be eligible if they meet the eligibility requirements described on pages 39-40.)

*Alcoa Medicare Supplement Plan*—This plan supplements Medicare benefits under both Part A and Part B and includes limited outpatient mental health coverage. In addition, it reimburses you for the Medicare Part B premium you pay each month.

*Medicare HMO*—Instead of the Alcoa Medicare Supplement Plan, you may choose a Medicare HMO if one is offered in your area. These are HMOs specifically designed to provide coverage for Medicare-eligible retirees. Benefits provided may vary widely between HMOs. Generally, Alcoa will pay the cost of your HMO coverage. However, some HMOs may require you to pay an additional premium. Since these plans are not sponsored by Alcoa, information on specific benefits must be obtained directly from the HMO.

## Covered Expenses

The chart on the next page summarizes the covered services under Medicare and the Alcoa Medicare Supplement Plan. Benefits are payable only for medically necessary care, up to the Medicare-approved amount. For more information on Medicare benefits, contact your local Medicare or Social Security office. For more information on the Alcoa Medicare Supplement Plan, call 1-800-433-9906 and press or say "2."

Case 3:06-cv-00448-PLR-CCS   Document 64-1   Filed 05/29/07   Page 57 of 58   PageID #:
<pageID>

COBRA lets you continue health care coverage in certain situations when it otherwise would end.

If you take a leave under the Family and Medical Leave Act (FMLA), eligibility for COBRA begins:

- at the end of the leave if you do not return after the leave; or
- on the date of termination if you decide to terminate your employment during the leave.

**When COBRA Coverage Ends**

COBRA coverage for a covered individual ends on the earliest of the:

- date the individual becomes covered under another plan;
- last period that premium payments are made for coverage;
- end of the 18-month, 29-month, or 36-month COBRA continuation period applicable to the qualifying event;
- date the individual becomes eligible for Medicare; or
- date Alcoa no longer provides health care coverage for any active employees.

When COBRA coverage ends, you or your covered dependents may be able to convert your coverage to an individual policy.

## Family and Medical Leave Act

The Family and Medical Leave Act (FMLA) is a federal law enacted in 1993 that provides for an unpaid leave of absence for up to 12 weeks during any 12-month period if you experience one of these events:

- the birth or adoption of a child or placement of a foster child in your home;

- a serious health condition affecting your child, spouse, or parent (does not include parents-in-law); or
- your own serious health condition.

For full details on FMLA, see the *Work & Personal Life Benefit Programs* booklet in your **Total Compensation Binder**.

## No Obligation to Continue Employment

The plan does not create an obligation for Alcoa or a subsidiary to continue your employment. In addition, the right of Alcoa or a subsidiary to terminate your employment or to take other personnel action is not limited by the effect that the action might have on your (or your beneficiary's) eligibility for benefits under this plan.

## Future of the Plan

The benefits described in this booklet are provided for the term of the collective bargaining agreement between the union and Alcoa Inc. The company reserves the right to make administrative changes to the health care plan from time to time. However, these changes cannot diminish the benefits negotiated under the terms of the agreement.

You will be informed of any changes to how the plan is administered.