# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **CHARLES CURTIS,** *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**ALCOA INC., Individually and as Fiduciary of the Employees' Group Benefits Plan of Alcoa Inc., Plan II,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civ. No. 3:06-cv-448** |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Alcoa's response to Plaintiffs' Preliminary Injunction motion hinges upon the letters that it drafted to resolve issues that it had regarding new accounting standard FAS-106 promulgated by the Federal Accounting Standards Board. Alcoa inserted these letters ("FAS-106 Letters") including their purported "caps" in the back of Collective Bargaining Agreements ("CBAs") after the signature pages beginning in 1993 and carried forward through 2006, without implementation, for over a decade. Alcoa obtained consent to insert these letters by representing to the Unions that they were merely for accounting purposes and could never affect retiree medical benefits. Now, Alcoa improperly seeks to use the same letters to justify an unlawful cutback of those benefits. Alcoa's position is incorrect in multiple respects.[1]

---

[1] Plaintiffs file herewith Exhibits A (Declaration of John Murphy), B (Dec. of Ernie LaBaff), C (Excerpts from Dan Henry Deposition), D (Excerpts from Jesse Sharber Dep.), E (Excerpts from Russell Pruitt Dep.), F (Excerpts from Terry Best Dep.), G (Excerpts from Lawrence Fountaine Dep.), H (Excerpts from Stephen Barse Dep.), I (Excerpts from Dennis Macy Dep.) and J (Unreported Cases). Plaintiffs are also filing a Supplemental Declaration of Counsel. Plaintiffs moved for leave to file this brief in excess of 25 pages on June 5, 2007 and have been advised by

1

***First***, the documents show vesting unambiguously in favor of Plaintiff and provide vested lifetime retiree healthcare benefits. In the alternative, at a minimum, the documents are ambiguous, allowing the Court to consider extrinsic evidence which favors Plaintiffs. The main text of the CBAs and SPDs states that Alcoa will pay the full cost of retiree healthcare benefits. The documents on which Alcoa relies in their argument to not pay the full cost are the FAS-106 Letters. Those are letters of understanding not included in the CBAs themselves but added after the signature pages. Such letters of understanding were not binding, merely provided guidance, and indeed could not be arbitrated. Further, the language of the letters cannot be construed to imply any agreement by Plaintiffs while active to give up their vested retiree welfare benefits because the text of the main CBAs specifically states that nothing in the agreement shall be construed as giving up their legally protected rights, such as rights to vested welfare benefits under ERISA and the LMRA. The FAS-106 letters are also inherently ambiguous. For instance, if effective, they leave unclear whether Alcoa would cap its annual contributions to create a fixed per person contribution or to create a total unchanging annual contribution amount by Alcoa. The main documents relating to welfare benefits also contradict the language of the letters, if effective—which Plaintiffs contend they are not. The CBAs and SPDs say benefits will only end at death. The CBAs and SPDs state that benefits cannot be reduced. The plan documents tie retiree medical to pension entitlement. All of these facts of vesting, and other facts enumerated below, conflict with an understanding of the FAS-106 Letters as being enforceable to allow reduction of retiree medical benefits. Plaintiffs' additional evidence includes both "top table" negotiators including the past Union President and many others whose testimony is consistent that

the Clerk to file this brief today and that the Court will review the motion for excess pages in due course.

2

Alcoa stated the letters were only for accounting purposes. Plaintiffs' evidence includes admissions against interest by key Alcoa representatives to this effect. Thus, the evidence is unambiguous in favor of Plaintiffs that they have vested benefits until death. In the alternative, the documents are at a minimum ambiguous as to intent, allowing extrinsic evidence which shows that the welfare benefits were intended to vest.

*Second,* the Plaintiffs never voted during their active employment on a cap intended to be implemented. Rather, their Union representatives, including those at the "top table," intended and were told by Alcoa the opposite. From 1992 until June of 2006, the vast majority, if not all, of the Plaintiffs belonged to the United Steelworkers of America ("USW") or the Aluminum, Brick, and Glassworkers Union ("ABG") Unions. Two of ABG Union's "top table" representatives provide declarations filed with this reply. John Murphy was the ABG Union's head negotiator at the top table for the 1993, 1996, and 2001 CBA negotiations. Ernie LaBaff was the ABG Union President during the 1993, and 1996 negotiations and signatory to the 1993 and 1996 FAS-106 Letters. Both testify they agreed to include the FAS language based on Alcoa's representations that it was only for accounting purposes and could not be implemented against retirees. They based their understanding on the clear representations made to them by Alcoa and Reynolds Metals Company ("RMC"), upon which they relied in signing the letters.

*Third,* Alcoa is incorrect that it is merely attempting to enforce agreed-upon contract rights. The rights Alcoa seeks to enforce were never agreed upon. The parties' course of conduct over more than a decade precisely matches what Plaintiffs' witnesses state the company told them: that the FAS "cap" was merely an accounting measure that would never be enforced and instead would just be rolled forward from year to year. Further, the documents in this case,

3

including the CBAs, and the SPDs incorporated by reference therein, reflect Plaintiffs' right to have the same retiree health care benefits they received when they retired until they die. Far from unambiguously favoring Alcoa, the plan documents favor Plaintiffs' claim of vested rights to their retiree health care benefits. This is especially so in light of Sixth Circuit law protecting retiree rights to such benefits in the Union context.

*Fourth*, only Union members who are active employees today – not any of the Plaintiffs who have already retired -- agreed to the 2006 CBA changes. Under the circumstances, their agreement can only bind <u>active</u> employees who <u>voted</u> for the 2006 CBA and will retire after January 1, 2007. As noted, under the law, the Union does not represent retirees after retirement absent post-retirement permission to do so. In addition, vested retiree benefits cannot be reduced without the agreement of retirees, even by subsequent CBAs between the Union and the employer. The fact that Alcoa was successful in pressuring active employees and Union members to let Alcoa seek to reduce the rights to retired employees who had no say or vote is immaterial. As clearly stated in the case law, the Union cannot agree to reduce its retired members' benefits without explicit permission to do so. If Alcoa agrees with the Union for said purpose, then Alcoa merely agrees with an unauthorized representative who has no more authority to waive retirees' vested benefits than the man on the corner selling newspapers. As such, Alcoa, as sole plan sponsor and fiduciary, has unlawfully unilaterally reduced Plaintiffs' benefits by failing to bargain directly with Plaintiffs or obtain their consent. Plaintiffs did not give permission to the Union to agree on their behalf to Alcoa's reduction of their retiree benefits after they retired.

*Fifth*, Plaintiffs have clearly shown the type of harm supporting an injunction. Their evidence, including both the number and contents of their affidavits, is on par with that typically

found by Sixth Circuit courts to support the grant of a preliminary injunction in other cases.

As such, Plaintiffs have shown that they are more likely than not entitled to these benefits and the weight of the testimony and evidence is in their favor. They also have shown that in weighing the harms, Plaintiffs, including sick retirees and surviving spouses under a great deal of anxiety as a result of Alcoa's acts, will suffer irreparable harm in contrast to Alcoa, a large financially sound corporation with billions of dollars in annual profits. As such, the balance of the scales tilts in Plaintiffs' favor.

The Union is not a party to this lawsuit. As stated in the Union's 2006 summary of the adoption of the new CBA, the Union was reluctant to engage in an "all or nothing" battle over the company's implementation of the cap. (A copy of the 2006 CBA Summary is attached as Ex. N to Mr. Quaglia's Declaration [docket no. 64-3]). Given the Union's responsibility to active employees, this is understandable. As discussed below, retirees cannot vote in the Union, and under Supreme Court precedent are not represented by the Union. Although the Union decided not to force this "all or nothing" issue, the Plaintiffs and retirees herein have no choice but to do so. Thus, as in other cases in which only retirees and not a union sued an employer for improper reduction of vested benefits, in this case the retirees themselves have sued Alcoa.[2]

## I. ADDITIONAL FACTS

Plaintiffs reiterate the facts stated in their initial brief and the exhibits thereto. As there has been some discovery since that time, Plaintiffs submit additional facts below.

---

[2] *See Wood v. Detroit Diesel Corp.*, 2007 WL 128772 (6th Cir. Jan. 17, 2007) (retirees alone sued); *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006) (same); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) (same); *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243 (6th Cir. 1996) (same); *Bailey v. AK Steel Co.*, 2006 WL 2727732 (S.D. Ohio Sept. 22, 2006) (same); *Deboard v. Sunshine Min. & Refining Co.*, 208 F.3d 1228 (10th Cir. 2000) (same).

5

Plaintiffs are former employees who worked at Alcoa or RMC (or are surviving spouses) at plants located in New York, Indiana, Kentucky, Iowa, North Carolina, Oregon, Texas, Arkansas, Washington, Louisiana, Pennsylvania and Tennessee. From 1992 until 2006, almost all of the Plaintiffs belonged to the USW or the ABG Unions. The ABG Union did not merge with the USW until on or about 1997, well after many of the RMC and Alcoa CBAs were entered into. (Murphy Dec. ¶ 3, attached as Ex. A). The presence of the ABG Union is critical in that in its brief Alcoa states that Plaintiffs lack "top table" witnesses. This is contradicted by two ABG witnesses directly involved in the highest-level, "top table" negotiations:

### John Murphy Declaration

John Murphy was Chief Negotiator for the ABG Union during the 1993 and 1996 CBA negotiations between Alcoa and the ABG Union. (Murphy Dec. ¶ 3). He participated in all "top table" negotiations regarding the 1993 Master CBA and was there when the FAS-106 Letter was discussed. (Id. ¶ 5). He was told by Alcoa and RMC representatives during the 1993 negotiations that the letter was solely for accounting or bookkeeping purposes. (Id.). He was told it would never be enforced or implemented against retirees. (Id.). He reported this information to ABG President Ernie LaBaff. (Id.). His Union negotiated jointly with the USWA. (Id.). What he was told, both Unions were told. (Id.). Mr. Murphy was a signatory to the 1993 CBA. (Id. ¶ 6). He signed it relying on Alcoa's and RMC's representations that the letter could never be used against the retirees, and would not have signed it had he known or been told otherwise. (Id.).

