THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE, TENNESSEE

CHARLES CURTIS, ET AL.,          :
                                 :
          PLAINTIFFS,            :          NO. 3:06-CV-448
                                 :
     VS.                         :          ORAL ARGUMENT ON MOTIONS
                                 :          FOR SUMMARY JUDGMENT
ALCOA, INC.,                     :
                                 :
          DEFENDANT.             :


     TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE THOMAS W.

PHILLIPS, U.S. DISTRICT JUDGE, ON AUGUST 27TH, 2008.


APPEARANCES:


          ON BEHALF OF THE PLAINTIFFS:

               GREGORY F. COLEMAN, ESQ.
               ROBERT S. CATAPANO-FRIEDMAN, ESQ.
               SARAH CATAPANO-FRIEDMAN, ESQ.
               ANDREW J. SCHWABA, ESQ.
               MONA LISA WALLACE, ESQ.


          ON BEHALF OF THE DEFENDANTS:

               EVAN R. CHESLER, ESQ.
               BENJAMIN GRUENSTEIN, ESQ.
               JOHN A. LUCAS, ESQ.
               JISUN PARK, ESQ.
               MEREDITH SHAW, ESQ.
               DANIEL SLIFKIN, ESQ.




          COURT REPORTER:

          DONNETTA KOCUBA, RPR-RMR
          800 MARKET STREET, SUITE 132
          KNOXVILLE, TENNESSEE  37902
          (865) 524-4590

1                                    INDEX

2    ORAL ARGUMENT ON SUMMARY JUDGMENT MOTIONS
3    RE: VESTING:

4            BY MR. COLEMAN – 4, 73

5            BY MR. CHESLER – 38

6


7    ORAL ARGUMENT ON SUMMARY JUDGMENT MOTIONS
8    RE:  EXTRINSIC EVIDENCE

9            BY MR. COLEMAN – 32, 73

10           BY MR. SLIFKIN – 58, 83

11   RECESSES:                                           37, 83

12   NEW TRIAL DATE:                                     87

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1      (WHEREUPON, WEDNESDAY, AUGUST 27TH, 2008, COURT CONVENED IN

2  THE FOLLOWING MATTER AT 9:08 A.M.)

3      THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.  MADAM

4  CLERK, IF YOU'LL CALL THE CASE FOR US, PLEASE.

5      COURTROOM DEPUTY:  YES, YOUR HONOR.  WE'RE HERE ON A

6  MOTION HEARING IN CASE 3:06-CV-448, CHARLES CURTIS VS. ALCOA,

7  INCORPORATED.  ARE THE DEFENDANTS (SIC) READY TO PROCEED?

8      MR. COLEMAN:  PLAINTIFFS ARE READY, YOUR HONOR.

9      COURTROOM DEPUTY:  ARE THE DEFENDANTS READY TO

10  PROCEED?

11      MR. CHESLER:  YES, WE ARE.

12      THE COURT:  OKAY.  ACTUALLY, WE HAVE, I THINK, SOME OTHER

13  PEOPLE WHO ARE WAITING TO GET INTO THE COURTROOM.  IF SOME OF YOU

14  WOULD LIKE TO FILL IN THE REST OF THE JURY BOX, WE'D BE DELIGHTED TO

15  HAVE YOU TAKE THOSE SEATS.  WE'LL GIVE YOU A FRONT ROW SEAT.  WE'LL

16  ALSO TAKE YOUR NAME AND CALL YOU FOR OUR NEXT JURY TRIAL.

17      (LAUGHTER)

18      THE COURT:  A METHOD TO OUR MADNESS.  OKAY.  I BELIEVE

19  THAT WE'RE HERE THIS MORNING TO HEAR THE MOTIONS FOR SUMMARY

20  JUDGMENT THAT HAVE BEEN FILED IN THIS CASE.  THE FIRST MOTION FOR

21  PARTIAL SUMMARY JUDGMENT WAS ACTUALLY FILED BY THE PLAINTIFFS.

22  WHO WILL BE PRESENTING THE ARGUMENTS FOR PLAINTIFFS, MR. COLEMAN?

23      MR. COLEMAN:  I WILL, YOUR HONOR.

24      THE COURT:  OKAY.  WILL YOU PRESENT ALL OF THE

25  ARGUMENTS?

1          MR. COLEMAN:  YES, YOUR HONOR.

2          THE COURT:  OKAY.  AND WHO WILL BE ARGUING FOR THE

3     DEFENDANTS?

4          MR. CHESLER:  IF YOUR HONOR PLEASE, EVAN CHESLER FOR

5     DEFENDANTS, AND MY COLLEAGUE, DANIEL SLIFKIN, WE'RE GOING TO DIVIDE

6     THIS, IF WE MAY.

7          THE COURT:  YOU CERTAINLY MAY.

8          MR. CHESLER:  I WILL ADDRESS THE VESTING-RELATED ISSUES, IF

9     THE COURT IS WILLING FOR ME TO DO THAT, AND MR. SLIFKIN WILL DEAL

10    WITH THE PAROL EVIDENCE ISSUES AND EXTRINSIC EVIDENCE ISSUES AND

11    THE CAP.

12         THE COURT:  VERY GOOD.  OKAY.  MR. COLEMAN, YOU MAY

13    PROCEED.

14         MR. COLEMAN:  THANK YOU, YOUR HONOR.  ON BEHALF OF THE

15    PLAINTIFFS, IT IS OUR PLEASURE TO BE HERE BEFORE THIS COURT.  WHAT I

16    WANT TO TALK WITH THE COURT ABOUT THIS MORNING IS, LIKE MR. CHESLER

17    DIVIDED, I'M GOING TO FIRST SPEAK ABOUT THE VESTING ISSUE AND THEN

18    THE EXTRINSIC EVIDENCE ISSUE.

19         THE ISSUES THAT WE HAVE BEFORE HIS HONOR ARE, WE BELIEVE

20    PLAINTIFFS HAVE LIFETIME VESTED HEALTH BENEFITS, THAT ALCOA, ON

21    JANUARY THE ONE, 2007, IMPERMISSIBLY REDUCED THOSE LIFETIME BENEFITS

22    BASED UPON THE FAS-106 LETTER.  IT'S PLAINTIFFS' POSITION THAT BECAUSE

23    THEIR BENEFITS ARE VESTED THEY CAN'T BE REDUCED OR ALTERED IN ANY

24    WAY.

25         JUST BRIEFLY, YOUR HONOR, I'M NOT GOING TO GO THROUGH THIS AT

1    LENGTH, BUT YOUR HONOR IS WELL AWARE OF THE CLASS DEFINITION THAT

2    WE HAVE IN THIS CASE. ESSENTIALLY, IT'S THOSE FOLKS WHO RETIRED

3    BETWEEN JUNE 1ST, 1993, AND JUNE 1ST, 2006, FROM THE FACILITIES LISTED IN

4    AN EXHIBIT THAT WAS ACCOMPANIED TO OUR PLEADINGS; AND THEN

5    SPOUSES, SURVIVING SPOUSES AND OTHERS.

6        AND I'M GOING TO GO THROUGH THIS NEXT PART IN SORT OF SUMMARY

7    FASHION AS WELL, BECAUSE THE COURT WELL KNOWS THE LAW WITH

8    REGARD TO SUMMARY JUDGMENT AND THE STANDARDS OF PROOF.

9        WE KNOW THAT SUMMARY JUDGMENT SHOULD BE GRANTED IF THE

10    PLEADINGS, DEPOSITIONS, ANSWERS, INTERROGATORIES AND OTHER THINGS,

11    TOGETHER WITH AFFIDAVITS, SHOW THAT THERE IS NO GENUINE ISSUE AS TO

12    ANY MATERIAL FACT AND THAT THE MOVING PARTY IS ENTITLED TO A

13    JUDGMENT AS A MATTER OF LAW. I KNOW THAT WE HAVE COMPETING

14    MOTIONS HERE THIS MORNING, SO THAT LAW IS OBVIOUSLY APPLICABLE TO

15    BOTH OF THE MOTIONS BEFORE THE COURT THIS MORNING.

16        BOTH PARTIES HAVE CITED SOME CASE LAW THAT WE BELIEVE ALLOWS

17    US IN THIS CASE TO PREVAIL ON MOTION FOR SUMMARY JUDGMENT. THE

18    MERE EXISTENCE OF A COLORABLE FACTUAL DISPUTE WILL NOT DEFEAT A

19    PROPERLY SUPPORTED MOTION, WE KNOW THAT'S THE LAW. AND THE

20    INQUIRY IS WHETHER THE EVIDENCE PRESENTED IS SUCH THAT A JURY,

21    APPLYING THE RELEVANT STANDARD, COULD REASONABLY FIND FOR EITHER

22    THE PLAINTIFF OR THE DEFENDANT. THAT'S WHAT THE <u>YOLTON</u> COURT HELD

23    IN REVIEWING THE LAW IN ITS CASE.

24        AND THEN, FINALLY, YOUR HONOR, THE CENTRAL INQUIRY IS WHETHER

25    THE EVIDENCE PRESENTS A SUFFICIENT DISAGREEMENT TO REQUIRE A

1    SUBMISSION TO THE JURY OR WHETHER IT IS SO ONE-SIDED THAT ONE PARTY

2    MUST PREVAIL AS A MATTER OF LAW.  AGAIN, THAT'S <u>YOLTON,</u> CITING

3    <u>ANDERSON VS. LIBERTY LOBBY</u>.

4        YOUR HONOR, FIRST OFF, I BELIEVE – AND I SAY THIS ON BEHALF OF

5    THE PLAINTIFFS – THAT THIS COURT NOW HAS IN FRONT OF IT, AND I WILL SAY

6    THIS WITH REGARD TO BOTH SIDES, THIS COURT NOW HAS IN FRONT OF IT A

7    PLETHORA OF EVIDENCE; DEPOSITIONS, WE'VE TAKEN OVER 50; WE'VE

8    SECURED BETWEEN FOUR AND 500,000 DOCUMENTS.  WE'VE BRIEFED THE

9    ISSUES PROBABLY TO THE COURT'S DISSATISFACTION ALMOST ON AN AD

10    NAUSEUM BASIS.  I KNOW THAT WE'VE PAPERED THE FILE VERY WELL.

11        BUT WE BELIEVE –

12          <u>THE COURT</u>:  BY THE WAY, DO YOU CHARGE BY THE PAGE OR BY

13    THE BRIEF?

14          <u>MR. COLEMAN</u>:  I KNOW IT, YOUR HONOR.  IT, UNFORTUNATELY,

15    HAS BEEN A CUMBERSOME CASE, BUT IT'S OF SUCH IMPORTANCE THAT WE

16    WANTED TO MAKE SURE THAT WE DID IT PROPERLY; I KNOW ALCOA FEELS

17    THE SAME WAY.

18        BUT WE BELIEVE THAT THERE IS ENOUGH EVIDENCE WHERE THE

19    COURT, RESPECTFULLY, AT THIS TIME, CAN MAKE A DECISION, AS WE SAY IN

20    THE COUNTRY, EITHER "FER US OR AGIN US," THAT IS, THAT THERE IS ENOUGH

21    BEFORE YOU, WE BELIEVE, THAT YOU CAN MAKE A DECISION ON THIS CASE.

22        BECAUSE IT IS OUR OPINION THAT THE EVIDENCE THAT THE COURT HAS

23    SEEN IN THE FILINGS ON THESE MOTIONS AND THAT WE WILL REVIEW TODAY

24    IN SUMMARY FASHION IS ENOUGH FOR THE COURT TO MAKE A DECISION.  IT

25    WON'T DIFFER HARDLY AT ALL TO WHAT WILL BE PRESENTED IF THERE IS A

1  TRIAL IN THIS CASE.  SO WITH THAT HAVING BEEN SAID –

2  THE COURT:  SO YOU THINK THE CASE CAN BE DISPOSED OF ON

3  THE CROSS-MOTIONS FOR SUMMARY JUDGMENT?

4  MR. COLEMAN:  WE DO, YOUR HONOR.  FIRST OF ALL, LANGUAGE

5  IN THE CBA'S AND SPD'S DEMONSTRATE THAT PLAINTIFFS HAVE VESTED

6  RETIREE HEALTH CARE BENEFITS.  THE LANGUAGE IN THOSE DOCUMENTS,

7  BOTH THE CBA'S – THE COLLECTIVE BARGAINING AGREEMENTS – AND THE

8  SPD'S – OR SUMMARY PLAN DESCRIPTIONS – THE NOTES OF THE PARTIES THAT

9  WE'VE OBTAINED, THE TESTIMONY, SHOW AN INTENT TO VEST AT

10  UNREDUCED LEVELS.  AND WE LOOK AT THE LANGUAGE OF THOSE SPD'S AND

11  WE MUST LOOK AT WHERE THE INTENT IS.

12  AND I STUDIED WITH PRETTY GOOD CARE, YOUR HONOR, YOUR

13  MEMORANDUM OPINION THAT YOU ISSUED WHEN WE WERE HERE BEFORE

14  THE COURT LAST SEPTEMBER.  IN SOME WAYS IT SEEMS LIKE FIVE YEARS AGO

15  AND THEN IN OTHER WAYS, BECAUSE THE PARTIES HAVE BEEN SO BUSY, IT

16  SEEMS LIKE THREE MONTHS AGO.

17  BUT THE COURT WANTED TO SEE MORE FROM THE PARTIES, AND

18  SPECIFICALLY THE PLAINTIFFS, WITH RESPECT TO "I UNDERSTAND WHAT

19  YOU'RE SAYING, MR. COLEMAN.  YOU TOLD ME IN SEPTEMBER.  BUT I WANT

20  TO SEE MORE OF THE EVIDENCE THAT YOU SAY SUPPORTS YOUR POSITION."

21  SO THAT'S WHAT WE SET OUT TO DO.

22  THE INTENT TO VEST BENEFIT LEVELS IN PLACE PRIOR TO JANUARY 1,

23  2007, IS EVIDENCED IN THE FOLLOWING DOCUMENTS WITHOUT LIMITATION.

24  IMPORTANTLY, YOUR HONOR, AND AS WE SET FORTH IN OUR BRIEF, THE

25  ALCOA SPD'S STATE THE BENEFITS END AT DEATH, ALL OF THEM; '79, '81, '93,

1    '97, '01 AND '02, ALCOA'S SUMMARY PLAN DESCRIPTIONS ALL SAY THAT.

2    THE 2002 ALCOA SPD REFERS TO SURVIVING SPOUSE OF AN ACTIVE

3    VESTED EMPLOYEE, LANGUAGE INDICATING THAT RETIREES ARE VESTED IN

4    THEIR WELFARE BENEFITS AND LINKING PENSION TO RETIREE HEALTH CARE

5    WELFARE BENEFITS.  THAT SAME LANGUAGE ABOUT SURVIVING SPOUSE OF

6    AN ACTIVE VESTED EMPLOYEE IS FOUND IN THE '93, '97 AND '01 SPD'S, AND

7    HERE IT IS, FOR EXAMPLE, FOR YOUR HONOR.

8    SPECIFICALLY, IF YOU'LL LOOK, UNDER THE 2002 ALCOA SUMMARY

9    PLAN DESCRIPTION, WHO IS ELIGIBLE, WHO IS ELIGIBLE?  WELL, IT'S OUR

10   OPINION THAT ALL OF THE FOLKS WHO ARE IN THE AUDIENCE AREA OF THE

11   COURTROOM FIT THIS DESCRIPTION; THAT IS, "YOU AND YOUR ELIGIBLE

12   SPOUSE WILL BE COVERED UNDER THIS PLAN IF YOU ARE:  AN HOURLY

13   EMPLOYEE WHO RETIRES ON OR AFTER APRIL THE 1ST, 2002," AND THEN,

14   IMPORTANTLY, DOWN HERE, YOUR HONOR, "AND YOU ARE COVERED UNDER

15   THE ALCOA RETIREMENT PLAN, PLAN II," LANGUAGE OBVIOUSLY LINKING

16   THE RECEIPT OF RETIREE MEDICAL BENEFITS TO PENSION PLAN ELIGIBILITY.

17   AND THEN DOWN HERE, IMPORTANTLY, THE AREA THAT I HAVE THAT'S

18   – EXCUSE ME, YOUR HONOR – THE AREA THAT I HAVE THAT IS HIGHLIGHTED

19   RIGHT HERE, "THE SURVIVING SPOUSE OF AN ACTIVE VESTED EMPLOYEE WHO

20   DIES WHILE ELIGIBLE FOR THE ALCOA RETIREMENT PLAN, PLAN II."  I DON'T

21   KNOW HOW MUCH MORE SPECIFIC THAT THE PLAINTIFFS CAN BE IN THIS

22   CASE.

23   RECEIPT OF RETIREE AND SURVIVING SPOUSE HEALTH CARE/WELFARE

24   BENEFITS IS TIED TO ELIGIBILITY FOR THE PENSION PLAN AND IS INDICATIVE

25   OF AN INTENT TO VEST THE WELFARE BENEFITS AND IS CONTAINED IN THE

1   FOLLOWING, AND WE LISTED THEM AT LENGTH, YOUR HONOR.  ALL OF THESE

2   DOCUMENTS LINK THE RECEIPT OF RETIREE MEDICAL BENEFITS TO PENSION

3   ELIGIBILITY.  THE ALCOA SPD'S ALL MENTION THIS, THE ALCOA CBA'S ALL

4   MENTION THIS.

5        AND AS YOU KNOW, YOLTON STANDS FOR THE PROPOSITION THAT,

6   "BECAUSE THE PENSION PLAN IS A LIFETIME PLAN AND THE HEALTH

7   INSURANCE BENEFITS ARE TIED TO THE PENSION PLAN, THE HEALTH

8   INSURANCE BENEFITS WERE VESTED AND INTENDED TO BE LIFETIME

9   BENEFITS."  "SINCE RETIREES ARE ELIGIBLE TO RECEIVE PENSION BENEFITS

10  FOR LIFE, THE COURT FOUND THAT THE PARTIES INTENDED THAT THE

11  COMPANY PROVIDED LIFETIME CARE HEALTH BENEFITS AS WELL."

12       AND THAT'S BOTH YOLTON, THE GOLDEN CASE, AND THEN JUDGE

13  TRAUGER – IN NASHVILLE, LAST YEAR, IN WINNETT VS. CATERPILLAR,

14  MENTIONED THE SAME FACTOR.  MANY OTHER CASES SAY THE SAME THING;

15  THAT IS, WHERE THERE IS THE LINK BETWEEN RETIREE MEDICAL TO PENSION

16  ELIGIBILITY, THIS CONSTITUTES STRONG EVIDENCE OF VESTING.

17       WELL, WHO DO WE KNOW FROM ALCOA THAT'S AGREED WITH US?  WE

18  WANTED TO PROFFER THAT INFORMATION TO THE COURT.  WELL, JIM

19  MICHAUD, WHO IS AN ALCOA – ONE OF THEIR HIGHER-UP'S WITH REGARD TO

20  PENSION AND HEALTH CARE BENEFITS; RUSS PORTER, WHO WAS GENERAL

21  COUNSEL AT THE TIME; RON HOFFMAN, WHO WAS THE V.P. OVER HEALTH

22  CARE DURING THE '93 NEGOTIATIONS; AND GARY MACDONALD, WHO WAS A

23  HIGHER-UP WITH REYNOLDS METALS COMPANY, ALL TESTIFIED THAT, PER

24  THE RELEVANT CBA'S IN THIS CASE, HEALTH CARE BENEFITS ARE TIED TO

25  PENSION PLANS.

1       THE TESTIMONY IN THIS CASE, THEREFORE, HAS ALSO ESTABLISHED –

2 AND, YOUR HONOR, I WANT TO TAKE JUST A MINUTE HERE. THE LINK IN THIS

3 CASE BETWEEN RETIREE HEALTH CARE AND PENSION ELIGIBILITY IS SO

4 STRONG THAT EVERY ONE OF THE FOLKS IN THIS COURTROOM AND ALL OF

5 THE PEOPLE THAT WE'VE ASKED THIS QUESTION ABOUT IN THEIR DEPOSITION,

6 HAVE SAID NOT ONLY ARE THEY LINKED IN THE DOCUMENTS, BUT WHEN I

7 RECEIVE A PENSION CHECK FROM ALCOA NOW, AUTOMATICALLY DEDUCTED

8 FROM MY PENSION CHECK IS THE MONTHLY PREMIUM FOR MY HEALTH CARE

9 BENEFITS.

10       IN OTHER WORDS, LET'S JUST SAY JANE DOE AND JOHN DOE; JOHN DOE

11 IS A RETIREE FROM ALCOA, JANE DOE IS HIS SPOUSE. THEY ARE BOTH

12 COVERED UNDER THE MEDICAL BENEFITS WITH THE CBA AND THE SPD.

13 FROM THEIR PENSION, FROM THE RETIREE'S PENSION IN THIS CASE, JOHN

14 DOE'S PENSION, THE SUM AUTOMATICALLY IS DEDUCED – OR DEDUCTED OF

15 $150 PER MONTH FROM THEIR PENSION.

