# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| CHARLES CURTIS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:06-CV-448 |
| ) | (Phillips) |
| ALCOA, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This is a class action brought pursuant to the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. §§ 141-187 and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 by a group of Alcoa retirees and/or their surviving spouses seeking fully funded lifetime retiree healthcare benefits. The class consists of retirees who retired between June 1, 1993 and June 30, 2006, their eligible spouses and dependents, and surviving spouses of such retirees and of active vested employees who died while still employed by Alcoa. Plaintiffs allege that Alcoa breached its promise to provide lifetime retiree medical benefits at no cost when it began charging them for a portion of their medical care. Currently pending are the parties' cross motions for summary judgment.

## Summary Judgment Standard

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment will be granted by the court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists. The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris to Crete Carrier Corp.,* 105 F.3d 279, 280-81 (6th Cir. 1987); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Once the moving party presents evidence sufficient to support a motion under Rule 56, Federal Rules of Civil Procedure, the non-moving party is not entitled to a trial simply on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *White,* 909 F.2d at 943-44. The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220 (6th Cir. 1996).

## Background

Over the years, the unions to which plaintiffs belonged agreed to a series of collective bargaining agreements (CBAs) with Alcoa Inc. and Reynolds Metal Company

(RMC), who issued a series of summary plan descriptions (SPDs) which included agreements to pay retiree, dependant and surviving spouse healthcare benefits. Plaintiffs allege they were told over the years by Alcoa representatives and by the language of the CBAs and SPDs that if they retired with entitlement to a pension, Alcoa would provide to them the same retiree healthcare benefits with which they retired at no cost to them until their death. Plaintiffs allege they specifically asked Alcoa representatives if their retiree healthcare benefits could be reduced after they retired and were told that their benefits could not be changed. The only change in these healthcare benefits occurred at the attainment of Medicare eligibility at age 65 (or due to a qualifying disability), when the benefits would be reduced only to account for plaintiffs' receipt of Medicare benefits.

The companies and the unions negotiated CBA's in sessions that took place in 1992-93, 1996, 2001 and 2005-06. At the 1992-93, 1996, 2001, and 2005-06 negotiations, all decisions over the key economic terms of the proposed labor contracts occurred at what was commonly known as the "top" table. There, a small group of lead negotiators from the companies and the unions negotiated wages, benefits and other elements of the economic package to be applied for the term of the next agreement. Ultimately, the union membership voted to ratify the agreements.

The companies and the unions engaged in formal bargaining in the fall of 1992, in an attempt to reach a new contract in advance of the June 1, 1993 contract

deadline. Ultimately, these negotiations broke down and the parties agreed to extend the existing CBA one more year and resume negotiations in 1993.

Effective June 1, 1993, the Union and Alcoa agreed to a side letter (cap letter), which set a cap on the companies' expenditures for retiree healthcare costs with an implementation date of January 1, 1998 (past the end of the negotiated CBA). Further, the parties agreed that the cap letter would be a mandatory subject of bargaining in the next labor negotiations. The cap letter in some cases was attached to the back of the Alcoa CBA booklet (in the case of RMC, the FASB letter was not part of the CBA booklet). In negotiating this cap letter, plaintiffs contend Alcoa's and RMC's representatives assured the Union that any cap language included in the letter would not be enforced and was merely for accounting purposes due to a new requirement issued by the Federal Accounting Standards Board, FAS-106.

The 1993 CBAs were set to expire on June 1, 1996, Under the terms of the 1993 cap letter, the caps would engage if the parties did not reach a new agreement about them in 1996. The cap agreement was negotiated at the top table. The parties agreed that the cap letter would remain in the labor contracts, and the implementation date would be extended until after the expiration of the 1996 CBAs. The unions retained the right to require the companies to bargain over the cap for retirees in future negotiations. The 1996 agreements were ratified by the union membership.

