UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| CHARLES CURTIS, *et al.*, | ) | |
| --- | --- | --- |
| Plaintiffs, | ) ) ) | Civ. No. 3:06-cv-448 |
| | ) | Judge Phillips |
| v. | ) ) | Hearing Requested |
| ALCOA INC., Individually and as Fiduciary of the Employees' Group Benefits Plan of Alcoa Inc., Plan II, | ) ) ) ) ) | |
| Defendant. | ) | |

## PRE-TRIAL ORDER

### I. JURISDICTION.

This is an action for Plaintiffs' retiree, surviving spouse, and dependants' health care benefits brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), and the National Labor-Management Relations Act of 1947, 29 U.S.C. § 141, *et seq.* ("LMRA"). This court has jurisdiction over this action under ERISA § 502(a)(1)(B), (a)(3), (e)(1) and (f), 29 U.S.C. § 1132(a)(1)(B), (a)(3), (e)(1), (f), LMRA § 301, 29 U.S.C. § 185, 29 U.S.C. § 1132(e) and (f), and the Declaratory Judgment Act, 28 U.S.C. § 2201, 28 U.S.C. § 1337 and 28 U.S.C. § 1331. This case is a "class action" under 28 U.S.C. § 1711(2), and a "mass action" under 28 U.S.C. § 1332(d)(11)(B)(i). The jurisdiction of the court is not disputed and is hereby determined to be present. VENUE. Venue is established in this Court under ERISA § 502(e)(2) and (f), 29 U.S.C. § 1132(e)(2) and (f) and under LMRA § 301, 29 U.S.C. § 185. Venue is laid in the United States Court for the Eastern District of Tennessee in Knoxville, Tennessee. A Class Certification Order has been entered.

Plaintiffs also bring this action for breach of fiduciary duty under ERISA §§ 404, 409 and 502(a)(3), 29 U.S.C. §§ 1104, 1109 and 1132(a)(3), but these claims will be determined at a later date.

A Consent Order of Class Certification has been entered. The parties have agreed to the certification of a properly defined class pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) to litigate Plaintiffs' contract-based claims (Counts One, Two and Four of the proposed Fifth Amended Complaint), and to the bifurcation of Plaintiffs' breach of fiduciary duty claims (Count Three) and a stay of all proceedings relating to those claims pending the resolution of Counts One, Two and Four. The Court agrees that the class certification pursuant to the parties' agreement is appropriate for Counts One, Two and Four of the Fifth Amended Complaint, and finds that the proposed class satisfies the requirements of Rule 23. The Court certifies, pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2), the following class of plaintiffs for their claims under Counts One, Two and Four of the Fifth Amended Complaint:

1

All individuals
- (1) who are
    - (a) former hourly union-represented employees of Alcoa Inc. or Reynolds Metals Company who retired between June 1, 1993 and June 1, 2006 from the facilities listed in Exhibit 1 (the 'Retirees'),
    - (b) spouses, surviving spouses of dependents of Retirees, or
    - (c) surviving spouses of former hourly union-represented employees of Alcoa Inc. or Reynolds Metals Company who died between June 1, 1993 and June 1, 2006 and who were eligible for an Alcoa Inc. and/or Reynolds Metals Company retirement plan from a facility listed in Exhibit 1 on the date of their death,
- (2) who are/were eligible to receive health care benefits from Alcoa Inc., and
- (3) whose health benefits were made subject to a limitation on Alcoa Inc.'s financial liability no later than January 1, 2007.

(See Exhibit 1 attached hereto).

## II. PLEADINGS.

The pleadings have been amended to conform with the pretrial order. All amended pleadings have been filed.