Mr. Murphy was also present during the 1996 CBA negotiations. (Id. ¶ 6). Once again he was at the top table. (Id.). Very little was said about the 1996 FAS-106 Letter. (Id.). This was

6

because the parties had already agreed back in 1993 that the letter was simply for accounting purposes and would not be used against retirees. (Id.). Mr. Murphy was a signatory to the 1996 CBA. (Id. ¶ 6). Once again, he signed the CBA relying on Alcoa's and RMC's representations that the FAS-106 Letter could never be used against the retirees, and would not have signed had he known otherwise. (Id.).

In 1997, after the merger of USW and ABG Unions, Mr. Murphy became the Director of the Aluminum Brick and Glass Division of the USW.[3]   (Id. ¶ 7). He was involved in the top table negotiations for the 2001 CBA. (Id.). Consistent with Alcoa's[4] representations in years past that the FAS-106 Letter was merely for accounting, it was moved forward into the 2001 CBA. (Id.). Mr. Murphy signed the 2001 CBA relying on Alcoa's representation that the letter could never be used against the retirees, and would not have signed it otherwise. (Id. ¶ 6).

### Ernie LaBaff Declaration

Ernie LaBaff was President of the ABG Union from 1985 until 1997. (LaBaff Dec. ¶ 2, attached as Ex. B). He signed each CBA between Alcoa and the ABG Union during that time. (Id.). In the 1993 CBA negotiations he was told that Alcoa needed to include the FAS-106 Letter but that it would never be enforced. (Id. ¶ 3). He was told that it was just for bookkeeping or accounting purposes. (Id.). Consistent with that understanding, he signed the letter and the letter was moved forward into each succeeding CBA over the years. (Id.).

Mr. LaBaff testifies that the only reason he allowed the FAS-106 Letter to be included in the back of the CBA for the ABG Union in 1993 was because Alcoa and RMC assured the Union

---

[3] The ABG Union merged with the USW after the date of the 1996 CBA. (Murphy Dec. ¶ 3).

[4] RMC merged into Alcoa in 2000. *See Sworden v. Reynolds Metals Co.*, 2005 WL 1389073, *1 (D. Or. June 08, 2005) (so stating).

that the letter would be for accounting purposes only and could never be used to limit retiree benefits. (Id. ¶ 4). Without this representation, Mr. LaBaff would never have agreed to sign the FAS-106 Letter or allow it to be attached to the 1993 CBA. (Id.). He was an actual signatory to the 1993 FAS-106 Letter. (Id. and see Ex. 1 to LaBaff Dec.). Mr. LaBaff also signed the 1996 FAS-106 Letter. (LaBaff Dec. ¶ 4 & Ex. 1). He signed those letters relying on Alcoa's and RMC's representations that they could not be used to affect retirement benefits. (Id. ¶ 4).[5]

Alcoa has deposed certain of the Plaintiffs and former Union officials. Some of their testimony is summarized below.

***Daniel Henry Deposition*** -- Daniel Henry worked for Alcoa from 1970 until when he retired from Alcoa in 2004. (Henry Dep. p. 12 ll. 4-8, 18-25). He testified that in 1992 contract negotiations, the issue of the FAS-106 rule came up, but was not dealt with at that time. (Id. p. 25 ll. 24-25, p. 26 ll. 1-12; see also p. 34 ll. 4-21). The issue was brought back up in 1993. "Alcoa in 1993 asked for relief from the FASB . . . and the steelworkers gave them that relief, and the company says that will never be used against you; it's for accounting purposes only." (Id. p. 23 ll. 10-14; see also p. 36 ll. 20-24, p. 38 ll. 3-15). Mr. Henry did not deal with the top table, but with the benefits negotiating table. (Id. p. 39 ll. 15-19). He was told by union representatives that the cap letter would never be implemented. He was also told this by the company representative. (Id. p. 43 ll. 14-25, p. 44 ll. 1-25). The letter "was meant to do whatever was required under FASB . . . it was merely meant to comply as a technicality." (Id. p. 73 ll. 2-4). "I've heard the company say that this FASB . . . requires some kind of disclosure related to their liabilities . . .

---

[5]Both Mr. Murphy and Mr. LaBaff were shocked to hear that Alcoa now contends it has the right to reduce benefits. (LaBaff Dec. ¶ 6; Murphy Dec. ¶ 9).

and that this letter resolved that issue." (Id. p. 94 ll. 10-16). When "we negotiated a new contract, the cap letter would automatically go forward." (Id. p. 45 ll. 17-23). The letter "would continue to roll or move forward with each subsequent negotiation, with each subsequent new contract." (Id. p. 48 ll. 5-10; p. 50 ll. 6-9). "In the 1996 contract negotiation that was reiterated." (Id. p. 23 ll. 16-17). In 1996 "the cap letter was dealt with without what I call anything more than passing comments; you know, we're going to continue with the letter in the back of the book, so on and so on." (Id. p. 27 ll. 11-15; see also p. 57 ll. 20-22, p. 106 ll. 19-25, p. 107 ll. 1-12).

"In meetings subsequent to the negotiations of 1996, the union and the company jointly acknowledged the purpose of that letter: for accounting purposes only; would never be implemented." (Id. p. 23 ll. 18-21; see also p. 60 ll. 2-8). It was a "non-issue." (Id. p. 54 ll. 24-25, p. 55 ll. 3-4, p. 108 ll. 3-6). "[T]he parties in one of those meetings, you know, once again reviewed the cap letter, and once again the parties were acknowledging that, yep, it was for accounting purposes only, never be implemented…." (Id. p. 27 ll. 24-25, p. 28 ll. 1-2).

> In 2001 Alcoa brought to the negotiations in Nashville a Mr. Tom Mordowanec, who attempted to deny the commitment around that letter. I for one told Mr. Mordowanec that he needed to go back and review the history of that letter, and I told him what my history with it was. <u>Mr. Mordowanec subsequently came back and said that he reviewed that with whomever in the company -- he didn't identify them by name -- but that Dan Henry was correct</u>. In the actual negotiations that brought forth a new contract in 2001, that letter once again was carried on.

(Id. p. 23 ll. 22-25, p. 24 ll. 1-7; see also p. 35 ll. 24-25, p. 36 ll. 1-6, emphasis added). Mr. Mordowanec was not at the 1993 negotiations; Mordowanec thought the cap could be implemented; Henry "gave him the history back to '93;" Henry asked Mordowanec "to review the matter with his people;" Mordowanec did so and came back and said "yes, he had reviewed it with his people, and that what I had said about the '93 understanding was, in fact, correct." (Id. p.

9

112, ll. 13-25, p. 113, ll. 1-25).

"In 2005 in the attempt to negotiate a new contract, Mr. Mordowanec once again acknowledged the commitment of that 1993 letter, but at that point Mr. Mordowanec said the company is no longer interested in continuing that. And I said, Mr. Mordowanec, that won't work. Mr. Mordowanec even went so far as to state that he knew that the steelworkers had taken less wage increases to pay for our benefit package." (Id. p. 24 ll. 8-15). But in 2006 "they forced active employees to vote whether or not to ratify a contract that took away what I had always understood was mine, what the company had always acknowledged was mine." (Henry Dep. p. 24 ll. 23-25, p. 25 l. 1).

***Jesse Sharber Deposition*** -- Mr. Sharber worked for Alcoa from 1980 until 2006 in maintenance. (Sharber Dep. p. 8 ll. 15-25, p. 9 ll. 1-10). He heard of the FAS-106 Letter in the 1993 negotiations. (Id. p. 34 ll. 9-11). At a meeting, Harvey Martin said "that letter is for accounting purposes only and would never be enforced or used against us." (Id. p. 42 ll. 15-24). Mr. Martin was the financial secretary for the Union. (Id. p. 43 ll. 22-24). In the 1996 negotiations, Mr. Sharber was told "they had updated that letter and moved it forward." (Id. p. 46 ll. 15-20). In 2001, the Union said Alcoa had raised an issue about retirees paying a portion of health care premiums, but then withdrew the issue. (Id. p. 48 ll. 1-25, p. 49 ll. 1-24).

His understanding was that Alcoa "wanted that language for accounting purposes." (Id. p. 52 ll. 8-11). When he read the letter in 2001, "believing that the wording was to deal with Alcoa's accounting issue and understanding that it was for accounting purposes only, that was my thought process as I read it." (Id. p. 53 ll. 8-14). "If people retired under this agreement that the letter came under, they would not be forced to pay any premiums." (Id. p. 59 ll. 10-12). As to

whether he thought the cap language was clear, Mr. Sharber testified that "[w]hat was clear to me . . . is this language was put there for the purpose of Alcoa dealing with some accounting purposes." (Id. p. 95 ll. 17-23).