16       LET ME GIVE YOU A BETTER EXAMPLE, YOUR HONOR. SAY SOMEONE

17 THAT RETIRED IN 1994, HAS BEEN RETIRED FOR 14 YEARS AND HAD NO CLUE

18 THAT THIS WAS GOING TO HAPPEN EFFECTIVE JANUARY 1, 2007. THAT

19 PERSON'S PENSION IS, SAY, $400 A MONTH. THEY WAKE UP JANUARY 1, 2007,

20 AND INSTEAD OF ALCOA SENDING THEM A BILL, INSTEAD OF ALCOA – WHERE I

21 GREW UP, MY GRANDFATHER CALLED IT GETTING DUNNED – INSTEAD OF

22 ALCOA SENDING THEM SOMETHING TO GET A PAYMENT BY CHECK, WHAT

23 ALCOA DOES IS AUTOMATICALLY DEDUCTS THE AMOUNT OF THEIR PREMIUM

24 EVERY MONTH FROM THEIR PENSION CHECK. THAT'S IT. THAT'S HOW THESE

25 PREMIUMS ARE PAID BY ALL 13, 14, 15,000 RETIREES IN THIS CASE.

1   WE THINK THAT IS STRONG EVIDENCE OF THE LINK BETWEEN PENSION

2 AND RETIREE BENEFITS IN THIS CASE.  THE ALCOA CBA'S AND SPD'S ALSO

3 INDICATE THAT THE PLAN COSTS WILL BE PAID FOR BY ALCOA; AND, OF

4 COURSE, <u>YOLTON</u> SAYS, AND OTHER CASES AS WELL, LANGUAGE INDICATING

5 EMPLOYER WOULD PAY THE FULL COST OF COVERAGE INDICATES INTENT TO

6 VEST WELFARE BENEFITS.  WE HAVE THAT.

7   THE ALCOA CBA'S STATE THAT THE EMPLOYEES MAY NOT HAVE THEIR

8 BENEFITS REDUCED.  WE'RE GOING TO SHOW YOU – THIS IS FROM A 1996 – IF

9 YOU'LL BACK UP ONE SLIDE – IT'S AT 1996.  I KNOW IT'S SMALL PRINT, YOUR

10 HONOR, BUT THAT'S THE MAY 31ST, 1996, CBA THAT WAS MADE EXHIBIT 192 TO

11 MR. PORTER, ALCOA'S LEGAL COUNSEL'S DEPOSITION.

12   WHAT IT SHOWS AND WHAT EVERY ARTICLE 22 GROUP INSURANCE

13 SECTION SHOWS IS THIS:  "NO EMPLOYEE COVERED BY THIS ARTICLE SHALL

14 SUFFER ANY REDUCTION IN THE LEVEL OF ANY OF THE SEVERAL HEALTH

15 CARE BENEFITS OF THIS ARTICLE."  ALL OF THOSE CBA'S CONTAIN THAT

16 LANGUAGE.

17   IN ADDITION, THE CBA'S AND SPD'S CONTAIN LANGUAGE GIVING

18 BENEFITS TO SURVIVING SPOUSES AND ELIGIBLE DEPENDENTS AFTER THE

19 DEATH OF THEIR VESTED ACTIVE EMPLOYEE OR RETIREE SPOUSE, INDICATING

20 AN INTENT TO CONTINUE BENEFITS OF EACH RETIREE UNTIL DEATH AND,

21 THEREFORE, AN INTENT TO VEST.  THAT'S THE <u>BAILEY VS. A K STEEL</u> CASE,

22 THAT WAS JUDGE BARRETT.  AND THEN, OF COURSE, THE <u>UAW</u> CASE THAT

23 WE'VE TALKED ABOUT BEFORE, YOUR HONOR, VERSUS ALCOA THAT JUDGE

24 O'MALLEY FOUND THE EXACT SAME LANGUAGE THAT IS APPLICABLE IN THIS

25 CASE TO BE VESTED BENEFITS FOR RETIREES.

1    "PLAINTIFFS ARE CORRECT THAT THE INCLUSION OF SURVIVING SPOUSE

2 BENEFITS, IN ADDITION TO OTHER INDICIA OF INTENT, IS AN INDICATION THAT

3 THE PARTIES INTENDED TO VEST WELFARE BENEFITS," THAT'S WHAT JUDGE

4 O'MALLEY SAID.  AND THEN <u>YOLTON VS. EL PASO</u> SAYS THE SAME THING.

5    THE ALCOA CBA'S AND SPD'S DISCUSS COVERAGE OF EMPLOYEES

6 AFTER THEY ARE ELIGIBLE FOR MEDICARE.  WELL, THAT'S ONE OF THE

7 FACTORS THAT THE SIXTH CIRCUIT COMMONLY LOOKS AT, YOUR HONOR;

8 AND, IN THIS CASE, ALL OF THOSE, ALL OF THE DOCUMENTS, POINT THAT OUT,

9 WHICH COULD MEAN TEN YEARS OR MORE AFTER THE EMPLOYEES RETIRE.

10 THIS INDICATES AN INTENT TO VEST; OTHERWISE, THE PROMISES ARE GOING

11 TO BE ILLUSORY.  AND AS WE KNOW, THE LAW IN THIS CIRCUIT IS, WE DON'T

12 WANT TO RENDER PROMISES ILLUSORY AND NON-NUGATORY.

13    SO THOSE EXACT SAME ISSUES THAT ARE PART OF THE CASE LAW IN

14 THE SIXTH CIRCUIT ARE ABSOLUTELY PRESENT WITH REGARD TO THE CBA'S

15 AND SPD'S IN THIS CASE.  IN ADDITION, THE ALCOA SPD'S IN '97, '01 AND '02,

16 GIVE SURVIVING SPOUSES BENEFITS THROUGH THEIR OWN DEATHS, SHOWING

17 AN INTENT TO GIVE THEM LIFETIME BENEFITS.

18    THERE'S ALSO A LEGAL RIGHTS SECTION INCLUDED IN ALL ALCOA

19 CBA'S THAT INDICATES, UNLESS EXPLICITLY STATED IN THE CBA, NOTHING

20 CAN BE CONSTRUED AS TAKING AWAY OR GIVING UP ANY VESTED RETIREE

21 HEALTH CARE BENEFIT.

22    THIS IS WHAT IT SAYS.  THIS IS THE '96 CBA.  UNDER "LEGAL RIGHTS,"

23 "NOTHING HEREIN SHALL BE CONSIDERED AS DEPRIVING EITHER PARTY OR

24 ANY EMPLOYEE OF ANY RIGHTS OR PROTECTION GRANTED UNDER ANY

25 APPLICABLE FEDERAL OR STATE LAW."

1       IMPORTANTLY, YOUR HONOR, BECAUSE YOU ASKED US ABOUT THIS AT

2    THE LAST HEARING IN SEPTEMBER, WHAT ABOUT A RESERVATION OF RIGHTS,

3    MR. COLEMAN?  WELL, NUMBER ONE, NONE OF THE ALCOA CBA'S INCLUDE A

4    RESERVATION OF RIGHTS, PERIOD; IT'S NOT THERE.  NUMBER TWO, WHEN YOU

5    LOOK AT THE SPD'S, YOUR HONOR, SOME IMPORTANT THINGS THAT YOU NEED

6    TO NOTE, AND I THINK THESE ARE IMPORTANT THINGS; IN FACT, I'VE NOTED

7    THEM.

8       THE 1993 SPD DOES NOT HAVE A RESERVATION OF RIGHTS CLAUSE, THE

9    2002 SPD ONLY PURPORTS TO ALLOW ADMINISTRATIVE CHANGES.  HERE IT IS,

10   YOUR HONOR.  THIS IS THE 2002 SPD: "FUTURE OF THE PLAN.  THE BENEFITS

11   DESCRIBED IN THIS BOOKLET ARE PROVIDED FOR THE TERM OF THE

12   COLLECTIVE BARGAINING AGREEMENT BETWEEN THE UNION AND ALCOA,

13   INC.  THE COMPANY RESERVES THE RIGHT TO MAKE ADMINISTRATIVE

14   CHANGES," AND THAT'S COMMON, "TO THE HEALTH CARE PLAN FROM TIME

15   TO TIME.  HOWEVER, IMPORTANTLY, THESE CHANGES CANNOT DIMINISH THE

16   BENEFITS NEGOTIATED UNDER THE TERMS OF THE AGREEMENT."

17      LET ME JUST SORT OF SETTLE RIGHT HERE FOR A MOMENT, YOUR

18   HONOR.  THE 1997 SPD HAS NO MENTION OF A CAP, BUT HAS RESERVATION OF

19   RIGHTS LANGUAGE.  THE '93 SPD HAS RESERVATION OF RIGHTS LANGUAGE

20   THAT ONLY ALLOWS ADMINISTRATIVE CHANGES.  THE 1998 REYNOLDS

21   METALS SPD HAS CAP LANGUAGE, BUT SAYS THE RESERVATION OF RIGHTS IS

22   SUBJECT TO THE CBA.

23      THE 2001 ALCOA SPD HAS NO CAP LETTER, BUT HAS AN ROR, A

24   RESERVATION OF RIGHTS.  AND THE ALCOA 2002 SPD, AS WE HAVE JUST SEEN,

25   IT MENTIONS A CAP LETTER, BUT DOESN'T ALLOW FOR ANY CHANGES WITH

1    THE RESERVATION OF RIGHTS.

2        IT'S A LOT OF THIS, YOUR HONOR.  THEY'RE NOT CONSISTENT, AND

3    THERE'S JUST NO WAY THAT YOU CAN EXTRAPOLATE, WE RESPECTFULLY

4    SAY, FROM THOSE SPD'S A REDUCTION IN THE PLAINTIFF'S BENEFITS IN THIS

5    CASE.

6        IMPORTANTLY, THIS IS ANOTHER FACTOR THAT THE COURTS LOOK AT.

7    THERE IS NO SPECIFIC DURATIONAL LANGUAGE IN EITHER THE COLLECTIVE

8    BARGAINING AGREEMENT OR THE SPD'S RELATING SPECIFICALLY TO RETIREE

9    HEALTH CARE/WELFARE BENEFITS BY WHICH TIME RETIREE BENEFITS WOULD

10    EXPIRE.

11        IN OTHER WORDS, THE ACTIVE PARTS OF THE CBA'S AND SPD'S HAVE

12    DURATIONAL LANGUAGE; THEY TALK ABOUT IT.  BUT THE COURTS, ALL OF

13    THE COURTS THAT HAVE CONSIDERED THIS ISSUE, SAY, WHERE THERE'S NO

14    SPECIFIC DURATIONAL LANGUAGE IN THE CBA'S OR SPD'S RELATING TO

15    SPECIFICALLY RETIREE BENEFITS, IT SAYS THIS – THIS IS YOLTON.

16        THIS IS THE SIXTH CIRCUIT OPINION:  "ABSENT SPECIFIC DURATIONAL

17    LANGUAGE," REFERRING TO RETIREE BENEFITS THEM SELVES, "COURTS HAVE

18    HELD THAT THE GENERAL DURATIONAL LANGUAGE SAYS NOTHING ABOUT

19    THESE RETIREE BENEFITS."

20        BECAUSE THE SPD'S TALK ABOUT UNTIL DEATH, EVERY ONE OF THEM.

21    THEY ALL – THE CESSATION OF BENEFITS IS UPON THE DEATH OF THE RETIREE

22    OR THE DEATH OF THE RETIREE'S SPOUSE.

23        AND I GO ON TO POINT THIS OUT.  ALTHOUGH THE SPD'S PROVIDE A

24    SECTION ON WHEN COVERAGE ENDS FOR ACTIVE EMPLOYEES AND A SECTION

25    GIVING VARIOUS END DATES FOR MEDICAL BENEFITS FOR ACTIVE EMPLOYEES

1 UNDER CERTAIN CIRCUMSTANCES, EXAMPLE, LEAVE OF ABSENCE, LAYOFF, ET

2 CETERA, THERE IS NO SIMILAR LANGUAGE TALKING ABOUT CESSATION OF

3 BENEFITS FOR RETIREES.  THE ONLY CESSATION, AS I INDICATED, IS DEATH.

4     LET'S JUST TALK FOR A MINUTE, YOUR HONOR, ABOUT VESTING OF

5 WELFARE BENEFITS IN GENERAL.  PLANS, AS WE'VE TALKED ABOUT, SUCH AS

6 THE ONES COVERING PLAINTIFFS, OR WELFARE BENEFITS AND UNDER ERISA

7 AND UNDER THE LMRA, THEY CAN BE VESTED EVEN THOUGH THEY'RE NOT

8 AUTOMATICALLY SO.

9     OF COURSE, THE COURT IS FAMILIAR WITH THE MAURER CASE AND THE

10 OTHER CASES THAT TALK ABOUT INTERNATIONAL UNION VS. YARD-MAN:  "IF

11 THE PARTIES INTENDED TO VEST BENEFITS AND THE AGREEMENT

12 ESTABLISHING THIS IS BREACHED, THERE IS AN ERISA VIOLATION AS WELL AS

13 AN LMRA VIOLATION."  AND, OF COURSE, AS THE COURT KNOWS, WE'VE SUED

14 UNDER BOTH STATUTES, UNDER BOTH CAUSES OF ACTION.

15     AND THEN THIS LANGUAGE IN YARD-MAN:  "RIGHTS ONCE VESTED

16 UPON THE EMPLOYEE'S RETIREMENT ARE INTERMINABLE, AND THE

17 EMPLOYER'S FAILURE TO SUPPLY THEM ACTIONABLE UNDER SECTION 301 BY

18 THE RETIREE."

19     VESTED RETIREE HEALTH CARE BENEFITS MAY BE BARGAINED FOR AND

20 INCLUDED IN THE CBA'S.  THE QUESTION IS WHETHER THERE WAS AN INTENT

21 THAT THEY CONTINUE IN THE TIME PAST THE END OF ANY PARTICULAR CBA.

22 WE KNOW THAT TO BE THE LAW.

23     VESTED RETIREMENT WELFARE BENEFITS ARE THOSE THAT ARE

24 INTENDED TO SURVIVE THE EXPIRATION OF THE UNDERLYING AGREEMENT.

25 AND THEN, IMPORTANTLY, EVEN THOUGH THIS IS GOING TO COME LATER, I

1  WANTED TO INCLUDE THIS BECAUSE WE ALREADY HAVE CASE LAW ON FAS-

2  106 LETTERS, YOUR HONOR.  EVEN THE LANGUAGE OF A FAS-106 LETTER CAN

3  SHOW THAT THE BENEFITS WERE INTENDED TO SURVIVE THE EXPIRATION OF

4  A PARTICULAR CBA.  ORMET, PRINGLE, AND YOLTON ALL TALK ABOUT THAT.

5       SPECIFICALLY, YOUR HONOR, THINK ABOUT THIS.  IN YOLTON AND IN

6  REESE AND IN OUR CASE, THE CAP LETTERS ALL ARE OUTSIDE OF THE

7  COLLECTIVE BARGAINING AGREEMENT TERM.  THEY ALL DISCUSSED THIS.

8  SO, CLEARLY, THE BENEFITS THEMSELVES WERE MEANT TO SURVIVE OR GO

9  PAST THE TERMINATION OF THE COLLECTIVE BARGAINING AGREEMENT.

10      THE LAW IS ALSO THAT, WHEN TERMS PROVIDE FOR RETIREE HEALTH

11  CARE BENEFITS WHICH SURVIVE THE TERMINATION OF A PARTICULAR CBA,

12  INTENT TO VEST THOSE BENEFITS IS INDICATED.

13      AND THEN, OF COURSE, I CITED FOR THE COURT AGAIN THE SAME

14  LANGUAGE THAT THE COURT CITED IN YOUR MEMORANDUM OPINION FROM

15  YARD-MAN, WHERE YOU TALK ABOUT MANY OF THE – YOU QUOTED, AND IT'S

16  TALKED ABOUT HERE, "THE INTENDED MEANING OF THE MOST EXPLICIT

17  LANGUAGE CAN, OF COURSE, BE ONLY UNDERSTOOD IN THE LIGHT OF THE

18  CONTEXT WHICH GAVE RISE TO ITS INCLUSION.

19      AS IN ALL CONTRACTS, THE COLLECTIVE BARGAINING AGREEMENT'S

20  TERMS MUST BE CONSTRUED SO AS TO RENDER NON-NUGATORY AND AVOID

21  ILLUSORY PROMISES.  AND SO THAT'S WHAT WE SAY IS THE CASE HERE, YOUR

22  HONOR.  THEY ARE VESTED BENEFITS.

23      AND, IMPORTANTLY, AND I DON'T – YOU KNOW, LAWYERS HAVE

24  GOTTEN TROUBLE ON THIS NEXT ISSUE, AND I WANT TO MAKE SURE THAT I'M

25  CLEAR AND THAT THE PLAINTIFFS' POSITION IS CLEAR.  YARD-MAN, AND ITS

1   PROGENY ESTABLISHED THAT RETIREE BENEFITS ARE IN A SENSE STATUS

2   BENEFITS WHICH CARRY WITH THEM AN INFERENCE – IT'S NOT A

3   PRESUMPTION, NOT SUGGESTING THAT IT IS, AND THE BURDEN DOESN'T SHIFT

4   TO ALCOA, WE UNDERSTAND THAT.  BUT THERE IS AN INFERENCE THAT THE

5   PARTIES LIKELY INTENDED THOSE BENEFITS TO CONTINUE AS LONG AS THE

6   BENEFICIARY REMAINS A RETIREE.

7        YARD-MAN IS STILL GOOD LAW.  NOE, THE CASE THAT JUST CAME OUT

8   IN MARCH OF '08, SAYS, HEY, WE DON'T HAVE TO REVISIT YARD-MAN, IT'S

9   STILL THE LAW.  AND AS I TALK ABOUT IT, IN 2008, IN MARCH, THE SIXTH

10   CIRCUIT SAID THE YARD-MAN INFERENCE REMAINS GOOD LAW AND GUIDES

11   COURTS FACED WITH THE TASK OF DISCERNING THE INTENT OF THE PARTIES

12   IN THESE TYPES OF CASES.

13        THIS LANGUAGE, YOUR HONOR, I THINK IS OUR CASE.  THE YARD-MAN

14   INFERENCE IS PARTICULARLY APPROPRIATE IN THE CONTEXT OF UNIONIZED

15   WORKERS.  AS THE SIXTH CIRCUIT NOTED IN YOLTON – AND I GIVE YOU THE

16   CITE THERE – THAT IS BECAUSE RETIREES WHO HAVE LEFT THEIR

17   BARGAINING UNIT AND CAN NO LONGER RELY ON THEIR UNION TO MAINTAIN

18   THEIR BENEFITS, ALL THESE FOLKS, ARE NOT LIKELY TO LEAVE THEIR

19   BENEFITS ALTERABLE BASED ON THE CHANGING WHIMS AND RELATIVE

20   BARGAINING POWER OF THEIR FORMER UNION AND EMPLOYER.

21        FOR EXAMPLE, THE GENTLEMAN THAT MAY HAVE RETIRED IN 1994

22   THINKING, OKAY, I'VE GIVEN THE COMPANY 40 YEARS, I'VE WORKED FOR

23   THESE BENEFITS, I'VE EARNED THEM, THE COMPANY'S GOING TO PROVIDE

24   THEM, I RETIRED UNDER THAT PRESUMPTION; AND THEN I WAKE UP JANUARY

25   1, 2007, AND REALIZE THAT WHAT I'VE HAD FOR THE LAST 14 YEARS ISN'T

1   THERE ANY LONGER.  SO THAT'S WHY WE SAY THAT LANGUAGE, WE BELIEVE,

2   IS VERY APPLICABLE IN THIS CASE.

3   I WANT TO GO THROUGH QUICKLY THE SIXTH CIRCUIT PRECEDENT

4   WITH REGARD TO VESTING AND HOW THEY SHOW IN THIS CASE THOSE

5   BENEFITS ARE VESTED.  I WANT TO REVISIT THE UAW VS. ALCOA CASE ONLY

6   BECAUSE I WANT TO MAKE SURE THAT, FROM OUR PERSPECTIVE, THE COURT

7   SEES THIS LANGUAGE THAT JUDGE O'MALLEY, IN THE UAW VS. ALCOA CASE,

8   RELIED UPON IN COMING TO HER CONCLUSION THAT THE RETIREE MEDICAL

9   BENEFITS IN THAT CASE WERE VESTED BENEFITS AND COULDN'T BE REDUCED

10  BY ALCOA.

11  THIS LANGUAGE, "THE COMPANY WILL PROVIDE THE FOLLOWING

12  COVERAGES FOR RETIRED EMPLOYEES (AND ELIGIBLE DEPENDENTS) AND

13  SURVIVING SPOUSES OF ACTIVE AND RETIRED EMPLOYEES WHO ARE

14  RECEIVING A PENSION UNDER THE PENSION AGREEMENT, ALL OF THE ABOVE

15  BENEFITS WILL BE PROVIDED WITHOUT COST TO EMPLOYEES AND RETIREES

16  EXCEPT AS OTHERWISE PROVIDED."

17  NOW, WHY IS THAT LANGUAGE IMPORTANT?  IT'S THE 1988 CBA.  THAT

18  WAS BEFORE, YOU KNOW, ALL OF THE OTHER THINGS THAT HAVE BEEN

19  GOING ON, BUT THE LANGUAGE IS STILL THE LANGUAGE.  THE EVIDENCE

20  THAT THE JUDGE LOOKED AT THAT WAS FOUND TO BE SUFFICIENT EXTRINSIC

21  EVIDENCE INDICATE VESTING WAS THE FOLLOWING; THE INCLUSION OF

22  SURVIVING SPOUSE BENEFITS IN SPD'S AND CBA'S.  IN THIS CASE, THEY

23  INCLUDE THE SAME THING, NOTHING'S CHANGED, SINCE JUDGE O'MALLEY

24  MADE HER DECISION.

25  THE FACT THAT DEPENDENT COVERAGE EXPRESSLY EXTENDS UNTIL

1    THE RETIREE'S DEATH IS PERSUASIVE OF INTENT TO VEST. SIMILARLY, IN OUR

2    CASE, THAT SAME CBA AND SPD LANGUAGE THAT WAS PRESENT WHEN JUDGE

3    O'MALLEY LOOKED AT IT IS PRESENT TODAY. DEPENDENT COVERAGE IN THE

4    CASE AT BAR EXTENDS TO THE RETIREE'S DEATH. THE SPD'S INCLUDE

5    INFORMATION FOR DEPENDENT COVERAGE BEYOND THE RETIREE'S DEATH.

6          THE COURT NOTED THE FAILURE OF CESSATION OF COVERAGE CLAUSE

7    OF THE SPD TO INCLUDE ANYTHING WHICH MIGHT CUT OFF A RETIREE'S

8    BENEFITS BEFORE DEATH OTHER THAN SPECIFIC MEDICAL INCIDENCES. IN

9    OTHER WORDS, WHAT I TALKED ABOUT BEFORE, IN JUDGE O'MALLEY'S CASE,

10    SHE WAS LOOKING AT CBA'S AND SPD'S ALMOST IDENTICAL TO WHAT THE

11    COURT IS CONSIDERING IN THIS CASE, THEY SAY THE SAME THING, THERE

12    WAS NO CESSATION OF BENEFITS TO RETIREES; ONLY DEATH.

13          AND THEN THE COMPANY'S ACTIONS IN CONTINUING WELFARE

14    BENEFITS COVERAGE FOR RETIREES PAST THE EXPIRATION OF A CBA, WHICH

15    IS GENERALLY THE POINT AT WHICH COVERAGE FOR ACTIVE EMPLOYEES

16    MIGHT BE TERMINATED, THAT'S ANOTHER THING THAT'S SIMILAR OR

17    IDENTICAL HERE.

18          AND IN THE CASE AT BAR MANY OF THE RETIREES, WELL, ALL OF THEM,

19    HAVE HAD THEIR WELFARE BENEFITS CONTINUED PAST THE EXPIRATION OF

20    ANY PARTICULAR CBA.

21          THE COURT FOUND THE SPD'S PROVISION GIVING DIFFERENT COVERAGE

22    TO THOSE RETIREES WHO ARE MEDICARE ELIGIBLE AND THOSE RETIREES

23    WHO ARE NOT MEDICARE ELIGIBLE INDICATIVE OF AN INTENT TO VEST. IN

24    THE CASE AT BAR THE SPD'S CONTAIN NEARLY IDENTICAL DISCUSSIONS OF

25    RETIREE WELFARE BENEFITS AND MEDICARE ELIGIBILITY.

1    AND ANOTHER INDICATION THAT THE PARTIES INTENDED TO PROVIDE

2    COVERAGE FOR LIFE IS THE FACT THAT THE CBA'S AND SPD'S TIE A RETIREE

3    AND SURVIVING SPOUSE ELIGIBILITY FOR COVERAGE TO ELIGIBILITY FOR

4    VESTED PENSION BENEFITS.  THE EXACT SAME THING.

5    AND I WANT YOU TO GO TO SLIDE 33, AND I WANT TO SHOW THE COURT.

6    THIS IS AGAIN THE 1996 CBA WHICH IS MADE AN EXHIBIT TO RUSS PORTER'S

7    DEPOSITION.  THIS LANGUAGE RIGHT HERE THAT I'M BRACKETING, YOUR

8    HONOR, "THE COMPANY WILL PROVIDE THE FOLLOWING COVERAGES FOR

9    RETIRED EMPLOYEES (AND ELIGIBLE DEPENDENTS) AND SURVIVING SPOUSES

10   OF ACTIVE AND RETIRED EMPLOYEES (AND ELIGIBLE DEPENDENTS) WHO ARE

11   RECEIVING A PENSION UNDER THE PENSION AGREEMENT," THEN, "ALL OF THE

12   ABOVE BENEFITS WILL BE PROVIDED WITHOUT COST TO EMPLOYEES AND

13   RETIREES EXCEPT AS OTHERWISE PROVIDED."

14   AND, AGAIN, THE SECTION, THIS SAME ARTICLE 22, "NO EMPLOYEE

15   COVERED BY THIS ARTICLE SHALL SUFFER ANY REDUCTION IN THE LEVEL OF

16   ANY OF THE SEVERAL HEALTH CARE BENEFITS OF THIS ARTICLE."  NOW, GO

17   BACK TO SLIDE 30.

18   SO KEEPING THIS LANGUAGE IN MIND, YOUR HONOR, THAT'S BEFORE

19   THE COURT IN THE '96 CBA, LET'S LOOK AT WHAT JUDGE O'MALLEY HAD TO

20   CONSIDER THERE.  HERE WAS THE LANGUAGE OF THE '88 CBA, AND, IN FACT, I

21   HAVE IT.  THIS WAS MADE EXHIBIT 190, AND THIS IS, AS YOU CAN SEE, YOUR

22   HONOR, THE 1988 CBA.

23   THE LANGUAGE IN THE 1988 CBA, UNDER ARTICLE 22, RIGHT HERE IS THE

24   EXACT SAME LANGUAGE THAT WE'RE GOING TO SEE AGAIN ON SLIDE – OR

25   ALMOST IDENTICAL LANGUAGE THAT YOU'RE GOING TO SEE ON SLIDE 33,

1  WHICH IS THE FOLLOWING: "THE COMPANY – IN ADDITION, THE COMPANY

2  WILL PROVIDE THE FOLLOWING COVERAGES FOR RETIRED EMPLOYEES (AND

3  ELIGIBLE DEPENDENTS) AND SURVIVING SPOUSES OF ACTIVE AND RETIRED

4  EMPLOYEES (AND ELIGIBLE DEPENDENTS) WHO ARE RECEIVING A PENSION

5  UNDER THE PENSION AGREEMENT."

6      OKAY.  WELL, HOW IS THIS GOING TO BE PAID FOR?  "ALL OF THE ABOVE

7  BENEFITS WILL BE PROVIDED WITHOUT COST TO EMPLOYEES AND RETIREES

8  EXCEPT AS OTHERWISE PROVIDED."  AND AS JUDGE O'MALLEY TALKS ABOUT

9  AND AS IS CONTAINED IN THE CBA, THAT'S ADMINISTRATIVE COSTS.

10     LET'S NOW SWITCH TO SLIDE 33.  THAT'S THE EXACT SAME LANGUAGE

11  THAT'S IN THE 1996 OR NEARLY IDENTICAL.  I CAN'T DISCERN A MEANINGFUL

12  DIFFERENCE.  THE 1996 CBA, WHICH SAYS, "THE COMPANY WILL PROVIDE THE

13  FOLLOWING COVERAGES FOR RETIRED EMPLOYEES (ELIGIBLE DEPENDENTS)

14  SURVIVING SPOUSES OF ACTIVE AND RETIRED EMPLOYEES (ELIGIBLE

15  DEPENDENTS) WHO ARE RECEIVING A PENSION UNDER THE PENSION

16  AGREEMENT," AND THE SAME LANGUAGE THAT I JUST SHOWED YOU, "ALL OF

17  THE ABOVE BENEFITS WILL BE PROVIDED WITHOUT COST TO EMPLOYEES AND

18  RETIREES EXCEPT AS OTHERWISE PROVIDED."  SAME THING.

19     AND JUDGE O'MALLEY SAID, HEY, THESE BENEFITS ARE VESTED

20  BENEFITS, YOU CAN'T ALTER OR AMEND THEM.

21     NOW, I TALKED ABOUT THIS EARLIER, ABOUT THE PREMIUM PAYMENTS

22  THAT ARE MADE BY THE RETIREES ARE ACTUALLY TAKEN FROM THEIR

23  PENSION CHECKS, SO WE WON'T DISCUSS THAT FURTHER.  AND WE GO ON TO

24  MAKE THIS STATEMENT.  I KNOW IT'S A BOLD STATEMENT, YOUR HONOR, BUT

25  I THINK IT'S AN ACCURATE ONE.

1     IN CONSIDERATION OF EXTRINSIC EVIDENCE IN THIS CASE WHICH PALES

2     IN – I MEAN, IN CONSIDERATION OF ALL THAT WE'VE GATHERED IN THIS CASE

3     IN COMPARISON TO THAT PRESENTED BY THE PLAINTIFFS TO JUDGE

4     O'MALLEY, WE THINK THAT IT IS A TRUE STATEMENT, HER FINDING THAT,

5     "UPON EXAMINATION OF THE OTHER PROVISIONS OF THE 1988 CBA AND SPD'S

6     INCORPORATED BY REFERENCE, THIS COURT FINDS THAT THESE PROVISIONS

7     WEIGH HEAVILY IN FAVOR OF FINDING THAT THE PARTIES INTENDED TO

8     CREATE VESTED LIFETIME WELFARE BENEFITS FOR PLAINTIFF RETIREES.

9     COUPLE THESE FACTORS WITH THE CONTEXT IN WHICH THE CONTRACTUAL

10    PROVISIONS AT ISSUE WERE AGREED TO," AND WHAT? "SUCH A FINDING IS