Pursuant to the terms of the 1996 agreements, Alcoa and the Union met for "re-opener" negotiations in May 2001. The cap agreement was again the subject of negotiations. The parties agreed to extend implementation of the cap letter to January 1, 2007. Also, the cap letter was again made a mandatory subject of collective bargaining prior to December 31, 2006. The 2001 labor agreement was ratified by the union membership.

The parties began negotiating what would become the 2006 CBA in re-opener bargaining sessions in August 2005. These negotiations were unsuccessful and bargaining resumed in early 2006. The new contract reached on May 31, 2006, included a provision implementing the cap agreement. Alcoa and the Union agreed that Alcoa would implement an annual cap on its contributions to the benefits provided to all post-May 31, 1993 retirees (and their spouses and eligible dependants). The 2006 labor agreement was ratified by the union membership. On or about June 30, 2006, Alcoa reduced retiree healthcare benefits, not only for future retirees, but also for plaintiffs, who had already retired. The reduction became effective on January 1, 2007.

Plaintiffs bring their motion for partial summary judgment requesting that the court reinstate their healthcare benefits at levels existing prior to January 1, 2007, order Alcoa to reimburse them for their excess costs beginning in 2007, and find that Alcoa violated both ERISA and the LMRA in reducing their benefits.

Alcoa responds that each and every plaintiff in this case was an active employee at the time the time the initial cap letter was negotiated by the companies and the unions in 1993, and retired with the cap letter in place – *i.e.,* they retired with benefits that were expressly to be capped if the companies' expenditures exceeded a certain amount. Because implementation of a cap was called for under the 1993 CBA, plaintiffs cannot contend that their health care benefits were reduced after their retirement.

## **Analysis**

*Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, (6th Cir. 2006) provides a useful summary of the legal context for plaintiffs' claims. A retiree health care insurance benefit plan is a welfare benefit plan under ERISA. Unlike pension plans, "there is no statutory right to lifetime health benefits." *Id.* at 578. If lifetime healthcare benefits exist for the plaintiffs, it is because the union and employer agreed to vest a welfare benefit plan. If a welfare benefit plan has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to the CBA. *Id.* If a welfare benefit plan has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation. *Id.*

Thus, to show their right to vested healthcare benefits, plaintiffs must show that the companies and the unions reached an agreement to that effect. Whether the benefits vest depends on the intent of the parties. Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement. In

-6-

determining the intent of the parties to a CBA, basic rules of contract interpretation apply. *Id.* Courts should first look at the explicit language of the collective bargaining agreement for clear manifestation of intent. *Id.* Moreover, courts should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. *Id.* When ambiguities exist, courts may look to other provisions of the document and other extrinsic evidence. *Id.*

The court has previously examined the language of the pertinent documents and found that the cap letters unambiguously allowed Alcoa to implement health care caps as early as 1997, ten years before their actual implementation. However, the court further held that the CBAs and other plan documents were ambiguous as to whether employees vested in their health benefits upon retirement, such that those benefits could not be reduced. The basic question before the court is what the parties intended when they first entered into the cap letter in 1993.

In a case such as this, where the language of the pertinent documents is inconclusive, extrinsic evidence is an appropriate and important aid in construing the parties' contractual agreement. The parties have submitted thousands of pages of documents and deposition testimony in support of their positions. The court has reviewed the voluminous record and finds that the extrinsic evidence submitted by the parties in this case cuts both ways.

In connection with the initial cap letter, plaintiffs have submitted extrinsic evidence attesting to plaintiffs' understanding that the cap letters were never intended to be implemented against the retirees, and were only a paper transaction for accounting purposes. Plaintiffs argue that the cap agreements reached in 1993, 1996 and 2001 did not authorize Alcoa and the Union to implement a cap in 2007 because the parties always understood that the cap would never be implemented. Plaintiffs contend it was their understanding during negotiations for each subsequent CBA, that the cap letter would simply be moved forward past the end of the next CBA and would never engage. Plaintiffs further understood that this moving forward of the cap letter would continue from one CBA to the next indefinitely. Further, many retirees have testified to hearing from Alcoa officials during the 1993 CBA explanation that the cap letter was not meant to reduce their benefits and was not meant to be effective against retirees.