## III. GENERAL NATURE OF THE CLAIMS OF THE PARTIES.

a) **Plaintiff's theory short summary:** Plaintiffs claim that they are entitled to uncapped vested retiree health care benefits under the Alcoa and Reynolds Metals Company retiree health care benefits plans described in their collective bargaining agreements and summary plan descriptions between their former unions and those companies. They claim that on or around January 1, 2007 Plaintiffs' retiree health care benefits were impermissibly reduced in violation of ERISA and the LMRA and they are entitled to injunctive and declaratory relief, reinstatement of their retiree health care benefits from Alcoa fully paid for by Alcoa, and back payments for the impermissible reduction in their benefits starting on or around January 1, 2007, as well as attorneys' fees and costs. Plaintiffs claim that their vested benefits are not subject to any "cap," but, in alternate, even if they were subject to a "cap" pursuant to FAS-106 Letters entered into between their unions and Alcoa between 1993 and 2001, their benefits were impermissibly reduced on or around January 1, 2007 beyond any reasonable interpretation of those FAS-106 Letters, in violation of ERISA and the LMRA. Plaintiffs' claim that even if the Court finds a cap agreement was entered into, the benefits provided by Alcoa are below the cap level and Plaintiffs have been damaged by making payments for benefits that they should not be making. As such, Plaintiffs are entitled to be reimbursed in amounts that will be shown at trial.

Plaintiffs also have brought fiduciary duty claims against Alcoa which are reserved until resolution of their other claims in this case.

Plaintiffs contend that their unions and Defendant entered into a series of FAS-106 Letters at three negotiating sessions between 1993 and 2005 solely to help Defendant with its accounting and reporting financial liabilities and that Plaintiffs and Defendant understood and agreed that the FAS-106 Letters were never intended to be implemented and were agreed to only with the promise that they never would be implemented and would be used for accounting purposes only. Plaintiffs contend that Plaintiffs and Defendant understood that the FAS-106 Letters would be rolled over from collective bargaining agreement to collective bargaining agreement for usage by Defendant only for accounting purposes.

Plaintiffs also contend that they became vested under ERISA and the LMRA in their retiree health care benefits after five years (previously before 1993 after ten years) of service with Alcoa, at the same time they became vested in their Alcoa pension benefits, to which the retiree health care benefits are inextricably tied, and that the vast majority of them had become vested in their retiree health care benefits before the first signing of a FAS-106 Letter by Alcoa and the Union in 1993 so that even if that letter might place a cap on retiree health care benefits, that cap would not apply to Plaintiffs, whose benefits had previously vested and could not be reduced by means of the subsequently signed FAS-106 Letters. Plaintiffs further contend that they became vested in their retiree health care benefits no later than at retirement, which in all instances preceded Alcoa's efforts to only partially pay for Plaintiffs' fully vested retiree health care benefits and that Alcoa's efforts are illegal as applied to Plaintiffs.

b) **Defendant's theory short summary:** In 1993, Alcoa and Reynolds proposed to the United Steelworkers International and the Aluminum, Brick and Glass Workers Union that they would put a cap on the annual contributions they would make toward the health benefits of future retirees. The purpose of the cap was two-fold: to address the rising cost of health benefits and to limit the impact of a new accounting rule (FAS-106) that required the companies to report as a liability the total expected future health care costs. After extensive bargaining in 1993, the companies and the unions agreed that on January 1, 1998, the companies would be permitted to cap their financial liability for the retiree benefits of all employees who retired after May 31, 1993. The cap was to be set at the per capita cost of retiree health care benefits during calendar year 1997, and the parties agreed that the cap would be a subject of mandatory bargaining in the negotiations leading up to the 1996 CBA.

In 1996 and again in 2001, the parties met in collective bargaining sessions to re-negotiate the prior CBAs. In both of those negotiations, the parties entered into essentially the same cap agreement covering employees who retired after May 31, 1993, but the parties agreed each year to defer implementation of the cap until the expiration of the next CBA. The parties also deferred the dates by which the cap would be measured.

In sessions held in 2005 and 2006, Alcoa and the United Steelworkers negotiated what would become the 2006 CBA. After extensive negotiations, the parties agreed that Alcoa would implement the cap in accordance with the prior CBAs rather than deferring implementation of the cap a third time. In order to ease any potential burden on retirees, Alcoa voluntarily contributed an additional $30 million into a fund that would be used for health care contributions. The new agreement became effective on January 1, 2007.