**_Russell Pruitt Deposition_** -- Mr. Pruitt worked as a mechanic for Alcoa. (Pruitt Dep. p. 15 l. 18). He was involved in CBA negotiations on behalf of the union local. (Id. p. 45 ll. 8-11). He heard about the "cap agreement" at the 1993 negotiations when they were voting on the contract. (Id. p. 60 ll. 9-21). Union representative Joe Kiker said the cap "is for Alcoa's interests; it's for bookkeeping purposes only." (Id. p. 64 ll. 22-24). Because it was "for bookkeeping purposes," the Union did not strike over the issue as it had back in 1986 when Alcoa sought to "cut our medical." (Id. p. 119 ll. 2-15). "That was a sacred item to us, we would give up other benefits" for it. (Id.). The 1986 strike had to do with proposed cuts in health care for active employees; "it wouldn't have been for retirees, because they were always locked in." (Id. p. 123 ll. 4-14).

**_Terry Best Deposition_** -- Mr. Best was another Union retiree witness. His understanding of the cap agreement was that it was "for bookkeeping purposes – and the bookkeeping purposes weren't going to affect retirees' health care benefits." (Best Dep. p. 55 ll. 21-24). He read the cap letter in 1993. (Id. p. 57 ll. 14-15). He read it to be "pertaining to bookkeeping." (Id. p. 58 ll. 3-9). He heard about it in the 1993 negotiations; what he heard was references in discussions to "cap language," questions about what it meant, and the answer was that "it's for accounting, bookkeeping, not to affect retirees' health care." (Id. p. 62 ll. 6-8).

**_Lawrence Fountaine Deposition_** -- Mr. Fountaine worked for Alcoa for 38 years through 2004 when he retired. (Fountaine Dep. p. 14 ll. 19-25). He held positions as business agent and president of the union local through the 1993 and 1996 contract negotiations. (Id. p. 16 ll. 2-19).

11

There was no discussion of anything related to a cap in the 1986 and 1988 CBA negotiations. (Id. p. 27 ll. 3-19). He first heard about a cap in the 1993 negotiations. (Id. p. 33 ll. 16-25). A company representative read the FAS-106 Letter. (Id. p. 35 ll. 4-25, p. 36 ll. 1-12). Mr. Fountaine questioned what the letter meant:

A: My question is what is this, where did this come from?

Q: And what answer did you get?

A: The answer to me was don't worry about it. All this is for is accounting purposes only. We've had an issue with the federal government, they feel that we're not being up front with our stockholders and people because of the ongoing liability with health care, and this is just a major tracking device to do that. And I said well, why is it here, and they said well, that's why we put it in the back of the book. It's after the signatures of the contract, which doesn't give it any weight, and it will never be used against you.

Q: What did -- It will what?

A: It will never be used against you.

(Id. p. 36 ll. 23-25, p. 37 ll. 1-21, emphasis added). "They said it was after the signature of the contract, and we all knew basically what that meant . . . Any of us that had been around the contracts or been in the arbitration, you could not arbitrate anything after the signature part of the contract because they did not carry anything." (Id. p. 40 ll. 9-15). The representation that it was for accounting purposes only was repeated at a meeting the next day. (Id. p. 42 ll. 14-24).

In 1996, "the date was changed then because of the new contract." (Id. p. 44 ll. 19-20, see also p. 51 ll. 2-7). The next time Mr. Fountaine heard of the cap was in the 2001 negotiations. (Id. p. 53 ll. 3-5). He heard that company representative Tom Mordowanec had brought up the issue. The union people told Mr. Mordowanec they had been told it would never be implemented.

Mr. Mordowanec said he would check it with his people. Mr. Mordowanec came back the next day and said the Union representatives were correct. (Id. p. 54 ll. 2-10, p. 56 18-23).

***Stephen Barse Deposition*** -- Mr. Barse testified that the cap issue first came up in the 1993 negotiations, when Mr. Fountaine raised concerns about what the "letter of intent" meant. (Barse Dep. p. 29 ll. 23-25, p. 30 ll. 1-11, p. 32 ll. 6-7). His concerns were "eliminated when it was delivered as a letter of intent because it appeared beyond the signature of the CBA." (Id. p. 34 ll. 2-6). This took it out of the scope of arbitration. (Id. p. 36 ll. 19-22). "Any letters of intent beyond the signature page through a grievance process or an arbitration are not allowed to be used as a supporting document." (Id.). Thus a letter of intent was merely "an understanding that we will, to the best of our ability, fulfill these letters." (Id. p. 37 ll. 13-15). Further at the "wrap-up" session, Mr. Barse was assured that the letter was "drafted for . . . accounting purposes and that it would serve no harm for us. It was for Alcoa's accounting mechanisms." (Id. p. 37 ll. 21-25, p. 38 ll. 1-6). In the 2001 negotiations, Alcoa spokesman Tom Mordowanec said Alcoa wanted to implement the cap. (Id. p. 60 ll. 1-7). The Union representatives responded that the prior understanding was it would never be implemented. (Id. p. 61 ll. 19-25). Mordowanec went and conferred with his people. He then returned and said "the intent of the letter was not to be imposed on us, and that  . . . it was for purposes of accounting." (Id. p. 62 ll. 2-20).

On past occasions, from time to time the company would want to move a given letter of intent from behind the signatures in the CBA, into the CBA. (Id. p. 63 ll. 6-20). The company did not seek that in 2001. (Id. and see p. 67 ll. 10-23). Letters of intent "were not a part of the CBA. They were letters inserted in the . . . back of the book that would provide in some instances guidance, uncommitted commitments, if that's proper." (Id. p. 77 ll. 13-20).

13

***Dennis Macy Deposition*** -- Mr. Macy retired from Alcoa in 2004. (Macy Dep. p. 7 ll. 7-8). He recalled negotiations from 1993. (Id. p. 12 ll. 4-11). The Union's chief negotiator at the "big table" [aka the top table] was John Murphy. (Id. p. 23 ll. 7-9). Mr. Macy's understanding of the cap was "it would never affect our benefits." (Id. p. 27 ll. 17-23). It was "for accounting purposes only." (Id. p. 28 ll. 22-24). He recalled a company representative explaining at a meeting that "it would not affect our benefits." (Id. p. 57 ll. 10-20, p. 58 ll. 6-9). Before he retired, he met with company benefits administrator Nancy Pointe and asked her if his retirement benefits were for his lifetime, and she said they were. (Id. p. 81 ll. 4-13, p. 84 ll. 2-10).

## II. ARGUMENT

Plaintiffs have introduced testimony by two "top table" Union negotiators as well as other Union members privy to negotiations whose testimony is consistent that Alcoa told them that the cap letters were for accounting purposes only and could never be used to reduce retiree medical benefits. That was the parties' understanding in 1993 when the first FAS-106 Letter was introduced; it was the understanding in 1996 when the letter was rolled-over into the new CBA; and it was the understanding again in 2001 when the letter was rolled-over again. Plaintiffs have introduced testimony that when a new company negotiator, Tom Mordowanec, became involved in 2001 and read the letter to mean otherwise, he was told by the Union to check with his colleagues as to what was the original understanding in 1993, and he returned and <u>agreed</u> that was the understanding.[6] This was the context in which the contract was formed; it was also the parties' course of conduct because indeed, the cap was never enforced but simply renewed in 1996 and 2001, consistent with the Plaintiffs' understanding of its meaning.

---

[6] That is an admission against interest admissible under Fed. R. Evid. 801(d)(2).

14

Further, the FAS Letters are ambiguous on their face and in the context of the rest of the CBAs and other plan documents. On their face the letters are ambiguous because they do not clearly state how the cap, if any were intended, would be calculated—for example, whether the company would cap the amount it pays annually for each retiree or would put a cap on the total amount it paid annually. This ambiguity is consistent with the parties' intent not to actually institute the cap. The letters are also ambiguous in context of the CBAs to which they are attached, as well as the SPDs, because those plan documents are replete with language supporting the *Yard-Man* inference that retiree and surviving spouse benefits vested. Because of these ambiguities, the Court may consider extrinsic evidence, the balance of which favors Plaintiffs.

## 1. Plaintiffs Have Shown A Clear Intent to Vest.

The main text of the CBAs and SPDs says Alcoa will pay the cost of retiree medical benefits. The FAS-106 Letters are letters of understanding not included in the CBAs themselves but added after the signature pages, they had no effect beyond accounting purposes and could not be arbitrated.[7] Further they were ambiguous. For example they leave unclear whether Alcoa will cap its annual contributions per person or its annual total contributions. They do not expressly state that the Union in 2006 could bargain for retirees.[8] They conflict moreover with vesting

---

[7] The company said "this is for accounting purposes only. . . And I said well, why is it here, and they said well, that's why we put it in the back of the book. It's after the signatures of the contract, which doesn't give it any weight, and it will never be used against you." (Fountaine Dep. p. 36 ll. 23-25, p. 37 ll. 1-21). "They said it was after the signature of the contract, and we all knew basically what that meant . . . you could not arbitrate anything after the signature part of the contract because they did not carry anything." (Id. p. 40 ll. 9-15). Mr. Barse's noted the "letter of intent . . . appeared beyond the signature of the CBA." (Barse Dep. p. 34 ll. 2-6).