11    MANDATED."

12    YOU KNOW, RESPECTFULLY, YOUR HONOR, THAT'S WHERE WE ARE

13    WITH THIS, THAT THE LANGUAGE OF THE CBA'S AND SPD'S IN COMBINATION

14    WITH – WE SAY YOU DON'T EVEN NEED TO GET TO EXTRINSIC EVIDENCE, BUT

15    IN THIS CASE, IN COMBINATION WITH THE EXTRINSIC EVIDENCE, SHOWS AN

16    INTENT TO VEST.

17    LET'S GO ON TO THE NEXT SLIDE, PLEASE, DAWN. THE <u>COLE VS.</u>

18    <u>ARVINMERITOR</u> CASE, YOUR HONOR, CITES THE PROPOSITION YET AGAIN

19    THAT, "TYING PENSION STATUS TO RETIREE HEALTH BENEFITS AND

20    PROVIDING THAT BENEFITS AGAIN AT THE TIME OF RETIREMENT AND SHALL

21    BE CONTINUED THEREAFTER FOR RETIREES AND ANY ELIGIBLE DEPENDENTS

22    CONSTITUTES AN ENFORCEABLE CONTRACTUAL PROMISE OF LIFETIME

23    RETIREE HEALTH BENEFITS TO ACCOMPANY LIFETIME PENSION BENEFITS

24    AND, SIMILARLY, REGARDING SURVIVING SPOUSES."

25    THAT'S WHAT WE BELIEVE IS THE CASE, YOUR HONOR. AND AS I

1    POINTED OUT, THE COURT, IN UAW, JUDGE O'MALLEY, CONSIDERED

2    EXTRINSIC EVIDENCE, INCLUDING THE SPD'S AND THE LANGUAGE AND FOUND

3    THAT THERE WAS VESTED BENEFITS.

4         UNDER THE LMRA, SPD'S ARE CONSIDERED EXTRINSIC EVIDENCE OF

5    INTENT, PRATER VS. OHIO EDUCATION ASSOCIATION.  THE COURT MAY ALSO

6    CONSIDER EVIDENCE OF REPRESENTATIONS MADE TO INDIVIDUAL RETIREES

7    AS WELL AS ADDITIONAL DOCUMENTARY EVIDENCE, AND WE'LL TALK ABOUT

8    THAT IN JUST A MOMENT.

9         WE ALSO SAY, YOUR HONOR, THAT THE INTENT TO VEST IN THIS CASE IS

10   FURTHER SUPPORTED BY THE CONDUCT AND REPRESENTATIONS OF THE

11   PARTIES.  WHEN YOU LOOK AT IT TOGETHER, WE BELIEVE THOSE ARE VESTED

12   BENEFITS WHICH COULD NOT BE REDUCED AS THEY WERE EFFECTIVE

13   JANUARY 1, 2007.

14        BUT WE JUST DON'T SAY THE BENEFITS ARE VESTED, YOUR HONOR.

15   THIS NEXT DOCUMENT WAS PROVIDED TO US.  AS YOU CAN TELL, IT'S NEAR

16   THE END OF THE DOCUMENT PRODUCTION.  THAT'S DOCUMENT NUMBER

17   448,703, AND WE MADE THIS EXHIBIT 601 TO THE DEPOSITION.  THIS IS AN

18   ALCOA INTERNAL DOCUMENT AROUND 1992-ISH.

19        HOLD ON A SECOND, DAWN, BEFORE YOU GO TO THAT SCREEN.  WHAT

20   THIS SCREEN SHOWS, YOUR HONOR, IS ALCOA'S OWN DEFINITION OF WHO'S

21   ELIGIBLE FOR RETIREE MEDICAL.  WHO IS THAT?  WHAT'S THE CATEGORY.

22   AND THIS ISN'T GREG COLEMAN SAYING IT, IT IS NOT THE UNION SAYING IT;

23   THIS IS ALCOA SAYING IT.

24        IT SAYS, "ACTIVES NOT ELIGIBLE," AND I KNOW IT'S SMALL PRINT, BUT

25   IT TALKS ABOUT ACTIVE EMPLOYEES WHO ARE NOT ELIGIBLE FOR RETIREE

1   MEDICAL, AND IT SAYS, "THESE ARE ACTIVE EMPLOYEES WHO HAVE NOT MET

2   THE AGE AND SERVICE REQUIREMENTS TO RETIRE WITH THE RETIREE

3   MEDICAL AND LIFE BENEFIT. UNDER THE NEW ACCOUNTING RULES,"

4   MEANING FAS-106, "BOTH SERVICE – " HANG ON, ONE SECOND, PLEASE, DAWN

5   " – BOTH SERVICE COSTS AND DISCOUNT COSTS ARE ASSOCIATED WITH THESE

6   EMPLOYEES."

7          SO THAT'S A GROUP THAT ALCOA INTERNALLY SAYS, LOOK, THESE ARE

8   ACTIVE FOLKS, THEY'RE NOT ELIGIBLE. WELL, WHAT ABOUT OTHER FOLKS,

9   ACTIVES WHO ARE ELIGIBLE? LET'S SEE THAT. "ACTIVES (ELIGIBLE), THESE

10  ARE ACTIVE EMPLOYEES WHO MEET THE AGE AND SERVICE REQUIREMENTS,"

11  FIVE YEARS NOW, YOUR HONOR. IT'S BEEN FIVE YEARS SINCE, I BELIEVE, 1988,

12  SO DEFINITELY IT WAS FIVE YEARS AT THE TIME OF 1993.

13         "THESE ARE ACTIVE EMPLOYEES WHO MEET THE AGE AND SERVICE

14  REQUIREMENTS FOR RETIREMENT AND WHO HAVE," WHAT, "VESTED – " I

15  MEAN, ALCOA EVEN PUTS IT IN QUOTATION MARKS " – IN THE RETIREE

16  MEDICAL AND LIFE BENEFIT. UNDER THE NEW ACCOUNTING RULES, ONLY

17  DISCOUNT COSTS IS ASSOCIATED WITH THESE EMPLOYEES."

18         I DON'T KNOW HOW MUCH – AGAIN, THIS IS EVIDENCE THAT WE HAVE

19  BEEN ABLE TO FORTUNATELY GET FROM ALCOA, BUT THAT SHOW THERE IS A

20  GROUP OF EMPLOYEES WHO HAVE MET THE AGE AND SERVICE

21  REQUIREMENTS WHILE THEY WERE ACTIVE WHO ARE VESTED. AND YOUR

22  HONOR WELL KNOWS THE LAW, HEY, ONCE YOU'RE VESTED, MAN, YOU HAVE

23  LIFETIME BENEFITS, "DO NOT PASS GO, DO NOT COLLECT $200."

24         AND SO WE SAY THAT THAT'S FURTHER EVIDENCE IN THIS CASE THAT

25  THESE RETIREES, ALL OF WHOM HAD THOSE AGE AND YEARS OF SERVICE AT

1    THE TIME OF JANUARY 1, 2007, CLEARLY HAD VESTED BENEFITS.

2         THE DOCUMENTS ALSO CONTAIN PROMISES OF RETIREE HEALTH CARE

3    BENEFITS BEING COMPLETELY TIED, AS WE'VE TALKED ABOUT, TO PENSION

4    BENEFIT ENTITLEMENT.  THEY LAST UNTIL DEATH, THEY ARE PROVIDED FOR

5    SURVIVING SPOUSES OF BOTH ACTIVE AND RETIRED EMPLOYEES UNTIL THEIR

6    OWN DEATH.

7         THE ONLY CHANGE FOR RETIREE HEALTH CARE BENEFITS IS TO OCCUR

8    AT THE RECEIPT OF MEDICARE AND THEN ONLY REDUCED BY WHAT

9    MEDICARE COVERS, BUT THEY CONTINUE AFTER MEDICARE'S ELIGIBILITY

10   COMMENCES.

11        AND, FURTHER, AGAIN, NOT TRYING TO BEAT A DEAD HORSE, THE

12   REPEATED, IRREFUTABLE AND UNMISTAKABLE REFERENCE IN THE SPD'S IS TO

13   ACTIVE EMPLOYEES BEING VESTED, AS I SHOWED YOU THAT 2002 SPD

14   PREVIOUSLY.

15        YOU KNOW, THERE IT IS AGAIN, JUST GO AHEAD AND SHOW IT.  THAT'S

16   THE LANGUAGE, REFERS TO AN ACTIVE VESTING, JUST LIKE EXHIBIT 601 DID

17   THAT I SHOWED THE COURT.  ALCOA HAS A GROUP OF ACTIVE EMPLOYEES

18   WHO ARE ELIGIBLE FOR VESTED BENEFITS.

19        WHAT ABOUT EXPLICIT LANGUAGE OF VESTING?  SIXTH CIRCUIT LOOKS

20   AT THREE MAIN FACTORS, YOUR HONOR.  YOU KNOW, THAT'S ALL WELL AND

21   GOOD, WHAT YOU SAY, MR. COLEMAN; WHAT DOES THE SIXTH CIRCUIT SAY?

22        SIXTH CIRCUIT LOOKS AT THREE FACTORS OF LANGUAGE THAT REVEAL

23   AN INTENT TO VEST BENEFITS.  WE SAY THAT WHEN YOU LOOK AT THOSE

24   FACTORS, YOUR HONOR, THE RETIREES SHOULD HAVE THEIR BENEFITS

25   RETURNED TO THE SAME LEVELS THAT EXISTED BEFORE JANUARY 1, 2007,

1    AND, THOUGH, BY THE WAY, PAY THEM BACK FOR WHAT THEY HAVE

2    WRONGLY HAD TO PAY.

3        THE SIXTH CIRCUIT LOOKS AT THIS.  IMPORTANTLY, ARE THOSE

4    WELFARE BENEFITS TIED TO PENSION BENEFITS?  WELL, WE KNOW IT WAS IN

5    NOE, WE KNOW IT WAS IN YARD-MAN, YOLTON, POLICY VS. POWELL PRESSED

6    STEEL, HINCKLEY VS. KELSEY-HAYES, AND, OF COURSE, UAW VS. ALCOA AND

7    THEN BAILEY VS. A K STEEL.  EVERYBODY SAYS THAT IN THIS CASE, YOUR

8    HONOR, THEY'RE TIED.

9        AS I SAID, ALCOA'S FOLKS ADMITTED TO ME, JUST LIKE YOU SAW IN THE

10   EXHIBITS, THEY'RE TIED TOGETHER.  THE FACT THAT THEY HAVE THE MONEY

11   TAKEN FROM THEIR PENSION CHECK TO PAY FOR THE PREMIUMS, THAT'S TIED

12   TOGETHER.

13       THEN THE COURTS LOOK AT, NUMBER TWO, WHETHER THE LANGUAGE

14   OF THE PLANS PLACE ANY DURATIONAL LIMITS.  WELL, WE'VE TALKED

15   ABOUT THAT BRIEFLY.  THERE ARE NO DURATIONAL LIMITS WITH REGARD TO

16   RETIREE HEALTH CARE.

17       IF THE PLANS INDICATE THAT THE BENEFITS ARE PROVIDED FOR LIFE

18   OR ARE PROVIDED UNTIL THE RETIREE'S DEATH OR WILL CONTINUE WITHOUT

19   A DEFINITE TERMINATION, THE LANGUAGE FINDS IN FAVOR OF VESTING.  WE

20   HAVE THAT.

21       THE CESSATION OF THAT, YOUR HONOR, IS SHOWN RIGHT HERE.  AGAIN,

22   I WANT TO JUST BRIEFLY SHOW YOU THE 2002 SPD, AND THIS LANGUAGE IS

23   THE SAME.  I JUST HAPPEN TO HAVE THE 2001 SPD WITH ME – OR 2002 SPD:

24   "WHO IS ELIGIBLE?"  WE'VE TALKED ABOUT THAT.  "WHO PAYS THE COSTS?

25   GENERALLY, ALCOA PAYS THE COST FOR YOU AND YOUR ELIGIBLE

1    DEPENDENTS.  WHEN RETIREE COVERAGE BEGINS, IT BEGINS ON YOUR

2    RETIREMENT DATE.  WHEN DOES IT END?  YOUR RETIREE HEALTH CARE

3    COVERAGE ENDS ON THE DATE OF YOUR DEATH."

4         SO THERE IS NO DURATIONAL LANGUAGE THAT WOULD BE APPLICABLE

5    TO THESE RETIREES THAT ARE THE PLAINTIFF IN THIS CASE.  SO WE MEET

6    THAT PRONG OF THE THREE-PART TEST THAT THE SIXTH CIRCUIT HAS

7    ESTABLISHED AS THE LAW.

8         LET'S LOOK AT NUMBER THREE.  COURTS LOOK AT WHETHER BENEFITS

9    ARE PROVIDED AT NO COST, I JUST SHOWED YOU THAT ON THE 2002 SPD,

10   GENERALLY ALCOA PAYS THE COST.  I SHOWED THAT TO YOU IN THE '96 CBA,

11   ALCOA WILL PAY THE COST EXCEPT FOR ADMINISTRATIVE CHARGES.

12        SO THE ALCOA CBA'S FROM 1977 TO '06 STATE THAT THE BENEFITS

13   WERE TO BE PROVIDED WITHOUT COST.  THE ALCOA AND REYNOLDS SPD'S

14   STATE THAT THE BENEFITS ARE PROVIDED, AS I JUST READ YOU, ALL OF THEM

15   SAY, "GENERALLY, AT NO COST TO YOU."

16        A REVIEW OF THE APPLICABLE CASE LAW IS AS FOLLOWS, TRY TO MAKE

17   THIS QUICK.  NOE, YOUR HONOR, I'M SURE YOU'VE LOOKED AT IT, AND AS

18   YOU CAN IMAGINE, I'VE SORT OF ALMOST HAD IT BY MY BED AT NIGHT

19   TRYING TO MAKE SURE I'VE GOT THE FULL EXTENT OF THE MEANING OF THIS

20   CASE.

21        THIS CASE CAME OUT IN MARCH OF THIS YEAR, AND THE SIXTH CIRCUIT

22   – AND I MEAN THIS RESPECTFULLY – THE SIXTH CIRCUIT, I DON'T WANT TO BE

23   SO STRONG AS TO SAY THEY TOOK UMBRAGE WITH WHAT THE TRIAL COURT

24   RULED, BUT THEY MADE IT PRETTY CLEAR IN THE LANGUAGE THAT – AND I'LL

25   TALK ABOUT THAT IN JUST A MINUTE – THAT EMPHATICALLY AND

1  UNEQUIVOCALLY CLEAR THAT GRANTING SUMMARY JUDGMENT TO A

2  DEFENDANT COMPANY IS REVERSIBLE ERROR AS A MATTER OF LAW, I MEAN,

3  AS A MATTER OF THE LAW; WHERE, AS, IN THE INSTANT CASE, RETIREE

4  HEALTH CARE PLANS TIE ELIGIBILITY FOR RETIREE HEALTH CARE BENEFITS

5  TO ELIGIBILITY FOR PENSION BENEFITS.

6       IN FACT, THE COURT IN NOE RULED AS A MATTER OF LAW THAT HEALTH

7  CARE BENEFITS TIED TO ELIGIBILITY FOR PENSION BENEFITS IS CLEAR

8  EVIDENCE OF AN INTENT TO VEST, AND AS SUCH, VESTED BENEFITS CANNOT

9  BE REDUCED AS ALCOA IS SEEKING TO DO IN THIS CASE.

10       WE TALK ABOUT NOE.  KEEP GOING, DAWN, TO THE NEXT BULLET

11  POINT.  I WANT TO SETTLE RIGHT HERE FOR A MOMENT, YOUR HONOR, AND I

12  WANT TO GET AWAY FROM THE POWERPOINT JUST FOR A SECOND AND JUST

13  TALK.  I KNOW YOU'RE LIKE, WELL, YOU'VE TALKED A LOT ALREADY, MR.

14  COLEMAN.

15       BUT, IN LIGHT OF THE SEVERAL CASES THAT HAVE COME OUT SINCE

16  THIS CASE WAS FILED, THE PLAINTIFFS BELIEVE, RESPECTFULLY, THAT WE

17  SHOULD HAVE SUMMARY JUDGMENT GRANTED.  HERE ARE THE CASES.  WE

18  FILED THIS CASE DECEMBER OF '06.  IN SEPTEMBER, 2006, BAILEY VS. A K

19  STEEL CAME OUT.  THERE JUDGE BARRETT GRANTED A MOTION FOR

20  PRELIMINARY INJUNCTION IN FAVOR OF THE PLAINTIFFS.

21       THAT CASE ULTIMATELY WENT ON TO SETTLE FOR 663 MILLION

22  DOLLARS THAT WAS PLACED INTO A VEBA FOR AROUND 7,000 RETIREES.

23       JANUARY, 2007, THE SIXTH CIRCUIT, IN WOOD VS. DETROIT DIESEL,

24  AFFIRMED THE TRIAL COURT AND GRANTED A MOTION FOR PRELIMINARY

25  INJUNCTION.  THAT CASE ALSO INVOLVED A CAP LETTER BY THE WAY.

1       MAY, 2007, JUDGE TRAUGER, <u>WINNETT VS. CATERPILLAR</u> CAME OUT,

2  AND SHE FOUND, ON MOTION FOR SUMMARY JUDGMENT, IN FAVOR OF THE

3  PLAINTIFFS AND FOUND AS WELL THIS, YOUR HONOR, WHICH I THINK IS AN

4  ISSUE IN THIS CASE; SPECIFICALLY, RETIREE BENEFITS VEST, VEST, WHILE

5  THEY'RE STILL ACTIVE.  THAT'S WHAT JUDGE TRAUGER SAID

6  UNEQUIVOCALLY IN HER OPINION, THAT YOU CAN HAVE VESTED BENEFITS

7  WHILE YOU'RE STILL ACTIVE.

8       THEN IN JULY OF 2007 <u>PRINGLE VS. CONTINENTAL TIRE</u> CAME OUT.

9  JUDGE ZOUHARY, JACK ZOUHARY, HE FOUND A MOTION FOR SUMMARY

10  JUDGMENT IN FAVOR OF THE PLAINTIFFS.  THAT CASE HAS SINCE GONE ON TO

11  SETTLE FOR 158 MILLION DOLLARS FOR AROUND 3,700 RETIREES.

12       AUGUST, 2007, JUDGE DUGGAN IN <u>REESE VS. CNH</u>, HE GRANTED A

13  MOTION FOR SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFFS INVOLVING

14  A CAP LETTER.  THAT CAP LETTER ONLY TOOK EFFECT, IF AT ALL, AFTER THE

15  TERM OF THE CBA, TIED PENSION BENEFITS TO THE RECEIPT OF – HEALTH

16  CARE BENEFITS TO RECEIPT OF PENSION BENEFITS AND FOUND IN FAVOR OF

17  THE PLAINTIFFS.

18       THEN IN OCTOBER OF 2007 THE SIXTH CIRCUIT CAME OUT WITH <u>PRATER</u>

19  <u>VS. OHIO EDUCATORS ASSOCIATION</u>.  THERE THEY REVERSED THE TRIAL

20  COURT WHO HAD FOUND IN FAVOR OF THE DEFENDANT.  WHAT <u>PRATER</u> SAID

21  IN THE SIXTH CIRCUIT – AND I HAVE THIS LANGUAGE IN MY HEAD; THAT IS, AN

22  SPD RESERVATION OF RIGHTS CANNOT VITIATE, QUOTE, CANNOT VITIATE

23  CONTRACTUALLY VESTED BENEFITS, AND THEY REVERSED THE TRIAL COURT

24  WHO HAD FOUND OTHERWISE.

25       MARCH OF '08 WE HAVE <u>YOLTON II</u> COME OUT, WHICH WAS JUDGE

1    DUGGAN. HE GRANTED THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,

2    JUST LIKE IN THIS CASE, AND <u>REESE</u> WAS AS WELL, YOUR HONOR. IN BOTH

3    THOSE CASES YOU HAD – JUDGE DUGGAN HAD COMPETING MOTIONS FOR

4    SUMMARY JUDGMENT FILED BY THE PARTIES. IN THAT CASE, JUDGE DUGGAN

5    HAD FOUND THAT THE PLAINTIFF HAD FAILED BECAUSE THE CAP WAS IN

6    EFFECT AFTER THE TERM OF THE CBA, THE LANGUAGE LINKED RETIREE

7    MEDICAL TO PENSION AND, AS A MATTER OF LAW, FOUND THAT FAS-LETTER,

8    WAS OF NO EFFECT.

9            <u>THE COURT</u>: MR. COLEMAN, ARE YOU ABOUT COMPLETED WITH

10   YOUR INITIAL ARGUMENT?

11           <u>MR. COLEMAN</u>: YES, I AM, YOUR HONOR.

12           <u>THE COURT</u>: OKAY.

13           <u>MR. COLEMAN</u>: IN MARCH OF '08, YOUR HONOR, <u>NOE VS.</u>

14   <u>POLYONE</u>, SAYS THE FOLLOWING: "THE VESTING DETERMINATION." THE

15   DISTRICT COURT HELD THAT RETIREE HEALTH BENEFITS PROVISIONS IN THE

16   EBA IS CLEARLY AND UNAMBIGUOUSLY ESTABLISHED THAT THE PARTIES DID

17   NOT INTEND FOR PLAINTIFFS' HEALTH BENEFITS TO VEST. HAVING EXAMINED

18   THE LANGUAGE OF THE MOA'S, THE COURT FINDS THAT THE DISTRICT COURT

19   IMPROPERLY GRANTED SUMMARY JUDGMENT IN FAVOR OF <u>POLYONE</u>" FOR

20   NUMEROUS REASONS.

21        FIRST, "<u>POLYONE'S</u> ARGUMENT THAT THE MOA'S LANGUAGE INCLUDES

22   THAT PLAINTIFFS' HEALTH BENEFITS WERE NOT VESTED, INTENDED TO VEST,

23   FAILS; SECOND, THE DURATIONAL PROVISIONS RELIED UPON BY <u>POLYONE</u> IN

24   THE DISTRICT COURT ARE GENERAL IN NATURE AND DON'T PRECLUDE A

25   FINDING THAT THE PARTIES INTENDED PLAINTIFFS' BENEFITS TO VEST; THIRD,

1  THE EBA'S EXPRESSLY TIE ELIGIBILITY FOR RETIREE HEALTH BENEFITS TO

2  ELIGIBILITY FOR A PENSION, WHICH WE HAVE REPEATEDLY HELD EVINCES AN

3  INTENT TO VEST.  FOURTH, ADOPTING THE INTERPRETATION URGED BY

4  POLYONE AND BY THE DISTRICT COURT WOULD RENDER SEVERAL PROMISES

5  ILLUSORY; FIFTH, THE PRESENCE OF SPECIFIC VESTING LANGUAGE IN THE

6  PENSION PORTION DOES NOT LEAD TO THE CONCLUSION THAT THE

7  PLAINTIFFS' HEALTH BENEFITS ARE NOT VESTED."

8       GO ON REAL QUICKLY, DAWN, BECAUSE I WANT TO USE THE TIME

9  WISELY, GO TO THE CONCLUSION.  THIS CONCLUSION, I THINK, IN LIGHT OF

10  WHAT I JUST READ, YOUR HONOR, IS PRETTY TELLING:

11       "WE'RE COGNIZANT OF THE OVERALL CLIMATE IN WHICH THIS CASE

12  REACHES THE COURT.  RISING HEALTH CARE COSTS AND FOREIGN

13  COMPETITION CERTAINLY PLACE CORPORATIONS SUCH AS POLYONE IN A

14  DIFFICULT ECONOMIC POSITION.  HOWEVER, IN THE ABSENCE OF

15  IMPOSSIBILITY OF PERFORMANCE, IT IS NOT THE PREROGATIVE OF THE

16  JUDICIARY TO REWRITE CONTRACTS IN ORDER TO RESCUE PARTIES FROM

17  THEIR IMPROVIDENT COMMITMENTS.  BECAUSE THE DISTRICT COURT ERRED

18  IN CONCLUDING THAT THE EBA'S DO NOT INDICATE AN INTENT TO VEST

19  PLAINTIFFS' HEALTH BENEFITS, WE VACATED," AND THEY DID IT AS A

20  MATTER OF LAW AND FOUND IN FAVOR, AS YOU KNOW, WHEN READING THE

21  FULL OPINION, THAT THEY WERE VESTED.

22       WELL, NOW, YOUR HONOR, THAT OVERALL CLIMATE AND THE

23  DIFFICULT ECONOMIC POSITION OF POLYONE ISN'T APPLICABLE IN THIS CASE.

24  WHY?  LET'S GO TO THE 2006, GO BACK TO THE SCREEN.

25       (ATTORNEY COLEMAN SPEAKING WITH TECHNICIAN.)

1        MR. COLEMAN:  IN 2007 ALCOA ANNOUNCED ITS REVENUES FOR

2   THE YEAR 2006.  WHAT HAPPENED WAS ALCOA ANNOUNCES HIGHEST INCOME

3   AND REVENUE IN COMPANY'S HISTORY.  "ALCOA TODAY ANNOUNCED THE

4   BEST FULL YEAR RESULTS IN THE COMPANY'S 118-YEAR HISTORY.  ANNUAL

5   INCOME FROM CONTINUING OPERATIONS WAS 2.2 BILLION AND REVENUES

6   FOR 2006 INCREASED 19 PERCENT TO A RECORD 34.4 BILLION."

7        WELL, WHAT ABOUT –

8        (ATTORNEY COLEMAN SPEAKING WITH TECHNICIAN.)

9        MR. COLEMAN:   TWO THOUSAND SEVEN, THE 2007 ANNUAL

10   REPORT SAYS THIS: "FELLOW SHAREOWNERS:  IN 2007 ALCOANS DELIVERED

11   THE SECOND CONSECUTIVE YEAR OF RECORD REVENUES, INCOME FROM

12   OPERATIONS AND CASH FROM OPERATIONS."

13        WE'RE NOT IN THE CLIMATE THAT POLYONE WAS IN, BUT NOE STILL

14   HELD, HEY, WE CAN'T RESCUE FOLKS FROM THEIR IMPROVIDENT

15   COMMITMENTS.

16        BEFORE I SIT DOWN, I JUST WANT TO TALK A COUPLE MINUTES, YOUR

17   HONOR, ABOUT EXTRINSIC EVIDENCE IN THE CASE.  DAWN, GO TO ROMAN

18   NUMERAL II, EXTRINSIC EVIDENCE.

19        THE EXTRINSIC EVIDENCE IN THIS CASE, YOUR HONOR, IS

20   OVERWHELMING.  AS I MENTIONED, WE'VE TAKEN OVER 50 DEPOSITIONS OF

21   ALCOA HIGH-LEVEL FOLK, OF RETIREE FOLK, OF UNION FOLK; AND THE FACT

22   OF THE MATTER IS, YOUR HONOR, IS THAT ALL OF THE EVIDENCE THAT WE

23   HAVE FOUND INDICATE THE FOLLOWING WITH REGARD TO THE FAS-106

24   LETTERS IN THIS CASE.

25        I KNOW THAT'S A QUESTION, WELL, MR. COLEMAN, I HEAR WHAT YOU

1    SAY, BUT WHAT ABOUT THAT FAS-106 LETTER?  WELL, AS I'VE TOLD THE

2    COURT, VARIOUS COURTS HAVE CONSIDERED THE FAS LETTERS AND SAID NO,

3    THEY'RE NOT GOING TO DIVEST VESTED BENEFITS.

4         WHAT DO THE FAS LETTERS REPRESENT IN THIS CASE?  WELL, WHAT

5    THEY REPRESENT IN THIS CASE, YOUR HONOR, IS WHAT'S CALLED A CAP WITH

6    A WINK.  WE'VE TAKEN, SINCE WE LAST WERE IN THIS COURTROOM, WE'VE

7    TAKEN THE DEPOSITION, WE'VE TAKEN SINCE THIS DEPOSITION – I MEAN,

8    SINCE THIS LAST HEARING DEPOSITIONS OF ALCOA PEOPLE, REYNOLDS

9    PEOPLE AND UNION PEOPLE THAT WERE AT THE NEGOTIATIONS, PEOPLE

10   ACTUALLY THERE.

11        THOSE NOTES REVEAL THAT THE FAS-106 CAP LETTER WAS WHAT'S

12   CALLED A CAP WITH A WINK.  SPECIFICALLY, STEVE WEIDMAN FROM

13   REYNOLDS, WHO WAS ONE OF THE MUCKETY-MUCKS, ONE OF THE HIGHER-

14   UPS WITH REYNOLDS, IN 1994 AND 1995 MET WITH REPRESENTATIVES FROM

15   ALCOA AND REYNOLDS.  THERE WERE NO UNION PEOPLE PRESENT AT ALL.

16   THERE WERE NO UNION PEOPLE PRESENT AT THESE MEETINGS.  THEY WERE

17   ALL HIGH-LEVEL ALCOA AND REYNOLDS PEOPLE.

18        MR. WEIDMAN'S NOTES INDICATE THAT ON SEVERAL OCCASIONS WHAT

19   WAS DISCUSSED BETWEEN THE PARTIES – HE'S GOT THEM IN HANDWRITING –

20   ARE THAT THESE WERE CAPS WITH A WINK, YOU KNOW, NOD-NOD, WINK-

21   WINK; NOT TO BE IMPLEMENTED.

22        ALSO PRESENT FROM ALCOA WAS, AS WE SEE HERE, DURING THE '94

23   AND '95 TIME FRAME, THESE NOTES STATE THE FOLLOWING.  THESE WERE THE

24   PEOPLE PRESENT.  SHOW THEM ALL, PLEASE.  THESE ARE ALL HIGH-LEVEL

25   REYNOLDS AND ALCOA PERSONNEL; NO UNION WAS PRESENT.

1    NEXT, KEEP GOING. THIS IS EXHIBIT 2000 – EXHIBIT 201, EXCUSE ME,

2    REVEALS, PRESENT FOR RMC ON FEBRUARY, '95, WERE BOB NEWMAN, STEVE

3    WEIDMAN, GARY MACDONALD, MIKE FOSTER; PRESENT FOR ALCOA WERE

4    RON HOFFMAN, DOUG ROOT, GENE WOLOSHYN, AND JIM MICHAUD.

5    THIS IS WHAT 201 REFERENCES, DATED FEBRUARY 20, '95: "DISCUSSED

6    MEDICARE CAPS.  RMC POSITION, CAPS WITH A WINK – " AND MR. WEIDMAN

7    TESTIFIED, YES, THAT WAS HIS HANDWRITING AND, YES, THAT'S WHAT IT

8    SAYS " – CAPS WITH A WINK TO BE INCREASED NEXT NEGOTIATIONS.  ALCOA

9    POSITION:  NOT SURE, MAY BE SOME ACCOUNTING PROBLEM WITH THIS FASB

10    (PHONETIC)."