Plaintiffs further argue that all of the local Union Presidents, Vice Presidents, and other local union representatives, as well as the Intentional Union negotiators at the top table who attended the 1993 CBA negotiations have testified or have notes that reveal that in 1993, Alcoa promised the FASB letter would only be for accounting purposes and would not be effective against future retirees – including testimony and notes from John Murphy, George Becker, Dan Henry, Lawrence Fountaine, Dennis Macy, Patti Seehafer, Jesse Sharber, Terry Best, Stephen Barse and Ernest LaBaff. John Murphy, the chief negotiator for the ABG union, testified he would not have signed the FASB letter unless these representations from Alcoa were made that the letter would never be implemented

against the retirees, but rather, rolled or carried forward from year to year. George Becker was chief negotiator for the United Steel Workers and represented them at the 1992-93 negotiations. His notes from the 1993 CBA negotiations indicated that the FASB letter was "not designed to put employees at future risk." Carol Story, a benefits administrator for Alcoa's Tennessee plant, was never informed about the FASB letter and never informed retirees about such a letter. Rather, she informed retirees that they would have medical benefits provided to them without cost by Alcoa for the rest of their lives.

In preparing for the negotiations in 1996, plaintiffs contend that Alcoa and RMC referred to the cap letters as a "cap with a wink." In the negotiations, Alcoa and RMC agreed to extend the cap beyond the term of the upcoming CBA. The union witnesses at the healthcare table have testified that the companies told them that the cap letter was for accounting purposes only. David Willett's notes from the 1996 negotiations state that a representative of Alcoa told him that the cap language was "merely a paper trail" and retiree benefits "will not be impacted, only accounting procedure for Federal Government."

Plaintiffs further contend that the course of conduct and testimony from both Union and Alcoa negotiators shows that in 1996, it was assumed that the cap letter was going to roll over to the next agreement and would continue to roll over. Doug Root, the chief negotiator for Alcoa in 1996 testified that Alcoa's intent, before the 1996 negotiations began, was to move the cap letter forward. He testified he understood the caps would not

become engaged unless such engagement was negotiated during future negotiations of a future contract and that this is why the cap date was pushed beyond the end of the CBA.

Patti Seehafer's meeting notes dated 10-30-96 read, "Retiree Medical Coverage Cap: redraft . . . only to limit FASB costs on Company's books . . . does <u>not</u> have any effect on retiree." Ernie LaBaff testified that "since it was only being used by Reynolds and Alcoa for accounting purposes and never to be enforced against the retirees, the letter was simply moved forward in the back of the Collective Bargaining Booklet during the various contract negotiations that followed."

At the 2001 negotiations, plaintiffs state that Thomas Mordowanec reported that Alcoa was implementing the cap letter. The union representatives informed Mordowanec that the cap letter was for accounting purposes only and was not intended to be engaged. At that point, the union representatives walked out of the meeting in protest. John Murphy's notes from the 2001 negotiations state "FASB not intended as a money issue, but a quote, paper transaction. Not to transfer the cost or shift any of it. Must pull out six months further. The FASB 4 percent issue. This was just a paper transaction. Help in bookkeeping." Union representatives testified that several days later, Mordowanec returned to the healthcare table and stated "you were right, I was wrong." The proposal to institute premiums on the retirees was dropped. In September 2001, the parties reached a new CBA. The date of the cap letter was pushed forward and the letter was attached to the back of the CBA.

-10-

Case 3:06-cv-00448-PLR-CCS   Document 392   Filed 03/19/09   Page 10 of 14   PageID #: 7864

Alcoa and the union began "re-opener" negotiations in 2005. Plaintiffs submit that John Murphy told Jim Robinson that implementation of the cap was inconsistent with the purpose of the agreement entered into between the Union and Alcoa in 1993. During discussions of the cap letter, the union's chief negotiator, Jim Robinson, stated that the cap letters were for accounting purposes only, were never intended to be engaged, and were only "caps with a wink."