3

The cap agreements negotiated between the companies and the unions unambiguously allowed Alcoa to engage the cap as early as January 1, 1998. Plaintiffs' retiree medical benefits were not vested such that the cap agreements could not engage in 2007. All Plaintiffs retired from Alcoa after May 31, 1993, when the first cap agreements were reached, and thus retired subject to the cap agreements, which were bargained, signed by all parties, and ratified by the union membership. The engagement of the cap in 2007 was contemplated and explicitly authorized by the 1993, 1996 and 2001 CBAs with respect to all employees retiring after May 31, 1993.

The extrinsic evidence demonstrates overwhelmingly that the parties to the 1993, 1996 and 2001 CBAs intended to put in place a real cap on Alcoa's future liability for retiree health care benefits. The parties' intent to enter into a binding agreement to cap retiree health care benefits is made plain by (1) witness testimony, including testimony from individuals who negotiated the caps themselves; (2) documents, including contemporaneous written evidence of the cap negotiations, as well as written statements the parties made to union members regarding the cap; and (3) the conduct of the parties over time, including the union's agreement with Alcoa's implementation of the cap in 2006. The 1993, 1996 and 2001 cap agreements were intended to put in place a real cap, which engaged on January 1, 2007, in accordance with those agreements.

## IV. FACTUAL ISSUES TO BE DECIDED AT TRIAL

PLAINTIFFS' PROPOSAL:

a) Whether Plaintiffs were and are vested in their retiree health care benefits?
b) If Plaintiffs vested in their retiree health care benefits, was Alcoa allowed to decrease those benefits and/or place a cap on Alcoa's contributions toward those benefits?

ALCOA'S PROPOSAL:

a) What, if any, retiree health care benefits became vested upon Plaintiffs' retirement?
b) Even if certain retiree health care benefits were vested, was Alcoa legally permitted, in agreement with the union, to modify those benefits?

## V. UNCONTROVERTED FACTS/STIPULATIONS OF FACT.

**The following facts are established by admissions in the pleadings, by order pursuant to Fed. R. Civ. P. 56(d), or by stipulation of counsel.**

Herein, all the unions to which Plaintiffs belonged while active employees shall be referred to as the "Union." Alcoa and Reynolds Metals Company shall be referred to herein as "Alcoa." Collective Bargaining Agreement shall be referred to herein as "CBA." "Negotiations" refer to negotiations between Alcoa and the Union. Reynolds Metals Company shall also be referred to as "RMC."

1. This action has been brought in the proper jurisdiction and venue.

2. While employed by Defendant, Plaintiffs were employed variously in Defendant's production plants in Alcoa, Tennessee, Davenport, Iowa, Bauxite, Arkansas, Massena, New York, Warrick, Indiana, Badin, North Carolina and other locations around the country (or are spouses, eligible dependants, or surviving spouses of former employees of Defendant).

3. Each Plaintiff was a member of a union (or derives his or her rights from such a member) which entered into collective bargaining agreements with Defendant over a number of years ("CBAs").

4. Defendant, as plan sponsor and administrator, is an ERISA fiduciary under 29 U.S.C. § 1002(21)(A) (Section 3(21)(A) of ERISA).

5. Class Representative Daniel Arthur Henry resides in Benton, Arkansas. He was born June 8, 1949. He is a participant in the Plan provided by Defendant. He began working for Alcoa in June 1970 and retired from Alcoa's Arkansas facility in March 2004. He was a member of United Steelworkers of America Union ("USW") Local 4880.

6. Class Representative Plaintiff Ernest Kemper, Jr. resides in Maryville, Tennessee. He was born November 25, 1947. He is a participant in the Plan provided by Defendant. He worked at the Alcoa facility in Alcoa, Tennessee until he retired in May 1, 2005. He was a Union member during his time of employment.

7. Class Representative Plaintiff Dennis Edward Macy resides in Brasher Falls, New York. He was born January 8, 1947. He is a participant in the Plan provided by Defendant. He began working for Alcoa in June 1973, and retired from Alcoa in April 2004. Throughout his employment, he worked at the Massena, New York plant and was a member of USW Local 420.