[8] *Cleveland Elec. Illum. Co. v. Util. Workers Union*, 440 F.3d 809, 817-18 (6th Cir. 2006) ("In order to arbitrate a retiree's benefits, the Union must obtain the consent of the retiree."); *UAW v. Ransom & Randolph*, 2006 WL 991057, *2 (N.D. Ohio April 13, 2006) ("Local 12 needed the

language in the main body of the CBAs and SPDs which state benefits will only end at death, that benefits cannot be reduced, and that tie retiree medical benefits to pension entitlement. All of these facts conflict with any purported understanding of the FAS-106 Letters as being enforceable to allow reduction of retiree medical benefits—and all of these facts are consistent both with Plaintiffs' own "top table" negotiators and Alcoa's own admissions against interest that the letters were only for accounting purposes only.[9]

It is clear the documents indicate that Plaintiffs have vested benefits until death. The evidence after discovery to date continues to show, without limitation, that:

- The 1993 and 1996 RMC CBAs <u>do not even have</u> the FAS-106 Letters in them. (Supp. Dec. Exs. 15-16). As noted above, the RMC-Alcoa merger did not occur until 2000.

- The Alcoa SPDs for 1979, 1981, 1986, 1997, 2001 and 2002, state that benefits <u>end at death</u>. (Id. Ex. 17 p. 37, Ex. 18 p. 53, Ex. 19 p. 53, Ex. 21 p. 19, Ex. 22 p. 7, Ex. 23 p. 39). *See* 1997, 2001, and 2002 Alcoa SPDs stating "[y]our health care coverage ends on the date of your death." (Id. Ex. 21 p. 19, Ex. 22 p. 7, Ex. 23 p. 39).

- The 1981, 1986, 1993, 1997, 2001, 2002 Alcoa SPDs allow for surviving spouse and dependant coverage after the death of a retiree, indicating that coverage for retirees lasts until death. (Id. Ex. 18 p. 11, Ex. 19, p. 11, Ex. 20 p. 28, Ex. 21 pp. 11, 15, Ex. 22 pp. 5, 7, Ex. 23 p. 39).

- Alcoa SPDs and CBAs <u>tie retiree medical benefits to eligibility for the pension plan</u>. *See* 1997 Alcoa SPD (Id. Ex. 21, p. 15); 2001 Alcoa SPD (Id. Ex. 22, p. 5), 1980 Alcoa CBA (Id. Ex. 2, p. 71), 1983 Alcoa CBA (Id. Ex. 4, p. 70), 1986 Alcoa CBA (Id. Ex. 6, p. 97), 1988 Alcoa CBA (Id. Ex. 8, p. 98), 1993 Alcoa CBA (Id. Ex. 9, p. 118), 1996 Alcoa CBA (Id. Ex. 10, p. 107), 2001 Alcoa CBA (Id. Ex. 12, p. 58).

- Alcoa CBAs and SPDs indicate that the <u>full welfare benefits plan costs will be paid by Alcoa</u>. (Id. Ex. 2 p. 72 (benefits "will be provided without cost to . . . retirees"); Ex. 20 p.

---

retired workers' consent to represent them.").

[9](See Murphy Dec.; LaBaff Dec.; Daniel Henry Dep. pp. 43-44 (company representative said letter unenforceable), pp. 23-24, 35-36, 112-13 (company representative Tom Mordowanec said Dan Henry's understanding was correct); Dennis Macy Dep. pp. 57-58 (company representative explaining at a meeting that "it would not affect our benefits")).

16

47 ("Health care benefits are funded by Alcoa"); Ex. 21 p. 1 ("Generally, Alcoa pays the cost of the Alcoa Retiree Medical Plan.") and p. 17 (same); Ex. 22 p. 6 ("Generally, Alcoa pays the cost of the Alcoa Retiree Medical Plan for you and your eligible dependants."); Ex. 23 p. 39 ("Generally, Alcoa pays the cost of retiree health care coverage for you and your eligible dependants.")).

- The 2002 Alcoa SPD for the retirement medical plan refers to "the surviving spouse of an active <u>vested</u> employee," language confirming that employees did become vested in their retiree health care benefits while still employed by Alcoa. (Id. Ex. 23 p. 39). Likewise the 2001 Alcoa SPD says the same, (id. Ex. 22 p. 5), as does the 1997 SPD (id. Ex. 21 p. 15). The 1993 Alcoa SPD refers to "the surviving spouse of an active, fully vested employee." (Id. Ex. 20 p. 28).

- The Alcoa SPDs dated 1979, 1981, 1986, 1993, 1997, 2001 and 2002 promise coverage of employees after they are eligible for Medicare, which could be 5 years or more <u>after</u> the employee retires, and this indicates an intent to vest, otherwise such promises would be illusory. (Id. Ex. 17 p. 23, Ex. 18 p. 36, Ex. 19 p. 36, Ex. 20 p. 28, Ex. 21 p. 18, Ex. 22 p. 6, Ex. 23 p. 40).

- The Alcoa SPDs dated 1997, 2001 and 2002 give surviving spouses benefits through <u>their</u> deaths. (Id. Ex. 21 p. 19, Ex. 22 p. 7, Ex. 23 p. 39).

- The 1993 Alcoa CBA states that "[n]o employee covered by this Article <u>shall suffer any reduction in the level of the several health-care benefits</u> of this Article." (Id. Ex. 9 pp. 120-21). The 1996 Alcoa CBA for the USW Union states the same (id. Ex. 10 p. 109), likewise the 1996 Alcoa CBA for the ABG Union (id. Ex. 11 p. 64) and the 2001 Alcoa CBA (id. Ex. 12 p. 58).

- None of the CBAs and the neither the 1993 nor the 2002 SPD reserved the right to terminate or amend the health care benefits. (Id. Exs. 20, 23). Rights reserved in the other SPDs track the language in the pension plan SPDs—pension plans which are vested by law--and so therefore, under case law, say nothing about an intent to vest. In addition, these reservations do not apply specifically to retiree benefits, but are contained at the back of lengthy SPDs addressing both active employee and retiree welfare benefits.

- There is no specific durational language by which time retiree benefits would expire in the CBAs or SPDs.

If the provisions cited by Plaintiffs in their initial brief and above do not constitute, in this Honorable Court's judgment, an unambiguous intent to vest, they at the very least create a clear ambiguity as to intent which requires inspection of extrinsic evidence of intent. *International Union v. Yard-Man, Inc.*, 716 F.2d 1476, 1480 (6th Cir. 1983).

17

Alcoa's reliance on *Sprague v. Gen. Motors Corp.,* 133 F.3d 388 (6th Cir. 1998) for their proposition that there is no ambiguity is misplaced. *Sprague* is distinguishable from the case at bar because *Sprague* addresses only a retiree welfare benefit plan *unilaterally* instituted by an employer, not bargained-for Union benefits.[10] *See also Maurer,* 212 F. 3d at 917 (distinguishing *Sprague* on the basis that it was a unilaterally instituted plan and did not deal with a CBA).[11]

Alcoa's attempts to rely on *Bittinger v. Tecumseh Products Co.,* 83 F.Supp.2d 851 (E.D. Mich. 1998) and *UAW v. Cleveland Gear Corp.,* 1983 WL 2174 (N.D. Ohio 1983) are ineffective. Both cases have been distinguished by cases similar to the case here. *See Yolton*, 435 F.3d at 581-82 and *Yolton*, 318 F.Supp.2d at 467-68. In Alcoa's cited cases there was no language indicating vesting -- no duration of benefits until death, no indication that costs will be paid by the employer, no linkage of eligibility for retiree health care to pension benefits, no discussion of retiree benefits changing only on receipt of Medicare, no language about benefits to surviving spouses, etc.[12] The

---

[10] In fact, *Sprague* has been distinguished on these grounds from subsequent Sixth Circuit cases which deal with the question of vested retiree welfare benefits provided by a CBA or through collective bargaining. For example, the year after *Sprague* was decided, the Sixth Circuit revisited that decision in *Internat'l Union v. BVR Liquidating, Inc.,* 190 F.3d 768 (6th Cir. 1999). That court clarified that the inference in *Yard-Man* was specifically intended to apply to CBAs as opposed to plans unilaterally instituted by a company. *Id.* at 773. The Sixth Circuit distinguished *Sprague* on the grounds it dealt with no CBA; the CBA in *BVR,* just like the CBA here, did not contain reservations of rights to unilaterally modify or terminate the agreement. *Id.*

[11] It is baffling that Alcoa tries to rely on *Miles v. Alcoa Inc.,* No. 3:06-cv-131 (E.D. Tenn. 2006). The *Miles* settlement and the suit itself are irrelevant. Not only did *Miles* deal only with employees at shut-down plants, but it never became a certified class action and never received a judgment from the court. Most of the current Plaintiffs are not from shut-down plants and none were parties to *Miles*. As such, *Miles* has no bearing on the current case.

[12] "[T]he district court in the instant case noted that the agreements in *Cleveland Gear* did not contain language that tied health insurance benefits to pension benefits as is the case here. Likewise, the agreements in *Bittinger* were devoid of any language that tied health insurance benefits to pension benefits." *Yolton,* 435 F.3d at 582.