11    NEXT LINE, PLEASE, DAWN.  EXHIBIT 202, DATED SIX-ONE-95, REVEALS

12    THOSE PRESENT WERE DOUG ROOT, GENE WOLOSHYN, MIKE GAMBILL AND

13    JIM MICHAUD, ALL ALCOA PEOPLE, AS WELL AS STEVE WEIDMAN FOR

14    REYNOLDS.  WHAT THIS SAYS IS THE FOLLOWING: "ECONOMICS, MEDICAL

15    CAPS.  CAN'T USE COST OF RAISING CAPS AGAINST PACKAGE," MEANING THE

16    HEALTH CARE PACKAGE, YOUR HONOR.  " CAPS WITH A WINK CAN USE

17    AGAINST UNIONS OR WE WILL LOSE CAPS.  BOTH SIDES AGREE."  THEY'RE

18    TALKING ABOUT THE CAPS WITH A WINK.

19    EXHIBIT 203, PRESENT WERE RON HOFFMAN, DOUG ROOT, GENE

20    WOLOSHYN, JIM MICHAUD AND STEVE WEIDMAN AGAIN.  THIS IS DATED FIVE-

21    22-95, AND WHAT IT SAYS IS THE FOLLOWING:  "ALCOA HAS AGREED CAPS

22    WITH A WINK."  THEN YOU MOVE TO, WELL, WHAT'S – WHAT DOES ALL OF

23    THIS MEAN? THIS MEANS THAT BEFORE THE NEGOTIATIONS WERE EVEN

24    ENTERED INTO WITH THE UNION IN '96, YOUR HONOR, ALCOA AND REYNOLDS

25    HAD ALREADY AGREED TO MOVE THE CAP.  THIS WAS A DOCUMENT DATED

1  SEVEN-SIX-95, BEFORE THE '96 NEGOTIATIONS, AND ALREADY GOING INTO

2  THOSE NEGOTIATIONS BOTH COMPANIES WERE WILLING TO MOVE THE CAPS.

3       LET'S MOVE QUICKLY, DAWN.  MR. GARY MACDONALD OF REYNOLDS,

4  HIS TESTIMONY IS WITH OUR MOTION AND BRIEF, HE SAYS THAT THE PHRASE

5  "CAPS WITH A WINK" COULD CONNOTE FRAUD.

6       THIS IS WHAT MR. PAUL O'NEIL – I TOOK HIS DEPOSITION IN D.C. A

7  COUPLE OF MONTHS AGO – THIS IS WHAT MR. O'NEIL INDICATES THAT IS HIS

8  PERCEPTION OF THE PHRASE "CAPS WITH A WINK."

9       (VIDEO CLIP PLAYING WITH VOLUME LOW AT VIDEO TIME OF 1:57:50

10  P.M.)

11       MR. COLEMAN:  OKAY.  SHE'S TURNED IT UP.

12       (DEPOSITION VIDEO CLIP PLAYED AS FOLLOWS:)

13       "Q   HAVE YOU EVER HEARD OF THE CAPS IN THIS CASE, AS PART

14       OF THE FAS-106 LETTER, HAVE YOU EVER HEARD IT REFERRED TO

15       AS A CAP WITH A WINK?

16       A    "ONLY – (INAUDIBLE).

17       Q    "NO QUESTION YOU ARE A MAN OF THE WORLD AND

18       (INAUDIBLE) BEEN A LOT OF PLACES (INAUDIBLE).  WHEN YOU

19       HEAR THE PHRASE 'CAP WITH A WINK,' I'M WANTING YOUR OWN

20       PERSONAL DEFINITION, WHAT WOULD THAT CONNOTE TO YOU?

21       "(UNIDENTIFIED SPEAKER):  OBJECTION TO LACK OF FOUNDATION.

22       "Q   YOU CAN ANSWER, SIR.

23       "A   DISHONESTY."

24       MR. COLEMAN:  CONNOTES TO PAUL O'NEIL, "CAPS WITH A WINK,"

25  CONNOTES DISHONESTY.  AND, YOUR HONOR, THAT, WE'VE PROVIDED TO THE

1    COURT DOCUMENT AFTER DOCUMENT, EXAMPLE AFTER EXAMPLE.

2         JUST REAL BRIEFLY, BEFORE I SIT DOWN, IN ADDITION TO THIS TYPE OF

3    VISIBLE EVIDENCE, HANDWRITTEN NOTES, WE'VE GOT EVIDENCE THAT

4    ALCOA VIEWED THE PLAN THAT WAS IN EFFECT TO BE AN UNCAPPED PLAN,

5    WHAT'S CALLED A SUBSTANTIVE PLAN, IT'S AN UNCAPPED PLAN, MEANING

6    THEY KNEW IT WASN'T GOING TO TAKE EFFECT BASED UPON THE PARTIES'

7    PAST PRACTICES, BASED UPON THE FACT THAT THE CAP LETTER HAD BEEN

8    MOVED FORWARD ALL OF THOSE YEARS.

9         DON'T FORGET, YOUR HONOR, WHAT MAKES THIS CASE EVEN MORE, IN

10   OUR OPINION, EGREGIOUS THAN YOLTON II AND REESE AND THE OTHERS IS, IN

11   YOLTON AND REESE THEY ONLY MOVED THE CAP FORWARD ONE TIME.  THE

12   JUDGE SAID, OH, NO, NO, NO, THAT'S EVIDENCE TO SHOW THAT YOU REALLY

13   DIDN'T MEAN TO INTEND THIS CAP – TO HAVE THIS CAP IMPLEMENTED.

14        IN THIS CASE, WE HAVE THREE COLLECTIVE BARGAINING AGREEMENTS,

15   '93, '96 AND '01, OVER A PERIOD OF 13 YEARS, WHERE THE CAP WAS MOVED;

16   AND IT WAS ONLY IN 2005, REALLY, THAT ALCOA RECEIVED AN E-MAIL FROM

17   PRICE WATERHOUSE COOPERS THAT INDICATED WE'RE HAVING ALL OF THESE

18   OTHER COMPANIES – AND YOU'VE GOT THOSE E-MAILS IN THE COURT FILE –

19   WE'RE HAVING ALL OF THESE OTHER COMPANIES THAT ARE NOW BEING

20   INVESTIGATED BY THE SEC, THEY ALL JUST HAD TO TAKE A FOUR-BILLION-

21   DOLLAR CHARGE ON THEIR 10-K.

22        THE E-MAIL FROM MR. DOUG DEAN INDICATES TO LAUREN

23   MCCULLOUGH, INDICATES THAT THE SEC'S NOW TAKING A LOOK AT THIS.

24   YOU KNOW, ALL THOSE GAINS THAT YOU COUNTED ON YOUR BOOKS,

25   SEVERAL HUNDRED MILLION DOLLARS, THEY'RE NOW TAKING A LOOK AT

1  THAT, AND IF YOU DON'T DO SOMETHING TO TRY TO COVER YOUR TRACKS,

2  YOU'RE GOING TO BE FACED WITH A "BABY BELL" SITUATION OF HAVING A

3  FOUR-BILLION-DOLLAR CHARGE.

4  THE E-MAIL IS – IT GOES ON TO SAY THAT THIS IS SOMETHING THAT OUR

5  NATIONAL OFFICE IS CONCERNED ABOUT AND AS SUCH WE BELIEVE THAT IT

6  NEEDS TO START BEING ENFORCED.  THEN WE HAVE THE NEGOTIATIONS, AND

7  BEGINNING '07, YOUR HONOR.  UNFORTUNATELY, THESE RETIREES HAD TO

8  START MAKING PAYMENTS THAT THEY OTHERWISE WOULD NOT HAVE HAD

9  TO.

10  THIS IS THAT E-MAIL, AS I SIT DOWN, YOUR HONOR.  GO TO IT; THERE,

11  WE GO.

12  THE COURT:  THANK YOU, MR. COLEMAN.  WHY DON'T WE TAKE A

13  BREAK AT THIS POINT, AND WE'LL RECONVENE AT 10:20, AND WE'LL GIVE THE

14  DEFENDANTS AN EQUAL 50 MINUTES.  THEN YOU CAN EACH HAVE TEN OR 15

15  MINUTES IN REBUTTAL IF YOU'D LIKE TO TAKE IT.

16  MR. COLEMAN:  WE'LL DO THAT, YOUR HONOR.

17  THE COURT:  WE'LL STAND IN RECESS.

18  (RECESS HAD AT 10:10 A.M.; COURT RECONVENED 10:25 A.M.)

19  THE COURT:  OKAY.  PLEASE BE SEATED, LADIES AND

20  GENTLEMEN.  OKAY.  NOW, I BELIEVE, MR. CHESLER, YOU'RE GOING TO BEGIN

21  FOR THE DEFENDANTS?

22  MR. CHESLER:  YES, YOUR HONOR, IF I MAY.

23  THE COURT:  YOU MAY PROCEED.

24  MR. CHESLER:  THANK YOU, YOUR HONOR.  AS I INDICATED, IT'S

25  GOING TO TAKE TWO OF US TO MATCH MR. COLEMAN, SO WE'RE GOING TO

1    DIVIDE THINGS UP A BIT.  I'M GOING TO COVER THE QUESTION OF VESTING.

2    I'M ALSO, YOUR HONOR, GOING TO COVER THE QUESTION OF WHAT HAPPENS

3    IF YOUR HONOR WERE TO DECIDE, WE BELIEVE, RESPECTFULLY, CONTRARY

4    TO THE RECORD HERE, THAT THE BENEFITS IN QUESTION DID VEST; THEN AS

5    OF WHEN DID THEY VEST, AN ISSUE WHICH MR. COLEMAN TOUCHED ON ONLY

6    VERY BRIEFLY.

7         AND THEN MR. SLIFKIN WILL COVER THE ISSUE OF ALCOA HAVING

8    PROPERLY IMPLEMENTED A REAL CAP WHEN I'M DONE.

9         TO START WITH A FEW LEGAL PRINCIPLES WHICH I DON'T THINK ARE IN

10   DISPUTE, I'M GOING TO GO THROUGH THEM VERY QUICKLY.  I JUST WANT TO

11   MENTION FOUR, AND I DON'T THINK THESE ARE IN DISPUTE.  THE FIRST IS,

12   THAT WELFARE BENEFITS OF WHICH RETIREE HEALTH BENEFITS ARE A TYPE

13   ARE CREATURES OF CONTRACT, NOT STATUTORY ENTITLEMENT LIKE PENSION

14   BENEFITS.  AND THEY VEST, SECONDLY, ONLY IF THE PARTIES TO THE

15   COLLECTIVE BARGAINING AGREEMENT INTENDED THEM TO VEST, THE

16   PARTIES TO THE AGREEMENT.

17        BY THE WAY, YOUR HONOR, THIS IS THE ONLY CASE WE CAN FIND, IN

18   HAVING READ ALL OF THE LAW IN THIS CIRCUIT ON THE SUBJECT, IN WHICH

19   THE TWO PARTIES TO THE COLLECTIVE BARGAINING AGREEMENT, THE UNION

20   AND THE COMPANY, AGREE ON WHAT IT IS THEY AGREED TO.  IN EVERY CASE

21   WE COULD FIND IT WAS EITHER A DISPUTE WHERE THE UNION ITSELF WAS A

22   PLAINTIFF OR THE UNION WAS ALIGNED WITH THE PLAINTIFFS.

23        IN THIS CASE, IN TESTIMONY THAT MR. COLEMAN DID NOT ALLUDE TO

24   IN HIS PRESENTATION, IT'S ABSOLUTELY CLEAR THAT THE UNION'S VIEW OF

25   WHAT WAS AGREED TO IN THIS AGREEMENT IS EXACTLY THE SAME AS

1    ALCOA'S AGREEMENT. SO BOTH PARTIES TO THE AGREEMENT HERE AGREE

2    ON WHAT THEY AGREED TO.

3        MR. COLEMAN AND HIS CLIENTS HAVE A DIFFERENT VIEW. THEY WERE

4    NOT – IN FACT, THAT VIEW IS NOT CONSISTENT WITH WHAT THE PARTIES

5    HAVE SAID.

6        THIRD, BECAUSE IT IS A QUESTION OF INTENT, AND THEY ARE NOT

7    VESTED AUTOMATICALLY BUT RATHER ONLY AS A CREATURE OF CONTRACT,

8    UNLESS AND UNTIL THOSE BENEFITS VEST THEY CAN BE REDUCED AND THEY

9    CAN EVEN BE ELIMINATED BY CONTRACT.

10       INDEED, IN THE YOLTON DECISION, TO WHICH MR. COLEMAN REFERRED

11    ON A NUMBER OF OCCASIONS, THERE IS A PASSAGE WHICH YOUR HONOR

12    QUOTES IN YOUR MEMORANDUM OPINION FROM LAST OCTOBER IN WHICH

13    THE SIXTH CIRCUIT SAYS, AND I QUOTE, "THE RETIREMENT PACKAGE

14    AVAILABLE TO SOMEONE CONTEMPLATING RETIREMENT WILL CHANGE WITH

15    THE EXPIRATION AND ADOPTION OF CBA'S."

16       HERE, OF COURSE, THE CAP WAS ONLY APPLIED TO RETIREES WHO

17    RETIRED AFTER THE CAP WAS NEGOTIATED, AFTER THE CAP WAS RATIFIED BY

18    THE UNION, AND AFTER THE CAP WAS PUT INTO THE COLLECTIVE

19    BARGAINING AGREEMENT AND THE EMPLOYEES WERE NOTIFIED ABOUT THE

20    CAP. THERE IS NOT A SINGLE MEMBER OF THIS CLASS WHO RETIRED PRIOR TO

21    ALL OF THOSE EVENTS HAVING TAKEN PLACE.

22       AND THE FOURTH LEGAL PRINCIPLE IS THAT, IF THE PARTIES TO A CBA

23    DID INTEND THE BENEFITS TO VEST AND THEY THEREFORE VESTED, THEY

24    VEST AS OF THE RETIREMENT OF AN INDIVIDUAL. IN THIS CASE, AS OF THE

25    RETIREMENT OF EVERY MEMBER OF THE CLASS, THE COLLECTIVE

1    BARGAINING AGREEMENT IN FORCE INCLUDED THE CAP.

2         I'D ALSO NOTE, YOUR HONOR, THAT ALTHOUGH THIS CASE IS ALL

3    ABOUT THIS CAP AGREEMENT – THERE WERE, OF COURSE, FOUR OF THEM

4    SIGNED OVER TIME – THE DOCUMENT WHICH WAS NOTICEABLY ABSENT FROM

5    MR. COLEMAN'S PRESENTATION, AND DESPITE ALL THE DOCUMENTS HE

6    SHOWED YOUR HONOR, WAS THE CAP AGREEMENT.  HE NEVER SHOWED IT, HE

7    NEVER QUOTED FROM IT, HE BARELY EVEN MENTIONED IT.  THAT'S WHAT

8    THIS CASE IS ABOUT, AND I'M GOING TO COME BACK TO THE CAP AGREEMENT

9    IN A MOMENT.

10        BUT BEFORE I TALK ABOUT THE DOCUMENTS WHICH <u>YARD-MAN</u> SAYS

11   SHOULD BE THE BEGINNING AND, IN MOST INSTANCES, THE END OF THE

12   ANALYSIS OF VESTING, THE CONTRACTUAL PROVISIONS THEMSELVES, WHICH

13   MR. COLEMAN ESSENTIALLY IGNORED, I WANT TO MAKE TWO FUNDAMENTAL

14   POINTS ABOUT THIS INTENT QUESTION.

15        AS I SAID, AND I DON'T THINK THERE'S ANY DISPUTE BETWEEN THE

16   PARTIES, THIS QUESTION OF WHETHER THESE PARTICULAR BENEFITS VEST OR

17   DON'T VEST IS ENTIRELY A QUESTION OF WHAT THE INTENT OF THE PARTIES

18   TO THE COLLECTIVE BARGAINING AGREEMENT WAS.

19        WITH RESPECT TO THAT INTENT QUESTION, THE FIRST POINT I WANT TO

20   MAKE BEFORE I GO TO THE DOCUMENTS THEMSELVES, IS, FOR 14 YEARS THE

21   UNION AND ALCOA WERE NEGOTIATING, RENEGOTIATING, RATIFYING, RE-

22   RATIFYING AND PUBLISHING NOTICE OF THESE CAP AGREEMENTS, WHICH,

23   ACCORDING TO THE PLAINTIFFS, WAS AN ENTIRELY MEANINGLESS AND

24   POINTLESS EXERCISE.

25        YOU'RE GOING TO HEAR, WHEN MR. SLIFKIN GETS UP TO TALK ABOUT

1    THE RECORD OF WHAT ACTUALLY HAPPENED IN THESE NEGOTIATIONS,

2    WHICH WAS ALMOST NOT MENTIONED AT ALL BY MR. COLEMAN, THAT THERE

3    WAS ACTUALLY IN '93 THE BEGINNING OF A STRIKE.  EMPLOYEES WERE

4    WALKING OUT, THE NEGOTIATIONS WENT WELL INTO THE NIGHT, PAST THE

5    DEADLINE, AND THEY WERE HUNG UP OVER ONE ISSUE AND IT WAS THE CAP.

6    THEY WERE NEGOTIATING THE CAP INTO THE NIGHT, AND LITERALLY THE

7    UNION HAD BEGUN A STRIKE OVER THIS ISSUE.

8         AND YET THE PLAINTIFFS' ENTIRE THEORY HERE IS THAT THOSE

9    BENEFITS THAT THEY WERE FIGHTING ABOUT, THE PARTIES TO THE

10   COLLECTIVE BARGAINING AGREEMENT WERE FIGHTING ABOUT, WERE,

11   ACCORDING TO THE PLAINTIFFS, FULLY VESTED, COULD NOT BE TOUCHED,

12   COULD NOT BE AMENDED IN ANY WAY.

13        SO ALL OF THAT ACTIVITY BY THE TWO PARTIES TO THE AGREEMENT IN

14   '93, ALL OF THAT CONTENTION AND ALL OF THE NEGOTIATIONS THAT TOOK

15   PLACE AGAIN IN '96 AND AGAIN IN 2001 AND AGAIN IN 2006, WAS POINTLESS.

16   YOU COULDN'T CHANGE THE BENEFITS, ACCORDING TO THE PLAINTIFFS.

17        SECOND POINT HERE, YOUR HONOR, IS THAT THE CAP, UNLIKE ANY OF

18   THE OTHER CASES THAT HAVE BEEN CITED, THE CAP HERE WAS EXPLICITLY

19   AGREED TO BE A MANDATORY SUBJECT OF COLLECTIVE BARGAINING.  ONE OF

20   THE PRINCIPAL PREMISES OF THE <u>YARD-MAN</u> INFERENCE – AND IT'S REPEATED

21   OVER AND OVER AGAIN IN THE SIXTH CIRCUIT CASES, AS I'M SURE YOUR

22   HONOR KNOWS – IS THAT BECAUSE RETIREE HEALTH BENEFITS ARE

23   PERMISSIVE ONLY THEY MAY OR MAY NOT EVER BE THE SUBJECT OF

24   FURTHER DISCUSSION.  THEY'RE NOT STRIKEABLE ISSUES AND THEY MAY

25   NEVER COME UP AGAIN.

1          AND SO THE WHOLE POINT IS, WHY WOULD AN EMPLOYEE WHO MAY

2    NEVER GET ANOTHER OPPORTUNITY TO ADDRESS THESE ISSUES SURRENDER

3    RIGHTS WITH RESPECT TO THOSE ISSUES SINCE THEY'RE PERMISSIVE?  IN THIS

4    CASE, THEY WERE EXPLICITLY MADE MANDATORY.

5          ONE OF THE PRINCIPAL GIVES IN THE GIVE AND TAKE BETWEEN ALCOA

6    AND THE UNION FROM THE VERY BEGINNING, AND IT WAS REPEATED IN

7    EVERY SUBSEQUENT CBA, WHICH INCLUDED EVERY SUBSEQUENT CAP

8    LETTER, WAS THAT THIS WAS A MANDATORY SUBJECT WHICH HAD TO BE

9    RENEGOTIATED AT THE NEXT COLLECTIVE BARGAINING AGREEMENT.  IT WAS

10   THEREFORE OF A FIXED DURATION, IT HAD A VERY FIXED TERM TO IT.

11   EVERYBODY UNDERSTOOD BY THE EXPLICIT TERMS OF THE AGREEMENT

12   THAT IT COULD ONLY LAST FOR THE DURATION OF THE COLLECTIVE

13   BARGAINING AGREEMENT.

14         BECAUSE, UNLIKE EVERY OTHER CASE AND UNLIKE THE CASES THAT

15   MR. COLEMAN REFERRED TO, HERE IT WAS A MANDATORY, NOT A

16   PERMISSIVE, SUBJECT OF NEGOTIATION.  AND SO IT PLAINLY WOULD HAVE TO

17   BE REVISITED AT THE TIME OF THE NEXT COLLECTIVE BARGAINING

18   AGREEMENT.

19         NOW, LET ME TURN TO THE CAP LETTERS.  AS I SAID, YOU NEVER SAW

20   THEM DURING THE PLAINTIFFS' PRESENTATION.  THE PLAINTIFF WOULD

21   RENDER THEM NUGATORY BECAUSE THE ENTIRE ARGUMENT THAT IS MADE

22   HERE IN FAVOR OF THE PLAINTIFFS' POSITION FOR VESTING IS MADE WITH

23   THE ASSUMPTION THAT THE CAP LETTERS EITHER DIDN'T EXIST AT ALL OR

24   ARE OF NO EFFECT.

25         BECAUSE IF THEY ARE GIVEN EFFECT, YOU HAVE TO READ WHAT THE

1    CAP LETTERS SAY, AND THERE ARE SEVERAL THINGS IN THE TERMS OF THE

2    CAP LETTERS, YOUR HONOR, THAT ARE QUITE EXPLICIT AND I THINK VERY

3    IMPORTANT.

4            THE FIRST ONE IS, THEY SAY THAT THE ANNUAL COST, QUOTE, SHALL

5    BE LIMITED; NOT IT'S POSSIBLE THAT THERE MAY IN THE FUTURE SOMEDAY

6    BE SOME KIND OF AN EFFECT UPON THE BENEFITS.  AS YOUR HONOR

7    DESCRIBED THOSE CAP LETTERS IN YOUR MEMORANDUM OF LAST OCTOBER,

8    YOU SAID – YOU USED THE WORD "CLEARLY DESCRIBED."  THEY CLEARLY

9    SAY THAT THE ANNUAL COSTS SHALL BE LIMITED.

10           THEY ALSO GIVE A SPECIFIC EFFECTIVE DATE IN EVERY SINGLE ONE OF

11   THE FOUR CAP LETTERS OF WHEN THE CAP SHALL BECOME EFFECTIVE.  THEY

12   EACH GIVE A VERY SPECIFIC FORMULA FOR HOW THE CAP SHALL BE

13   CALCULATED BASED UPON PER CAPITA COSTS IN THE DESIGNATED YEAR.

14   THEY EACH SAY THAT ANY EXCESS OF PER CAPITA COSTS UNDER THAT

15   FORMULA, QUOTE, SHALL BE PAID BY EACH COVERED PERSON.  ABSOLUTELY

16   CLEAR, MANDATORY LANGUAGE.  AND THEY SAY THAT THE CAP SHALL BE A

17   MANDATORY SUBJECT OF BARGAINING IN THE NEXT ROUND.

18           I SUBMIT, YOUR HONOR, THAT THOSE TERMS ARE NOT EQUIVOCAL,

19   THEY'RE NOT HARD TO FOLLOW OR UNDERSTAND.  THEY ARE EXACTLY WHAT

20   YOUR HONOR SAID THEY ARE, THEY ARE CLEAR.

21           THE CBA'S ALSO SAY, WITH RESPECT TO THE COSTS OF THOSE BENEFITS

22   – AND COUNSEL CANDIDLY PUT THIS TERM UP OVER AND OVER AGAIN.  THEY

23   DIDN'T FOCUS ON THE CRITICAL LANGUAGE.  THEY SAY ALL OF THE ABOVE

24   BENEFITS WILL BE PROVIDED WITHOUT COST TO EMPLOYEES AND RETIREES

25   "EXCEPT AS OTHERWISE PROVIDED."