Alcoa has responded with its own extrinsic evidence in support of its position that because implementation of a cap was called for under the 1993 CBA, plaintiffs retired with caps in place. Contrary to plaintiffs' argument that the cap letter was merely a "paper transaction," Alcoa states that the cap letter was an enforceable agreement between the parties, demonstrated by the fact that the cap was the subject of mandatory bargaining at each subsequent CBA negotiation after 1993. In support of their argument, defendants have submitted the testimony of company negotiators Russ Porter, Ron Hoffman, and Bob Newman, who testified that no promises were made by company negotiators that the cap letters would never be implemented. Further, the unions' Rule 30(b)(6) witness, Jim Robinson, also testified that no promises were made to the unions that the cap letter would never be implemented.

Alcoa admits that some RMC employees used the phrase "caps with a wink," however, those RMC employees testified that they used the phrase to denote caps that "don't energize or engage during the term of the contract." Alcoa employee Doug Root

-11-

testified that Alcoa did intend to implement the cap at a later date: "We always thought that you're going to have caps that engage." He further testified he understood the caps would not become engaged unless such engagement was negotiated during future negotiations of a future contract and that this is why the cap date was pushed beyond the end of a CBA. The engagement of the cap would be "negotiated subsequently." Gene Woloshyn, Director of Human Resources for Alcoa, testified: "If both parties assume they're always going to move, then the caps are not a legitimate reduction in liability and that's the reason why we never made that assumption. . . . We actually bargained in good faith over this issue in those subsequent negotiations. We did not ever make the assumption that the caps would continually move." Woloshyn further testified that he did not recall the cap letter referred to as a paper transaction. "Many of these sort of comments or shorthands like caps with a wink I interpreted to refer to the fact that though the caps were in place, the parties knew there would be an intervening negotiation prior to the actual engagement of the caps."

Alcoa disputes that John Murphy, top table negotiator for one of the unions was told that a cap would never be implemented, as he testified that "no one ever told him that." Alcoa further disputes that the cap letter was simply "rolled over" in 1996 and 2001. Alcoa argues that the record shows that the cap letter was the subject of mandatory bargaining and an extension was negotiated pursuant to bargaining in 1996 and 2001. Moreover, Russ Porter denied telling John Murphy that the cap letter was needed for the FASB requirements and that it was just a paper shuffle or paper transaction. Harvey Martin

testified that no employee representative said that the cap would never be implemented, only that it would not be implemented during the term of the bargaining agreement. Gary McDonald testified that he never promised the caps would never energize and disputed that the parties agreed or intended to defer the cap automatically. David Willett's notes from the 1996 negotiations state, "Alcoa will cap the amount the company pays for your retiree medical coverage in 2001. Unless there is a mutual agreement reached prior to the year 2001."

Tom Mordowanec, Director of Employee Benefits for Alcoa, denied telling the union at the 2001 negotiations that the cap letter was not intended to be imposed and that it was for accounting purposes only. "I never told the union at any point in time that their allegations that the cap letter was negotiated with an intent that it never be engaged was true. I never said that to them." Brickey Beasley testified that no international union official ever told him that the Union and the Company had agreed that the cap letter would never be implemented. Bob Newman testified that his understanding of the phrase "caps with a wink" meant caps which did not energize or engage during the term of the CBA.

Viewing the record as a whole, the court finds there exist material issues of fact as to whether Alcoa and the Union had an oral agreement that the cap agreements would never be implemented against the plaintiff retirees. The plaintiffs have presented extrinsic evidence in support of such an agreement; the defendant has presented extrinsic evidence that no such agreement existed. Where an examination of the available extrinsic

evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *Int'l Union, United Mine Works of Am. v. Apogee Coal Co.,* 330 F.3d 740, 744 (6th Cir. 2003). Accordingly, the parties cross-motions for summary judgment [Docs. 254, 255] are **DENIED.** The parties will prepare the case for trial.

      **IT IS SO ORDERED.**

      **ENTER:**

            s/ Thomas W. Phillips
           United States District Judge