8. Class Representative Plaintiff Michael A. Stotlar resides in Bettendorf, Iowa. He was born January 8, 1947. He is a participant in the Plan provided by Defendant. He worked for Alcoa for 34 years and was a member of USW Local 105. He retired from Alcoa's Davenport, Iowa facility in 2002.

9. Defendant Alcoa Inc. is a corporation whose corporate headquarters is located at 201 Isabella Street, Pittsburgh, Pennsylvania, 15212-5858.

10. Plaintiffs do not vote in Union matters (including collective bargaining agreements) after they retire.

11. The Companies faced changes in the accounting treatment to be accorded to post-employment benefits, including retiree health care. In 1990, the Financial Accounting Standards Board ("FASB") revised FAS 106, the rule governing how companies report post-retirement benfit obligations (known as "Other Post-Employment Expected Benfits", or "OPEB liability"), to require that employers recognize the cost of providing post-retirement benefits on an accrual basis, rather than on the "pay-as-you-go" basis.

5

**1993**

12. The top table negotiators in the 1992-1993 bargaining round included George Becker, Joe Kiker and Jack Golden on behalf of the USW; John Murphy on behalf of the ABG; Russ Porter and Ron Hoffman on behalf of Alcoa; and John McGill, Bob Newman and Don Cowles on behalf of Reynolds.

13. Ultimately, the parties were not able to reach an agreement at the September 1992 negotiations.

14. The Companies and the Unions met for negotiations in Cleveland, Ohio on May 16, 1993. The parties concluded all negotiations on the morning of June 1, 1993.

15. The Unions continued to reject the Companies' FAS 106 proposal, and on May 31, 1993, the final day of negotiations, the parties had not yet reached agreement.

16. Alcoa reached a Collective Bargaining Agreement with the USW dated May 31, 1993.

17. Alcoa published a Summary Plan Description for active employees that were members of the USW dated May 31, 1993.

18. Alcoa reached a Collective Bargaining Agreement with the ABG dated June 1, 1993 covering ABG Locals 105 – Davenport, IA; 115- Lafayette, IN; 445 – Lebenon, PA; 420 – Massena, NY; and 104- Warrick, IN.

19. Alcoa published a Summary Plan Description for active employees that were members of the ABG locals of Davenport Iowa, Lafayette Indiana, Lebanon Pennsylvania, Massena New York, and Wenatchee Washington dated June 1, 1993.

20. RMC reached a Collective Bargaining Agreement with the USW dated June 1, 1993.

21. RMC reached individual Collective Bargaining Agreements with employees of various plants whose employees were represented by the ABG dated June 1, 1993.

22. The 1993 CBAs were ratified by the union memberships.

23. Alcoa published a Summary Plan Description dated August 16, 1995 for active hourly employees pursuant to the Collective Bargaining Agreement with the USW locals at Alcoa, TN; Badin, NC; Bauxite, AR; Mobile, AL; Point Comfort, TX; and Rockdale, TX.

24. In September of 1995, Reynolds Metals Company published a Summary Plan Description of Active Hourly Employees Healthcare Benefits.

25. The terms of the health plans negotiated by the Companies and the Unions were memorialized in summary plan descriptions ("SPDs"), which were reviewed by the Unions before the Companies distributed them to employees.

26. In 1995, Alcoa and Reynolds met and spent considerable time strategizing about potential bargaining positions with respect to upcoming negotiations. At those meetings, the Companies routinely discussed the topic of retiree health care.

## 1996

27. Negotiations for the 1996 contracts began on May 20, 1996, in Buffalo, New York. The "top table" negotiators were Doug Root, Ron Hoffman and Gene Woloshyn for Alcoa; Bob Newman and Steve Weidman for Reynolds; Dick Davis, Joe Kiker and Jack Golden for the Steelworkers; and John Murphy and Harvey Martin for the ABG.

28. The Unions took the initial position at negotiations that they wanted the FAS 106 letter deleted from the collective bargaining agreement.

29. The Unions retained the right to require the Companies to bargain over the FAS 106 letter for retirees in future negotiations.