18

courts have found all these factors indicative of vested benefits; the Alcoa retirees' relevant CBAs and SPDs contain such language.[13]  Plaintiffs have quoted a plethora of such language.[14]

The Southern District of Ohio has also recently ruled that durational clauses relating to benefits plans may be ambiguous as to whether the clause applies only to active employees or to retirees.  *Bailey, supra*.  "Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Yolton,* 435 F.3d at 581.  The "durational clause" cited by Alcoa in its Brief is contained in a separate section at the back of SPDs relating both to active and retired employee benefits and does not specify to which it applies.  It is therefore not specific durational language referring to retiree benefits and is the type of general durational language which is inapposite.

Courts in the Sixth Circuit also support the proposition that if the durational clause is the same for pension plan benefits as it is for retiree health care plan benefits then it indicates that the retiree health care benefits are not limited for retirees because pension plans cannot be so limited.  *See Bailey, supra.*  This is the case for the minority of SPDs in this case which make any attempt

---

[13]The Sixth Circuit also found vested benefits in *Yolton*, despite reservation of rights clauses in the SPDs in that case. *Yolton,* 435 F. 3d at 582. In addition to deeming the reservation of rights clause nullified by the vesting of benefits under the CBA, the *Yolton* District Court also stated that it was important to consider the reservation clause in context of the rest of the SPD. The Court considered the fact that the SPD in *Yolton*, like the SPDs in the instant case, also included language giving surviving spouses' benefits after the date of the retiree's death.  This was an important factor for not giving weight to the reservation clause, as it "suggests that Case and UAW intended such benefits to continue indefinitely, despite Case's retention of some right to change the Group Insurance Plan." *Yolton,* 318 F. Supp. 2d at 468 (E.D. Mich. 2003).

[14]For example, language as found here promising that the employer will pay Medicare premiums when the retiree reaches an age greater than the age at which the retiree was eligible to retire indicates an intent to vest because otherwise such a promise to pay Medicare premiums in the future would be illusory. *Bailey,* 2006 WL 2727732, at *19.

19

to state a reservation of rights clause at all.

Alcoa's attempts to distinguish Plaintiffs' cases are unavailing. *Yard-Man, supra*, and *BVR, supra*, apply to a unilateral modification by an employer of benefits for which retirees had previously bargained. Plaintiffs here did not agree to any reduction in their vested benefits. Alcoa is the sole plan sponsor who provides those benefits and has a duty to provide them. Thus is Alcoa who has acted to not give Plaintiffs their full vested benefits. It is not the Union which provides retiree health care benefits and any agreement by the Union cannot divest retirees of vested benefits. Since Alcoa is the one who has a duty, it is Alcoa who is acting unilaterally, to deprive Plaintiffs' benefits.[15] Accordingly Alcoa is properly subject to suit as sole Defendant.[16]

## 2. The "Cap" Language Was For Accounting Purposes Only.

The Court may apply normal rules of contract construction under both the LRMA[17] and

---

[15] *See Yard-Man*, 716 F.2d at 1482 n.8 (holding that union cannot negotiate away vested retiree rights: "the union may choose to forego such benefits in future negotiations in favor of more immediate compensation. It may not, however, bargain away retiree benefits which have already vested in particular individuals. Such rights, once vested upon the employee's retirement, are interminable and the employer's failure to provide them actionable under § 301 by the retiree").

[16] Alcoa also tries to distinguish *Yolton* by mistaking a failure to grant a preliminary injunction in that case to some of the Plaintiffs as a ruling that those who retired before a cap were not vested. This was not the ruling in *Yolton*. In fact, the district court left the door open to grant relief at a later date if it believed the FAS letter in that case was for accounting purposes only, by emphasizing that "*[a]t this time*, the Court is not convinced that the FAS-106 Letter was merely for accounting purposes . . ." 318 F.Supp.2d at 473 (emphasis added). In reviewing the question of vesting, the Sixth Circuit did not review the district court's failure to grant preliminary injunction to give pre-capped levels of benefits to those retiring after the cap; it appears the Plaintiffs did not appeal that partial denial. *See Yolton*, 345 F.3d 571 (6th Cir. 2006). The *Yolton* court did not discuss whether the post-cap retirees were vested at the post-cap levels.

[17] *Sterling Fluid Systems, Inc. v. Chauffeurs, Teamsters & Helpers Local Union*, 322 F.Supp.2d 837 (W.D. Mich. 2004) ("Federal law governs the enforcement and interpretation of collective bargaining agreements under § 301 of the Labor Management Relations Act ("LMRA"), 29

ERISA.[18]   Under those rules, the Court may consider the parties' positions and surrounding circumstances.  The testimony of Mr. Murphy and Mr. LaBaff highlights the ambiguity of the FAS-106 Letters.  The Court can consider this testimony.  *Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 684 n.12 (6th Cir. 2000) ("Extrinsic evidence can become a consideration *before* an ambiguity has been identified from the face of the contract as a matter of law, in the limited sense that such evidence can assist the court in determining whether, as a matter of law, two plausible interpretations exist in the manner necessary to give rise to the *existence* of an ambiguity.").   "Obviously, the natural and ordinary meaning of language, reasonable construction of a contract, surrounding circumstances, and positions and actions of the parties are issues that cannot be weighed in a vacuum."  *Id.*

While as Alcoa notes that *Yolton*, 435 F.3d 571 (6th Cir. 2006) instructs to "first look to the explicit language of the collective bargaining agreement for clear manifestations of intent," the court adds that "courts 'should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.'  When ambiguities exist, courts may look to other provisions of the document and other extrinsic evidence."  *Id.* at 578-579 (*quoting Yard-Man*, 716 F.2d at 1479-80).   The court must first look at the main text of the CBA

---

U.S.C. § 185, but traditional rules of contract interpretation apply insofar as they are consistent with federal labor policies.").

[18] *Regents of University of Michigan v. Employees of Agency Rent-A-Car Hosp. Ass'n*, 122 F.3d 336 (6th Cir. 1997).  "In those limited situations where ERISA fails to address a particular issue, federal courts are expected to develop a body of federal common law to fill the interstitial gap in the statutory mandate . . . In developing such federal common law, the federal court may take direction from the law of the state in which it sits . . ."  *Id.*  at 339.

and then to the documents as a whole, which reflect an intent to vest. *Cf. UAW v. Aluminum Company of America*, 932 F.Supp. 997, 1004-07 (N.D. Oh. 1996). In that case the court found vested welfare benefits; here, the SPDs from 1993 on have even stronger language, specifically providing that the cost of the welfare benefits plans would be paid by the company and would continue until death for retirees and surviving spouses. This intent to vest is further supported by the conduct of the parties. Reviewing the CBAs and SPDs together, it is obvious that Alcoa's claims about the FAS-106 Letter stand in contrast to the multiple promises of retiree health care benefits lasting until death, benefits for surviving spouses until their own deaths, the only change for retiree health care benefits occurring at the receipt of Medicare benefits and then only reduced by what Medicare covers, retiree health care benefits lasting after Medicare eligibility commences, and other such indicia of intent to vest. Therefore, the relevant documents either clearly show an intent to vest benefits or at minimum are ambiguous and the court must then turn to extrinsic evidence for evidence of intent.[19] The context here includes testimony that Alcoa witnesses agreed the FAS-106 Letters were unenforceable against retirees. Thus Mr. Murphy and Mr. LaBaff expected it to be rolled over into each new CBA. This course of conduct is precisely what occurred: the FAS-106 Letter was simply rolled over into the later 1996 CBA, and again into the 2001 CBA. (Murphy Dec. ¶¶ 6-8, LaBaff Dec. ¶ 3).[20]

---

[19] This reflects the holding in *Yard-Man* that even the most explicit language does not stand alone and should be interpreted in the context of the document as a whole and "in light of the context which gave rise to its inclusion." *Id.* at 1479. *See also UAW*, 932 F.Supp. at 1004-05 (accord).

[20] As Mr. LaBaff testifies, "since it was only being used by Reynolds and Alcoa for accounting purposes and never to be enforced against the retirees, the letter was simply 'moved forward' in the back of the Collective Bargaining Booklet during the various contract negotiations that followed." (LaBaff Dec. ¶ 3).

The company points to the language of the FAS Letters as setting a date in the future when the cap would purportedly begin. However, the Plaintiffs point to other language in the main text of the CBAs and SPDs, what Alcoa told the top ABG negotiators, the parties' actual custom of indeed rolling the dates forward, and Alcoa's need to negotiate a new CBA in 2006 to reduce benefits rather than instituting what it claimed was an already agreed-upon cap. This evidence creates a clear inference that the parties intended for retiree benefits to vest.

The 1993 Letter referenced a cap based on benefit costs during 1997 as a measuring date, and contributions to cover the excess would begin after January 1, 1998. Consistent with Plaintiffs' understanding of the contract, that 1998 implementation never happened. Instead, the cap was rolled over into the 1996 Letter. The 1996 Letter referenced benefit costs during 2002 as the measuring date, and contributions to cover the excess to begin after January 1, 2003. Once again, this never occurred. The cap was rolled over again in 2001. The 2001 Letter likewise recited 2006 as the measuring date, with contributions to start after January 1, 2007. Yet, Alcoa found it necessary to negotiate a reduction in benefits in the main body of the 2006 CBA rather than merely instituting the cap they claim they were entitled to institute on January 1, 2007. This course of conduct through 2006 conformed with the Plaintiffs' understanding that, indeed, the cap language was just an accommodation for the accountants, to be rolled forward indefinitely. This was the parties' practice and custom and was an implied term of the CBA.[21]

---

[21] "CBAs may contain implied terms, and the parties' practice, usage, and custom can be considered." *Maurer v. Joy Tech., Inc.,* 212 F.3d 907, 915 (6th Cir. 2000). The practice of rolling over the FAS-106 Letter was also consistent with an understanding that these were "status" benefits for retired workers – benefits that were vested and could not change. Retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Maurer, supra* (quoting *BVR Liquidating, Inc.*, 190 F.3d at 772).