1          FROM 1993, ON, EVERY SINGLE ONE OF THE COLLECTIVE BARGAINING

2    AGREEMENTS HAD AS A PART OF THE AGREEMENT THE CAP LETTER.  THEY

3    DID OTHERWISE PROVIDE HOW THE BENEFITS WOULD BE PAID FOR, EXACTLY

4    AS THE COST PROVISION SAYS, "EXCEPT AS OTHERWISE PROVIDED," AND IT

5    WAS OTHERWISE PROVIDED.

6          THE ONLY ARGUMENT I'VE SEEN IN THE PLAINTIFFS' PAPERS THAT

7    DEAL WITH THAT PROBLEM – AND IT'S A BIG PROBLEM FOR THEM WHEN THEY

8    SAY AS A MATTER OF LAW THESE BENEFITS WERE VESTED AND THEY COULD

9    NOT HAVE BEEN A SUBJECT OF THE CAP – THE ONLY THING I HAVE SEEN THEM

10   SAY IS, WELL, EVEN THE CBA BEFORE 1993 SAID, "EXCEPT AS OTHERWISE

11   PROVIDED," AND THERE WAS NO CAP AGREEMENT IN 1988, FOR EXAMPLE, AND

12   THEY'RE RIGHT ABOUT THAT.

13         BUT, YOUR HONOR, FIRST, THE LANGUAGE "EXCEPT AS OTHERWISE

14   PROVIDED" ONLY BECOMES OPERATIVE IF IT IS OTHERWISE PROVIDED, AND IF

15   THERE IS NO PROVISION THAT FILLS THAT EXCEPTION, THEN THE COSTS ARE

16   COVERED BY THE COMPANY.  FROM 1993, ON, THERE WAS SUCH A PROVISION,

17   THE CAP LETTER.

18         MOREOVER, EVEN BEFORE 1993 THERE WERE DEDUCTIBLES, AND THOSE

19   DEDUCTIBLES HAVE INCREASED OVER TIME.  IN FACT, IF YOU COMPARE THE

20   DEDUCTIBLE LEVELS FROM 1988 TO 2006, THEY HAVE GONE UP BY

21   SIGNIFICANT AMOUNTS.  THEY'RE UP NOW FOR FAMILY COVERAGE, UNDER

22   SOME CIRCUMSTANCES, BY AS MUCH AS A THOUSAND DOLLARS PER YEAR.

23   THEY WERE IN THE RANGE OF ABOUT $50 PER YEAR COMPARABLY IN 1988.

24         NOTWITHSTANDING THE PLAINTIFFS' CONTENTION THAT THESE

25   BENEFITS WERE ALL ALONG VESTED AND COULD NEVER BE REDUCED, THOSE

1   BENEFITS WERE REDUCED OVER AND OVER AGAIN, EVERY TIME THE

2   DEDUCTIBLES WERE INCREASED.

3          AND WHY WAS THAT PERMITTED?  BECAUSE THE BENEFITS WERE NOT

4   VESTED, AND THE CBA SAID EXPLICITLY THAT IT WAS WITHOUT COST TO

5   EMPLOYEES OR RETIREES EXCEPT AS OTHERWISE PROVIDED.  IN FACT, THEY

6   WERE OTHERWISE PROVIDED, THAT THE DEDUCTIBLES WERE WHATEVER

7   THEY WERE AND THEY CHANGED OVER TIME.

8          NOW, COUNSEL POINTED YOUR HONOR TO ONE PROVISION IN THE CBA'S

9   WHICH SAYS THAT THERE SHALL BE NO REDUCTION IN BENEFITS.  HE SPENT

10  SEVERAL MINUTES SAYING THAT THAT SHOWED THAT THESE WERE VESTED.

11  WELL, THERE ARE TWO THINGS THAT COUNSEL DIDN'T POINT OUT.

12         THE FIRST IS THAT THAT PROVISION THAT TALKS ABOUT NOT BEING

13  ANY REDUCTION, THERE NOT BEING ANY REDUCTION OF BENEFITS, IT

14  APPEARS IN A SECTION OF THE DOCUMENTS REFERRING TO UNIVERSAL

15  HEALTH CARE.  IT'S TITLED THAT AND IT'S ABSOLUTELY CLEAR IN THE

16  DOCUMENT.

17         WHAT IT SAYS IS, IF THERE IS A UNIVERSAL HEALTH CARE PROGRAM

18  PUT INTO EFFECT BY THE CONGRESS – AND YOUR HONOR, I'M SURE, WILL

19  RECALL IN 1993 WAS THE BEGINNING OF THE CLINTON ADMINISTRATION AND

20  MRS. CLINTON WAS WORKING WITH THE CONGRESS TO TRY TO GET A

21  UNIVERSAL HEALTH CARE PLAN, IT WAS ALL OVER THE NEWSPAPERS, AND

22  THAT WAS A SUBJECT OF THIS AGREEMENT IN '93.

23         AND IT SAYS VERY CLEARLY, IF UNIVERSAL HEALTH CARE SHALL COME

24  INTO EFFECT IT WILL APPLY BY WHATEVER ITS TERMS ARE AND IN THAT

25  EVENT THERE SHALL BE NO REDUCTION IN THE BENEFITS PROVIDED UNDER

1       THIS PLAN.

2              THEY'VE LIFTED THAT SENTENCE OUT OF CONTEXT, DON'T POINT OUT

3       TO THE COURT IT RELATES TO THE UNIVERSAL HEALTH CARE PROVISION, AND

4       CITE IT AS EVIDENCE THAT THE BENEFITS HAVE VESTED, WHEN THAT'S NOT IN

5       FACT WHAT THE CONTRACT SAYS.

6              ALSO, YOUR HONOR, THAT PASSAGE DOES NOT USE THE PHRASE

7       "RETIREE."  IT TALKS ABOUT EMPLOYEES.  IT DOESN'T SAY A WORD ABOUT

8       RETIREES.  WE'VE ASKED SEVERAL WITNESSES ABOUT THAT, AND THEY, OF

9       COURSE, HAVE CONCEDED THAT THE DOCUMENT SAYS WHAT IT SAYS,

10      EMPLOYEES AND NOT RETIREES.

11             SO TO PAUSE FOR A MOMENT, WITH RESPECT TO THE CBA'S, THE

12      COLLECTIVE BARGAINING AGREEMENTS, EVERY ONE OF THEM CONTAINED,

13      FROM '93 ON, THE CAP LETTER.  THE CAP LETTER TERMS ARE ABSOLUTELY

14      CLEAR AND THEY ARE ALWAYS THE SUBJECT OF MANDATORY NEGOTIATION

15      IN THE NEXT ROUND, AND EVERY ONE OF THEM WAS NEGOTIATED AGAIN.  IN

16      EVERY INSTANCE, AS MR. SLIFKIN WILL SET FORTH IN SOME GREATER DETAIL,

17      THERE WAS A LOT OF CONTENTION OVER IT, A LOT OF ISSUE AS TO WHETHER

18      OR NOT IT WOULD COME OUT.

19             ONE OF THE REMARKABLE THINGS, YOUR HONOR, IF THESE BENEFITS

20      WERE VESTED AND/OR IF THIS WAS A SHAM, WHICH IS WHAT PLAINTIFF SAY

21      IS, THE FIRST POSITION THE PLAINTIFFS TOOK WHEN THEY WENT TO THE – THE

22      UNION TOOK, EXCUSE ME, WHEN THEY WENT TO THE '96 NEGOTIATION WAS

23      THEY WANTED THE CAP OUT.

24             IF THE CAP WAS MEANINGLESS, IF THE BENEFITS WERE VESTED AND

25      THE UNION AND THE COMPANY THOUGHT THEY WERE VESTED, WHICH AGAIN

1  IS THE HALLMARK TEST HERE, INTENT, OR IF THIS WAS SOME SIDE

2  AGREEMENT, SOME SECRET AGREEMENT THAT WAS A SHAM AND THAT

3  NOBODY INTENDED TO BE ENFORCEABLE, THEN WHY WAS THE FIRST

4  NEGOTIATING POINT THE UNION CAME IN AND POUNDED THE TABLE ABOUT IN

5  1996, GET RID OF THE CAP?