30. Alcoa reached a Collective Bargaining Agreement with the USW dated May 31, 1996.

31. Alcoa published an Updated Plan Summary Plan Description for active employees that were members of the USW dated June 1, 1996.

32. Alcoa reached a Collective Bargaining Agreement with the ABG dated May 31, 1996.

33. Alcoa published an Amended Plan Features of their June 1, 1993 Summary Plan Description for active employees that were members of the ABG dated June 1, 1996.

34. RMC reached a Collective Bargaining Agreement with the USW dated May 31, 1996.

35. RMC reached individual Collective Bargaining Agreements with employees of various plants whose employees were represented by the ABG dated June 1, 1996.

36. After the conclusion of negotiations, the 1996 labor agreements were ratified by the union memberships.

37. Alcoa published a Retiree Benefits Handbook SPD, effective April 1, 1997 covering hourly retirees who were covered by collective bargaining agreements, certain hourly retirees who were not covered by collective bargaining agreements and their eligible dependents.

7

38. The April 1, 1997 Retiree Benefits Handbook SPD included descriptions of the Retiree Health Care Plan, Life Insurance, Pension Benefits, and the Savings Plan.

39. Reynolds Metals Company published a Retiree Health Care Benefits Handbook in April of 1998 for former USW and ABG represented retirees of RMC.

40. In the year 2000, Alcoa purchased all of RMC, including all of RMC's plants and, as part of that purchase and merger, adopted and assumed all of the retiree health care welfare benefit-related duties and liabilities owed to former Reynolds Metals Company employees, eligible dependants, spouses, and retirees under the previous CBAs with the Union and SPDs provided to Reynolds Metals Company employees for their employee welfare benefit plan as defined by ERISA, 29 U.S.C. § 1002(1) and (3).

41. The Plaintiffs who retired from RMC participated as employees and retirees of RMC in a pension plan and an employee welfare benefit plan which is currently administered and sponsored by Alcoa and which was and is an employee welfare benefit plan as defined by ERISA, 29 U.S.C. § 1002(1) and (3) during all times relevant to this litigation.

42. Prior to the merger with Alcoa, RMC employees and retirees (and those Plaintiffs who derived their welfare benefit rights from RMC employees or retirees) were covered by what shall be known herein as the "RMC Plan," an employee welfare benefits plan within the meaning of ERISA § 3(1) and (3), 29 U.S.C. § 1002(1) and (3).

43. The USW and ABG unions merged into the USW in 1997.

## 2001

44. Pursuant to the terms of the 1996 CBAs, Alcoa and the USW met for "re-opener" negotiations in May of 2001 in Nashville, Tennessee.

45. The top table included John Murphy, Dick Davis, international Vice President of the USW, and Gene Woloshyn and Joe Quaglia, who represented Alcoa.

46. The parties returned to the bargaining table in September 2001 to attempt again to reach a long-term agreement.

47. Alcoa published a Retiree Benefits Handbook SPD, effective January 1, 2001 covering hourly retirees who were covered by collective bargaining agreements, certain hourly retirees who were not covered by collective bargaining agreements and their eligible dependents.

48. The January 1, 2001 Retiree Benefits Handbook SPD included descriptions of the Retiree Health Care Plan, Life Insurance, Pension Benefits, and the Savings Plan.

49. Alcoa reached a Collective Bargaining Agreement with the USW dated May 31, 2001 covering USW represented employees at Alcoa, TN; Badin, NC; Bauxite, AR; Mobile, AL; Point Comfort, TX; and Rockdale, TX.

8

50. Alcoa reached a separate Collective Bargaining Agreement with the USW dated May 31, 2001 covering USW represented employees at Davenport, IA; Lafayette, IN; Lebanon, PA; Massena, NY; and Warrick, IN.

51. The 2001 labor agreement was ratified by the union membership.

## 2002

52. Alcoa published a Summary Plan Description for active employees that were members of the USW dated April 1, 2002.

## 2006

53. Alcoa and the USW began negotiating what would become the 2006 CBA in re-opener bargaining sessions in St. Louis, Missouri, in August of 2005.