23

Reviewing all the language in the SPDs (which are incorporated by reference into the CBAs) and the CBAs[22] it is impossible to conclude that the relevant documents read in their entirety could be unambiguous in favor of Alcoa. Alcoa neglects to note that most, if not all, the CBAs incorporated by reference the SPDs. The CBAs and SPDs, if not indicating a clear intent to vest, at minimum raise numerous ambiguities. For example, statements in the 1998 RMC SPD limit termination to the terms of the CBAs. However, RMC CBAs lack language about terminating or amending the retiree health care plan for retirees. This indicates that the reservation of rights clauses were not meant to modify benefits under the CBA. *Yolton*, 435 F. 3d at 582. Most of the SPDs do not have any language about plan modification, save to make administrative changes[23] (such as form changes or personnel changes). The language in the SPDs and CBAs points to benefits continuing until death and being paid for entirely by Alcoa.

Alcoa's position that the parties intended the FAS-106 Letter to be eventually implemented contradicts the position of the signatory to the letter in 1993 and 1996 and President of the ABG Union, Ernie LaBaff, that he intended the FAS-106 letter for accounting purposes only and never agreed that it could be enforced against retirees to reduce their benefits. As such,

---

[22] See Plaintiffs' main brief, pp. 20-23 [docket no. 22], discussing promises of benefits continuing until death, spousal benefits for spouses after the death of their spouse, linkage of eligibility for vested health care benefits to eligibility for a vested pension, statements that retirees and surviving spouses' retiree health care benefits will continue "at no cost" to them and that Alcoa would pay all the costs of such retiree health care benefits, and reference to "active, fully vested" retirees regarding welfare benefits.

[23] In the 1993 and 2002 Alcoa SPDs.

the Court may alternatively find that there was no meeting of the minds in regard to the letters signed by Mr. LaBaff and, as such, no contract to reduce or cap benefits was entered into.[24]

The company also argues that the union should have arbitrated any questions about the FAS-106 Letters. First, the Plaintiffs' witnesses are clear on what the parties' understanding was; there was no need to arbitrate it.[25] Second, because the letter was a side letter following the signature pages, the longstanding custom was it could not be arbitrated.[26] Third, both the 1996 and 2001 letters themselves state that they cannot be subject to arbitration. See Exs. 1 and 2 to LaBaff Dec. and Ex. A to Quaglia Dec. Accordingly under Sixth Circuit case law the letters were not arbitrable. *USW v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 278-79 (6th Cir. 2007) (side letters not arbitrable where parties so state).

---

[24] It is fundamental that in order to form a valid contract, there must be a meeting of the minds. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550 (Tenn. Ct. App. 1991). Since vested benefits cannot be reduced without the consent of those in whom the benefits have vested and Mr. LaBaff, as representative signatory for and President of the Union, never intended for the FAS-106 Letter to be anything more than an accounting measure, there was no meeting of the minds to reduce vested benefits and any such FAS-106 Letter is invalid as under contract law.

[25] For example, John Murphy was told by Alcoa and RMC representatives in 1993 that the letter was solely for accounting or bookkeeping purposes. (Murphy Dec. ¶ 3).

[26] Mr. Fountaine testified that at the time of the 1993 negotiations, company representatives "said it [the FAS-106 Letter] was after the signature of the contract, and we all knew basically what that meant . . . you could not arbitrate anything after the signature part of the contract because they did not carry anything." (Fountaine Dep. p. 40 ll. 9-15). His "understanding is when it's past the signature part of the booklet, it's a letter of intend and it doesn't really mean anything. It's not anything that can be challenged by either side." (Id. p. 64 ll. 18-21). If the company violated one of these side letters, "[w]e had no right to arbitrate" though "[w]e could strike." (Id. p. 66 ll. 6-12). In his years of experience he was never aware of an occasion where a claimed violation of a letter of understanding had been taken to arbitration. (Id. p. 70 ll. 3-7).

25

**3. The Retirees Did Not Agree To Have Their Vested Benefits Reduced.**

Alcoa argues that the Union had representational bargaining authority for Plaintiffs during the 2006 negotiations, citing cases stating that generally, employees must be bound to the terms of the CBAs they negotiated as active employees. However, none of the Plaintiffs herein were active when the vote on the benefit cutback in 2006 occurred. Alcoa overreaches when it seeks to impose its 2006 change retroactively on already-retired workers. Stated differently, Alcoa could agree with the Union to change retirement benefits prospectively for active employees who could vote on the proposal and had not yet retired, but not for employees who had already retired and whose benefits had already vested. This is because "[i]f benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees." *Maurer,* 212 F.3d at 918.

Typically, Unions do not have representational authority for retired members unless the retired members consent to such representation after their retirement. *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 176 (1971) (noting that "retirees are neither "employees" nor bargaining unit members"); *Cleveland Elec. Illum. Co. v. Util. Workers Union,* 440 F.3d 809, 817-18 (6th Cir. 2006) (holding that retirees may sue their employer for bargained-for benefits without the participation of the Union and that, "[i]n order to arbitrate a retiree's benefits, the Union must obtain the consent of the retiree."); *UAW v. Ransom & Randolph,* 2006 WL 991057, *2 (N.D. Ohio April 13, 2006) ("Local 12 needed the retired workers' consent to represent them."); *Rossetto v. Pabst Brewing Co.,* 128 F.3d 538, 541 (7th Cir. 1997) ( "In short, [the Union] does not have any right to represent the retirees making up the class in this case

26

unless each of the retirees assents to its representation.").[27]

Nowhere in the FAS-106 Letters or anywhere else does it state that once retired, the retirees appointed the Union to reduce any benefits on their behalf.[28] The letters merely recite an agreement between the "parties" to bargain further on retiree benefits in the future. First, although once represented by the Union while active employees, upon retirement, retirees were no longer part of the Union and became individual "parties." Second, there is a substantial difference between the mandatory discussion of such benefits and the agreement to reduce such benefits. The 1993 Letter states that "the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiation between the 'parties' occurring after May 31, 1993." (LaBaff Dec. Ex. 1). The "party" as of 1993 was the Union acting in a representative capacity on behalf of all active employees who would vote on the measure. The Union in 1996

---

[27] "[R]etirees are not members of the bargaining unit." *Pittsburgh Plate Glass*, 404 U.S. at 181 n.20. *See Yard-Man, Inc.*, 716 F.2d at 1484-85 (holding that retirees are entitled to settle a claim against the company arising under a CBA even when the retirees' former union has a suit pending on the same issue); *International Ass'n of Machinists and Aerospace Workers Local Lodge v. Goodrich Corp.,* 410 F.3d 204, 211-12 (5th Cir. 2005) ("The statutory definition of employee does not include retired former employees," citing 29 U.S.C. § 152(3)); *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1268-72 (5th Cir. 1990) (union does not have the statutory authority to act as the exclusive and binding agent of a retiree in the same way that a union can so act on behalf of its active bargaining-unit members). Dan Henry testified that in the 2001 negotiations, "[t]he company made it clearly known that they were not going to bargain for retirees, that retirees were -- they were no longer actual employees of the company. There was no legal obligation to do that, that they were no longer productive for the company. . . ." (Henry Dep. p. 28 ll. 16-20). Mr. Fountaine testified that he disagreed when the Union took the position in 2006 that it could in fact negotiate for already-retired employees. (Fountaine Dep. p. 94 ll. 11-25). Mr. Barse testified that "the closing date of engagement is set forward beyond the expiration so, in fact, that it would not affect our retirees." (Barse Dep. p. 82 ll. 15-21).

[28] *Cf. Groover v. Michelin North America, Inc.*, 90 F.Supp.2d 1236, 1249-50, 1264 (M.D. Ala. 2000) ("side letters" not in the main body of the CBA were "not evidence capable of rendering an ambiguous agreement unambiguous;" court found that "whether . . . retirees are contractually bound by those side letters . . . is a disputed issue of fact.").

27

represented active employees as of that date. The Union "party" to the 1996 CBA consisted of the Union's active members at that time. There is no explicit language in the 1993 CBA stating that Union members agreed that once they retired, the Union still represented them and had power to agree to a cutback over ten years later. The CBAs themselves contain language that protects the Plaintiffs from any action by the Union and/or Alcoa acting unilaterally or by agreement to reduce their vested retiree health care benefits, protected by ERISA and LMRA law, regardless of the existence of the FAS 106 Letter. (See Fountaine Dec. ¶ 10, Barse Dec. ¶ 11, Article XXV of various ABG Union CBAs with Alcoa and Section 39 of various USW CBAs with Alcoa attached to supplemental declaration). The retirees were not directly or by representation a "party" to the 2006 CBA and could not be bound by it.