6  AND, BY THE WAY, IF THE CAP DIDN'T ALREADY APPLY TO THE PEOPLE

7  WHO HAD RETIRED DURING THE COURSE OF THE '93 AGREEMENT, THEN THERE

8  WOULD HAVE BEEN NO IMPACT AT ALL OVER THE CAP AT THAT POINT, NONE.

9  IF IT ONLY APPLIED PROSPECTIVELY AT SOME POINT, WHICH IS WHAT

10  THE PLAINTIFFS ARE ARGUING, THEN THE UNION GAVE UP NOTHING IN 1993

11  WHEN THEY AGREED TO THE CAP, ACCORDING TO THE PLAINTIFFS.  IF ALL THE

12  UNION SAID IS THERE WON'T BE A CAP DURING THE LIFE OF THIS AGREEMENT,

13  MAYBE IN THE FUTURE THERE WILL BE, THAT'S THE PLAINTIFFS' POSITION.

14  OUR POSITION IS THAT THE UNION AGREED TO WHAT THE DOCUMENT

15  SAYS, THERE SHALL BE A CAP, THERE SHALL BE A LIMIT, YOU SHALL PAY FOR

16  ANY EXCESS, EMPLOYEES.

17  SO THE ONLY THING THE UNION GAVE UP IN AGREEING TO THAT WAS

18  THAT WHEN THE CAP WAS ULTIMATELY IMPLEMENTED IT WOULD BE

19  IMPLEMENTED ACCORDING TO ITS EXPLICIT TERMS, WHICH WAS TO APPLY TO

20  ANYONE WHO RETIRED AFTER MAY OF 1993; WHICH IS EXACTLY WHAT THE

21  COMPANY AND THE UNION DID WHEN THE CAP WAS FINALLY IMPLEMENTED

22  UNDER THE 2006 AGREEMENT.

23  LET ME TURN TO THE SPD'S FOR A MOMENT.  EVERY ONE'S

24  INCORPORATED BY REFERENCE INTO THE COLLECTIVE BARGAINING

25  AGREEMENTS.  THERE ARE, I BELIEVE, ALL OR PORTIONS OF SEVEN SPD'S IN

1   THE RECORD.  FIVE OF THEM EXPLICITLY SAY THERE'S A CAP, TWO OF THEM

2   EXPLICITLY SAY THAT THERE IS NO VESTING.

3         THE PLAINTIFFS SAY THAT IT'S ABSOLUTELY CLEAR ON THE FACE OF

4   THE DOCUMENTS, ON THE FACE OF THE DOCUMENTS, THAT THESE BENEFITS

5   WERE VESTED AND COULD NOT BE CAPPED; AND YET FIVE OF THE

6   DOCUMENTS SAY THEY ARE CAPPED, FIVE OF THE SPD'S, EVERY ONE OF THE

7   CBA'S SAYS IT, FIVE OF THE SEVEN SPD'S SAY IT AND TWO OF THEM SAY THAT

8   THERE IS NO VESTING.

9         JUST FOR THE SAMPLE LANGUAGE, HERE'S THE '95 ALCOA SPD.  IT

10  REFERS TO THE '93 COLLECTIVE BARGAINING AGREEMENT.  I'M JUST GOING

11  TO QUOTE THIS ONE – THESE TWO SENTENCES:  "IN 1997 ALCOA WILL CAP THE

12  AMOUNT THE COMPANY PAYS FOR YOUR RETIREE MEDICAL COVERAGE.  IN

13  FUTURE YEARS, IF MEDICAL COSTS INCREASE ABOVE THE 1997 LEVEL, YOU

14  WILL BE REQUIRED TO PAY THE DIFFERENCE."

15        THAT'S THE SUMMARY PLAN DESCRIPTION OF THE '93 CBA CONTAINED

16  IN THE '95 SPD, AND SIMILAR LANGUAGE IS REPEATED OVER AND OVER AND

17  OVER AGAIN.  AND YET THE PLAINTIFFS SAY AS A MATTER OF LAW IT'S CLEAR

18  THAT THESE BENEFITS WERE VESTED AND COULD NOT BE REDUCED IN ANY

19  WAY.

20        THE '97 ALCOA SPD'S, WHICH REFERS TO THE '96 COLLECTIVE

21  BARGAINING AGREEMENT, HAS SOME VERY CRITICAL LANGUAGE WHICH

22  ALSO MAKES THIS CASE DIFFERENT FROM EVERY OTHER CASE WE CAN FIND

23  IN SIXTH CIRCUIT DECISIONS.  IT SAYS, "ALCOA MAY CHANGE THE LEVEL OF

24  BENEFITS AT ANY TIME.  ONCE AN ADJUSTMENT IS MADE, THERE ARE NO

25  VESTED RIGHTS TO BENEFITS BASED ON EARLIER PLAN PROVISIONS."

1     AND IN THE SAME SPD, IT GOES ON TO SAY, "THE COMPANY EXPECTS

2   THAT THIS PLAN WILL CONTINUE INDEFINITELY, HOWEVER, THE BOARD OF

3   DIRECTORS OR INSIDE DIRECTORS COMMITTEE OF THE COMPANY CAN AMEND,

4   MODIFY, SUSPEND OR TERMINATE ALL OR PART OF THE PLAN AT ANY TIME."

5   AND THEN IT SAYS, YOUR HONOR, "BENEFITS UNDER THE PLAN ARE NOT

6   VESTED."

7     WE CANNOT FIND A SINGLE CASE IN WHICH THE CONTRACTUAL

8   DOCUMENTS EXPLICITLY SAY THE BENEFITS ARE NOT VESTED AND A COURT

9   HAS HELD THAT THEY ARE VESTED.  THE CASES ALL RELATE TO THE COURTS

10  TRYING TO INFER FROM OTHER LANGUAGE IN THE AGREEMENTS WHETHER OR

11  NOT THE PARTIES INTENDED TO VEST THE BENEFITS.

12    AS I SAID BEFORE, AND I REPEAT IT, RESPECTFULLY, YOUR HONOR, NOT

13  ONE OF THOSE CASES INVOLVES A SITUATION WHERE BOTH PARTIES TO THE

14  AGREEMENT AGREE ON WHAT THEY AGREE TO, UNLIKE HERE.  YET THE

15  PLAINTIFFS ARE ARGUING THAT THE PARTIES WERE NEGOTIATING FOR 14

16  YEARS FOR A MEANINGLESS PURPOSE OVER SOMETHING THAT COULDN'T BE

17  FIXED.

18    NONE OF THE AGREEMENTS HAS CONTRACT LANGUAGE IN IT THAT

19  SAYS THESE BENEFITS ARE NOT VESTED, AND YET A COURT WENT ON AND

20  SAID, WELL, I'M GOING TO IGNORE WHAT THE PARTIES' OWN DOCUMENTS

21  SAID, I'M GOING TO FIND THEY WERE VESTED EVEN THOUGH THE PARTIES

22  SAID THEY WERE NOT VESTED.  NONE OF THEM HAS THAT LANGUAGE IN IT

23  THAT WE CAN FIND.

24    WITH RESPECT TO THE CONDUCT OF THE COMPANY, HERE ALCOA DID

25  EXACTLY WHAT THE DOCUMENTS SAID IT SHOULD AND COULD DO.  UNLIKE

1    THE CASES WHERE THE COURTS HAVE SAID THE CONDUCT IS INCONSISTENT

2    WITH THE POSITION OF NON-VESTING, HERE, AS SOON AS THE CAP WAS

3    IMPLEMENTED BY CONTRACT, IT WAS IMPLEMENTED IN FACT UNDER THE 2006

4    CBA.  SO LONG AS THE TRIGGER DATE OF THE IMPLEMENTATION HAD BEEN

5    PUT OFF UNDER THE AGREEMENTS, IT WAS NOT TRIGGERED.

6          HERE THE CONTRACT SAID IT WAS A MANDATORY SUBJECT OF

7    NEGOTIATION.  EVERY TIME THERE WAS A NEGOTIATION IT WAS REVISITED

8    AND NEGOTIATED.  THE COMPANY CONDUCTED ITSELF EXACTLY AS THE

9    AGREEMENT SAID.

10          HERE THE CONTRACT SAID THERE WERE DEDUCTIBLES FOR RETIREES.

11    THAT'S INCONSISTENT WITH THE IDEA THAT THEY COULDN'T BE CHANGED.

12    THERE IS NO LIGHT SPACE, NO GAP BETWEEN THE CONDUCT HERE AND THE

13    LANGUAGE.

14          DURATIONAL LANGUAGE AND RESERVATION OF RIGHTS, THERE IS

15    EXPLICIT DURATIONAL LANGUAGE.  THE REASON COUNSEL CAN KEEP SAYING

16    THERE'S NO DURATIONAL LANGUAGE HERE THAT'S SPECIFIC IS THEY'RE

17    IGNORING THE CAP LETTERS.  THAT'S WHY THEY DIDN'T PUT THEM UP ON THE

18    SCREEN.

19          THE CAP LETTER SAYS THIS CAP IS IN EFFECT UNTIL THE END OF THE

20    CBA, AND THEN IT'S A MANDATORY SUBJECT OF RENEGOTIATION THE NEXT

21    TIME.  AND THEN, WHO KNOWS, IT MAY OR MAY NOT BE RENEGOTIATED,

22    CHANGED, RE-IMPLEMENTED.  IT COULD NOT BE MORE EXPLICIT.

23          IT'S NOT THE GENERAL LANGUAGE THAT SAYS WHATEVER THE

24    BENEFITS ARE, ARE GIVEN UNDER THIS AGREEMENT, FROM WHICH OTHERS

25    HAVE ARGUED THAT MEANS THEY ONLY LAST FOR THE LENGTH OF THE

1    AGREEMENT.  IT EXPLICITLY SAYS IT ONLY LASTS UNDER THIS AGREEMENT,

2    IT'S MANDATORY THAT YOU GO BACK AND RENEGOTIATE.  IT'S A STRIKEABLE

3    ISSUE NEXT TIME, COMPLETELY DIFFERENT.

4         PENSION BENEFITS, COUNSEL REPEATED OVER AND OVER AGAIN, THE

5    ELIGIBILITY IS TIED TOGETHER, AND THAT'S THE KEY WORD, YOUR HONOR,

6    AND THAT'S WHERE THE FINESSE TOOK PLACE HERE.

7         HERE'S THE LANGUAGE OF OUR CBA'S, "THE COMPANY WILL PROVIDE

8    THE FOLLOWING COVERAGES FOR RETIRED EMPLOYEES AND ELIGIBLE

9    DEPENDENTS AND SURVIVING SPOUSES OF ACTIVE AND RETIRED EMPLOYEES

10   AND ELIGIBLE DEPENDENTS WHO ARE RECEIVING A PENSION UNDER THE

11   PENSION AGREEMENT."

12        I'VE GONE BACK, I'VE LOOKED AT THE DOCUMENTS IN THE OTHER

13   CASES.  THE OTHER CASES TIE ELIGIBILITY FOR A PENSION TO ELIGIBILITY FOR

14   BENEFITS.  THAT IS NOT WHAT THIS DOCUMENT DOES.  OUR DOCUMENTS

15   SIMPLY DESCRIBE THE PEOPLE WHO WILL BE GETTING THE BENEFITS WHEN

16   THEY RETIRE AS A SUBSET OF PEOPLE WHO ARE OTHERWISE GETTING

17   PENSIONS WHO ARE THE PEOPLE WHO ARE RETIRED.  IT DOESN'T SAY WHO

18   ARE ELIGIBLE FOR A PENSION; IT SAYS THE PEOPLE WHO ARE RECEIVING

19   PENSIONS, WHO MEET THESE OTHER REQUIREMENTS, ARE THE PEOPLE WHO

20   WILL BE GETTING THE BENEFITS.

21        THE LANGUAGE, ALSO, YOUR HONOR, DOES SOMETHING ELSE THAT'S

22   VERY IMPORTANT HERE WITH RESPECT TO PENSION.  IT NOT ONLY

23   DEMONSTRATES IT'S NOT TIED TO ELIGIBILITY, BUT RATHER SIMPLY THAT

24   THESE PEOPLE ARE DESCRIBED AS THOSE WHO ARE RECEIVING PENSIONS, BUT

25   IT ALSO CLEARLY SUPPORTS THE POINT THAT IF YOU GET THESE RETIREMENT

1    BENEFITS YOU GET THEM ON THE BASIS OF HAVING ACTUALLY RETIRED, NOT

2    FOR FIVE YEARS OF SERVICE, WHICH I'LL COME BACK TO IN A FEW MOMENTS,

3    AS PLAINTIFFS WOULD CONTEND.

4           BECAUSE YOU DON'T GET A PENSION UNLESS YOU'RE RETIRED.  AND IT

5    SAYS PEOPLE WHO ARE RECEIVING A PENSION, PEOPLE WHO ARE RECEIVING A

6    PENSION, ARE BY DEFINITION RETIRED.  IF YOU'RE NOT RETIRED, YOU'RE NOT

7    GETTING THESE BENEFITS.

8           IF THERE'S ANY VESTING AT ALL HERE, YOUR HONOR – WE'D SUBMIT

9    THAT THE RECORD DEMONSTRATES THAT YOU CAN'T FIND AS A MATTER OF

10   LAW, RESPECTFULLY, THAT THERE IS.  IF THERE WERE ANY VESTING, IT HAS

11   TO BE AS OF RETIREMENT, EVEN BY THE CLEAR LANGUAGE THAT THEY POINT

12   TO AND MISCONSTRUE.  BECAUSE ANYBODY WHO IS RECEIVING A PENSION IS,

13   BY DEFINITION, RETIRED.

14          ONE MISCELLANEOUS POINT BEFORE I TURN TO THE VESTING AS OF

15   RETIREMENT, AND THEN I'LL BE DONE, YOUR HONOR.  COUNSEL POINTED TO

16   EXHIBIT 601 AND READ A PHRASE OUT OF A DOCUMENT AND SAYS, YOU SEE,

17   EVEN ALCOA SAYS INTERNALLY THAT THESE BENEFITS ARE VESTED.

18          COUNSEL DIDN'T TELL YOU WHAT THE WITNESS WHOM THEY

19   QUESTIONED ABOUT THIS DOCUMENT SAID.  IT WAS ONE OF ALCOA'S IN-

20   HOUSE LAWYERS, MR. STORM.  HE WAS ASKED ABOUT THIS DOCUMENT,

21   HERE'S HIS TESTIMONY.

22          REMEMBER, THIS IS A SUMMARY JUDGMENT MOTION WE'RE HERE

23   ABOUT TODAY, YOUR HONOR.  "WE DO NOT VEST OUR RETIREE MEDICAL

24   BENEFITS.  THERE ARE ACTIVE EMPLOYEES THAT ARE CURRENTLY ELIGIBLE

25   FOR THE RETIREE MEDICAL BENEFITS AS THEY MAY EXIST IN THE FUTURE

1   WHEN THEY ULTIMATELY RETIRE." THAT WAS HIS TESTIMONY ABOUT THIS

2   SAME DOCUMENT, WHICH WAS NOT MENTIONED.

3         THERE'S NO EVIDENCE IN THIS RECORD THAT THIS DOCUMENT STANDS

4   FOR AND IN FACT IT DEMONSTRATES THAT ALCOA REGARDED ACTIVE

5   EMPLOYEES AS HAVING AN ENTITLEMENT TO HEALTH BENEFITS PRIOR TO THE

6   TIME THAT THEY RETIRE. THAT SIMPLY IS NOT WHAT THE RECORD SHOWS.

7         NOW, IF – I COME BACK TO THE SECOND POINT NOW, YOUR HONOR – SO

8   IF YOUR HONOR, FOR PURPOSES OF THIS MOTION, TREATS THEM AS VESTED

9   NOTWITHSTANDING WHAT I HAVE JUST SAID, AS OF AND WHEN DO THEY

10  VEST?

11        AND THE FIRST POINT, YOUR HONOR, IS THERE IS NOT A SINGLE SIXTH

12  CIRCUIT OPINION WE COULD FIND, AND I BELIEVE WE'VE LOOKED AT ALL OF

13  THEM, THAT HAS EVER FOUND – AND THERE ARE A NUMBER THAT HAVE

14  FOUND VESTED RIGHTS, AS I'M SURE YOUR HONOR IS AWARE – THERE IS NOT

15  ONE THAT HAS EVER FOUND THE RIGHTS VESTED AT ANY TIME OTHER THAN

16  RETIREMENT.

17        IF YOUR HONOR WERE TO FIND THAT THESE RIGHTS VESTED, AS

18  PLAINTIFFS ARGUE, AT FIVE YEARS OF SERVICE, THAT WOULD BE THE FIRST

19  TIME THAT THAT HAS BEEN DETERMINED. THERE'S ONE DISTRICT COURT

20  CASE THAT HAS SOME LANGUAGE ABOUT VESTING AS OF ELIGIBILITY; THERE

21  IS NOT A SINGLE SIXTH CIRCUIT CASE THAT SO HOLDS.

22        AND IN THAT CONNECTION COUNSEL POINTED TO THE UAW VS. ALCOA

23  CASE BACK IN '96. I WANT TO READ WHAT THE DISTRICT JUDGE ACTUALLY

24  SAID IN THAT CASE, BECAUSE IT BEARS DIRECTLY ON THIS POINT AND IS

25  INCONSISTENT WITH HOW COUNSEL DESCRIBED THE CASE: "THE COURT

1  FINDS THAT THE PARTIES TO THE 1988 CBA UNDER WHICH THE RETIREE

2  PLAINTIFFS RETIRED INTENDED TO PROVIDE TO THOSE RETIREES VESTED

3  BENEFITS AT THE LEVELS IN EFFECT AT THE TIME OF RETIREMENT," THEIR

4  RETIREMENT, AND – REMEMBER HE SAID THAT THEY COULDN'T BE TOUCHED,

5  THEY COULDN'T BE CHANGED "– AND THAT ANY MODIFICATION OF THESE

6  BENEFITS, EXCEPT IN LIMITED EXPRESS CIRCUMSTANCES, COULD ONLY BE

7  MADE MY MUTUAL AGREEMENT."

8      NOW, FIRST, THIS CASE HAS NOTHING TO DO WITH THE BENEFITS OF

9  PEOPLE WHO RETIRED UNDER THE 1988 CBA, BECAUSE AS I'VE SAID TO YOUR

10  HONOR SEVERAL TIMES, I'M SURE YOU KNOW, THIS CASE HAS TO DO ONLY

11  WITH THE CLASS OF PLAINTIFFS WHO RETIRED ONCE THIS CAP AGREEMENT

12  HAD BEEN RATIFIED BY THE UNION AND IMPLEMENTED AS PART OF THE CBA

13  IN '93. SO IT DOESN'T TOUCH THOSE PEOPLE.

14      BUT WHAT THE DISTRICT COURT SAID IN THAT CASE, ON ITS FACE, IN

15  THE VERY SENTENCE THAT COUNSEL ALLUDED TO, BUT DIDN'T QUOTE, IS,

16  THAT MODIFICATION OF THESE BENEFITS COULD ONLY BE MADE BY MUTUAL

17  AGREEMENT. AND PROSPECTIVELY WHAT HAPPENED? THERE WAS MUTUAL

18  AGREEMENT. THE UNION AND ALCOA AGREED IN '93, IN '96, IN '02, IN '06 TO

19  CAP LETTERS THAT ARE CLEAR ON THEIR FACE.

20      NOW, WITH RESPECT TO THE APPLICATION OF THE CAP LETTERS TO

21  EVERYONE WHO'S RETIRED FROM – AFTER MAY OF '93 ON, FIRST, THAT'S

22  WHAT THE CAP LETTERS CLEARLY SAY. THIS IS ABOUT LOOKING AT THE

23  CONTRACTS AND READING THE CONTRACTS AND USING THEM AS THE FIRST,

24  IN THE FIRST INSTANCE, AS THE EVIDENCE OF INTENT. THE CAP LETTERS

25  COULD NOT BE CLEARER THAT THEY APPLIED TO EVERYBODY WHO'S

1     RETIRED FROM MAY OF '93, ON, WHO RETIRED SUBJECT TO THE CAP.

2        AS I SAID BEFORE, THE ONLY THING THE UNION GAVE UP WHEN IT

3     AGREED TO A CAP IN '93 WAS THE FACT THAT IT WOULD APPLY TO RETIREES

4     WHO RETIRED UNDER THE '93 PLAN, EVEN THOUGH THE CAP HAD NOT YET

5     BEEN IMPLEMENTED.  OTHERWISE, THE UNION WAS GIVING NOTHING UP.

6        OTHERWISE, WHY WOULD THE UNION MEMBERS HAD STARTED TO GO

7     ON STRIKE AND FIGHT ABOUT THIS, IF IT HAD NO EFFECT UPON THE UNION

8     AND MAY OR MAY NOT EVER SHOW UP IN A LATER AGREEMENT BECAUSE IT

9     WAS THE SUBJECT OF A LATER MANDATORY BARGAINING?  THE REASON IT'S

10     SO IMPORTANT IS, THEY KNEW WHAT IT SAID, THEY COULD READ IT.

11        IT SAID THAT ANYBODY WHO RETIRES UNDER THIS CBA WILL BE

12     SUBJECT TO A CAP; IT'S SIMPLY THAT THE AMOUNT OF THE CAP WILL BE SET

13     BY WHAT THE COSTS ARE AT A DATE CERTAIN IN THE FUTURE.  THE

14     IMPLEMENTATION WAS DEFERRED, THE CAP WAS AGREED TO NOW.  THAT'S

15     WHY IT WAS A POINT OF SUCH CONTENTION.

16        BY THE WAY, EVEN THE PLAINTIFFS DON'T ARGUE, EVEN THE

17     PLAINTIFFS DON'T ARGUE, THAT PEOPLE WHO RETIRED AFTER THE '06

18     AGREEMENT WAS RATIFIED, BUT BEFORE JANUARY OF '07, ARE NOT SUBJECT

19     TO IT.  EVEN THEY ADMIT THAT ONCE THE '06 AGREEMENT WAS RATIFIED

20     PEOPLE WHO RETIRED UNDER IT WERE SUBJECT TO CAP.

21        ALTHOUGH I BELIEVE THEY ARGUE THAT WHEN THEY DO RETIRE THEY

22     GET FULLY – IF THEY HAD FIVE YEARS OF SERVICE AT THE TIME OF THE '06

23     CBA, I BELIEVE THE PLAINTIFFS ARGUE THAT EVEN THOUGH THEY RETIRED

24     SUBJECT TO THE CAP, WHEN THEY RETIRE, THEY SOMEHOW ARE ENTITLED TO

25     UNCAPPED BENEFITS BECAUSE THEY VESTED AT THE TIME THEY HAD FIVE

1    YEARS OF SERVICE.

2         AND LET ME THEREFORE TURN TO THAT QUESTION.  RESPECTFULLY,

3    THE ARGUMENT THAT THESE BENEFITS, CONTRARY OR AT LEAST NOT

4    SUPPORTED BY A SINGLE SIXTH CIRCUIT OPINION THAT THESE BENEFITS VEST

5    AT FIVE YEARS OF SERVICE, SIMPLY MAKES NO SENSE.  FIRST OF ALL, WE

6    HAVE A CLASS HERE, AND WHAT THE PLAINTIFFS WOULD SAY IS THAT EVERY

7    MEMBER OF THAT CLASS EFFECTIVELY HAS A CUSTOMIZED SET OF BENEFITS,

8    THE BENEFITS THAT VESTED, THAT LOCKED IN FOR THAT PERSON OR

9    WHATEVER THE BENEFITS HAPPENED TO BE, ON HIS OR HER FIFTH

10   ANNIVERSARY OF SERVICE.  AND UNLESS TWO PEOPLE START ON THE SAME

11   DAY, EVERYONE HAS A UNIQUE FIFTH ANNIVERSARY OF SERVICE.

12         SO EXACTLY WHAT THE DEDUCTIBLES ARE, EXACTLY WHICH DRUGS

13   ARE COVERED OR NOT COVERED, WHETHER GENERICS OR BRAND DRUGS CAN

14   BE COVERED, EXACTLY WHICH MEDICAL PROCEDURES ARE DEEMED

15   EXPERIMENTAL AND NOT COVERED VERSUS STANDARD AND COVERED,

16   WOULD BE DIFFERENT FOR VIRTUALLY EVERY MEMBER OF THE CLASS UNDER

17   THEIR THEORY, BECAUSE IT WOULD ALL BE DICTATED BY WHAT THE WORLD

18   LOOKED LIKE ON EACH PERSON'S RESPECTIVE FIFTH ANNIVERSARY OF

19   SERVICE.

20         THAT'S NOT WHAT THE CONTRACT SAYS.  YOU WILL FIND NOTHING IN

21   THE CONTRACT THAT SAYS THESE BENEFITS VEST ON YOUR FIFTH

22   ANNIVERSARY OF SERVICE.  PLAINTIFFS HAVE JUST READ THAT IN.  THERE'S

23   NO BASIS FOR IT.

24         AND I WOULD ASK YOUR HONOR TO JUST TAKE THIS HYPOTHETICAL

25   CIRCUMSTANCE, WHICH I THINK UNDERSCORES WHY THIS SIMPLY – WHY NO

1    SIXTH CIRCUIT CASE HAS EVER DECIDED THIS. SUPPOSE A PERSON GOES TO

2    WORK FOR ALCOA AND WORKS FOR FIVE YEARS AND A DAY AND IS A YOUNG

3    MAN OR WOMAN 30 YEARS OLD, LEAVES AND GOES TO ANOTHER COMPANY

4    AND THEN SPENDS 30 YEARS WORKING FOR ANOTHER COMPANY, AND NOW

5    HE OR SHE RETIRES AT THE AGE OF 60 OR SO.

6        ACCORDING TO THE PLAINTIFFS, THEY CAN COME BACK, THAT PERSON

7    WHO HADN'T WORKED FOR ALCOA 30 YEARS, BUT WHO WORKED FOR FIVE

8    YEARS AND A DAY BACK WHEN HE WAS 25 TO 30 YEARS OLD, CAN COME BACK

9    TO ALCOA AND SAY, WELL, I'M NOW READY TO RETIRE, AND YOU'RE GOING

10   TO PAY ALL OF MY MEDICAL BENEFITS AT NO COST FOR THE REST OF MY LIFE,

11   BECAUSE THOSE BENEFITS VESTED WHEN I WAS 30 YEARS OLD.

12       I WOULD RESPECTFULLY ASK YOUR HONOR TO ASK PLAINTIFFS WHERE

13   THAT'S IN THE AGREEMENT. WHERE DOES THE CONTRACT SAY THAT

14   ANYBODY COULD DO THAT? THAT'S CERTAINLY NOT WHAT THE COURT IN

15   THE UAW VS. ALCOA CASE ASSUMED WHEN SAID "AS OF RETIREMENT." IT'S

16   NOT WHAT THE SIXTH CIRCUIT CASES SAID WHEN THEY SAID THAT THESE

17   BENEFITS, IF VESTED, VEST AS OF RETIREMENT, AND IT SIMPLY MAKES NO

18   SENSE.

19       YOUR HONOR, THERE ARE OTHER THINGS – LAST POINT, AND THAT IS

20   THAT, UNDER YARD-MAN AND THE YARD-MAN INFERENCE, I WOULD JUST

21   POINT OUT THAT NEITHER OF THE BASES FOR THE YARD-MAN INFERENCE IS

22   CONSISTENT WITH THE PLAINTIFFS' THEORY OF VESTING AT FIVE YEARS.

23       FIRST OF ALL, VESTING AT FIVE YEARS MEANS YOU'VE GOT MANY,

24   MANY, MANY YEARS OF ACTIVE SERVICE AHEAD OF YOU, PRESUMABLY,

25   BEFORE YOU'RE ELIGIBLE TO RETIRE. THE WHOLE PREMISE OF THE YARD-

1  MAN RATIONALE IS THAT THESE BENEFITS ARE STATUS BENEFITS – THAT'S

2  THE FIRST PREMISE – THAT APPLY TO THE STATUS OF RETIREMENT; THAT

3  THEY WOULD HAVE THEM APPLY TO THE STATUS OF BEING AN ACTIVE

4  EMPLOYEE.

5      THAT 30-YEAR-OLD MAN IN MY HYPOTHETICAL WHO'S GOT 30 MORE

6  YEARS TO WORK, THESE BENEFITS WOULD APPLY TO HIM IN THAT STATUS

7  EVEN THOUGH HE'S NOT YET RETIRED.  THAT'S INCONSISTENT WITH YARD-

8  MAN.

9      AND IT ALSO IS INCONSISTENT WITH THE SECOND PREMISE, WHICH IS,

10  THE REASON THAT THERE MAY BE AN INFERENCE OF VESTING IS THAT YOU

11  HAVE NO SAY IN THE FUTURE DISCUSSIONS OF THESE BENEFITS BECAUSE

12  YOU'RE GONE, YOU'RE RETIRED.  BUT IF YOU'RE 30 YEARS OLD, GOING TO

13  WORK FOR 30 MORE YEARS, YOU HAVE A SAY BECAUSE YOU CAN RATIFY OR

14  REFUSE TO RATIFY EVERY NEW AGREEMENT.

15      SO NEITHER ONE OF THE YARD-MAN BASES IS RECONCILABLE WITH THE

16  PLAINTIFFS' THEORY OF VESTING AT FIVE YEARS, AND THAT'S WHY, YOUR

17  HONOR, THE CASES DON'T SUPPORT IT.

18      WITH THAT, YOUR HONOR, I'LL SIT DOWN, AND IF I MAY, YIELD THE

19  MICROPHONE TO MR. SLIFKIN.

20          THE COURT:  THANK YOU, MR. CHESLER.

21          MR. CHESLER:  THANK YOU.

22          THE COURT:  MR. SLIFKIN?

23          MR. SLIFKIN:  THANK YOU, YOUR HONOR.  SO IF WE GET PAST THE

24  QUESTION OF WHETHER OR NOT ALCOA AND THE UNION WERE LEGALLY

25  PERMITTED TO MAKE SOME MODIFICATION TO THE BENEFIT PLAN IN 1993, THE

1 QUESTION THEN BECOMES WHAT'S BEEN CHARACTERIZED AS THE EXTRINSIC

2 EVIDENCE QUESTION. BUT, MORE BROADLY, IT IS WHAT IS IT THAT THEY

3 ACTUALLY DID IN 1993, WHAT WAS THE INTENT BEHIND THIS LETTER THAT WE

4 KNOW WAS NEGOTIATED, SIGNED AND ATTACHED TO THE CBA.

5 WITH RESPECT, I THINK WE SHOULD START WITH THE CONTRACT

6 LANGUAGE. NOW, THERE'S REALLY NO DISPUTE THAT THE CAP LETTER IS

7 PART OF THE CBA AND ENFORCEABLE ON BOTH SIDES. THERE ARE CASES

8 THAT MAKE CRYSTAL CLEAR, AND WE CITE THEM IN OUR PAPERS, THAT THE

9 FACT THAT A LETTER IS ATTACHED TO THE BACK OF THE CBA DOESN'T MEAN

10 THAT IT'S NOT PART OF THE CBA.

11 THE QUESTION THEN IS, IF IT'S PART OF THE CBA, WHAT IS ITS EFFECT?

12 PLAINTIFFS' THEORY IS THAT THIS CAP LETTER HAD NO EFFECT WHATSOEVER,

13 THAT THE RIGHTS OF THE PEOPLE WHO RETIRED AFTER 1993 ARE EXACTLY

14 THE SAME AS THE RIGHTS OF PEOPLE WHO RETIRED BEFORE 1993.

15 THEY SAY THE FACT THAT YOU HAVE ATTACHED THIS TO THE BACK OF

16 THE CBA IS IRRELEVANT; THE RIGHTS ARE THE SAME AS IF IT HAD NEVER

17 BEEN THERE AT ALL.

18 BUT AS COUNSEL, I BELIEVE IT WAS THREE TIMES, TOLD THE COURT IN

19 HIS ARGUMENT AND PUT THE LANGUAGE ON THE SCREEN, THE YARD-MAN

20 DECISION HOLDS THAT, "AS IN ALL CONTRACTS, THE COLLECTIVE

21 BARGAINING AGREEMENT'S TERMS MUST BE CONSTRUED SO AS TO RENDER

22 NON-NUGATORY."

23 PLAINTIFFS' APPROACH, HOWEVER, RENDERED THE ENTIRE CAP LETTER

24 IRRELEVANT AND TOTALLY VIOLATED THAT PRINCIPLE. SO HOW DID

25 PLAINTIFFS GET TO THAT POINT? WELL, I THINK THEY MAKE TWO

1    ARGUMENTS, YOUR HONOR.

2         ONE IS TO SUGGEST, AND NOT VERY EXPLICITLY, THAT THERE WAS

3    SOME KIND OF ORAL SIDE AGREEMENT.  WE'RE NEVER TOLD THAT THERE WAS

4    AN ACTUAL AGREEMENT, THERE WAS A HANDSHAKE, THAT THERE WERE

5    TERMS WERE SET, BUT THEY REFER TO CERTAIN PHASES, PEOPLE USED SOME

6    PHRASES AND PEOPLE ASSUMED THINGS.

7         THE REASON I BELIEVE THAT THAT ARGUMENT IS NOT REALLY PRESSED

8    IS BECAUSE, IN SPRAGUE, THE SIXTH CIRCUIT SAID, "OUR COURT HAS

9    CONSISTENTLY REFUSED TO RECOGNIZE ORAL MODIFICATIONS TO WRITTEN

10   PLAN DOCUMENTS."  ORAL SIDE AGREEMENTS AREN'T ALLOWED.

11        SO WHAT'S THE NEXT ARGUMENT AS TO THE INTERPRETATION OF THE

12   CONTRACT?  WELL, AS YOU WILL SEE FROM THE PAPERS, PLAINTIFFS SAY,

13   WELL, THE WAY YOU OUGHT TO READ THE CAP LETTER IS THAT THE TOTAL

14   AMOUNT THAT ALCOA SPENT IN HEALTH CARE IN 2006, MANY, MANY

15   MILLIONS OF DOLLARS, THAT SHOULD BE THE PER PERSON CAP.

16        THEY THEMSELVES SAY, IN THEIR OPPOSITION PAPERS AT 38, THAT

17   THAT IS UTTERLY MEANINGLESS AND THE CAP WOULD NEVER COME INTO

18   EFFECT IF YOU READ THE LETTER THAT WAY.  OKAY.  WELL, THAT, OF

19   COURSE, VIOLATES YARD-MAN'S POINT OF MAKING IT NUGATORY.

20        BUT WE ALSO CITE TO YOUR HONOR THE 2007 DECISION OF THE SIXTH

21   CIRCUIT IN THE CERTIFIED RESTORATION CASE, "CONTRACT MUST BE

22   CONSTRUED CONSISTENT WITH COMMON SENSE AND IN A MANNER THAT

23   AVOIDS ABSURD RESULTS."

24        AS YOUR HONOR SUGGESTED WHEN WE WERE LAST BEFORE YOU

25   ARGUING ABOUT THE SHAPE OF THE TABLE FOR THIS CASE GOING FORWARD,

1    THE CAP LETTER PLAINLY INTENDS TO CAP SOMETHING.  THAT'S THE ONLY

2    PROPER READING OF IT.

3           WE BELIEVE THERE'S NO PERMISSIBLE INTERPRETATION OF THE CAP

4    LETTER OTHER THAN THAT THE PARTIES INTENDED TO CAP ALCOA'S

5    LIABILITY AS OF 1997 IN THE ORIGINAL LETTER, SUBJECT TO FURTHER

6    MANDATORY BARGAINING.  IF ONE WERE TO GO BEYOND THE LANGUAGE,

7    THOUGH, IN TERMS OF EXTRINSIC EVIDENCE, IT MERELY CONFIRMS THAT

8    CONCLUSION, THAT THAT IS THE INTENT.

9           NOW, VERY LITTLE WAS SAID ABOUT THE EXTRINSIC EVIDENCE IN

10   PLAINTIFFS' PRESENTATION.  I BELIEVE THERE'S A REASON FOR THAT.

11   BECAUSE IF YOU ACTUALLY DELVE INTO IT, IT ENTIRELY CONTRADICTS THE

12   POSITION THAT THEY ARE PURSUING.  IT'S AN INCONVENIENT TRUTH THAT

13   GETS IN THE WAY OF THE ARGUMENT THAT'S BEING PURSUED.

14          LET ME LOOK AT ALCOA'S EVIDENCE, AND THEN I'LL TURN TO

15   PLAINTIFFS' EVIDENCE.  THE EMPLOYER NEGOTIATORS FROM 1993 HAVE

16   UNIFORMLY TESTIFIED THAT THERE WAS A REAL CAP, THAT THIS WAS PART

17   OF A HARD-FOUGHT NEGOTIATION AND THIS CAP WAS INTENDED TO APPLY AS

18   IT WAS WRITTEN.

19          RUSS PORTER OF ALCOA WAS THE CHIEF NEGOTIATOR FOR ALCOA.

20   PAGES 89 TO 91 OF HIS DEPOSITION, HE SAYS THAT CLEARLY.  RON HOFFMAN

21   WAS HIS BOSS, HE SAT NEXT TO HIM AT THE NEGOTIATIONS, AND ALL OF THE

22   TOP TABLE NEGOTIATIONS.  IF YOU LOOK AT PAGES 12 TO 13 AND 39 TO 40 OF

23   HIS DEPOSITION, HIS TESTIMONY IS CONSISTENT.

24          THE CHIEF NEGOTIATOR FOR REYNOLDS WAS A GENTLEMAN CALLED

25   BOB NEWMAN.  HE WAS IN ALL OF THE TOP TABLE NEGOTIATIONS.  HE'S

1   TESTIFIED ALSO.  I REFER YOU TO PAGES 65 AND 92 OF HIS DEPOSITION.  HE

2   TESTIFIED ALSO THAT THIS WAS INTENDED TO BE REAL.

3           BUT THIS ISN'T JUST A BALD STATEMENT.  THESE GENTLEMEN ARE

4   VERY SPECIFIC ABOUT WHAT WAS GOING ON.  FIRST, THEY DESCRIBED THE

5   MOTIVATION BEHIND THE CAP, THAT THERE WAS, ONE, A SERIOUS CONCERN

6   IN 1993 WITH THE RISING COST OF HEALTH CARE; AND, TWO, THERE WERE NEW

7   ACCOUNTING RULES AT THE TIME, FAS-106, THAT MADE THAT CONCERN

8   IMMEDIATE, BECAUSE IT REQUIRED THE ENTIRE FUTURE COSTS TO BE

9   RECORDED ON ALCOA'S BOOKS.  THAT'S MR. PORTER'S DEPOSITION AT 17 TO

10  18.

11          MOREOVER, THE EMPLOYERS UNDERSTOOD THAT ONLY A REAL CAP

12  WOULD SOLVE THEIR PROBLEM, WOULD ASSIST THEM; MR. PORTER, 26 TO 28.

13  THE EVIDENCE IS ALSO CLEAR THAT THE EMPLOYERS, ALCOA AND REYNOLDS,

14  WERE PREPARED TO ACCEPT A STRIKE IF THEIR MINIMUM DEMAND THAT THE

15  CAPS SHOULD BE ENGAGED IN 1997 WASN'T ACCEPTED.

16          IF YOU LOOK AT MR. HOFFMAN'S DEPOSITION, PAGES 36 TO 37 AND PAGE

17  40, HE DESCRIBES HOW HE WENT TO THE CHIEF EXECUTIVE OFFICER AND

18  CHAIRMAN OF ALCOA, MR. O'NEIL, ON MAY 31ST, 1993, AND GOT SPECIFIC

19  AUTHORIZATION FROM HIM TO ACCEPT A STRIKE IF THIS CAP LETTER WAS

20  NOT AGREED UPON BY THE UNION.

21          THIS ISSUE, AS MR. CHESLER MENTIONED, WAS SO IMPORTANT ON BOTH

22  SIDES, THAT IT WAS NEGOTIATED EVEN PAST THE STRIKE DEADLINE ON MAY

23  31ST, 1993.  PEOPLE WERE ALREADY WALKING OUT OF ALCOA FACTORIES

24  AROUND THE COUNTRY.  MR. MURPHY WAS ON THE PHONE TRYING TO GET

25  THEM BACK TO WORK TO AVOID AN ULTIMATE ALL-OUT STRIKE, AND THE

1 PARTIES WENT INTO THE EARLY HOURS OF THE MORNING OF JUNE 1ST, 1993,

2 NEGOTIATING THIS.  THIS WAS A REAL DEAL.

3 NOW, ALL THIS TESTIMONY I'VE JUST DESCRIBED, ALL OF IT, IS

4 CORROBORATED BY CONTEMPORANEOUS BUSINESS RECORDS, DOCUMENTS

5 THAT ARE PLAINLY DESIGNED FOR THE PURPOSE OF BEING USED IN

6 PROCEEDINGS SUCH AS THIS, AS A RECORD OF WHAT HAPPENED, AND THEY

7 CONFIRM IT.

8 NOTABLY, IF YOU LOOK AT EXHIBIT 182, MEMORANDUM BY – WE CALL

9 LINDA BURK, IT RECALLS MEETINGS AT THE HIGHEST LEVELS OF THE TWO

10 COMPANIES, WHERE THEY RECOGNIZED THE PROBLEM AND COME TO THE

11 CONCLUSION THAT THE CAPS MUST BE REAL.

12 OKAY.  A LETTER THAT IS A SHAM, THAT IS ILLUSORY, AS PLAINTIFFS

13 WOULD URGE ON THIS COURT, WAS RECOGNIZED BY THE COMPANY AS

14 SOMETHING THEY DIDN'T WANT.  THAT WAS EXPRESSLY NOT THEIR INTENT.

15 I WOULD ALSO REFER YOUR HONOR TO EXHIBIT 140.  NOW, THAT'S VERY

16 IMPORTANT.  THESE ARE MR. HOFFMAN'S TYPE-WRITTEN NOTES OF THE

17 MEETINGS.  HE TESTIFIED THAT HE ATTENDED ALL THE TOP TABLE

18 NEGOTIATIONS, HIS JOB WAS TO TAKE VERY CAREFUL NOTES.

19 HE WOULD GO BACK TO HIS HOTEL ROOM AND TYPE THOSE NOTES UP

20 EVERY NIGHT AND SEND THEM TO THE CHAIRMAN AND THE CEO AS A RECORD

21 OF THE PROCEEDINGS.  AND THOSE NOTES, IN GREAT DETAIL, SET FORTH AND

22 CORROBORATE PRECISELY WHAT PEOPLE HAVE TESTIFIED TO, THE

23 INSISTENCE OF THE EMPLOYERS ON GETTING THESE CAPS, THE FACT THAT IT

24 HAD TO BE 1997 AS THE DATE, THE FACT THAT THEY'RE PREPARED TO ACCEPT

25 A STRIKE, THE FACT THAT THIS WENT PAST THE STRIKE DEADLINE.

1    LOOKING AT THE CONTEMPORANEOUS DOCUMENTS, I WOULD ALSO

2  REFER YOUR HONOR TO EXHIBIT 185. IF THIS IS THE FIRST DRAFT OF THE CAP

3  LETTER DRAFTED BY THE UNION, THE UNION UNDERSTOOD THEY HAD TO

4  TAKE A CAP LETTER, DRAFTED IT AND PUT IN A DATE OF 2000.

5    OKAY. THAT WASN'T GOOD ENOUGH; IT HAD TO BE '97. ULTIMATELY,

6  THE PARTIES AGREED IN THE SMALL HOURS OF THE MORNING ON JUNE 1ST,

7  1993, TO THAT '97 DATE.

8    AND THEN THE FIRST THING THEY DID, IMMEDIATELY, EVEN BEFORE

9  THE CAP LETTERS WERE TYPED UP AND WRITTEN, THEY ENTERED INTO A

10  MEMORANDUM OF SETTLEMENT. THERE WERE TWO – ONE FOR EACH

11  COMPANY AND EACH UNION – TO RECORD PRECISELY WHAT THEY HAD

12  AGREED UPON. AND EXHIBITS 186 AND 187 ARE THE RELEVANT MEMORANDA

13  OF SETTLEMENT, AND THEY BOTH SAY, "PLAN COSTS CAPPED AT EXPECTED

14  1997 LEVELS."

15    NOW, OBVIOUSLY, ONCE AN AGREEMENT IS REACHED, IT HAS TO BE

16  RATIFIED BY ITS MEMBERSHIP. AND BEFORE THE MEMBERSHIP OF THE UNION,

17  ALL THEIR CURRENT EMPLOYEES RATIFY THE DEAL, THEY HAVE TO BE TOLD

18  WHAT IT CONTAINS. SO THERE ARE PRESENTATIONS PREPARED BY THE UNION

19  AND ALCOA TO EXPLAIN THE DEAL TO THE UNION MEMBERSHIP, AND WE

20  HAVE THOSE PRESENTATIONS.

21    I REFER YOU TO DEPOSITION EXHIBITS 151 AND 112. THESE ARE FROM

22  THE ABG PRESENTATION AS AN EXAMPLE. SO THIS IS THE PRESENTATION

23  THAT THE UNION AND ALCOA MADE TO THE THEN ALCOA EMPLOYEES, NOW

24  RETIREES, WERE PART OF THIS CLASS, BEFORE THEY RATIFIED THIS DEAL.

25    THE SLIDE SAID, QUOTE, "COST CAP AT EXPECTED 1997 LEVELS." THE

1    PRESENTATION SCRIPT, EXHIBIT 112, SAYS, "THERE IS A CAP ON THE COMPANY

2    CONTRIBUTIONS OF FUTURE RETIREE HEALTH CARE COSTS.  THE CAP WILL

3    NOT COME INTO EFFECT DURING THE TERM OF THIS AGREEMENT."

4         THAT IS ENTIRELY CONSISTENT WITH OUR INTERPRETATION OF THE

5    AGREEMENT AND ENTIRELY INCONSISTENT WITH PLAINTIFFS'

6    INTERPRETATION.

7         MR. CHESLER MENTIONED THE SPD'S, THEY CAN BE DEEMED EXTRINSIC

8    EVIDENCE.  THESE SPD'S ARE ACTUALLY INCORPORATED INTO THE

9    AGREEMENT BY REFERENCE.  LET ME JUST REPEAT WHAT HE SAID THROUGH

10   THE LENS OF WHAT DO THEY TELL US ABOUT THE INTENT OF THE PARTIES TO

11   THESE VARIOUS AGREEMENTS.  THERE ARE SEVEN IN THE RECORD, FIVE OF

12   THEM EXPLICITLY MENTIONS THE CAP.

13        NOW, PLAINTIFFS DON'T TALK ABOUT THOSE, THEY TALK ABOUT THE

14   OTHER TWO, AND THEY SAID, WELL, THERE'S NO MENTION OF CAP IN THE

15   OTHER TWO.  THOSE OTHER TWO HAVE EVEN BROADER RESERVATION OF

16   RIGHTS LANGUAGE, SAYING, AS MR. CHESLER POINTED OUT, THAT ALCOA

17   CAN CHANGE OR TERMINATE THESE BENEFITS AT WILL, THAT THEY ARE NOT

18   VESTED.

19        IT IS SIMPLY IMPOSSIBLE TO DERIVE FROM THIS RECORD, THIS

20   DOCUMENTARY AND TESTIMONIAL RECORD, THE INTENT THAT PLAINTIFFS

21   URGE UPON THE COURT.  MOST IMPORTANTLY – AND THIS IS A FACTUAL

22   POINT THAT DISTINGUISHES THIS CASE, I BELIEVE, FROM ALL OF THE OTHER

23   CASES THAT HAVE BEEN DECIDED, YOUR HONOR, MOST IMPORTANTLY, THE

24   UNION AGREES WITH ALCOA.

25        THE ABG AND THE USW, AS YOUR HONOR KNOWS, NOW MERGED AND IS

1    JUST UNITED STEEL WORKERS.  JIM ROBINSON WAS THE 30(b)(6)

2    REPRESENTATIVE ON BEHALF OF THE UNION.  PAGES 34 TO 35 IN HIS

3    DEPOSITION, HE WAS EXPLICIT THAT IT WAS THE UNION'S VIEW – WELL, I'LL

4    READ YOU THE QUESTION AND ANSWER.

5        "DID THE UNION CONSIDER THE CAP AGREEMENT IN THE 1993 MASTER

6    LABOR AGREEMENT TO BE BINDING ON THE PARTIES?

7        "ANSWER:  YES.

8        "QUESTION:  IN THE 1993 NEGOTIATION, WOULD YOU TELL US WHETHER

9    THE COMPANY, ALCOA OR REYNOLDS METALS, AND THE UNION EVER AGREED

10    TO SOME ORAL SIDE AGREEMENT TO THE EFFECT THAT THE CAP AGREEMENT

11    WAS MERELY AN ACCOUNTING GIMMICK OR THAT IT WOULD NEVER BE

12    IMPLEMENTED?

13        "ANSWER:  NO."