54. Jim Robinson, Ron Bloom and Tom Conway were the lead negotiators for the USW; Alcoa was represented by Joe Quaglia, Paul Thomas and Alan Cransburg.

55. Health care – and in particular retiree health care – was a key item on the agenda. One of Alcoa's health care bargaining proposals was to implement a cap which would require post-May 31, 1993 retirees to pay all of the costs of their health benefits in excess of the per capita costs paid by Alcoa in 2006.

56. The re-opener negotiations were unsuccessful, and bargaining resumed in early 2006.

57. In connection with the 2005 re-opener negotiations, the USW periodically provided updates to its membership regarding the progress of the bargaining.

58. The parties reached agreement on a new contract on May 31, 2006, the last day of negotiations.

59. The 2006 labor agreement was ratified by the union membership.

60. For Medicare eligible retirees, the 2006 CBA imposes $40.00 per month premium payments for retirees and $40.00 per month premium payment for Medicare eligible retiree spouses. For those retirees and spouses of retirees who are not yet Medicare eligible, the 2006 CBA imposes a premium charge of $75.00 per month per person.

## VI. NOVEL CONTESTED ISSUES OF LAW OR EVIDENCE

### PLAINTIFFS' PROPOSAL:

1. The Plaintiffs take the position that their benefits were clearly vested upon their retirement based on *Reese v. CNH America LLC*, 2009 WL 2213465 (6th Cir. 2009); *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008) and *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). However, the Plaintiffs also take the position that their benefits were vested before their retirement, when they obtained pension eligibility. In *Winnett v. Caterpillar*, the Court determined whether benefits could vest upon pension eligibility. *Winnett* held that an employer and a union could agree to provide retiree medical benefits that vest upon pension eligibility, but no extrinsic evidence or plan language existed to show such agreement. Unlike *Winnett*, the plan language in the present case provided retiree health care benefits to "active vested employees." The Plaintiffs will also rely on extrinsic evidence to show vesting occurred upon pension eligibility. As a result, a question to be determined at trial is whether the Plaintiffs were vested in their retiree medical coverage when they obtained pension eligibility.

2. According to statute and case law, a Defendant is not allowed to significantly reduce vested benefits. See e.g., *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008); *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006); *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). Consistent with this authority, the *Reese v. CNH America LLC*, 2009 WL 2213465 (6th Cir. 2009) decision upheld this "significant reduction" framework by allowing modifications to benefits that "reasonably alter" the benefits provided in the applicable CBAs, such as administrative changes, like the substitution of managed care providers. See *Reese*, 2009 WL 2213465 at *10. The Defendants take the position that they were allowed to reasonably modify the Plaintiffs health care benefits based upon the *Reese* decision. The Plaintiffs believe the CBAs by which they retired did not allow their benefits to be reduced by a "cap" or any other agreement. In addition, the Plaintiffs take the position that even if the Defendant was allowed to reduce their vested benefits, the Defendant significantly reduced those benefits beyond any applicable plan language. Therefore, a secondary question the court may need to address (if the court concludes the Defendant was allowed to reduce the Plaintiffs' benefits based on a "cap") includes whether the significant reductions and substantially increased costs to the Plaintiffs' retiree health care benefits were "reasonable alterations" within the provisions of the applicable CBAs.

### ALCOA'S PROPOSAL:

In addition to the issues identified by the Court in its summary judgment decision, there are two recent Sixth Circuit cases the application of which raises novel questions under the circumstances of this case.

1. Plaintiffs argue that their retiree medical benefits vested prior to their retirement from Alcoa. In *Winnett v. Caterpillar, Inc.*, however, the Sixth Circuit held that "in the absence of explicit contractual language", retiree health benefits provided under a CBA

do not vest prior to retirement. 553 F.3d 1000, 1008, 1012 (6th Cir. 2009). Like the *Winnett* plaintiffs, the Plaintiffs in this case point to statements made in the plan documents that medical benefits are to be provided "without cost", and they contend that those statements indicate that the benefits vested prior to an employee's retirement. *Id.* at 1009. The Sixth Circuit, however, rejected that argument and concluded that those provisions could not "be reasonably interpreted to explicitly state that benefits vested as soon as a worker became eligible for a pension or to retire". *Id.* In light of *Winnett* and the Court's summary judgment decision, the relevant question to be addressed at trial is what, if any, retiree health care benefits became vested upon Plaintiffs' retirement.