Retirees are not ordinarily part of a Union's bargaining unit and the retirees and surviving spouses here did not agree at any time during their active employment or retirement to go against that general rule and provide the Union with the right to continue to bargain for retirees up to a decade after they retired. Thus "retirees need not submit to union representation." *Rossetto*, 128 F.3d at 540. "[U]nions may bargain on behalf of retirees if the employer is willing, although the retirees need not accept the offer of representation." *Merk v. Jewel Cos*., 848 F.2d 761, 766 (7th Cir.), *cert. denied*, 488 U.S. 956 (1988) (emphasis added). Thus any right for the Union to change vested retiree medical benefits must come from the retirees. *Cf. Rossetto*, 128 F.3d at 540 ("What we are saying is that any right District 10 has to pursue arbitration of the retirees' grievance must come from the retirees.").

Thus Alcoa must show that either by statute or by agreement, the Plaintiffs conferred upon the Union the right to continue to represent them with regard to their retiree medical benefits after

they retired.  No statute confers this authority.  Nor is it found in any agreement.  The Plaintiffs testify that they never gave any authority to the Union to negotiate or make an agreement on their behalf during the 2006 negotiations.  The noted language in the FAS-106 Letters--even if effective, which Plaintiffs argue it was not intended to be--does not suffice because it is too vague and merely an agreement to open discussion about benefits between the "parties."  Although the Union represented the retirees while they were active employees and, as such retirees would have become a "party" to whatever the Union agreed to on their behalf as active employees, once the retirees have retired, the Union no longer represents them as a "party" to any discussions about their benefits—particularly where there was no express consent to do so.  The FAS-106 Letter does not state that workers who have retired by the time of subsequent negotiations between the Union and the Company agree that the Union represents them.  As such, the Union could not reduce benefits on Plaintiffs' behalf.  *Cf. Maurer,* 212 F.3d at 918 ("If benefits have vested, then retirees must agree before the benefits can be modified, *even by a subsequent CBA between the employer and active employees,*" emphasis added).

Because the union bargaining relationship is unique, there are special considerations for courts considering whether benefits vest.  The *Yard-Man* approach of protecting vulnerable benefits is, in part, premised precisely on the fact that unions have no duty to protect the retirees in future bargaining.  716 F.2d at 1482.  As the Supreme Court in *Pittsburgh Plate Glass* specifically recognized, the "risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits." 404 U.S. at 173.  That is what has here occurred.  Because retirees earned these benefits in the past by trading away wages for the benefits in the form of deferred

compensation, retirees would have expected these benefits to vest because the union would not protect them after retirement. *Yard-Man*, 716 F.2d at 1482. Because unions have no duty to represent retirees, and indeed do not represent them absent their post-retirement consent to do so, a presumption of vesting serves to protect the voiceless in the subsequent negotiating process.

**4. The USW 2006 CBA Summary Supports the Plaintiffs.**

Alcoa quotes the 2006 Master CBA Summary's statement that "[t]he May 31, 1993 Labor Agreement places a cap on the Company's retiree health care costs for employees who retired after May 31, 1993." (Alcoa Br. p. 9). However, this sentence is qualified by the immediately following sentences in the document:

> *The Union initially agreed to the cap to address the Company's concerns about new rules on how to account for retiree insurance benefit obligations. The Union fully expected to move the effective date of the cap back in each subsequent set of negotiations. . . . Making matters worse, recent accounting and corporate scandals have caused accounting firms to be much more conservative -- including in the area of how retiree health care costs and obligations are measured and reported.* Alcoa told the Union that moving the effective date of the cap . . . would require a charge against its profits of over $1 billion over the next few years. The Union's independent analysis has verified that Alcoa's accountants would indeed force the Company to account for moving the cap in this fashion . . . . Instead of a high-stakes, all-or-nothing strategy, the Union sought an alternative approach . . . .

*Id.* (emphasis added). This emphasized language indicates the Union did indeed understand the "cap" to be an accounting formality that would be rolled over into later CBAs as long as necessary. The language also indicates that accounting scandals occurring after the 1993 CBA led Alcoa to change its opinion of what it could do and whether indeed Alcoa could get away with treating the FAS-106 Letters as formalities. It raises the question of how Alcoa had been accounting for the retiree medical liability in previous years. If moving the effective date would require a charge against its profits of over $1 billion, does that mean the company had not

previously been reporting the liability at all? In prior years, had Alcoa been using the letters as a basis not to report such a liability? Stated differently, if the evidence shows that Alcoa was handling the liability in one manner in its accounting from 1993 to 2006, but now believed it had to change its approach in 2006 because of Enron-style scandals, this would tend to support the Plaintiffs' contention that indeed, prior to 2006 Alcoa had no intent to ever enforce the cap.

It is clear from the emphasized language in the 2006 Summary that the Union believed the cap would be moved back in each new CBA. This understanding is precisely consistent with Mr. Murphy's and Mr. LaBaff's understanding. They believed Alcoa needed the cap language for its accountants, but would not enforce it -- instead, Alcoa would simply roll it forward into each new CBA. Indeed, this was precisely the course of conduct of the parties in 1996 and again in 2001.

The 2006 CBA Summary indicates that Alcoa believed that, because of changes in its accountants' accounting practices, it would now have to report this continuing benefits obligation if the CBA were not changed in 2006 to remove the obligation. Stated differently, at this point the parties' course of conduct continues to support the proposition that the FAS-106 Letters were unenforceable accounting accommodations. The 2006 Summary states that in 2006 the Union compromised with Alcoa to reduce benefits rather than stand firm ground because the Union wanted to avoid a "high-stakes, all-or-nothing" battle. However, Plaintiffs, who did not agree to this new 2006 CBA and its changes, have brought the above captioned action and intend to stand firm in defending their promised life long health care benefits.

Such a new agreement to reduce benefits as that in the 2006 CBA would not have been necessary if such a reduction in benefits on a specified date had truly been agreed to by other "cap" language in previous FAS-106 Letters. Alcoa's belief that it had to enter into a new

31

agreement is further evidence that the FAS-106 Letter was never to be implemented.

The 2006 CBA Summary in summary shows that (1) the Union believed that the original cap was only for accounting purposes, (2) Alcoa did not believe it could unilaterally institute the cap based on the FAS-106 Letter and instead had to obtain a further agreement to do so, and (3) Alcoa admitted to the Union that under <u>new</u> accounting practices it could not continue the letter arrangement because, even by moving the cap forward to 2010, it would now have to report the retirees' health care benefits as future liabilities under more "conservative" accounting practices unless the CBA underwent a more significant change. As such, the 2006 Summary makes it clear that Alcoa stated to the Union that, in order to avoid reporting future liability for the retirees' unreduced health care benefits under their accountants' new, more "conservative" accounting practices (and indeed, to avoid having said liability, which Alcoa certainly wished to do in 2006), a new agreement had to be reached in 2006 and the FAS-106 Letter would not suffice. This, in addition to all of the evidence from Union officials and signatories of the FAS-106 Letters and CBAs, clearly belies Alcoa's contention that the FAS-106 Letters were an agreement which Alcoa could enforce at a specified date.

In addition, Exhibit M to the Quaglia Dec. (from the 2001 negotiations) actually supports Plaintiffs' position that their retiree health care benefits are vested and that neither Alcoa nor the Union could reduce those benefits after they retired. It states, "The retiree medical cap was moved to the year following expiration of the new contracts. This means current and future retirees will not be required to make any premium contributions towards their medical coverage until at least the year 2007. **Also, the Company can't change the benefits for retirees**." (emphasis added). This clearly states that current and future retirees will not have to pay for their retiree health care

benefits through the duration of the newly enacted CBA (which expired in 2006) and that the Company cannot change the retiree health care benefits for those who have already retired. This document is consistent with Plaintiffs' position that when an individual retires, his health care benefits vest and cannot be changed. It is also consistent with the perpetual moving forward of the letter from one CBA to the next and that it was never intended to be implemented.

**5. Plaintiffs' Fiduciary Duty Claim Is Well-Supported.**

Plaintiffs' claim of breach of fiduciary duty is alleged in the alternative to their vesting claim. If Plaintiffs' benefits are indeed not vested, then Plaintiffs have a claim for breach of fiduciary duty based on Alcoa's provision of incorrect information about that plan.

In contradiction to Alcoa's contentions, the evidence shows that Alcoa's representatives, including those at the top table, made representations about lifetime benefits and that the FAS-106 Letters were for accounting purposes only. Alcoa cannot claim that people it employed either to negotiate benefits or to describe retiree health care benefits and the rights thereunder did not have the fiduciary authority to make representations on behalf of Alcoa as its agents.

Alcoa's reliance on *Sprague* is again inapposite. The subsequently published Sixth Circuit Court of Appeals cases cited by Plaintiffs in their initial brief distinguish the discussion in *Sprague* from this case. *See, e.g. Gregg v. Transportation Workers of America*, 343 F.3d 833, 841 (6th Cir. 2003) ("Significantly, 'a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements were made negligently or intentionally.'") (*quoting Krohn v. Huron Memorial Hosp.,* 173 F.3d 542, 547 (6th Cir. 1999)); *James v. Pirelli Armstrong Tire Corp.,* 305 F. 3d 439, 455 (6th Cir. 2002) (same).

33

"*Sprague* considered whether a plan administrator must provide unrequested information, not whether an administrator may mislead when providing information." *Gregg, supra,* at 845. The present matter differs from *Sprague* because it alleges affirmative misrepresentations by Alcoa regarding whether or not benefits will continue at the same rate for the rest of Plaintiffs' lives. The *Sprague* court merely held that when there are no misrepresentations, the employer is not affirmatively required to tell the retiree that its plan is subject to alteration. However when an employer "provided materially misleading and inaccurate information to the plaintiffs in group meetings designed to convey information about benefits," it breached its fiduciary duty. *Gregg, supra,* at 846 (*citing James,* 305 F.3d 439 (6th Cir. 2002)).