14        HE FURTHER TESTIFIED, "THE COMPANY DID NOT PROMISE TO ROLL

15    OVER IN FUTURE NEGOTIATIONS AND THAT GROUP DID NOT RELY ON ANY

16    UNDERSTANDING THE COMPANY WOULD ROLL OVER IN FUTURE

17    NEGOTIATIONS.  BUT THAT GROUP BELIEVED THAT THE UNION HAD THE

18    BARGAINING POWER TO DO WHAT WAS NECESSARY IN FUTURE NEGOTIATIONS

19    TO PROTECT THE RETIREES."

20        OKAY.  MR. RON BLOOM, WHO IS CURRENTLY A SPECIAL ASSISTANT TO

21    THE PRESIDENT OF THE UNION, I TOOK HIS DEPOSITION IN PITTSBURGH AT

22    USW HEADQUARTERS.  PAGES 19 TO 21 OF HIS DEPOSITION, HE EXPLAINED

23    WHAT HIS UNDERSTANDING WAS WHEN HE PERSONALLY NEGOTIATED THE

24    CAP LETTER, THE CAP AGREEMENT THAT WAS ENTERED INTO IN 2006 AND

25    CURRENTLY OBTAINED.  HE WAS SAYING, "I UNDERSTOOD THAT WE WOULD

1  BARGAIN OVER THIS, AND WE HOPED WE WOULD ROLL IT OVER.  BUT THEY

2  UNDERSTOOD THAT IF IT DIDN'T ROLL OVER IT IMPLEMENTED."

3         THE WHOLE BARGAINING HISTORY, IF ONE GOES BEYOND WHAT I'VE

4  JUST SPOKEN TO OTHER CONTEMPORANEOUS EXTRINSIC EVIDENCE, THE

5  BARGAINING HISTORY SUPPORTS ALL OF THIS.  MR. CHESLER MENTIONED IN

6  BOTH '96 AND 2001 THE UNION CAME TO ALCOA AND SAID, WE WANT YOU TO

7  ELIMINATE THIS CAP.

8         LOOK AT EXHIBIT 152, THE UNION PROPOSAL FROM '96; EXHIBITS 314,

9  THE UNION PROPOSAL FROM 2001.  ALL RIGHT.  WHY WOULD THE UNION ASK

10  FOR REMOVAL OF THE CAP IF IT WAS TOTALLY ILLUSORY?  THERE WAS NO

11  REASON FOR THAT.

12         THE UNION HOPE WAS THAT THEY WOULD BE ABLE TO SECURE AN

13  EXTENSION.  OKAY.  THEY WERE RIGHT TWICE.  THEY DID THAT IN 2006, THEY

14  DID IN 2001, BUT THAT'S NOT FOREVER.

15         LET ME QUOTE FROM TWO UNION DOCUMENTS, YOUR HONOR, BECAUSE

16  I THINK THEY'RE VERY INSTRUCTIVE.  IN 2005 AND 2006 THE UNION WROTE TO

17  ITS MEMBERSHIP TO TELL THEM WHAT WAS GOING ON.  IN 2005 THE UNION

18  WROTE AS FOLLOWS, CLEAR EVIDENCE OF THEIR STATE OF MIND:  "IN 1993, TO

19  ADDRESS THE COMPANY'S ACCOUNTING PROBLEMS, WE AGREED TO ALLOW

20  THE COMPANY TO CAP THE COSTS OF RETIREE HEALTH CARE FOR PEOPLE

21  WHO RETIRED AFTER 1993.  THIS CAP WAS ADDRESSED IN NEGOTIATIONS IN '96

22  AND AGAIN IN 2001.  DURING THESE NEGOTIATIONS THE COMPANY HAS

23  REFUSED TO MOVE ON THIS ISSUE."

24         AGAIN, EXHIBIT 111 – THAT WAS EXHIBIT 18, YOUR HONOR – EXHIBIT 111

25  IS FROM 2006, DESCRIBING WHAT HAD HAPPENED THERE:  "THE UNION FULLY

1  EXPECTED TO MOVE THE EFFECTIVE DATE OF THE CAP BACK IN EACH

2  SUBSEQUENT SET OF NEGOTIATIONS.  HOWEVER, HEALTH CARE COSTS AND

3  THE NUMBER OF ALCOA RETIREES HAVE DRAMATICALLY INCREASED SINCE

4  1993.  INSTEAD OF A HIGH-STAKES ALL OR NOTHING STRATEGY, THE UNION

5  SOUGHT AN ALTERNATIVE APPROACH WHICH WOULD ALLOW THE COMPANY

6  TO RETAIN ITS COST CAP WITHOUT REQUIRING RETIREES TO BEAR THE BRUNT

7  OF HEALTH CARE INFLATION."

8          OKAY.  THE UNION KNEW THAT, ABSENT AN AGREEMENT, THIS CAP

9  WOULD IMPLEMENT.  THEY GOT AN AGREEMENT TWICE, THEY HOPED TO GET

10  AN AGREEMENT IN 2006.  BUT THEIR HOPE AS TO WHAT THEY WOULD BE ABLE

11  TO DO IN THE FUTURE, WHAT THEY'D BE ABLE TO OBTAIN IN AGREEMENTS IN

12  THE FUTURE, IS IRRELEVANT TO WHAT THEY ALREADY AGREED UPON IN THE

13  PAST.

14          LET ME SAY, IF I COULD HAVE ANOTHER FIVE MINUTES, YOUR HONOR,

15  I'LL ADDRESS THE PLAINTIFFS' EVIDENCE.  OKAY.  AGAINST THE

16  BACKGROUND I'VE JUST DESCRIBED OF THE HISTORY OF THE PARTIES'

17  NEGOTIATIONS, PLAINTIFFS' EVIDENCE IS UTTERLY INADEQUATE TO CREATE

18  A GENUINE ISSUE FOR TRIAL.

19          I'M NOT SAYING OUR EVIDENCE IS STRONGER THAN THEIR EVIDENCE.

20  I'M SAYING, WHEN YOU ACTUALLY LOOK AT THEIR EVIDENCE IN LIGHT OF

21  THE SWEEP OF THE PARTIES' NEGOTIATIONS, YOU REALIZE IT'S JUST A BUNCH

22  OF SOUND BYTES PULLED OUT OF CONTEXT.  IT DOESN'T AMOUNT TO A HILL

23  OF BEANS.

24          OKAY.  NOW, WE DID A DETAILED POINT BY POINT REBUTTAL IN OUR

25  PAPERS.  I DON'T WANT TO DO THAT.  I WANT TO DO THIS CATEGORICALLY, IF I

1 MAY, BUT IN THOSE FOUR POINTS WE'RE TALKING ABOUT.

2  PLAINTIFFS SAY, WELL, THERE'S EVIDENCE THAT THE CAPS WERE FOR

3 ACCOUNTING PURPOSES. COUNSEL REFERRED TO A PRICE WATERHOUSE

4 MEMO IN 2000 – I THINK COUNSEL SAID IT WAS FROM 2005. ACTUALLY, IT'S

5 FROM 2006, AND IT WAS ACTUALLY LONG INTO THE NEGOTIATIONS OVER

6 IMPLEMENTATION OF THE CAP.

7  BUT THEY SAY, WELL, LOOK, THIS IS FOR ACCOUNTING ISSUES. LOTS OF

8 THEIR EVIDENCE HAVE PROBLEMS UNDER 602 AND 801, BUT LEAVE THOSE

9 ASIDE. OKAY. SO WHAT? RIGHT? IF IT'S FOR ACCOUNTING PURPOSES, IT'S

10 STILL REAL.

11  THERE IS NO DISTINCTION BETWEEN ACCOUNTING TREATMENT AND

12 THE TRUTH. THAT'S WHAT FAS-106 SAYS. IT SAID YOU'RE ENTITLED TO THE

13 FOLLOWING ACCOUNTING TREATMENT IF IT'S REAL. AND ALCOA

14 RECOGNIZED THAT IN THE LINDA BURK (PHONETIC) MEMORANDUM THAT I

15 MENTIONED BEFORE.

16  OKAY. NOW, PLAINTIFFS' SECOND BIG POINT, SAY, WELL, REYNOLDS,

17 JUST THE REYNOLDS PEOPLE, USED THE PHRASE "CAP WITH A WINK." OKAY.

18 SO WHAT? NOW, COUNSEL SAID, WELL, "CAP WITH A WINK" MEANS IT WAS

19 NEVER ENGAGED. THAT IS ENTIRELY FABRICATED FOR THIS HEARING. THERE

20 IS NO EVIDENCE OF THAT AT ALL.

21  THEY PLAYED YOU MR. O'NEIL'S TESTIMONY. MR. O'NEIL, THE

22 CHAIRMAN AND CHIEF EXECUTIVE OFFICER OF ALCOA UNTIL THE END OF 2000,

23 SAID HE HAD NEVER HEARD THE PHRASE UNTIL HIS DEPOSITION. WHAT

24 EVIDENCE OF INTENT IN 1993 IS THAT? IT'S NOTHING.

25  OKAY. LET ME TELL YOU WHAT THE RECORD SHOWS. ONE PERSON, MR.

1   HARVEY MARTIN OF THE ABG, HAS TESTIFIED THAT HE HEARD THAT PHRASE

2   IN 1993.  PAGE 25 OF HIS DEPOSITION HE SAYS, "I HEARD THAT PHRASE, AND

3   GARY MACDONALD USED IT."  OKAY.  SO BOTH THOSE GENTLEMEN WERE

4   ASKED IN THEIR DEPOSITION WHAT DOES THAT MEAN.

5         PAGE 142 FROM MR. MACDONALD'S TRANSCRIPT, HE SAID, "WELL, 'CAP

6   WITH A WINK' MEANS THESE CAPS WON'T ENGAGE DURING THE LIFE OF THE

7   COLLECTIVE BARGAINING AGREEMENT.  THEY'LL ONLY ENGAGE AFTER THAT

8   AND AFTER THERE'S A PERIOD OF NEGOTIATION."

9         AND I ASKED MR. MARTIN WHAT HE THOUGHT IT MEANT:

10        "WHAT DID YOU UNDERSTAND 'CAP WITH A WINK' TO MEAN?

11        "ANSWER:  THAT IT WOULD NOT BE IMPLEMENTED.

12        "QUESTION:  WOULD NOT BE IMPLEMENTED WHEN?

13        "ANSWER:  DURING THE TERM OF THAT AGREEMENT."

14        SO THERE IS NO FACTUAL DISPUTE THAT "CAP WITH A WINK" MEANS

15   WHAT WE SAY THE AGREEMENTS HOLD, WHAT THEY SAY ON THEIR FACE.

16        NOW, THERE'S SOME EVIDENCE IN MR. MURPHY AND MR. MARTIN'S

17   DECLARATIONS THAT THESE CAPS WOULD NEVER ENGAGE.  OKAY.  WHEN WE

18   ASKED THEM IN THEIR DEPOSITIONS, NOT THE DECLARATIONS DRAFTED BY

19   COUNSEL, BUT IN THEIR DEPOSITIONS, DID ANYBODY TELL YOU THESE CAPS

20   WOULD NEVER ENGAGE, THEY SAY, "I CAN'T SAY THAT.  I DON'T RECALL

21   ANYBODY USING THE PHRASE NEVER."

22        MR. MURPHY, 153 TO 154, "THE WORD 'NEVER,' I DON'T RECALL.  I DON'T

23   RECALL.  I MIGHT HAVE SAID IT, BUT I CAN'T RECALL THAT."  ONE-FIFTY-

24   SEVEN, "THE WORD 'NEVER,' I DON'T RECALL.  I DON'T RECALL THAT.  I

25   CERTAINLY ASSUMED IT, BUT IT WASN'T ACTUALLY SAID."

1          AND MR. MARTIN IS THE SAME.  MR. MARTIN, AT 22, "IT'S YOUR

2   TESTIMONY THE TOP TABLE REPRESENTATIVES FROM THE EMPLOYER SAID

3   THE CAP LETTER, THE FAS-106 LETTER, WOULD NEVER BE IMPLEMENTED; IS

4   THAT RIGHT?" "I CAN'T SAY MADE THE COMMENT 'NEVER.'"

5          SO WHAT ARE WE LEFT WITH?  I THINK WE'RE LEFT WITH VERY MUCH

6   WHERE WE WERE WHEN WE LAST SAW YOUR HONOR LAST SEPTEMBER.  MR.

7   MURPHY SAID, OF THE ABG, TESTIFIED HE HAD A CONVERSATION WITH MR.

8   PORTER OF ALCOA IN WHICH MR. PORTER USED THE PHRASE, "THIS IS A PAPER

9   TRANSACTION."  THAT IS IT.  THERE ARE NO WITNESSES TO THAT, THERE ARE

10  NO NOTES OF THAT MEETING, AND IT IS FLATLY DISPUTED BY MR. PORTER.

11         OKAY.  DOES THAT REQUIRE A TRIAL?  WELL, IF YOU'RE GOING TO RELY

12  UPON MR. MURPHY'S TESTIMONY FOR A DECISION, IT'S DISPUTED, AND YOU

13  NEED A TRIAL.  BUT IN OUR VIEW IT'S NOT MATERIAL BECAUSE, AS I SAID AT

14  THE OUTSET, FOR PLAINTIFFS TO SUCCEED THE EVIDENCE HAS TO BE THAT

15  THE CAP LETTERS WERE ENTIRELY ILLUSORY.  OKAY.  THEY SIMPLY TAKE

16  THAT CAP LETTER AND THEY CROSS IT OUT, OKAY, THAT IT WAS A SHAM.

17         SO I PUT THAT TO MR. MURPHY, AND THIS IS PAGES 67 TO 68 OF HIS

18  DEPOSITION.  I'LL JUST QUICKLY READ YOU THE QUESTIONS AND ANSWERS,

19  YOUR HONOR:

20         "DO YOU THINK THE LETTER WAS SOMEHOW AN ACCOUNTING

21  GIMMICK?

22         "NO.

23         "DO YOU THINK IT WAS A TRICK?

24         "NO.

25         "DO YOU THINK THE LETTER THAT MR. LABAFF SIGNED WAS UNTRUE?

1      "NO.

2      "DO YOU THINK IT WAS A FRAUD?

3      "NO, DEFINITELY NOT.

4      "DO YOU THINK THAT MR. LABAFF WAS TRYING TO ASSIST ALCOA IN

5  COOKING ITS BOOKS?

6      "NO, ABSOLUTELY NOT.

7      "DID YOU THINK YOU WERE GETTING MR. LABAFF TO SIGN SOMETHING

8  THAT WAS GENUINE – THAT WASN'T GENUINE?

9      "GENUINE, NO.

10      "DO YOU THINK THAT THE UNION WAS IN SOME WAY ASSISTING ALCOA

11  IN MAKING A MISREPRESENTATION TO ITS AUDITORS?

12      "NO, ABSOLUTELY NOT."

13      OKAY.  THAT'S WHAT MR. MURPHY SAID.  SO EVEN IF YOU CREDIT HIS

14  TESTIMONY, YOU DON'T GET TO WHERE THEY NEED TO BE.  THE TRUTH HERE

15  IS EXACTLY WITHIN THE 2005-2006 LETTERS FROM THE UNION THAT I QUOTED

16  YOU, EXHIBITS 18 AND 111.  THE UNION AGREED TO THIS CAP.  THEY HOPED TO

17  MOVE IT, THEY DID IT TWICE, THEN THEY FAILED.

18      OKAY.  HAVING FAILED TO SECURE ANY FURTHER AGREEMENT TO

19  MOVE IT, WE ARE FORCED TO RETURN TO THE WRITTEN, SIGNED, RATIFIED,

20  DISCLOSED DEAL.  ALCOA IS LIVING UP TO THAT DEAL.  ALCOA PAYS ALMOST

21  $8,000 PER PERSON PER YEAR PRE-MEDICARE FOR HEALTH CARE AND WILL

22  FOR THE REST OF THESE PEOPLE'S LIVES.  IT'S PAID MILLIONS MORE EVERY

23  YEAR, PURSUANT TO THE 2006 AGREEMENT, IN BURNOUT PAYMENTS.  THAT IS

24  ALL THAT IS REQUIRED, YOUR HONOR.  THANK YOU.

25      THE COURT:  THANK YOU, MR. SLIFKIN.  SO I TAKE IT, MR. SLIFKIN,

1    YOU DO NOT THINK THAT THIS CASE COULD NECESSARILY BE DECIDED BY

2    SUMMARY JUDGMENT MOTIONS?

3              MR. SLIFKIN:  NO, WE THINK IT CAN BE DECIDED BY SUMMARY

4    JUDGMENT MOTIONS, YOUR HONOR.

5              THE COURT:  BY CONSIDERING SOME OF THE EVIDENCE AS

6    IRRELEVANT?

7              MR. SLIFKIN:  BY DETERMINING WHAT IS A MATERIAL ISSUE FOR

8    DETERMINATION AND DETERMINING WHETHER IT IS GENUINELY IN DISPUTE

9    OR NOT.  WE THINK, IF YOU APPLIED THOSE FAMILIAR STANDARDS, YOU COME

10   TO THE CONCLUSION THAT ALCOA MUST WIN THIS CASE.

11             THE COURT:  THANK YOU, MR. SLIFKIN.

12             MR. SLIFKIN:  THANK YOU, YOUR HONOR.

13             THE COURT:  MR. COLEMAN, WOULD YOU LIKE TO HAVE A FEW

14   MINUTES REBUTTAL?

15             MR. COLEMAN:  YES, YOUR HONOR.  WOULD YOU TELL ME HOW

16   LONG, AND I'LL TRY TO MAKE SURE THAT I ABIDE BY THAT, OBVIOUSLY.

17             THE COURT:  IS TEN MINUTES SUFFICIENT?

18             MR. COLEMAN:  COULD I ASK FOR 15?

19             THE COURT:  YOU MAY.

20             MR. COLEMAN:  OKAY.  CAN I PAUSE ONE MINUTE TO TALK WITH

21   CO-COUNSEL?

22             THE COURT:  SURE.  DO YOU NEED A MINUTE BEFORE YOU BEGIN?

23             MR. COLEMAN:  I DON'T THINK SO, YOUR HONOR.

24             THE COURT:  OKAY.

25             MR. COLEMAN:  I WANT TO GO AHEAD AND PULL UP SOME

1 DOCUMENTS THAT I THINK WILL HELP, I HOPE, ILLUMINATE THE PLAINTIFFS'

2 POSITION IN THE CASE, AND INSTEAD OF TALKING ABOUT IT, WHAT I'VE TRIED

3 TO DO – YOU KNOW, SOMETIMES POWERPOINTS ARE JUST NOTHING BUT I FEEL

4 LIKE I'M FULL OF SOUND AND FURY SIGNIFYING NOTHING.

5      BUT I WANT TO DO THIS TO SHOW THE COURT THAT WHAT WE'RE

6 SAYING WE ACTUALLY HAVE EVIDENCE OF, WHICH IS CONTRARY TO WHAT

7 ALCOA'S SAYING.  LET'S GO TO SLIDE 95.

8      JOHN MURPHY, FOR EXAMPLE, YOUR HONOR, WAS THE LEAD

9 NEGOTIATOR FOR THE ABG IN '93.  HARVEY MARTIN WAS ALSO ONE OF THE

10 NEGOTIATORS AT THE TOP TABLE IN '93.  WE HAVE BOTH OF THEIR

11 TESTIMONY AVAILABLE FOR YOU HERE TODAY AND I'M NOT GOING TO

12 OBVIOUSLY DO ALL THAT I WAS PLANNING TO.

13      BUT JOHN MURPHY IS STILL SPECIAL ASSISTANT TO THE PRESIDENT OF

14 THE UNION.  HE'S THE SAME – HE'S SORT OF THE SAME LEVEL THAT RON

15 BLOOM THAT MR. SLIFKIN MENTIONED.

16      WE TOOK HIS DEPOSITION, AND WHAT'S IMPORTANT TO KNOW IS, JOHN

17 MURPHY WAS THERE IN '93, HE WAS THERE IN '92 AT THE PRE-'93

18 NEGOTIATIONS, HE WAS THERE IN '96, HE WAS THERE IN '01.  RON BLOOM AND

19 JIM ROBINSON WEREN'T THERE, PERIOD, UNTIL THE '05-'06 NEGOTIATIONS.

20      NUMBER ONE, WHAT JOHN MURPHY SAYS, IN REGARD TO THE '01

21 NEGOTIATIONS, IS THIS:  "FASB."  THIS WAS DURING THE NEGOTIATIONS

22 ITSELF.  JOE QUAGLIA FROM ALCOA WAS PRESENT, AND YOU'LL EVEN SEE HIS

23 NAME – IF YOU'LL GO BACK TO THE PREVIOUS SCREEN, DAWN – YOU'LL EVEN

24 SEE THE NAME "JOE" REFERENCED OUT TO THE SIDE IN A COUPLE OF PLACES,

25 THERE AND THERE.

1       NOW, MR. MURPHY DOESN'T SAY NECESSARILY THAT IT WAS JOE

2    QUAGLIA THAT TOLD HIM THIS, BUT THESE ARE THE NOTES THAT HE HAD

3    FROM THOSE NEGOTIATIONS AND THESE ARE WHAT THEY SAY: "FASB, NOT

4    INTENDED AS A MONEY ISSUE, BUT A PAPER TRANSACTION. NOT TO

5    TRANSFER THE COST OR SHIFT ANY OF IT. MUST PULL OUT SIX MONTHS

6    FURTHER THE FASB FOUR PERCENT ISSUE. THIS WAS JUST A PAPER

7    TRANSACTION. HELPING BOOKKEEPING."

8       HERE WE ARE IN THE '01 NEGOTIATIONS, AND THAT'S WHAT ALCOA IS

9    STILL TELLING MR. MURPHY AND THAT'S WHAT MR. MURPHY'S NOTES, AS

10   ONE OF THE CHIEF NEGOTIATORS FOR THE UNION, REVEALS.

11      LET'S GO TO THE NEXT SLIDE. DAVE WILLETT'S NOTES REGARDING THE

12   1996 NEGOTIATIONS ALSO INDICATE THE FASB LETTER WAS AN ACCOUNTING

13   MEASURE ONLY AND WOULD NOT BE USED AGAINST RETIREES. THESE ARE

14   HIS NOTES. THE NEGOTIATIONS IN 1996 HAD JUST CONCLUDED.

15      HE TALKS WITH PATTY SEEHAFER, WHO IS A HIGH-UP UNION EMPLOYEE,

16   ABOUT THIS RETIREE MEDICAL CAP, AND THIS IS WHAT IT SAYS: "LETTER –

17   RETIREE BENEFITS WILL NOT BE IMPACTED, ONLY AN ACCOUNTING

18   PROCEDURE FOR FEDERAL GOVERNMENT. FASB, RETIREES ARE PROTECTED,

19   NO ADDITIONAL COSTS. HAD SAME TYPE OF LETTER FOR RETIREES IN '93

20   CONTRACT. THIS IS NOT A DISPUTED ITEM. NEW LETTER WILL HAVE CORRECT

21   DATE AND EXPLAIN THE ISSUE BETTER. WILL HAVE TO BE EXTENDED PASS –

22   PASSAGE," WHATEVER, "CONTRACT, ONE YEAR. MERELY A PAPER THING."

23      MR. WILLETT, YOUR HONOR, I WANT TO MAKE SURE THAT YOU

24   UNDERSTAND THE CONTEXT. I HAD NEVER MET THE MAN BEFORE WE TOOK

25   HIS DEPOSITION. I HAD NO CLUE WHAT HE WAS GOING TO SAY. HE WAS

1   REPRESENTED BY THE UNION AT HIS DEPOSITION.  SO IT WASN'T ONE OF

2   THOSE WHERE I GOT TO GO IN AND TALK WITH A WITNESS AND DUST OFF

3   HOME PLATE.

4         THESE THINGS ALL HAPPENED SIMULTANEOUSLY WITH ME ASKING HIM

5   QUESTIONS.  THIS IS WHAT MR. WILLETT SAYS:

6         (DEPOSITION VIDEO CLIP PLAYED AS FOLLOWS:)

7               "DURING THE MAY, 2001, NEGOTIATIONS OF NASHVILLE, WAS

8         THE FASB LETTER DISCUSSED AT ANY POINT THAT YOU RECALL?

9               "YES.

10              "CAN YOU TELL US WHAT THOSE DISCUSSIONS WERE?

11              "ONCE THE COMPANY BROUGHT THEIR PROPOSAL TO US,

12        THEIR PROPOSAL HAD THE FASB CAP BEND (PHONETIC) PUT IN

13        PLACE, MEANING THAT IT WAS GOING TO BE CAPPED IN 2002.  THAT

14        WAS THEIR POSITION, THAT THEY WAS GOING TO EXERCISE THE

15        CAP.

16              "WHO WAS IT THAT MADE THAT STATEMENT OR GAVE THAT

17        POSITION?

18              "MR. MORDOWANEC.

19              "WAS IT MR. MORDOWANEC, ON BEHALF OF ALCOA, THAT

20        MADE THIS STATEMENT IN THE MAY, 2001, NEGOTIATIONS THAT

21        THE COMPANY WAS GOING TO START TO IMPLEMENT THE CAP?

22              "HE WAS THE ONE THAT MADE THE STATEMENT THAT IT WAS

23        THE COMPANY'S WISHES, UNDER THE NEXT CONTRACT, THEY WAS

24        GOING TO EXERCISE THAT RIGHT.

25              "WHAT WAS THE RESPONSE FROM THE HEALTH CARE TABLE?

1    "MR. HENRY, MR. BRICKEY, STATED THAT THEY WAS IN

2    NEGOTIATIONS IN 1993 AND THERE WAS A PROMISE MADE.  THEY

3    INFORMED HIM HE WAS NOT THERE, THEY WERE, AND A PROMISE

4    WAS MADE THAT THAT CAP WOULD NEVER COME INTO EXISTENCE.

5    SO IT WAS ALL THE LOCALS THAT WAS IN OPPOSITION, 104, I

6    STATED THAT WE WAS IN OPPOSITION OF OUR RETIREES PAYING

7    FOR THEIR HEALTH CARE.  THERE WAS A LIVELY DEBATE.  WE TOLD

8    HIM THAT WE WOULD NOT SIT IN THE MEETING AND BASICALLY

9    WE REFUSED TO MEET WITH THEM, BROKE UP, WALKED OUT OF

10   THE MEETING, LEFT HIM SITTING THERE AT THE TABLE.

11           "AND THIS WAS AT THE MAY, 2001 MEETING?

12           "YES, SIR.

13           "NOW, I THINK I WROTE DOWN WHAT YOU SAID

14   ACCURATELY.  YOU SAID THAT IT WAS YOUR POSITION AND THE

15   104 LOCAL POSITION THAT THE RETIREES WERE NOT GOING TO PAY

16   FOR THEIR HEALTH CARE?

17           "AT THAT TIME, YES, SIR.

18           "AND DID YOU MAKE THAT STATEMENT TO MR.

19   MORDOWANEC?

20           "YES, SIR.

21           "WHAT WAS MR. MORDOWANEC'S RESPONSE TO WHAT YOU

22   TOLD HIM?

23           "HE UNDERSTOOD WHAT I TOLD HIM.  TOLD HIM WE WEREN'T

24   GOING TO MEET WITH HIM, IT WOULD END UP IN A LABOR DISPUTE.

25   WE WALKED OUT OF THE MEETING SHORTLY THEREAFTER.  ALL

1     LOCALS WALKED OUT SIMULTANEOUSLY.

2          "DID YOU OR ANY OF THE OTHER LOCAL REPRESENTATIVES

3     MEET AGAIN WITH MR. MORDOWANEC DURING THE 2001 CONTRACT

4     NEGOTIATIONS?

5          "YES, SIR.

6          "CAN YOU TELL ME ABOUT THAT, PLEASE, SIR?

7          "A DAY OR TWO AFTER THE WALKOUT WE RECONVENED.

8     MR. MORDOWANEC STARTED OUR MEETING OFF.  WHAT I RECALL

9     HIM STATING WAS, YOU WAS RIGHT, I WAS WRONG, AT THIS TIME

10    THE COMPANY'S REMOVING THE CAP ISSUE FROM THE TABLE,

11    WE'RE NOT PLANNING ON USING THE CAP AT THIS TIME, AND

12    MOVED IT, BASICALLY TOOK IT OFF IN THE NEGOTIATIONS."

13          YOUR HONOR, WHY I POINT THAT OUT IS, AS YOU CAN SEE, THAT'S

14    WHAT MR. WILLETT SAID WITH REGARD TO THE 2001 CONTRACT

15    NEGOTIATIONS.  THERE WAS AN EARLY PART IN MAY THAT THAT EXCHANGE

16    TOOK PLACE WITH THE LOCALS AND MR. MORDOWANEC ON BEHALF OF

17    ALCOA.

18          THEN, IF YOU GO BACK, DAWN, TO SLIDE 95, IN SEPTEMBER OF 2001 WAS

19    WHEN THESE NOTES WERE MADE CONFIRMING EXACTLY WHAT MR. WILLETT

20    TESTIFIED ABOUT IN MAY OF 2001.

21          (ATTORNEY COLEMAN SPEAKING TO TECHNICIAN.)