2. Plaintiffs also argue that Alcoa impermissibly reduced Plaintiffs' post-retirement health care benefits. As an initial matter, Alcoa posits that no reduction in benefits occurred because Plaintiffs retired subject to a cap on their benefits that was scheduled to be implemented on January 1, 1997, or at a later time if the cap were moved in subsequent negotiations. Even where a post-retirement reduction in benefits has occurred, however, Sixth Circuit law holds that not all reductions in post-retirement benefits are impermissible. *See Reese v. CNH Am. LLC*, 2009 WL 2213465 (6th Cir. 2009). The *Reese* court held that absent "extrinsic evidence that is contemporaneous with the [relevant] CBA and that clearly establishes a promise of lifetime benefits that can never vary", a company may reasonably modify retiree health care benefits after the employees have retired. *Id.* at *9. Accordingly, even if certain retiree health care benefits were vested, an additional question to be addressed at trial is whether Alcoa was legally permitted, in agreement with the union, to modify those benefits.

## VII. TRIAL SETTING AND ESTIMATED LENGTH OF TRIAL.

The case will be set for trial to begin 9 a.m. on September 22, 2009. Estimated length of trial is 10-15 days.

## VIII. POSSIBILITY OF SETTLEMENT.

The parties agree that settlement is unlikely.

## IX. MISCELLANEOUS MATTERS.

The parties agree to use the court's evidence presentation system.

DATED: _____

BY THE COURT

_____
**UNITED STATES DISTRICT JUDGE PHILLIPS**

**The foregoing proposed pretrial order (prior to execution by the court) is hereby adopted this 24th day of August, 2009.**

                                                s/Gregory F. Coleman
Gregory F. Coleman, Esq.
Attorney for Plaintiffs
4800 Old Kingston Pike, suite 120
Knoxville, Tennessee 37919
(865) 247-0080 (phone)
gcoleman@colemanedwardspc.com
BPR No. 014092
gcoleman@dmcpclaw.com

s/Robert S. Catapano-Friedman
Robert S. Catapano-Friedman, Esq.
Robert S. Catapano-Friedman, PC
744 Broadway
Albany, New York 12207
(518) 463-7501 (phone)
(518) 463-7501 (fax)
catapan@worldnet.att.net
*Admitted pro hac vice*

s/Sarah Catapano-Friedman
Sarah Catapano-Friedman, Esq.
The Catapano-Friedman Law Firm
50 Franklin Street, 4th Floor
Boston, MA 02110
(617) 542-7711
scf@cflawfirm.com
*Admitted pro hac vice*

s/Mona Lisa Wallace
Mona Lisa Wallace, Esq.
Wallace and Graham, P.A.
Andrew J. Schwaba, Esq.
Wallace and Graham, P.A.
525 North Main Street
Salisbury, NC 28144
(800) 849-5291 (phone)
(704) 633-9424 (fax)
mwallace@wallacegraham.com
*Admitted pro hac vice*

Attorneys for Plaintiffs


s/Evan R. Chesler
Evan R. Chesler, Esq.
Daniel Slifkin, Esq.
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000 (phone)
(212) 474-3700 (fax)
echesler@cravath.com
dslifkin@cravath.com
*Admitted pro hac vice*

s/John A. Lucas
John A. Lucas, Esq.
MERCHANT & GOULD, P.C.
Suite 203
110 McGhee Tyson Boulevard
Alcoa, Tennessee 37701
(865) 380-5978 (phone)
(865) 380-5999 (fax)
jlucas@merchantgould.com

s/James P. Naughton
James P. Naughton, Esq.
HUNTON & WILLIAMS LLP
500 East Main, Suite 1000
Norfolk, Virginia 23510
(757) 640-5300 (phone)
(757) 625-7720 (fax)
jnaughton@hunton.com
*Admitted pro hac vice*

Attorneys for Alcoa Inc.