Similarly, if benefits are not vested, Alcoa made affirmative misrepresentations that benefits would continue at the same rate until death in the SPDs they published, in the verbal representations they made to Plaintiffs before Plaintiffs retired (both at meetings and one on one), and in the verbal representations they made to Union negotiators that the FAS-106 Letters would not affect retiree benefits and retiree benefits would continue at the same rate as the date of retirement for their lifetime.

It is important to note that no FAS-106 Letter or similar letter appeared at the back of the RMC CBAs; the first one to appear for former RMC employees was in the 2001 CBA after the merger for Alcoa and RMC, so retirees prior to 2001 could not be affected by the 2001 CBA. RMC retirees up through 2001 when the 2001 CBA was approved never even received the 1993 and 1996 FAS-106 Letters that Alcoa employees received during that time.

**6. Plaintiffs Show Irreparable Harm.**

Alcoa mischaracterize *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co*, 520 U.S. 510 (1997).  The Supreme Court in that case does not state that there is strong public policy exempting welfare benefits from ERISA vesting requirements. Rather, the Supreme Court in that case discusses the ERISA § 501 limitations on employers for benefits which do not vest.  *Id.* at 514-16.  "In *Inter-Modal*, the Supreme Court simply held that § 510 prohibits not only the interference with vested benefit rights, but also with non-vested welfare benefit rights." *Almond v. ABB Indus. Sys.*, 2001 WL 242548 (S.D. Ohio March 6, 2001).

Alcoa attempts to use *Adkins v. American Std., Inc.*, 2005 WL 2137740 (E.D. Ky. Sep. 2, 2005) in support of their argument that Plaintiffs are not irreparably harmed.  However, that case is distinguished from the case at bar in the same way it was distinguished in the *Bailey* case, *supra.*  In *Adkins*, the Kentucky district court:

> held that plaintiffs could be made whole by money damages if they were to succeed on the merits.  However . . . *Adkins* [is not from] this Circuit and in [that] case the plaintiffs waited until over two and one-half years . . . after their benefits were terminated prior to seeking an injunction. This Court does not find either case applicable here as the Plaintiffs here filed suit prior to the termination of their benefits and because the Plaintiffs have demonstrated, by way of Declarations, that AK Steel's actions are causing stress and anxiety to the retirees and/or their spouses.

*Bailey,* 2006 WL 2727732, *9 (S.D. Ohio Sept. 22, 2006).  Since the *Adkins* ruling in 2005, *Bailey*, *supra* is the only case the undersigned has found that cites *Adkins* and does so only to distinguish it.  Similar to the *Bailey* case, Plaintiffs in the case at bar filed suit within a few months of the beginning of the reduction of their benefits and have testified that they are not only spending additional money on healthcare many cannot afford to lose as a result of Alcoa's actions, they are suffering from worry, anxiety, depression and/or stress which, standing alone, also

35

constitutes sufficient irreparable harm.  This is reflected in the depositions.  As Mr. Henry testified, "I'm sure a lot of those retirees had pensions well under a thousand dollars. . . And now you're saying, you know, that you're going to make them take money out of that little bitty pension to pay from what they've had all this time and what everyone understood was theirs . . . I was sickened; I was disgusted to hear Alcoa saying that . . . I've suffered harm." (Henry Dep., p. 30 ll. 2-16, p. 126 l. 14).  "[T]he biggest hardship is prescription drugs at this point." (Pruitt Dep. p. 102 ll. 11-12).

In addition, the Sixth Circuit Court of Appeals has granted preliminary injunctions that favor a large number of the Plaintiffs, even if, "some of the plaintiffs were high-level executives with [the employer] who would not necessarily face hardship as a result of reductions in health insurance," because this "does not change the fact that the proposed class of plaintiffs in this case contains a large number of individuals who would face irreparable harm." *Helwig v. Kelsey-Hayes Co.*, 857 F.Supp. 1168, 1180 (E.D. Mich. 1994), *aff'd* 93 F.3d 243 (6th Cir. 1996). Even though there was a proposed class in *Helwig* at the time of the granting of the preliminary injunction, there is never any guarantee that such a class will be certified. As such, the court granted a preliminary injunction to the uncertified Plaintiffs and whoever else would join the action.  Similarly, there are a large number of Plaintiffs in the case at bar and a preliminary injunction is appropriate based on the evidence submitted.

In support of their position that the declarations submitted by Plaintiffs are insufficient in number, Alcoa cites only cases outside the Sixth Circuit.  The case most heavily relied on by Alcoa, *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3rd Cir.  2000), is outside the Sixth Circuit, and the three courts in the Sixth Circuit to discuss *Adams* have ruled contrary to it.

36

*Yolton*, 318 F. Supp. 2d 455, 472 (E.D. Mich. 2003), *aff'd* 435 F. 3d 571 (6th Cir. 2006) (granting preliminary injunction on the basis of 34 affidavits); *Wood,* 2007 WL 128722 (6th Cir. Jan. 17, 2007) (granting preliminary injunction prior to class certification on the basis of 10 declarations); *Bailey, supra* (accord).   Cases in the Sixth Circuit allow representative Plaintiffs to file declarations in support of successful preliminary injunctions involving a large number of Plaintiffs.   See, for example, *Wood*, *supra* (granting preliminary injunction *prior to class certification* for potentially 4500 Plaintiff members on the basis of ten (10) declarations); *Yolton,* 318 F.Supp. at 472, *aff'd,* 435 F.3d 571 (6th Cir. 2006) (granting preliminary injunction for approximately 3700 Plaintiffs on the basis of 34 affidavits); *Hinkley v. Kelsey-Hayes Co.*, 866 F.Supp. 1034, 1044-45 (E.D. Mich. 1994) (granting preliminary injunction for a class *prior to class certification* on the basis of two affidavits presenting evidence of irreparable harm); *Helwig v. Kelsey-Hayes Co.*, 857 F.Supp. 1168, 1180 (E.D. Mich. 1994), *aff'd* 93 F.3d 243 (6th Cir. 1996) (allowing preliminary injunction *prior to class certification* on the basis of a few affidavits). It is important to note that these preliminary injunctions were granted prior to class certification because there is never any guarantee that a class will be certified. Nonetheless, it was appropriate for these Sixth Circuit courts to grant preliminary injunction on the basis of <u>fewer</u> affidavits than Plaintiffs have submitted here.

Alcoa cannot seriously contend both that Plaintiffs should file their Motion for Preliminary Injunction at the first possible moment <u>and</u> should have obtained over 3000 declarations prior to filing their Motion.   Such a position is self-contradictory.   Preliminary injunction has been granted in similar welfare benefits cases even when such motions have been brought ten months after the benefits reductions were instituted. *See Hinkley*, 866 F.Supp. at 1044

n.9 (E.D. Mich. 1994) ("Defendant also cites plaintiffs' failure to file their motion for preliminary injunction at an earlier date as evidence of the lack of irreparable injury. . . . [P]laintiffs contend that the irreparable nature of the injuries they face has only become apparent since the benefit changes have been in effect for the past ten months.").  In the case at bar, Plaintiffs brought their Motion for Preliminary Injunction as soon as they could after the effects of the reduction in their benefits became clear. It is clear from the declarations submitted and the identities of the majority of the Plaintiffs as former metal workers and surviving spouses of former metal workers, that a large number of Plaintiffs will suffer irreparable harm absent injunction.   However, the undersigned stands ready to provide additional declarations and testimony should this Honorable Court deem it appropriate.

## CONCLUSION

Plaintiffs respectfully request that the Court grant the requested preliminary injunction.

38

Respectfully submitted this the 8th day of June, 2007 by:

s/Gregory F. Coleman
Gregory F. Coleman, Esq.
Attorney for Plaintiffs
4800 Old Kingston Pike, suite 120
Knoxville, Tennessee 37919
(865) 247-0080 (phone)
gcoleman@colemanedwardspc.com
BPR No. 014092

s/Robert S. Catapano-Friedman
Robert S. Catapano-Friedman, P.C.
744 Broadway
Albany, New York 12207
(518) 463-7501 (phone)
(518) 463-7502 (fax)
catapan@inbox.com
Admitted Pro Hac Vice

s/Sarah Catapano-Friedman
Sarah Catapano-Friedman, Esq.
The Catapano-Friedman Law Firm
50 Franklin Street, 4th Floor
Boston, MA 02110
(617) 542-7711 (phone)
(617) 542-7712 (fax)
scf@cflawfirm.com
Admitted Pro Hac Vice

s/Mona Lisa Wallace
Mona Lisa Wallace, Esq.
Attorney for Plaintiffs,
Wallace and Graham, P.A.
525 North Main Street
Salisbury, NC 28144
(800) 849-5291 (phone)
(704) 633-9424 (fax)
mwallace@wallacegraham.com
Admitted Pro Hac Vice

39

**CERTIFICATE OF SERVICE**

I hereby certify on this 8th day of June, 2007, I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF filing system, which will electronically service on the same date the attorneys for Defendant as indicated on the electronic filing receipt.

<u>s/John Hughes</u>
John Hughes