22          MR. COLEMAN:  NINETY-FIVE.  THERE WE GO.  YOU CAN SEE THE

23    DATE.  MR. MURPHY TESTIFIED THIS WAS IN SEPTEMBER WHEN THEY FINALLY

24    HELD ANOTHER ROUND OF NEGOTIATIONS, AND THIS, THAT LANGUAGE, WAS

25    WHAT HE WAS TOLD.  HE EVEN SAYS IN HIS DEPOSITION THAT ALCOA FORGOT

1    TO MENTION THAT, LOOK, MY MEN CAME TO ME AND TOLD ME ABOUT  WHAT

2    THIS GUY SAYS, MORDOWANEC SAYS, AND I WAS LIKE, NO, THAT'S NOT TRUE,

3    YOU NEED TO GO BACK AND TALK WITH HIM.  AND THEN THEY DID GO BACK

4    AND TALKED WITH HIM, TALKING IN MAY.

5        AND WHAT WE'VE SAID IS EXACTLY WHAT MR. WILLETT SAYS AND

6    WHAT MR. MURPHY SAYS, THAT THEY WERE TOLD BY ALCOA THIS WAS A

7    PAPER TRANSACTION, IT WAS NEVER MEANT TO BE IMPLEMENTED.

8        NOW, WHAT OTHER EXTRINSIC EVIDENCE DO WE HAVE OTHER THAN ME

9    STANDING UP HERE AND TALKING ABOUT IT?  WE'VE GOT THE SAME THING IN

10   '05.  MR. WILLIS' NOTES INDICATE THAT IT WAS – THE CAP WOULD NOT

11   AFFECT THE RETIREES.  THIS IS RICKY BEASLEY.  I HAVE HIS DEPOSITION

12   READY FOR THE COURT TO REVIEW, BUT I WANT TO SAY THIS WITH THE FEW

13   MINUTES THAT I HAVE LEFT.

14       MR. BEASLEY IS THE LOCAL UNION PRESIDENT.  HE WAS THERE IN '93,

15   HE WAS ALSO THERE IN '96 AND '01 WITH MR. WILLETT.  MR. BEASLEY HAS

16   TESTIFIED – AND I HAVE HIS VIDEO CLIP FOR THE COURT, BUT WE'RE RUNNING

17   OUT OF TIME.

18       HE SAYS – AND AGAIN, I DIDN'T HAVE A CHANCE TO MEET WITH MR.

19   BEASLEY, NEVER MET THE MAN BEFORE DEPOSITION, DIDN'T GET TO DUST

20   OFF HOME PLATE OR ANYTHING.

21       HE SAYS – I ASKED HIM, "DID YOU HAVE A CONVERSATION WITH MR.

22   MORDOWANEC IN '01?"  HE SAYS, "YES.

23       I SAID, "WELL, WHAT DID HE TELL YOU?

24       "WE'RE TRYING TO IMPLEMENT THE CAP.

25       "WELL, WHAT DID THE HEALTH CARE TABLE SAY TO MR.

1  MORDOWANEC?

2      "YOU CAN'T DO THAT BECAUSE THE PROMISES THAT WERE MADE BACK

3  IN '93."

4      AND MR. BEASLEY SAYS, "WE GOT UP, WALKED OUT, CAME BACK IN A

5  COUPLE OF DAYS LATER," AND I SAID, BECAUSE I REALLY WANTED TO KNOW,

6  "WELL, WHAT DID MR. MORDOWANEC TELL YOU WHEN YOU RECONVENED

7  TWO DAYS LATER AFTER WALKING OUT?"

8      "MR. MORDOWANEC TOLD US, YOU WAS RIGHT, I WAS WRONG, THIS IS

9  NOT SUPPOSED TO BE ON THE TABLE, AND IT WAS NEVER MENTIONED." NOW,

10  YOUR HONOR, WE HAVE EVIDENCE UPON EVIDENCE OF THAT, INCLUDING

11  OTHER WRITTEN NOTES.

12      EXHIBIT 401, MARY ELLEN LAMMEL, WHO IS A HIGHER UP IN ALCOA,

13  THIS IS WHAT THESE NOTES SAY IN A MEETING THAT SHE WAS PRESENT AT IN

14  OCTOBER OF '96. MARY ELLEN LAMMEL AND KEVIN OXLEY WERE PRESENT

15  FOR ALCOA WITH OTHER UNION MEMBERS, AND THESE ARE WHAT THE NOTES

16  SAY: "RETIREE MEDICAL COVERAGE CAP. ONLY TO LIMIT FASB COSTS ON

17  COMPANY'S BOOKS. DOES NOT HAVE ANY EFFECT ON RETIREE."

18      IF YOU LOOK AT EXHIBIT 402 TO MS. LAMMEL'S DEPOSITION, DAN

19  HENRY, WHO WAS A PART OF THIS HEALTH CARE SUBCOMMITTEE AS A UNION

20  REPRESENTATIVE, MET WITH MS. LAMMEL AND MR. OXLEY AGAIN IN

21  DECEMBER OF '96. THIS IS WHAT THOSE NOTES REVEAL: "HAS AGREED TO

22  LETTER FROM COMPANY SIGNED BY MICHAUD TOTALLY CLARIFYING THE

23  RETIREE MEDICAL COVERAGE CAP. IN BRIEF, THIS IS FOR ACCOUNTING

24  PURPOSES ONLY," AND ON AND ON AND ON. KEEP GOING, PLEASE, DAWN.

25      WE HAVE NOTES FROM BYRON PETERSON. I HAVE A CLIP, BUT I'M

1    RUNNING OUT OF TIME, YOUR HONOR.  HARVEY MARTIN –

2         (ATTORNEY COLEMAN SPEAKING WITH TECHNICIAN.)

3              MR. COLEMAN:  LET ME JUST TELL THE COURT, MR. SLIFKIN

4    FAILED TO ADVISE THE COURT.  HE ASKED MR. MARTIN A SERIES OF

5    QUESTIONS, AND HE SAID I ASKED OTHERS.  HE ASKED MR. MARTIN, WHO WAS

6    PRESENT ON BEHALF OF THE UNION IN THE '93 NEGOTIATIONS, THESE

7    QUESTIONS:  "DO YOU THINK THIS FASB LETTER WAS AN ACCOUNTING

8    GIMMICK?"

9         MR. MARTIN SAYS, "YES, THAT'S WHAT I THINK."

10        MR. SLIFKIN ASKED MR. MARTIN, "DO YOU THINK THAT THIS IS A

11   FRAUD?"

12        MR. MARTIN SAYS, "YOU KNOW, I HATE TO THINK OF IT LIKE THAT, BUT

13   IN TRUTH IT REALLY LOOKS LIKE IT IS."

14        MR. SLIFKIN THEN ASKED MR. MARTIN THE QUESTION, "DO YOU THINK

15   THAT THIS WAS SOMEHOW SOME SORT OF MISREPRESENTATION?"

16        MR. MARTIN SAYS, "WELL, YEAH, YOU KNOW, BY THE EXPERIENCE OF

17   IT, IT IS."  BECAUSE MR. MARTIN GOES ON TO SAY, CONTRARY TO MR.

18   SLIFKIN'S STATEMENTS, "THIS WAS NOT SUPPOSED TO COME BACK AND

19   IMPACT RETIREES."

20        MR. MURPHY SAYS THAT, MR. LABAFF, THE PRESIDENT OF THE UNION,

21   SAYS THAT, AND ON AND ON AND ON.

22        FINALLY, AND I GUESS LIKE MY PASTOR, WHO SAYS FINALLY, BUT NOT

23   IMMEDIATELY, I'LL BE FINALLY, YOUR HONOR, WHAT I WOULD POINT OUT TO

24   THE COURT IS, BECAUSE I KNOW MY 15 MINUTES ARE ALMOST UP, THE CASE

25   LAW WITH THE VERITABLE PLETHORA – AND THAT'S I GUESS LATIN FOR

1    SOMETHING, HUH – THE PLETHORA OF EVIDENCE THAT WE HAVE IN THIS CASE

2    THAT WE'VE SUPPLIED ON THE CAPS WITH A WINK AND ALL OF THE MEETINGS

3    WITH THE ALCOA PEOPLE, THE DISCUSSIONS WITH JOHN MURPHY, WHO WAS

4    THERE IN THE '93 NEGOTIATIONS, ERNIE LABAFF, PRESIDENT, STEVE

5    WEIDMAN, RON REYNOLDS, GARY MACDONALD, AND IT'S ON AND ON AND ON.

6           THERE IS A DOCUMENT THAT EVEN ALCOA HAS RESISTED, AND I WANT

7    TO ASK THE COURT, BEFORE I EVEN MENTION WHAT THE DOCUMENT SAYS, IS

8    THE COURT AWARE OF A DOCUMENT INVOLVING MR. MORDOWANEC AND A

9    RULING THAT JUDGE SHIRLEY MADE YESTERDAY?

10          THE COURT:  NOT AT THIS POINT, NO.

11          MR. COLEMAN:  AND I'VE ALREADY TOLD ALCOA I'M NOT GOING

12   TO BRING IT UP OR DISCUSS WHAT THAT DOCUMENT SAYS WITHOUT SOME

13   OPINION OR APPROVAL FROM YOU, BUT THERE IS A DOCUMENT THAT ALSO

14   INDICATES SOME THINGS VERY CONSISTENT WITH WHAT WE HAVE SAID

15   ABOUT THE CAPS AND TRIGGERING.

16          NOW, I CAN'T GO INTO IT ANY FURTHER, I DON'T SUPPOSE, BECAUSE

17   ALCOA HAS FIVE DAYS ABOUT WHICH TO APPEAL, AND I'VE TALKED TO EVAN

18   AND DAN BEFORE AND SAID I WOULDN'T GET INTO IT UNLESS THE COURT

19   WANTED ME TO.

20          BUT AT THIS POINT THERE IS OTHER EVIDENCE AND INDICATIONS, YOUR

21   HONOR, THAT WE HAVE TO SHOW TO THE COURT THAT WHAT WE'RE SAYING

22   IS NOT SOMETHING THAT I PULLED OUT OF THE SKY OR THAT THE PLAINTIFFS

23   PULLED OUT OF THE SKY, BUT IS REAL LIFE PROOF.

24          FINALLY, FOR REAL, THE YOLTON – LET'S GO TO SLIDE 60 AND 62.  I KIND

25   OF LAUGHED, BECAUSE MR. CHESLER WAS POUNDING HIS FIST AT ME, "AND

1    MR. COLEMAN DIDN'T SHOW YOU THE FAS-106 LETTER." I WAS LIKE, OKAY,

2    MR. CHESLER, ARE YOU GOING TO SHOW IT TO HIM OR NOT, AND HE NEVER

3    DID. SO I'LL SHOW IT TO THE COURT. I'LL BE HAPPY TO; IN FACT, I'D PLANNED

4    ON SHOWING IT TO YOU.

5                THE COURT: FRANKLY, MR. COLEMAN. I AM VERY FAMILIAR

6    WITH THE LETTER.

7                MR. COLEMAN: OKAY.

8                THE COURT: AND WE'RE RUNNING OUT OF TIME. COUNSEL,

9    WE'RE GOING TO TAKE A BRIEF RECESS DURING THE COURSE OF WHICH I

10   WANT YOU TO CONFER WITH EACH OTHER. I'M NOT AT ALL CERTAIN THAT

11   THIS CASE CAN BE DISPOSED OF ON SUMMARY JUDGMENT MOTIONS. IT MAY

12   BE; IT MAY NOT BE.

13       BUT WHEN WE RECONVENE AT TEN TILL, I WANT TO KNOW A REALISTIC

14   ESTIMATE OF WHEN YOU THINK THIS CASE WILL BE READY TO GO TO TRIAL.

15               MR. COLEMAN: THANK YOU, YOUR HONOR, WE'LL DO.

16               THE COURT: THANK YOU VERY MUCH, COUNSEL.

17       (RECESS HAD 11:42 A.M.; RECONVENED AT 11:50 A.M.)

18               THE COURT: PLEASE HAVE A SEAT, LADIES AND GENTLEMEN.

19   YOU PROBABLY DO NEED TO TALK TO MY COURTROOM DEPUTY ABOUT

20   AVAILABLE DATES, SO WHAT I WOULD LIKE TO DO IS GO AHEAD AND LET THE

21   DEFENDANTS COMPLETE THEIR ARGUMENTS, AND THEN YOU CAN TALK WITH

22   MY COURTROOM DEPUTY ABOUT SCHEDULING DATES; OKAY?

23               MR. COLEMAN: YES, YOUR HONOR.

24               THE COURT: OKAY. MR. SLIFKIN, YOU MAY PROCEED.

25               MR. SLIFKIN: THANK YOU VERY MUCH, YOUR HONOR. I'LL BE

1    BRIEF. WHILE I SAID IN MY ARGUMENT THAT, SET AGAINST THE SWEEP OF

2    THE HISTORY THE PARTIES MAY AGREE ON, PLAINTIFFS DO REALLY RESORT

3    TO A SERIES OF SOUND BYTES TAKEN OUT OF CONTEXT. UNFORTUNATELY, I

4    HAVE NOT SEEN ANYTHING IN PLAINTIFFS' REBUTTAL TO DISREBUT ME OF

5    THAT NOTION.

6           THEY QUITE DELIBERATELY ESCHEWED TAKING A STEP BY STEP

7    CHRONOLOGICAL APPROACH AND DID WHAT I THOUGHT THEY WOULD DO,

8    WHICH IS YET AGAIN TO TAKE A SERIES OF SOUND BYTES OUT OF CONTEXT.

9           I DON'T WANT TO BELABOR EVERY SINGLE ONE OF THEM, BUT LET ME

10   GIVE YOU SOME EXAMPLES. THEY SHOWED YOU A CLIP FROM MR. WILLETT'S

11   DEPOSITION ABOUT HIS PURPORTED CONVERSATION WITH MR.

12   MORDOWANEC. OKAY. LET ME READ TO YOU FROM MR. MORDOWANEC'S

13   DEPOSITION.

14          THIS IS HIS DEPOSITION TRANSCRIPT, PAGE 39 TO 40. THIS IS MR.

15   COLEMAN ASKING THE QUESTION, SAYS:

16          "YESTERDAY WE TOOK THE DEPOSITION OF DAVE WILLETT –" THAT'S

17   THE VIDEO YOU SAW, "AND MR. NORTON AND MRS. KENNEDY WERE THERE

18   WITH ME. MR. WILLETT'S MEMORY AND TESTIMONY UNDER OATH WAS THAT

19   AFTER THAT COUPLE OF DAYS PERIOD FROM THE INITIAL MEETING OF THE

20   2001 NEGOTIATIONS THAT YOU CAME BACK, LIKE YOU SAID, AND TALKED

21   ABOUT ANOTHER PROPOSAL, BUT THAT YOU ALSO TOLD THE HEALTH CARE

22   COMMITTEE THAT, QUOTE, YOU'RE RIGHT, I'M WRONG, END QUOTE. DO YOU

23   RECALL MAKING THAT STATEMENT?

24          "ANSWER: I NEVER TOLD THE UNION AT ANY POINT IN TIME THAT

25   THEIR ALLEGATIONS THAT THE CAP LETTER WAS NEGOTIATED WITH AN

1    INTENT THAT IT NEVER BE ENGAGED WAS TRUE.  I NEVER SAID THAT TO

2    THEM.

3          "QUESTION:  DO YOU REMEMBER SAYING THE WORDS TO THE

4    COMMITTEE OR ANYONE THERE AT THE COMMITTEE TABLE, 'YOU'RE RIGHT,

5    I'M WRONG,' AS IT RELATES TO THE CAP OR FASB LETTER?

6          "ANSWER:  NO, I DID NOT SAY THAT."

7          NOW, TO THE EXTENT THE PLAINTIFFS RELY ON MR. WILLETT'S

8    TESTIMONY IN SUPPORT OF THEIR SUMMARY JUDGMENT MOTION, MR.

9    MORDOWANEC'S TESTIMONY PRECLUDES SUMMARY JUDGMENT.  THERE IS A

10   FLAT OUT DISPUTE.

11         BUT OUR VIEW, OF COURSE – THAT WAS THEIR VIEW, BUT OUR VIEW,

12   THIS IS ALL WHOLLY IMMATERIAL, BECAUSE WHAT HAPPENED IN 2001 IS

13   IRRELEVANT.  AS THE QUESTIONS THEMSELVES ASKED ABOUT, THEY ASKED

14   ABOUT, AND THE ANSWERS SPOKE ABOUT, THE INTENT IN '93.

15         I CAN GIVE YOU MORE.  WE HAVE MR. WILLETT'S NOTES FROM THE '96

16   NEGOTIATIONS, EXHIBIT 50.  WHAT HE WAS TOLD IN '96 IN HIS OWN NOTES AT

17   BATES NUMBER USW-969, "ALCOA WILL CAP THE AMOUNT THE COMPANY

18   PAYS FOR YOUR RETIREE'S MEDICAL COVERAGE IN 2001 UNLESS THERE IS A

19   MUTUAL AGREEMENT REACHED PRIOR TO THE YEAR 2001."

20         OKAY.  BUT THAT'S '96, WHAT DO YOU CARE ABOUT '96?  MR. COLEMAN

21   SHOWED YOU EXHIBIT 117, MR. MURPHY'S HANDWRITTEN NOTES.  AGAIN,

22   THAT'S FROM 2001.

23         NOW, WE WANT TO BE VERY CLEAR HERE THERE'S A DATE AT THE TOP,

24   AND IT SAYS, "JOE," JOE QUAGLIA, AND THEN THERE'S SOME HANDWRITTEN

25   NOTES THAT MR. COLEMAN POINTED OUT TO YOU.  THE COPY HE SHOWED

1   YOU, THERE'S A PHOTOCOPYING ERROR, AND THE DATE, 9-23, IS CUT OFF; YOU

2   CAN JUST SEE THE THREE.

3          I WANT TO BE VERY CLEAR, BECAUSE MR. MURPHY WAS VERY CLEAR IN

4   HIS TESTIMONY, HE CLEARLY TESTIFIED THAT MR. QUAGLIA WAS NOT THE

5   PERSON WHO SAID TO HIM WHAT IS IDENTIFIED AND HIGHLIGHTED IN THE

6   NOTES.  HE SAID THAT WAS JUST JOHN MURPHY WRITING IT DOWN.

7          AND WHAT WAS IT THAT HE WROTE DOWN IN 2001?  HE WROTE DOWN

8   THAT THIS IS TO DO WITH ACCOUNTING AND IT IS A PAPER TRANSACTION.

9   THERE IS NO QUESTION, AS I SAID IN MY PRINCIPAL ARGUMENT, YOUR HONOR,

10  THAT HE BELIEVES THAT.  LET'S SAY HE BELIEVES THAT.  SO WHAT?  WHAT

11  COUNTS HERE IS WHAT HAPPENED IN 1993.

12         IN '96 AND 2001 THEY SIMPLY TOOK THE '93 LETTER AND EXTENDED IT

13  OUT, RIGHT?  WHAT WE REALLY CARE ABOUT IS WHAT THE INTENT OF THE

14  PARTIES WAS IN 1993.  IS IT FOR ACCOUNTING PURPOSES?  YES, IT IS FOR

15  ACCOUNTING PURPOSES.  IS IT A PAPER TRANSACTION?  I DON'T KNOW WHAT

16  THAT MEANS.  MY MORTGAGE IS A PAPER TRANSACTION, I REMEMBER

17  SIGNING THE PAPERS.  I STILL HAVE TO PAY IT EVERY MONTH.

18         LIKE WHAT DOES IT MEAN, WHAT IS THE INTENT OF THE PARTIES?  HOW

19  DO YOU DETERMINE THE INTENT OF THE PARTIES?  WELL, AS YOU SAID

20  BEFORE, YOU CAN LOOK THE INTENT, MR. MURPHY'S TESTIMONY, AND I

21  WASN'T JUST REMEMBERING WHAT HE SAID.  I WAS READING OUT FROM HIS

22  DEPOSITION TRANSCRIPT.  I'LL BE EXPLICIT.

23         THIS IS IN THE RECORD, GRUENSTEIN DECLARATION, EXHIBIT 62,

24  MURPHY TRANSCRIPT AT 67, LINE 14, TO 68, LINE 17.  IT'S NOT A SHAM, IT'S

25  NOT A TRICK, IT'S NOT ILLUSORY, AS PLAINTIFFS WOULD HAVE YOU SAY.

1      WE CAN LOOK AT WHAT THEY SAID TO THEIR MEMBERS IN 1993.

2   DEPOSITION EXHIBIT 150 AND 112, AS I READ OUT PREVIOUSLY, YOUR HONOR,

3   THE PEOPLE, SOME OF WHOM ARE SITTING IN THE ROOM TODAY, WERE TOLD

4   BY THEIR OWN UNION IN 1993, COSTS CAP AT EXPECTED 1997 LEVELS.  THAT IS

5   A CAP ON THE COMPANY CONTRIBUTIONS FOR FUTURE RETIREE HEALTH

6   CARE COSTS; OR WE CAN DO WHAT, DESPITE EVERYTHING THAT MR. CHESLER

7   AND I HAVE SAID PLAINTIFFS STILL FAILED TO DO, WHICH IS TO PULL OUT THE

8   CAP AGREEMENT AND PUT IT IN FRONT OF YOU.

9      WE KNOW YOU KNOW WHAT IT SAYS, AND JUST READ IT OUT.  BECAUSE

10   IT'S CRYSTAL CLEAR THAT IT CAPS THE LIABILITY OF THE COMPANY AT A

11   FUTURE DATE, AND ANY ADDITIONAL EXPENSES HAVE TO BE BORNE BY THE

12   RETIREES.

13      AS I SAID IN THE PRINCIPAL ARGUMENT, YOUR HONOR, ALCOA'S

14   PAYING ALMOST $8,000 PER PERSON PRE-MEDICARE.  WE'LL CONTINUE TO DO

15   THAT FOR THE REST OF THEIR LIVES.  IT'S MAKING ADDITIONAL PAYMENTS

16   ABOVE AND BEYOND THAT, OVER 50 MILLION DOLLARS, OVER THE FIVE-YEAR

17   PERIOD SINCE THE BEGINNING OF 2007.  THAT'S ALL THAT ALCOA HAS TO DO.

18   THANK YOU, YOUR HONOR.

19         THE COURT:  OKAY.  THANK YOU, MR. SLIFKIN.  COUNSEL, WHAT

20   DID YOU AGREE WOULD BE A REALISTIC TIME FRAME FOR A NEW TRIAL

21   DATE?  HOW MUCH TIME DO YOU THINK YOU NEED TO BE READY TO GO TO

22   TRIAL IF THE CASE DOES GO TO TRIAL?

23         MR. COLEMAN:  I THINK WE ALL AGREE THE ISSUE IS NOT – WE'RE

24   PROBABLY READY NOW, YOUR HONOR.  IT'S JUST A CALENDARING ISSUE.  WE

25   HAD AVAILABLE AS THE FIRST DATE – WE CAUCUSED AMONGST OURSELVES –

1    DECEMBER THE 8TH.

2          THE COURT:  OKAY.  WELL, I'LL HAVE TO LET YOU GET WITH MY

3    COURTROOM DEPUTY, AND SHE CAN GIVE YOU WHAT I HAVE AVAILABLE.

4    BUT I TAKE IT THEN THAT YOU'VE TAKEN ALL THE DISCOVERY THAT YOU

5    FEEL IS NECESSARY?

6          MR. COLEMAN:  YOU KNOW THAT, I GUESS IN TRYING TO THINK

7    THROUGH IT, YOUR HONOR, I WOULD SAY THE VAST MAJORITY MAY BE SOME

8    – THERE MAY BE SOMETHING THAT WOULD NEED TO BE DONE, FOR EXAMPLE,

9    IN LIGHT OF THE RULING OF JUDGE SHIRLEY YESTERDAY.  SO I CAN'T – IT'S

10   HARD FOR ME TO TELL YOU AS AN OFFICER OF THE COURT WITH 100 PERCENT

11   CERTAINTY.  BUT THE VAST MAJORITY OF IT HAS BEEN CONDUCTED, YES.

12         THE COURT:  OKAY.  DOES EITHER SIDE WISH TO SUPPLEMENT

13   YOUR ORAL ARGUMENTS TODAY WITH WRITTEN PAPERS, BRIEF, I MIGHT ADD,

14   BRIEF STATEMENTS OF ANYTHING THAT YOU FORGOT TO TELL ME ABOUT

15   THIS MORNING?

16         MR. COLEMAN:  AGAIN, THAT WOULD REVOLVE IN SOME EXTENT

17   AROUND THAT DOCUMENT THAT EITHER WE'RE GOING TO MAKE AN

18   AGREEMENT ON OR ALCOA HAS FIVE DAYS TO APPEAL THE RULING OF JUDGE

19   SHIRLEY TO YOUR HONOR.  SO THAT MAY BE ONE THING WE WOULD

20   SUPPLEMENT, IF POSSIBLE.

21         THE COURT:  OKAY.  SO I GUESS WE PROBABLY NEED TO HAVE

22   THOSE SUBMISSIONS ABOUT TWO WEEKS FROM TODAY?

23         MR. COLEMAN:  I THINK, I MEAN, THAT WOULD BE FINE.  BY THAT

24   TIME, WE WOULD KNOW.

25         MR. CHESLER:  YES, YOUR HONOR.  JUST SO WE'RE CLEAR, WE

1    DON'T HAVE ANYTHING ELSE WE WOULD WISH TO SUPPLEMENT THE RECORD

2    FOR.  WE THINK – I'M SURE YOUR HONOR'S BEEN EXTRAORDINARILY PATIENT

3    WADING THROUGH THE PILE YOU ALREADY HAVE AND PATIENT LISTENING

4    TODAY.  BUT FOR THIS ONE ISSUE THAT COUNSEL ALLUDED TO –

5            MR. COLEMAN:  YEAH, I'M NOT AWARE.

6            THE COURT:  VERY WELL.  IF YOU NEED TO ADDRESS THAT ISSUE,

7    THEN PLEASE HAVE YOUR SUBMISSIONS IN TWO WEEKS FROM TODAY'S DATE;

8    OKAY?

9            MR. COLEMAN:  WE'LL DO, YOUR HONOR.

10           MR. CHESLER:  SIMULTANEOUSLY, YOUR HONOR?

11           THE COURT:  YES.  I SEE NO REASON TO DELAY.  AND I'LL TRY TO

12   GET MY DECISION ON THESE ISSUES TO YOU AS QUICKLY AS POSSIBLE.  AS

13   YOU'RE WELL AWARE, THESE ARE COMPLICATED, COMPLEX ISSUES.  THE

14   ARGUMENTS THIS MORNING HAVE REALLY BEEN EXCELLENT, YOUR BRIEFS

15   HAVE BEEN REALLY WELL-RESEARCHED AND PREPARED AND PRESENTED.

16           IT'S GOING TO TAKE SOME TIME FOR ME TO GO THROUGH ALL THESE

17   MATERIALS AND MAKE A REASONED DECISION WHICH I WILL HOPE TO DO SO

18   AS QUICKLY AS POSSIBLE.  THANK YOU VERY MUCH, COUNSEL, AND HAVE A

19   GOOD DAY.

20           MR. COLEMAN:  THANK YOU, YOUR HONOR.

21           MR. CHESLER:  THANK YOU VERY MUCH, YOUR HONOR.

22           (HEARING CONCLUDED AT NOON.)

# C E R T I F I C A T I O N

I CERTIFY THAT THE FOREGOING IS AN ACCURATE TRANSCRIPT OF THE

RECORD OF PROCEEDINGS IN THE TITLED MATTER.


*/s/ Donnetta Kocuba*                                              *September 9, 2008*
DONNETTA KOCUBA, RPR-RMR                               DATE
OFFICIAL COURT REPORTER
U.S. DISTRICT COURT
KNOXVILLE, TENNESSEE  37902