CHARLES CURTIS, et al.,    )
            )
   Plaintiffs,    )
            )
v.           )  No.  3:06-CV-448
            )  (Phillips)
ALCOA, INC., Individually and as )
Fiduciary of the Employees' Group )
Benefits Plan of Alcoa Inc., Plan II, )
            )
   Defendant.    )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a class action brought pursuant to the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. §§ 141-187 and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 by a group of Alcoa retirees and/or their surviving spouses seeking fully funded lifetime retiree healthcare benefits.  The class consists of retirees who retired between June 1, 1993 and June 30, 2006, their eligible spouses and dependents, and surviving spouses of such retirees and of employees who died while still employed by Alcoa.  Plaintiffs allege that Alcoa breached its promise to provide lifetime retiree medical benefits at no cost when it began charging them for a portion of their medical care.  Plaintiffs filed suit against Alcoa, Inc., alleging that their

healthcare benefits were vested and therefore, could not be reduced pursuant to the LMRA and ERISA.

Defendant claims a cap letter attached to the back of the Collective Bargaining Agreements (CBAs) afforded them the right to reduce plaintiffs' benefits. Defendant argues that all plaintiffs retired from Alcoa after May 31, 1993, when the first cap agreements were reached, and thus retired subject to the cap agreements, which were bargained, signed by all parties, and ratified by the union membership. Thus, the engagement of the cap in 2007 was contemplated and authorized by the 1993, 1996 and 2001 CBAs with respect to all employees retiring after May 31, 1993.

Plaintiffs assert that the cap letter was included with guarantees that it would never be implemented and was for accounting purposes only. In addition, plaintiffs claim that their benefits were vested before the cap letter came into existence. They also claim that choice of law language from conflicting Summary Plan Descriptions (SPDs) renders any reference to a "cap" in the SPDs ineffectual. Finally, plaintiffs claim that even if the defendant was permitted to "cap" their retiree medical benefits, their benefits were impermissibly reduced below the cap level.

A bench trial was conducted commencing September 22, 2009, and concluding October 1, 2009. Subsequent to the bench trial, the Court permitted the parties to supplement the record with any appropriate filings, which they have done. Further, the Court ordered the parties to submit their respective proposed Findings of Fact and Conclusions of Law. The parties have done so, and having reviewed the evidence and the parties' proposed submissions, the Court hereby issues its Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

# FINDINGS OF FACT

## I.  THE PARTIES

1.   Plaintiffs are a class of former hourly union-represented employees of Alcoa or Reynolds who retired between June 1, 1993 and June 1, 2006, from certain facilities, who are eligible to receive healthcare benefits from Alcoa, and the spouses or dependents of such retirees.   Over the years, the unions to which plaintiffs belonged agreed to a series of CBAs with defendants, who issued a series of SPDs which included agreements to pay retiree, dependent and surviving spouse healthcare benefits.  Plaintiffs all retired under CBAs negotiated and ratified in 1993, 1996 and 2001.

2.  Defendant Alcoa is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.   In 2000, Alcoa purchased Reynolds Metals Company, including all of Reynolds' plants.  As part of that purchase and merger, Alcoa adopted and assumed all of the retiree healthcare and welfare benefit-related duties and liabilities owed to former Reynolds employees, eligible dependants, spouses and retirees under the previous CBAs with Reynolds' unions and SPDs provided to Reynolds employees for their employee welfare benefit plan.

## II.  BACKGROUND

3.   Healthcare costs at Alcoa in the late 1980s and early 1990s were increasing at a rapid rate.  Alcoa's per capita employee medical (including retiree medical), HMO and Medicare Part B reimbursement had risen from $3,669 in 1986 to $5,323 in 1989. Healthcare was one of Alcoa's most rapidly rising costs of doing business during this

period.  Alcoa estimated that its healthcare costs would continue to rise between 12% and 15% annually if left unchecked.

4.  Alcoa Chairman and CEO Paul O'Neill and others in Alcoa management were concerned with the escalation of healthcare costs because of its impact on employee compensation and its threat to Alcoa's competitive position.  O'Neill directed a team of Alcoa employees to develop an approach to managing healthcare costs with a focus on individual responsibility.

5.  Jim Michaud began working for Alcoa as its Manager of Group Benefits in 1989, and was involved in Alcoa's attempts to understand what was driving the increase in healthcare costs for the four populations comprising Alcoa's workforce – active salaried, active hourly, retired salaried, and retired hourly.  Michaud's team determined that Alcoa's total projected retiree medical liability was $1.66 billion, with approximately one-third of the total liability coming from Alcoa's retired hourly employees.  Michaud and his team began to look at alternatives available to help mitigate expenses for those populations, including potential bargaining positions that Alcoa might take at labor negotiations for its hourly active and retired populations.

6.  In the late 1980s and early 1990s, Reynolds was also concerned with the growing costs associated with healthcare.  In particular, Reynolds was concerned with the growing costs of retiree medical care and began to assess ways to mitigate these costs. Reynolds recognized a number of possible solutions to the problem: (1) reducing retiree medical benefits; (2) tightening eligibility restrictions for retiree medical benefits; (3) transferring the cost of retiree medical care to the retirees; (4)  establishing managed care networks; and (5) getting out of the retiree healthcare business entirely.

7.  In February 1989, the Financial Accounting Standards Board (FASB) approved FAS-106, to go into effect on December 15, 1992.  FAS-106 required accrual accounting for post-retirement benefits other than pensions.  This new requirement significantly increased the liability for which the Companies would have to account on their balance sheets.  For example, Reynolds estimated that the 1993 expense on its income statement would be approximately $1 billion, between four and seven times greater than its expense under the pay-as-you-go accounting rules.  In its December 1992 annual report, Alcoa informed shareholders that it reported a $1.139 billion loss in 1992, including a charge of $1.166 billion to comply with FAS-106.

8.  Because of the rising costs of healthcare and the impact of FAS-106, the Companies realized that they needed to address the problem of healthcare costs in the 1992-1993 negotiations with the Unions (United Steel Workers, and the Aluminum, Brick and Glass Workers Union).

## III.  1992-1993 COLLECTIVE BARGAINING NEGOTIATIONS

### A.  Retiree Healthcare Issue

9.  In advance of the 1993 negotiations, the Companies were focused on their long-term healthcare costs, and they viewed those costs as presenting two related problems.  One problem was that healthcare costs were increasing rapidly and the Companies could not continue to bear the cost of healthcare inflation.  Another problem was that, because of  FAS-106, the Companies could no longer account for healthcare

costs on a pay-as-you-go basis and would be forced to record substantial charges against earnings unless the Companies modified their healthcare plans.

10. In preparation for negotiations, Alcoa's benefits, finance and accounting staff projected the cost of various changes to the overall economic package, including potential changes to Alcoa's retiree healthcare plan. Alcoa analyzed how plan design changes and total healthcare liability reduction efforts worked together, how plan design changes could lower Alcoa's healthcare expenses and how imposing a cap on retiree medical expenses could mitigate those expenses even further.

11. At Reynolds, human resources and benefits executives met with senior management to discuss retiree healthcare liability and to review the impact of the new FAS-106 regulation. Reynolds' senior management, including CEO Dick Holder, requested that a post-retirement welfare benefits committee, composed of Reynolds' finance and human resources staff members, be formed. The committee was tasked with defining and prioritizing issues and formulating potential solutions with respect to Reynolds' FAS-106 and healthcare cost concerns.

12. Alcoa informed employees of its rising healthcare costs. Representatives from Alcoa's Human Resources and Industrial Relations departments met with Alcoa's business unit presidents who managed USW or ABG plants to discuss Alcoa's options to limit the rise of retiree medical costs. Alcoa determined to decrease its future medical cost increases through managed care and a cap.

13. Alcoa's actuarial firm, Buck Consultants, evaluated potential plan design changes and other approaches to reduce Alcoa's healthcare liability. Buck evaluated the impact of a cap with immediate engagement at 1991 levels, which would require increased

out-of-pocket expenditures for retirees. Buck also considered the impact of employing deferred caps on Alcoa's retiree healthcare liability while at the same time implementing immediate plan design changes that would increase retirees' out-of-pocket expenditures. Deferred caps were relatively common in Buck's practice, as deferred caps allowed retirees to plan for the increased premiums that would eventually be required. Buck also looked at the possibility of implementing caps with indexing, meaning that the cap would increase gradually, at a rate less than the rate of healthcare inflation. Such a plan would have also increased retirees' out-of-pocket costs. Buck considered other plan design approaches as well, such as benefits credits based on years of service for retirees.

14. Alcoa determined that it could most effectively slow the increase in its healthcare expenditures by implementing plan design changes and imposing a cap.

15. Both Reynolds and Alcoa's outside consultants advised the Companies that a cap would have to be real to reduce liability. At O'Neill's request, Alcoa consulted with its auditor, Coopers & Lybrand, to confirm that its understanding of the requirements of FAS-106 was accurate. Also at O'Neill's request, Alcoa confirmed with FASB representatives that a deferred cap that was intended to be implemented at a future time would reduce FAS-106 liability. Alcoa understood that an artificial cap would not limit its FAS-106 liability and further understood that an artificial cap would not have addressed the problem of escalating healthcare costs in the long term, and thus would not have solved Alcoa's primary goal of curbing those expenses.

16. The Companies also investigated what peer companies were doing with respect to healthcare costs for hourly collectively bargained employees. In the early 1990s,

many other companies dealt with the implementation of FAS-106 and the increase in expense and liability by changing plan designs and capping their plans.

17.  Alcoa and Reynolds learned in advance of the 1992-1993 negotiations that other companies were negotiating caps on their retiree health benefits in their CBAs. Alcoa contacted representatives from peer companies to discuss the success those companies had negotiating with their unions.  In June 1990, Reynolds met with labor executives from Bell Atlantic to learn about the cap agreement Bell Atlantic had crafted with its unions.

18.  Reynolds' actuarial consultants informed Reynolds that caps had been instituted by numerous other companies, including IBM, AT&T, Ameritech, BellSouth, Pillsbury, Kodak, American Airlines, and Procter and Gamble.  Other companies in the metals industry, including U.S. Steel and Mittal Steel, had instituted caps as well.

19.  The Companies learned that the ABG and the USW had negotiated caps with other companies.  Alcoa learned that some of the companies that had negotiated cap agreements with the USW had deferred caps.  For instance, prior to negotiations, Russ Porter learned through discussions with his counterpart at American National Can that American National Can's cap agreement with the USW provided for engagement of the cap subsequent to the term of the CBA.  Deferred caps were common among companies that chose to cap their plans.  Alcoa believed that the fact that the USW had negotiated a cap with other companies made it more likely that it would agree to a cap with Alcoa.

**B.   Negotiations Prior to May 1993**

20.   The Companies met periodically in advance of the 1992-1993 CBA negotiations to determine their joint position on the negotiation issues, including healthcare.

Alcoa and Reynolds concluded that they would seek to implement a cap on their financial contributions to hourly retiree healthcare costs. The Companies also decided that they would switch to a managed care plan for their retirees. Alcoa made similar changes to the healthcare plans of salaried employees by capping its contribution for salaried employees' healthcare costs and switching them to a managed care plan.

21. On August 18, 1992, the Companies met to discuss the cap and agreed that they understood that the cap needed to be "real" if it was going to serve to limit the Companies' FAS-106 liability. Alcoa's internal memorandum discussing the meeting stated that both Companies agreed that "the cap will not used as an artificial way to decrease the liability for financial accounting purposes." Reynolds' internal memorandum discussing the meeting similarly stated, "It is [the author's] understanding that we do not view caps as an artificial means to reduce the initial FAS-106 cost calculations and therefore would consider them in the initial cost calculations. Again, Alcoa agreed with our position."

22. The Companies and the Unions met several times leading up to the 1992-1993 negotiations, during which time the Companies communicated to the Unions their concerns over rising healthcare costs and FAS-106, and the Companies' need to implement a cap on retiree healthcare costs to address those concerns.

23. Reynolds and Union representatives (including John Murphy and Harvey Martin for the ABG) met as early as the summer of 1990 and discussed both FAS-106 and the problem of increasing healthcare costs.

24. Alcoa communicated with, and made presentations to, the Unions in advance of negotiations concerning its need to cap future liability for retiree medical costs.

25.   In June 1991, representatives from Reynolds and the ABG met to continue ongoing communications regarding the issue of escalating healthcare costs.

26.   Reynolds CEO Dick Holder met with Lynn Williams, President of the USW, in advance of the 1992 negotiations to discuss Reynolds' healthcare cost concern. Holder informed Williams that healthcare was among the fastest rising costs at Reynolds. Holder noted that if the trend continued, by 2000, annual cost per employee would grow from $5,300 to nearly $16,000.  Holder told Williams that Reynolds was aware that the USW had reached agreements regarding healthcare with other companies in the metal industry.

27.   In January 1992, Alcoa and Reynolds representatives met with John Murphy and Harvey Martin of the ABG and George Becker, Jim English and Joe Kiker of the USW.   The Companies confirmed that healthcare was the major issue and reminded the Unions that "FASB is not the major problem – runaway costs are – and [the Company] only [has] so much money to spend for compensation."  The Unions responded that they would not agree to any healthcare proposal that shifted costs to employees.

28.   Reynolds provided a written proposal for a cap to the Unions in early 1992.  The Companies and the Unions met again in February 1992.  The purpose of this meeting was to determine whether or not the parties should enter into early negotiations. The Companies' position was that any discussion of other issues and company concessions would be contingent on the Unions' acceptance of the healthcare proposal presented at the previous meeting.

29.   On February 7, 1992, the Unions presented the Companies with a response to the Companies' healthcare proposal.  The Unions' counterproposal did not

address the Companies' request to reduce healthcare costs and in fact proposed increasing Alcoa's healthcare costs significantly. Alcoa responded on February 11, 1992 that, while the Unions' counterproposal was silent on FASB, FAS-106 would increase Alcoa's liability for post-retirement welfare benefits and have a negative effect on profit sharing. Alcoa warned the Unions that unless the Unions were ready to deal realistically with healthcare costs, Alcoa would have to "turn down business" and would "not be able to share cost savings" with employees.

30. In August 1992, Paul O'Neill distributed a memorandum to Alcoa's business unit presidents, requesting that the presidents communicate the healthcare issue to their employees and provide O'Neill with feedback on that communication. The response from George Bergeron, the business unit president in charge of the Warrick and Tennessee operations, indicated that both Warrick and Tennessee union leadership and employees had been well educated on the subject of healthcare costs.

31. Reynolds' FAS-106 actuarial consultant, Mike Gulotta, also gave presentations to local unions concerning the requirements of FAS-106, including the requirement that the cap be real.

32. Negotiations prior to May 1993 did not yield a new contract, largely because of the parties' inability to reach an agreement on the issue of healthcare. The 1988 CBA was set to expire on May 31, 1992. A general economic recession during the early 1990s had hit Alcoa particularly hard, as Russian producers suddenly began to flood the market with aluminum, depressing prices. O'Neill was concerned with the effect this recession would have on the 1992 negotiations, so in the spring of 1992, he approached

Lynn Williams, President of the USW, and the parties agreed to a one-year extension of the existing CBA.

33. As part of the extension agreement, the parties established a joint committee to examine the issue of healthcare costs in advance of the next round of negotiations. The joint committee met on multiple occasions over the course of the Summer of 1992. Healthcare benefits consultants and field experts participated in those meetings. During the meetings, union representatives acknowledged the Companies' healthcare cost management goals.

34. Alcoa and the Unions met in August 1992, with Paul O'Neill present. During that meeting, the Unions expressed their belief that healthcare would be nationalized, thereby solving the healthcare cost problem. O'Neill stressed the FAS-106 problem as well. ABG negotiator John Murphy acknowledged that this was Alcoa's major issue. Alcoa again expressed that it needed to change fundamentally its healthcare program, including implementing caps.

35. The Companies and the Unions met in Pittsburgh in September 1992 in an attempt to negotiate a new CBA. Alcoa and Reynolds negotiated jointly. The USW and ABG also negotiated jointly. Ultimately, each company entered into a separate agreement with each union.

36. The primary decision-making authority for wage and benefit issues rested at the "top table." The proposed cap agreement was only negotiated at the top table. Russ Porter and Ron Hoffman were the Alcoa representatives at the top table, Bob Newman, John McGill and Don Cowles were the Reynolds representatives at the top table. George

Becker, Joe Kiker and Jack Golden were the primary USW representatives at the top table. John Murphy and Harvey Martin were the ABG representatives at the top table.

37. At the opening assembly of the September 1992 negotiations, Paul O'Neill announced that Alcoa was seeking substantial changes to employee healthcare in order to manage escalating costs and to comply with FAS-106.

38. During the negotiations, the Companies stressed the importance of changing the healthcare plan and instituting a cap on retiree medical benefits. The Companies told the Unions that money saved by reducing healthcare costs could be used to provide other economic benefits such as wage increases. The negotiations were unsuccessful primarily because the parties could not agree on the healthcare issue.

39. Shortly after the failure of the September 1992 negotiations, Alcoa began to take steps to prepare for the possibility of a work stoppage. Alcoa's primary healthcare objectives going into the 1992-1993 negotiations were to achieve (1) managed care and (2) a cap on retiree medical benefits. The USW obtained authorization for a strike if the parties had not reached an agreement at the 1993 negotiations. Alcoa was willing to accept a strike if the Unions would not agree to managed care and a cap on retiree healthcare costs. Alcoa informed the Unions it was prepared for a strike.

40. The Companies and the Unions met again in February 1993 in Miami in an attempt to each an agreement on a new CBA. During those discussions, the Companies again proposed a cap on retiree medical benefits. However, as a concession to the Unions, the Companies proposed a cap that would not engage until after the expiration of the contract. Despite the concession, the Companies and the Unions remained unable to reach an agreement in the February 1993 meetings.

## C. May 1993 Contract Negotiations

41. The negotiations in May 1993 were held in Cleveland, Ohio. Ronald Hoffman was the Executive Vice-President of Human Resources for Alcoa. He attended each negotiating session in May 1993. Throughout the May negotiations, the Companies continued to express to the Unions that they wanted the Unions to agree to a cap. For the majority of the May negotiations, the Unions resisted the notion of a cap in its entirety.

42. During a meeting on the morning of May 30, the day before the CBA was to expire, George Becker, the chief negotiator for the Unions, proposed deleting the cap from the Companies' healthcare proposal. After this meeting, the Companies linked the Unions' proposal of enhanced pensions with the Companies' proposal for managed care and a cap on retiree medical costs, and the Companies informed the Unions that they could not agree to one without the other.

43. On the afternoon of May 31, the final day of the CBA, the Unions again refused to agree to the cap. In response, Bob Newman, a Reynolds' negotiator, stated that the Companies would not accept the Unions' position on caps. On May 31, at approximately 7:30 p.m. (hours before the midnight strike deadline), the Unions handed across the table a letter that contained a cap proposal. The Unions' proposed cap letter provided for a cap that would limit costs at 2000 levels and would not engage until January 1, 2001. The Unions' proposed cap letter provided that the cap would be a mandatory subject of bargaining at all future negotiations.

44. It was important to the Unions that the cap be a mandatory subject of bargaining because the Unions wanted to have the opportunity to bargain over the cap again before the Companies implemented it. Ernie LaBaff, the President of ABG and a

signatory to the cap letter, testified that he could not explain why the parties would make the cap a mandatory subject of bargaining if the cap were not real.

45.  During a caucus in the negotiations, the Companies discussed the Unions' proposed cap letter and decided to respond with a cap that would engage in 1998 at 1997 cost levels.  At that caucus, Ron Hoffman advised Paul O'Neill of the status of the negotiations, and O'Neill authorized a last, best and final offer which included a cap at 1997 levels.  At this point, Alcoa was prepared to accept a work stoppage if the Unions did not accept its version of the cap letter.

46. The Companies returned to the top table and, at approximately 1:30 a.m., responded with their own proposed cap letter.  The Companies' proposed cap letter called for a cap that would go into effect on January 1, 1998 at 1997 levels.  The Companies' proposed cap letter provided that the cap would be a mandatory subject of bargaining at the next round of negotiations, as opposed to all future negotiations, as the Unions had proposed earlier.

47.  During the early morning hours of June 1, 1993, after the strike deadline passed, some workers began walking off facilities while the negotiations were ongoing.  At approximately 1:55 a.m. on June 1, the Unions agreed to the Companies' version of the cap letter.  In exchange for the Unions' agreement to the Companies' cap proposal, the Companies agreed to enhanced pensions and 401(k) benefits for employees.  The Companies' version of the cap letter was memorialized in the 1993 CBAs.

48.  The parties understood that the 1993 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented.  According to Jim Robinson, the Union's corporate designee, Alcoa would have had the right

to engage the cap in 1996 if the Unions had been unsuccessful in bargaining for a movement of the cap in the 1996 negotiations.

49.   There is no credible evidence of an oral side agreement between the Companies and the Unions that the cap would never engage.   Plaintiffs rely on the testimony of only one 1993 top table negotiator, John Murphy, as evidence that the Companies entered into a side agreement with the Unions that the cap would never engage.   However, John Murphy was unable to identify any explicit statement by either Company that the cap would never be implemented.   Russ Porter of Alcoa testified that he never privately discussed the cap agreement with Murphy during the May 1993 negotiations; that he never told Murphy that the cap was never to be implemented; and that he never told Murphy that the cap was an "accounting gimmick," a "paper transaction," or a "paper shuffle."   Porter further testified that he never referred to the cap as a "cap with a wink."   On cross-examination, Murphy conceded that Porter never told him that the cap would never be implemented.

50.   Murphy also testified that Gary MacDonald of Reynolds referred to the cap as a "cap with a wink."   However, both Union and Company representatives (including MacDonald) testified that the phrase "cap with a wink" referred to a cap that would not engage during the term of the current agreement.   MacDonald testified that he used the phrase "cap with a wink" to mean a cap that was "not likely to be energized during the term of the contract."   Moreover, MacDonald was on the benefits subcommittee in the 1993 negotiations and was not a top table negotiator.   As such, he was not capable of binding Reynolds through oral representations inconsistent with the parties' written agreements. Harvey Martin, who represented ABG at the top table with Murphy in 1993, testified that

"caps with a wink" referred to a cap that "would not be implemented . . . during the term of that agreement."

51. The testimony of other union members indicates that the Companies and the Unions did not enter into any side agreement pertaining to the cap. Martin testified that no Company representative told him that the cap letter would never be implemented. Brickey Beasley, a USW official who was at the benefits table in 1993, testified that the Unions historically required that any binding commitment from the Companies be reduced to writing. According to Jim Robinson, the Unions' corporate designee, the Companies and the Unions did not agree in 1993 that the cap would never be implemented.

52. Murphy offered no plausible explanation as to why, if the cap were not real, the Union later negotiated to delete it in the 1996 and 2001 negotiations. His explanation that it was an attempt by the Union to assist Alcoa in reducing accounting liability, it was just a paper transaction, and that no costs would be shifted to union members, is simply not credible. Plaintiffs assert that Murphy never would have signed the CBA and would have instead initiated a strike if the Companies told him they intended to cap retiree health benefits. Murphy's testimony is inconsistent with the weight of the evidence, as he was repeatedly informed from 1991 through the May 1993 negotiations, through presentations, proposals and negotiations, that the Companies intended to implement a cap on retiree health benefits. Nevertheless, Murphy did in fact sign the CBA and he did not initiate a strike.

53. Neither the Companies nor the Unions would have accepted a key contractual provision that was not memorialized in writing. Paul O'Neill testified he would

never have accepted a key contractual provision that was not memorialized in writing, and neither would Lynn Williams, who was the USW's president at the time.

54.   Ernie LaBaff, President of the ABG, was a signatory to the 1993 cap agreement.   LaBaff testified that he understood the cap was strictly for bookkeeping purposes.  However, LaBaff admitted he had no personal knowledge of any side agreement concerning the cap letter that he signed; he was not present at the top table in 1993; and he never had a conversation with anyone from Reynolds or Alcoa about the cap letter. Further, LaBaff testified that he did not read the cap agreement when he signed it.  He further testified that he did not read the cap agreement until 2007, before his deposition in this case, and after he submitted to the court a sworn declaration about his understanding of the cap agreement.

55.   LaBaff also was not aware that the Companies and the Unions traded proposed cap letters on the evening of May 31, 1993 and in the early morning of June 1, 1993.  LaBaff admitted that his knowledge of whatever was said at the top table in 1993 was derived from John Murphy and Harvey Martin.   LaBaff testified that he contacted Murphy to discuss the cap agreement after he was asked to prepare a declaration in this case.

56.   The Unions disclosed the cap agreements to their local officials and members after the negotiations concluded.  On June 1, 1993, the Unions informed their local representatives that the parties had agreed to a cap during negotiations.  The USW and the ABG each held a meeting during the morning of June 1, 1993, to advise the local union officials of the agreements that had been reached at the top table during negotiations.

57.   Three of plaintiffs' witnesses, Russell Pruitt, Brickey Beasley and Larry Fountaine, testified that they learned about the cap agreement at an early-morning meeting on June 1, 1993.  Pruitt testified that  Joe Kiker, the chief negotiator for the USW, said that the cap letter was for bookkeeping purposes only.  He also testified that there were no company representatives present at this meeting.  However, Pruitt did not testify that anyone ever told him that the cap never would be implemented.  Brickey Beasley testified that he first learned about the cap letter at this meeting and that cap letter was "something the Unions did for the company," but he did not testify that anyone ever told him that the cap never would be implemented.  He also testified that there were no Company representatives present at the meeting.

58.   Larry Fountaine, a former local ABG president and a plaintiff in this lawsuit, was the only one of plaintiff's witnesses to testify that he learned from a meeting attended by a Company representative that the cap never would be implemented.  He testified that in a meeting at 11:30 p.m. on May 31, 1992, Gene Woloshyn or Ed Smith of Alcoa stated that the cap was for accounting purposes and that it would not be used against the workers.  However, Fountaine's testimony is inconsistent with that of other Union members who Fountaine testified were present at the meeting.

59.   Woloshyn testified that he never discussed the cap with Fountaine and that he never read out the cap letter to personnel from either Union.  Ed Smith testified that he never spoke to anyone from the Unions about the cap letter.

60.   Fountaine is the only witness to testify that there were two meetings, aside from the top table, at which the cap was discussed: one at 11:30 p.m. on May 31, and then another in the early morning of June 1.  Fountaine testified that Jess Sharber and

John Murphy were present at the 11:30 p.m. meeting in which either Woloshyn or Ed Smith discussed the cap, but Sharber and Murphy both testified that they attended no such meeting. Further, the cap letter could not possibly have been read aloud at an 11:30 p.m. meeting because the Companies did not propose their version of the cap letter, which was ultimately accepted, until 1:30 a.m. on June 1. It is not possible that anyone read the final cap letter to the Unions at a meeting two hours before the letter was even proposed to the Unions.

61. In further contradiction of Fountaine's testimony, in a letter explaining the retiree medical cap negotiated with another company, the USW indicated both that the cap was "simply to limit the total amount of retiree healthcare liability the company must show on its books for accounting purposes," and that the cap would require no retiree payments "during the term of the new labor agreement." The letter notes that the cap is a mandatory subject of bargaining, affording the USW "leverage" in case the company should "seek to implement the cap during any future labor agreement."

62. Further, the memoranda of settlement among the Companies and the Unions disclosed the cap agreement. At the conclusion of the negotiations, the Companies and the Unions entered into memoranda of settlement. Memoranda of settlement are designed to be a complete summary of the agreement reached by the parties. The memoranda of settlement related to the 1993 CBA disclosed the cap agreement: "Plan costs capped at expected 1997 levels."

63. The Unions made presentations to their membership in advance of the ratification votes that disclosed the cap and did not mention any side agreement or understanding that the cap would never go into effect. The Companies provided the

Unions with informational materials so that the Unions could brief their members on the terms of the proposed CBA. The informational materials disclosed the cap agreement.

64. The Unions had an opportunity to view the materials before the materials were distributed to the membership. John Murphy received the materials, specifically reviewed the portions which disclosed the cap, objected to certain parts of the materials, but did not object that the terms of the cap appeared in the ratification materials. In July 1993, Murphy contacted James Michaud at Alcoa to inform Michaud that two slides in the materials contained errors. The two slides concerned retiree medical benefits and stated "costs capped at expected 1997 levels," but Murphy did not indicate that the cap language was erroneous.

65. It was the local president's job to read the informational materials and explain the proposed agreement to the membership. Ernie LaBaff testified that it is important to the Unions that the employees fully understand the proposed contract before they are asked to vote on it. Fountaine was the local president of the Massena, New York facility in 1993. He read the informational materials to the membership before the membership voted on the contract. Pruitt, the former local president of the Point Comfort, Texas facility, testified that when he reviewed the cap letter with his membership, he did not mention any side deal concerning the cap letter.

66. Alcoa disclosed the cap agreement to its directors, auditors and personnel managers. Senior management at Alcoa briefed the Alcoa Board of Directors about the terms of the 1993 CBA. The briefing materials explicitly provided that "future retiree plan costs capped at expected 1997 levels." Alcoa also disclosed the cap to its

actuaries so that the actuaries could perform calculations based on the newly negotiated agreement to be included in its publicly disclosed financial statements.

67. Buck Consultants understood Alcoa's plan documents to create a valid cap, and Buck recognized Alcoa's healthcare plan as capped in its actuarial valuations of Alcoa from 1993 to 1996.

68. On June 7, 1993, immediately after the 1993 negotiations, Alcoa sent a memorandum to personnel managers at ABG plants, explaining the terms of the newly negotiated medical plan. In describing certain plan design options available to the local ABG unions, Alcoa stated: "The settlement language regarding retiree caps and medicare Part B freeze is clear. Therefore, the language on retiree caps engaging in 1997 and Medicare Part B frozen at $46.10 will apply to all locations, regardless of the medical plan selected by the local parties."

### D.   1993 Written Plan Documents

69. The written plan documents negotiated in 1993 unambiguously allowed Alcoa to implement a retiree healthcare cap. Alcoa published the 1993 cap letter in its CBAs. The 1993 cap letter provides: "In the event that the average per capita company contribution exceeds the amount established [in the per capita formula] above in any calendar year, the excess shall be allotted to and paid by each covered personal on a pro rata basis." The letter further provides: "The parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations between the parties occurring subsequent to May 31, 1993, and prior to October 31, 1996."

70. Reynolds and the Unions entered into the same signed, written cap agreement as Alcoa did with the Unions.

71.	Larry Fountaine and Tom Moore each testified that the cap letter was unenforceable because it was a letter of understanding, or "love letter," that appeared after the signature page of the CBA.  However, neither Fountaine nor Moore could articulate a credible explanation for that position.  Fountaine acknowledged that the Unions have the right to strike over letters of understanding and that he personally had filed grievances over letters of understanding.  The USW sued Alcoa to enforce against the Company the terms of the very cap letter that plaintiffs now claim cannot be enforced against them.  Fountaine conceded that he was aware of the 1995 arbitration in Warrick where the Union and the Company arbitrated over the terms of another letter of understanding in the 1993 CBA.  Moore acknowledged that he had no personal knowledge of the negotiations surrounding the cap letter and that he was not present when the parties agreed on the cap.

72.	Gene Woloshyn testified that he understood that the cap letter was binding and that he never heard anyone suggest that the letter was not binding.

73.	The SPDs clearly disclosed the plan agreement and unambiguously allowed Alcoa to implement a cap.  Following each set of negotiations, the Companies and the Unions negotiated SPDs, which reflected the agreements reached by the parties.  The SPDs were collectively bargained.  After the Companies completed a draft of the SPD, the Unions had the opportunity to review it.

74.	It was important to the Unions that statements in the SPDs were accurate, because the members read, and relied upon, the SPDs in order to understand their benefits.  The SPDs distributed in connection with the 1993 CBA clearly and unambiguously provide that the Companies may cap retiree benefits after the expiration of the CBA.

75.  For example, one of the SPDs issued pursuant to the May 1993 CBA between Alcoa and the USW contains the following provision: "In 1997, Alcoa will cap the amount that the company pays for your retiree medical coverage.  In future years, if medical costs increase above the 1997 level, you will be required to pay the difference." During a February 1991 meeting between Reynolds and Mike Gulotta, Reynolds' FAS-106 actuarial consultant, Gulotta cautioned that SPDs published during the term of an agreement for a deferred cap which merely specify that changes are likely to occur may not be sufficient to demonstrate that the plan is capped.  Therefore, Reynolds included in its SPDs language explaining that the cap will engage.

76.  The Alcoa SPDs issued after the 1993 negotiations are incorporated by reference into the 1993 Alcoa CBAs.  Article XXII of the CBA between Alcoa and the USW provides that "separate booklets describing these benefits are incorporated herein and made a part of this Agreement."  Article XXIII of the CBA between Alcoa and the ABG provides that "separate booklets describing these benefits are incorporated herein and made a part of this agreement."  The SPDs themselves all contain language incorporating them into the CBA.  For example, one of the SPDs issued pursuant to the May 1993 CBA between Alcoa and the USW provides that "the benefits described in this booklet are incorporated in and made part of the Article XXII-Group Insurance of the Labor Agreement between [Alcoa] and the International Union, United Steelworkers of America, dated May 31, 1993."

77.  The Reynolds' SPDs issued after the 1993 negotiations are incorporated by reference into the 1993 Reynolds' CBAs.  Article XXIX of the CBA between Reynolds and the USW provides: "There is attached hereto as an exhibit an Insurance Plan which

shall become effective as provided herein.  The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."  Article XXXVIII of the CBA between Reynolds and the ABG provides: "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein and continue in effect for the life of this Agreement.  The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."

### E.  The 1993 Cap Agreement Was Real

78.  The Companies understood that the 1993 cap agreement was real.  Russ Porter, the lead negotiator for Alcoa, testified that he understood that the 1993 cap agreement was real.  Bob Newman, a Reynolds' negotiator, testified that Reynolds was not interested in having an artificial cap.

79.  The Unions understood that the 1993 cap agreement was real.  According to Jim Robinson, the Unions' corporate designee, the Unions understood that the cap was real but believed that they had the bargaining power to defer engagement of the cap in future negotiations.

80.  In subsequent communications to its membership in 2005, the union acknowledged that it had agreed in 1993 to allow Alcoa to cap the cost of retiree medical benefits: "In 1993, to address the company's accounting problems, we agreed to allow the company to cap the cost of retiree healthcare for people who retired after 1993."  Dave Willett, a current union official and a witness for the plaintiffs, confirmed that this union bulletin was accurate.

81.   In an informational packet provided to the membership in advance of the 2006 CBA ratification vote, the Union again acknowledged that the cap negotiated in 1993 was real: "The May 31, 1993 Labor Agreement placed a cap on the company's retiree healthcare costs for employees who retired after May 31, 1993."  Harvey Martin, a former union official who participated at the top table in 1993, agreed with that language.

82.   After ratification of the 2006 CBA, the union sent another letter to union members who retired after May 1993.  That letter indicated that the union agreed in 1993 to allow Alcoa to cap the cost of retiree medical benefits and that the union had hoped to negotiate extensions of the cap letter at subsequent negotiations.  Dave Willett and Harvey Martin each testified that the letter was accurate.

83.   The conduct of the Companies and the Unions demonstrated that neither party believed that active employees were vested in their retirement benefits in 1993.  For example, the parties negotiated a cap and a change to managed care during the 1993 negotiations, and there was no suggestion at the time that it was impermissible to do so for employees who had not yet retired.

84.   Harvey Martin, a senior ABG official and top table negotiator in 1993, testified that he did not believe, nor did he hear from any other union representative at the time, that it was impermissible for the parties to change the benefits of active employees, including changing co-pays and deductibles.

85.   Plaintiffs' own witnesses testified that an employee's retirement benefits can change until the employee retires.  Ernie LaBaff, the former President of the ABG, understood that an employee's retirement benefits could go up or down as long as he was active.  He further testified that he advised union members to retire before the next CBA

negotiations because their benefits could change if they remained active.  Russ Pruitt, a former union official, testified that an employee's benefits are determined based on the plan in place at the time the employee retired.  Larry Fountaine, a former union official, testified that an employee's retiree benefits are determined based on the plan that is in effect at the time the employee retired.

86.  Plaintiffs rely on the phrase "active vested employee" in certain SPDs to demonstrate that active employees can be vested in their retiree medical benefits. However, Nick Storm, Senior Counsel for Alcoa, testified that the term "vested" in that context refers to vesting for pension purposes.  Additionally, Joe Quaglia, Alcoa's former Director of Industrial Relations who sat at the top table in 2001 and 2006, similarly testified that the term "vested" in that context refers to vesting for pension purposes.

87.  Plaintiffs rely on a portion of a document with a reference to active employees who have "vested in the retiree medical and life benefit."  The document purports to describe various accounting methodologies and includes a list of "categories of employees," one of which consists of "active employees who meet the age and service requirements for retirement and who have vested in the retiree medical and life benefit." That language in the document, however, is not evidence that active employees were legally vested with retiree medical benefits, because it is not a complete document and neither Alcoa nor plaintiffs have been able to identify the remainder of the document. Without any context, it is unclear how, if at all, this reference to vesting relates to the type of legal vesting that plaintiffs must demonstrate in order to prevail.

88.  FASB expressly provides that "vested" is a term of art under FAS-106 that refers to vesting in the "accounting sense, not the legal context."  In the accounting

context, the term "vested" refers to "an employee's right to receive present or future benefits whether or not the employee remains in the service of the employer;" the term bears no relation to whether a company has the right to change employees' benefits in future negotiations.

89.  Plaintiffs interpret out of context language in Alcoa's CBAs stating that benefits will not be reduced as a result of future legislation concerning universal healthcare. Alcoa's 1988 CBA provided: "Notwithstanding the provisions in 2 and 4 above, when and if, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain healthcare or other medical, dental, vision or surgical benefits <u>by reason of the enactment by the United States or any state of the United States of a Governmental System of heath security or medical service program</u> (Governmental System) for active employees, the parties shall promptly meet and undertake to negotiate a modification of the benefits under this Article XXII of the type and character provided or available under such Governmental System in order to achieve or to assure the following results: (a) No employee covered by this Article shall suffer any reduction in the level of any of the several healthcare benefits of this Article; (b) the Company shall, without cost to the employee, provide a plan of benefits supplementary to those available under such Governmental System to the extent necessary to make each benefit comparable to the corresponding benefit provided under this Article." (emphasis added).

90.  Plaintiffs improperly interpret the provision that "no employee covered by this Article shall suffer any reduction in the level of any of the several healthcare benefits of this Article" as a general provision rather than one of the results to be assured in the event that a government healthcare program is enacted, as provided in the agreement.

The provision that the parties "shall promptly meet . . . in order to achieve or to assure the following results," including that "no employee shall suffer any reduction in benefits," is clearly related to and contingent upon the enactment of a governmental healthcare program.

91.   Plaintiffs mistakenly rely on language in Alcoa's CBA's as evidence that healthcare benefits vested prior to retirement.  The 1986 CBAs provided: "In addition, the Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Agreement."  Alcoa CBAs from 1988 and 1993 also contain the same provision.  Contrary to plaintiff's assertions that this language indicates that healthcare benefits vest at the same time that pension benefits vest, Alcoa retirees did not receive benefits under the plan that was in place at the time their pensions vested.  Instead, Alcoa retirees (or their surviving spouses) received benefits under the plan that was in place at the time of their retirement (or, in the case of a surviving spouse, at the time of the employee's death), and those benefits were subject to change based on future contract negotiations.  The 1993 Active Employee SPD provided that retirees would receive retiree medical benefits on the <u>first day of their retirement</u> and they would last until the death of the retiree.  Included in the "Future of the Plan" section is the statement that "The Company reserves the right to make administrative changes from time to time.  The changes cannot diminish the benefits <u>negotiated under the terms of the Agreement</u>.

92.   Plaintiffs interpret out of context language in Article XXII of the CBA that benefits will be provided "without cost to employees and retirees except as otherwise

provided." However, the cap agreement is one of a number of instances where the Companies and the Unions "otherwise provided," and made an exception to the general rule that Alcoa provides health benefits at no cost to employees. There are a number of other "otherwise provided" examples, including co–pays and deductibles that were in place prior to 1993 and thereafter.

## IV.   1996 NEGOTIATIONS

### A.   Retiree Healthcare Still An Issue

93.   The conduct of the Companies and the Unions leading up to the 1996 negotiations demonstrates that the parties believed that the cap was real.  Notes of a company caucus during a joint meeting with the Unions on October 11, 1995 in Birmingham, Alabama reflect that the Companies "agreed retiree medical is a costly item."

94.   Notes of a company caucus taken during another joint meeting with the Unions on November 4, 1995 in Charlotte, North Carolina reflect a desire by the Companies to "get their issues on the table so they would not be a surprise to the Unions later (retiree healthcare cost, wage compression)."

95.   A document setting out the function of Alcoa's Industrial Relations Council (IR Council), which included Alcoa's 1996 top table negotiators Doug Root, Gene Woloshyn and Ron Hoffman, emphasized the "high cost of retiree medical" and noted that "employees don't understand they need to prepare to accept financial responsibility."  The IR Council understood that retiree medical benefits for union employees were capped.

96. The companies met several times in advance of negotiations and discussed, among other issues, how they would address the retiree healthcare cap at the upcoming negotiations. Alcoa held numerous pre-negotiation meetings, often jointly with Reynolds, in which the caps were a topic of discussion. In their joint discussion meetings, Alcoa and Reynolds recognized that the caps would be a subject of bargaining in the upcoming negotiations.

97. Alcoa and Reynolds agreed that moving the cap to engage after the expiration of the 1996 CBA would be part of an overall economic package negotiated with the Unions, but the Companies did not agree before negotiations that they necessarily would move the cap. Notes from a February 20, 1995 meeting between Alcoa and Reynolds indicate that Alcoa initially was unsure whether it wanted to agree to defer the caps in the 1996 negotiations. Notes from an April 5, 1995 meeting recognize the caps as part of "the negotiated plan" and state that "moving the caps is a real cost that should be discussed with the unions."

98. Plaintiffs rely on certain handwritten notes of meetings between Alcoa and Reynolds that refer to the caps as "caps with a wink." Plaintiffs misconstrue that phrase to mean that the caps would not be real, but Alcoa and Reynolds understood the phrase to mean that the caps would not engage during the life of a particular CBA. In fact, Stephen Weidman, who authored the notes relied upon by plaintiffs, testified that he understood and used the phrase "caps with a wink" to refer to caps that "don't energize or engage during the term of the contract." This understanding of the phrase is consistent with that of Harvey Martin, a former ABG official. The phrase does not indicate, as plaintiffs

claim, that the cap was fake or would never be implemented. To the contrary, Weidman testified that it was not Reynolds' position that the caps were intended never to engage.

99.  Bob Newman, former Reynolds' Vice President of Human Resources, and Gary MacDonald, former Reynolds Director of Compensation and Benefits, were present on behalf of Reynolds at the February 20, 1995 meeting and they each understood the phrase "caps with a wink" to refer to caps that would not engage during the term of the contract. Gene Woloshyn, who was present at each of the meetings, understood "caps with a wink" to mean that the caps would not engage during the term of the current agreement.

100.  Weidman, Newman, MacDonald, Hoffman and Root, all of whom were present at one or more of the meetings memorialized in the referenced notes, do not recall the phrase "caps with a wink" ever actually being spoken in the pre-negotiation meetings between Alcoa and Reynolds. The very fact that the Companies discussed the caps during at least five joint pre-negotiation meetings supports the conclusion that the Companies realized that the cap would be a subject of bargaining at the upcoming negotiations.

101.  The Companies recognized that the caps could be deferred, but only as part of the negotiation of the overall economic package. The Companies counted the potential movement of the cap as a component of the "Total Hourly Employee Cost" (THEC), meaning that the added expense of moving the cap would have to be offset by reducing Alcoa's expense for other THEC components.

102.  The Companies understood that the cap could not be rolled over indefinitely. Alcoa considered whether to move the caps forward in 1996. Alcoa had two concerns with rolling the caps forward: first, that moving the caps would increase the

amount the company was committed to pay; and second, that rolling the cap forward would not permit Alcoa to recognize a reduction in FAS-106 liability reflecting the cap. Both Alcoa and Reynolds understood that if the caps were never intended to be implemented, the Companies would not be permitted to reduce their FAS-106 liability. Gene Woloshyn testified that Alcoa would never have recognized a capped retiree medical liability on its books if Alcoa had believed that the caps would always roll over and would never be implemented.

103. In studies analyzing various scenarios concerning the caps, Alcoa's actuaries, Buck Consultants, recognized that Alcoa's current plan was capped and conducted its analyses on that basis. Duane Lee of Buck Consultants advised Alcoa that it could defer the cap in the 1996 negotiations and still recognize its plan as capped.

### B. 1996 Contract Negotiations

104. The cap was a subject of bargaining during the 1996 negotiations held in Buffalo, New York. Gene Woloshyn, Doug Root, George Bergeron and Ron Hoffman represented Alcoa at the top table, and Bob Newman and Steve Weidman represented Reynolds. Dick Davis, Joe Kiker and Jack Golden represented the USW at the top table, and John Murphy and Harvey Martin represented the ABG.

105. In his opening remarks at the start of the negotiations, George Bergeron, a member of Alcoa's IR Council, emphasized that efforts to "slow the escalation in the cost of medical benefits" must continue. The Unions initially proposed to delete the caps; and Alcoa resisted movement or elimination of the caps. Notes from the 1996 negotiations reflect discussion of the caps at the top table. The Companies are quoted as saying in a May 21, 1996 top table meeting that "we have retiree medical cost issues to get

on the table including caps." The same notes further reflect that the Companies recognized the extension of the caps as a genuine concession being given to the Unions through the bargaining process. Additionally, notes from a May 29, 1996 meeting between representatives of the Companies and the Unions show that the parties compared the cost of moving the caps for three years versus six years, as well as the cost of removal.

106. The parties ultimately agreed as a result of negotiations to defer implementation of the caps until January 1, 2003, after the term of the 1996 CBA. Although Alcoa remained concerned about rising healthcare costs, the company could afford to move the caps because of record earnings in the mid-nineties as well as some abatement in the escalation of healthcare costs after 1993. Dan Henry testified that in 1996, the Unions accepted lower wages in exchange for improvements in their insurance. Other than the movement of the caps, however, no significant change in the Unions' health insurance plan was negotiated in 1996. If the parties had agreed in 1993 never to engage the caps, the Unions' willingness to give up wages in exchange for movement of the caps would not make sense.

107. Plaintiffs presented no evidence on which to conclude that the Companies and the Unions entered into any "side deal" beyond the language of the cap letter in the 1996 negotiations. The Companies top table representatives understood the caps to be real and did not agree to any "side deal" beyond the language of the cap letters. No one from the Companies told anyone from the Unions that the 1996 cap letters were not real or that the caps would never be implemented. Harvey Martin, a former ABG official, was present at the top table during the 1996 negotiations and does not recall anyone saying in those negotiations that the cap letter would never be implemented.

108.  The Unions disclosed the cap agreements to their membership prior to ratification of the 1996 CBA.  The Memorandum of Settlement agreed to by the Companies and the Unions disclosed the cap agreements to the union members.  A union presentation given to the membership prior to ratification of the CBA disclosed the cap agreements and indicated that the caps would "reflect actual costs in effect the year the bargaining agreement expires."

109.  The Unions understood that the caps agreed to in 1996 were real.  On June 10, 1996, Patti Seehafer, Assistant to the President of the USW and Director of the USW Research and Benefits Department, sent a fax with a copy of the cap letter to several union officers, including John Murphy, in which she wrote that the Unions "achieved the objectives of (1) achieving language to protect all retirees and surviving spouses throughout the term of the agreement, including the re-opener period, and (2) allowing for favorable accounting treatment for the respective companies."

### C.   1996 Written Plan Documents

110.  Moreover, after the 1996 negotiations, the Companies and the Unions negotiated over the SPDs to ensure that the cap agreement was accurately reflected in the SPDs.  A Joint Healthcare Committee comprised of representatives from both the Unions and the Companies held meetings after the 1996 negotiations.   In a Joint Healthcare Committee meeting on October 30, 1996, a group of union representatives including Seehafer and David Willett, a local union president, met with Kevin Oxley, a benefits specialist at Alcoa.  The parties discussed the cap language contained in the SPD.  Willet took notes of this meeting, and his notes state – consistent with the 1996 cap letter – that "Alcoa will cap the amount the Company pays for your retiree medical coverage in 2001,

unless there is a mutual agreement reached prior to the year 2001."  The notes also state that "all the protection that [the union members] need is included in this letter."  Willet testified that "this letter" refers to the cap letter and that the "protection" to which he refers is the right to mandatory bargaining, as set forth in the cap letter.

111.  Willet's notes from this meeting also refer to "page 28 of the Healthcare book," which is the page in the SPD that contains an explanation of the cap.  The parties modified the language of the SPD to reflect the "protection", *i.e.*, the mandatory bargaining provision, discussed in Willet's notes.  Page 28 of the SPD contains the following language: "On January 1, 2003, Alcoa will cap the amount it pays for retiree medical coverage unless the parties reach an agreement before this date, exclusive of interest arbitration.

112.  In a Joint Healthcare Committee meeting on December 3, 1996, Seehafer, Dan Henry, and other union members met with Kevin Oxley and Mary Ellen Lammel.  Plaintiffs claim that Oxley stated in this meeting that the cap letter was intended never to engage, but this conclusion is not supported by the evidence.  Oxley recalled participating with Seehafer in meetings of the Joint Healthcare Committee after the 1996 negotiations, and he remembered Seehafer assuring union members that the cap letter would not have an effect during the term of the contract and that the parties would be able to negotiate again before the cap engaged.  Oxley testified that Seehafer never said that the cap would never go into effect, never said it was "only for accounting purposes," and never said it was just a "paper transaction."  Oxley understood that the cap would affect all retirees who retired after the 1993 CBA.  Oxley believed that Seehafer understood that the cap would engage at some point, and that Seehafer never would have accepted an oral agreement from Alcoa that the cap would never engage.  Lammel understood that Alcoa

intended to engage the caps, and she never heard anyone indicate to the Unions that the caps would never engage.

113.  After the 1996 negotiations, Alcoa and the Unions worked together to prepare a letter for employees explaining the terms of the cap agreement.  The letter stated to employees that "Alcoa will cap the amount it pays for retiree medical coverage on January 1, 2003, unless the parties reach an agreement before this date, exclusive of interest arbitration."  The letter went on to explain that no retirees would be required to pay contributions "during the term of this agreement between the parties."  The language in the letter was approved by union leaders before the letter was distributed to employees.

114.  The written plan documents in 1996 unambiguously allowed Alcoa to implement a retiree healthcare cap in 2003.  Alcoa published the 1996 cap letter in its CBAs.  The 1996 cap letters provide: "In the event that the average per capita Company contribution exceeds the amount established [in the per capita formula] above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rata basis."  The 1996 cap letters further provide: "The parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations prior to December 31, 2002, but no additional contributions shall be engaged before 2003."  Reynolds and the Unions entered into the same cap agreement as Alcoa did with its unions.

115.  SPDs distributed in connection with the 1996 CBAs include clear and unambiguous language describing the cap that was negotiated in 1996.  A 1996 insert to the Alcoa Total Compensation Binder provides: "Alcoa will cap the amount it pays for

retiree medical coverage on January 1, 2003, unless the parties reach an agreement before this date, exclusive of interest arbitration."

116.  The SPDs are incorporated by reference into the 1996 CBAs.  Article XXII of the CBA between Alcoa and the USW provides: "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement."  Article XXIII of the CBA between Alcoa and the ABG provides: "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement."  Article XXXVIII of the CBA between Reynolds and the USW provides: "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein.  The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."  Article XXIX of the CBA between Reynolds and the ABG provides: "There is attached hereto as an exhibit an Insurance Plan which shall become effective as provided therein and continue in effect for the life of this Agreement.  The parties agree that this Insurance Plan is hereby incorporated into this Agreement by reference and the parties agree to comply with and be bound by all of its terms and provisions."  The Alcoa SPDs provide that "the benefits described in this booklet are incorporated in and made part of Article XXIII-Group Insurance of the Labor Agreement between Alcoa and the Aluminum, Brick and Glass Workers International Union, dated June 1, 1993."

117. The 1996 Active Employee Healthcare SPD provided that retirees would receive retiree medical benefits on the first day of their retirement and they would last until the death of the retiree.  The 1996 Active Employee Healthcare SPD also provided retiree medical benefits to surviving spouses.

118. Plaintiffs rely on an SPD distributed in 1997 that does not contain a reference to the cap agreement. However, unlike the other SPD's issued by Alcoa during this period, this 1997 SPD was sent both to union employees (who were subject to the cap) as well as non-union employees (who were not subject to the cap negotiated between Alcoa and the Unions). In addition, while the SPD does not state that a cap would go into effect after the term of the CBA, it has much stronger language: "Alcoa may change the level of benefits provided under the Employees' Group Benefits Plan of the Aluminum Company of America – Plan II at any time. If a change is made, benefits for claims incurred after the date the adjustment takes effect will be paid according to the revised plan provisions. In other words, once an adjustment is made, there are no vested rights to benefits based on earlier plan provisions . . . . The company expects that this plan will continue indefinitely. However, the Board of Directors or Inside Director Committee of the company can amend, modify, suspend, or terminate all or part of the plan at any time. Benefits under the plan are not vested."

119. Alcoa's Actuary valued a capped plan in each actuarial valuation from 1996 through 2001. Buck Consultants understood Alcoa's plan documents to create a valid cap, and Buck recognized Alcoa's healthcare plan as capped in Buck's actuarial valuations of Alcoa from 1996 to 2001. After Alcoa acquired Reynolds, Buck also conducted actuarial valuations of the Reynolds plan and recognized that plan as capped.

## V.   2001 NEGOTIATIONS

### A.   Preparation For 2001 Negotiations

120.  The USW and the ABG unions merged into the USW effective January 20, 1997.  In 2000, Alcoa purchased the Reynolds Metals Company, including all of Reynolds' plants.

121.  Lauren McCullough, Alcoa's Director of Global Finance Development and Human Resource Finance, made a presentation to the IR Council on May 6, 2001.  In the presentation, McCullough presented several potential options as to how Alcoa could approach the cap in the upcoming negotiations, including the option to implement the cap in 2003.  Each option was accompanied by an analysis as to the effect of the option on Alcoa's THEC.   One of the options considered in the IR Council presentation was to "maintain 2002 cap," meaning to negotiate no movement of the cap in the 2001 CBA negotiations and instead to engage the cap as provided in the 1996 cap letter.

122.   In an April 11, 2000 memorandum summarizing the strategies developed by the IR Council for communicating with hourly employees prior to the 2001 CBA negotiations, Joe Quaglia, former Alcoa Director of Industrial Relations, noted that the escalation of retiree medical costs was a "very serious problem" and that "employee contributions are part of competitive compensation packages."

123.  Prior to the 2001 negotiations, Alcoa asked Buck Consultants to analyze various scenarios for healthcare plan design changes, including projections of what potential retiree contributions would be if the cap was implemented in 2003, as anticipated by the 1996 cap agreement.  For example, Buck provided analyses of the impact of the

following scenarios that would require retirees to make immediate contributions to their healthcare: (1) engaging the cap in 2003; (2) instituting $10/$30 contributions for retirees and dependents; and (3) requiring retirees to pay 50 percent of cost increases above the 2002 cap.

124. In a March 5, 2001 email to McCullough and Quaglia, Duane Lee of Buck Consultants stated that under the 1996 CBA, Alcoa retirees were required to "pay for all increases in excess of the 2002 cap." Buck estimated that if the cap were engaged pursuant to the 1996 CBA, the level for Alcoa employees would be $4,928 for pre-65 retirees and $1,794 for post-65 retirees.

125. Buck's explanation of FAS-106 and analyses of various cap scenarios do not indicate, as plaintiffs claim, that Buck believed Alcoa's substantive plan to be uncapped. Buck understood that where the "substantive plan" differed from the "written plan," the substantive plan was to be valued under FAS-106. Buck did not express the opinion that Alcoa's written plan differed from its substantive plan. Duane Lee did not believe that Alcoa's retiree medical cap was intended never to engage, and he had no reason to doubt that the cap was real.

126. Alcoa understood that if it deferred the cap in the 2001 negotiations, the cap would have to be engaged at the following round of negotiations. Alcoa's auditors, PricewaterhouseCoopers, advised Alcoa that it could defer the cap a second time in 2001 and still recognize its plan as capped under FAS-106, but that a third deferral of the cap in the next round of negotiations would result in Alcoa's plan being viewed as uncapped.

### B. 2001 Contract Negotiations

127.   The cap was a subject of bargaining in the May 2001 re-opener negotiations.  In May 2001, the parties met in Nashville, Tennessee to engage in re-opener negotiations, attempting to negotiate a new contract one year prior to the termination of the 1996 CBA.  Gene Woloshyn and Joe Quaglia represented Alcoa at the top table in the 2001 re-opener negotiations.  Dick Davis and John Murphy represented the USW at the top table in 2001.  The cap was a subject of bargaining at the top table in 2001.

128.   Alcoa's initial proposal in the 2001 re-opener negotiations was to implement the cap immediately in accordance with the language of the 1996 cap agreement.  Quaglia and Woloshyn testified that at no time before or during the 2001 re-opener negotiations was there any discussion among Alcoa representatives that the cap was intended not to engage.

129.   The Union's initial proposal during the 2001 negotiations was to eliminate the cap.  Alcoa refused to eliminate the cap, but responded that it would be willing to move the cap if the Union agreed to institute premiums for retiree healthcare benefits.  As the May 2001 re-opener negotiations drew to an end, the issue of Alcoa's proposal to move the cap only in exchange for premiums remained one of the major controversies preventing the parties from reaching a final agreement.

130.   Several of plaintiff's witnesses testified that they understood Tom Mordowanec, Alcoa's representative at the benefits table, to have conveyed to them that he agreed with their understanding of the cap – that it would never take effect.   In particular, those witnesses testified that after Mordowanec relayed Alcoa's proposal for an immediate implementation of the cap letter at the benefits table in 2001, the local union

officials expressed concern about that proposal and argued that the cap letter was intended never to engage, and walked out. Those witnesses further testified that Mordowanec said at the next meeting of the benefits table "you're right, I'm wrong" about the cap letter.

131.  The evidence does not support plaintiffs' argument that Mordowanec believed that the cap would never take effect.  First, the testimony of plaintiffs' witnesses that they walked out of the meeting in which Mordowanec proposed implementing the cap is inconsistent with a May 31, 2001 executive summary of the benefits committee negotiations.  That summary indicates that the walk-out in fact occurred on May 29, 2001, near the end of the May 2001 bargaining sessions, in response to Alcoa's proposal to institute a "Flex" plan that involved retiree premiums rather than in response to the initial company proposal simply to implement the cap immediately.

132.  According to plaintiffs' witnesses, Mordowanec never said that the cap would not engage, only that the union officials were "right" and he was "wrong," with no explanation of that alleged statement.  They merely assumed that Mordowanec had spoken to someone else about the cap letter.  In fact, Dave Willet testified that Mordowanec said only that the cap "would not be implemented at this time."  Furthermore, Mordowanec testified that he made no statement that the union members were right and he was wrong with respect to the cap letter and that he did not agree with the position that the cap was never to engage.

133.  Mordowanec testified that all decision-making authority was held by Alcoa's top table negotiators, and Mordowanec was never involved in top table negotiations.  Gene Woloshyn, who handed down instructions from the top table to Mordowanec, never told Mordowanec that the cap was only to help with accounting or that

the cap would never engage. Mordowanec raised the cap issue again in bargaining sessions later that same year and then yet again in bargaining sessions in 2005 and 2006. In addition, in May 2002, Mordowanec circulated a slide presentation to the IR Council and others at Alcoa which noted that Alcoa caps would require "significant cost shifting to retirees in subsequent years." It is not plausible that Mordowanec would recognize that the caps would shift costs and would propose engaging the cap in subsequent negotiations if he had previously acknowledged that the cap would never take effect.

134. As a result of disagreement over the cap and other issues, Alcoa and the Union did not reach a final agreement in May of 2001. In the event that the parties did not reach a long-term agreement, the parties were obligated to negotiate a one-year agreement on economics. Because the parties could not even reach agreement on a one-year economic contract in May of 2001, the dispute went to arbitration; however, the parties continued to negotiate during the arbitration process.

135. The parties met in Pittsburgh in the Fall of 2001 to attempt to reach an agreement before the arbitrator issued a decision. Initially, a small group of lead negotiators met to develop a framework for a potential long-term agreement. After that meeting, the larger group gathered to resume full-scale negotiations. The cap was a subject of bargaining during the September 2001 negotiations. The Union maintained its proposal to eliminate the cap, while Alcoa maintained its position that it would move the cap only in exchange for premiums.

136. Plaintiffs rely on notes dated September 27, 2001, purporting to memorialize a meeting in which Nick Storm, Alcoa's Senior Counsel, discussed the cap to support their assertion that Storm believed that the cap was not real. Storm recalled having

a conversation regarding whether the cap should remain a mandatory subject of bargaining after the parties had entered interest arbitration, as they did in 2001. Storm's advice in that conversation was that the cap should remain a mandatory subject of bargaining, even though arbitration proceedings had commenced. Storm's advice was based on his reading and understanding of the cap letter, as he was not involved in the negotiation of the 1993 or 1996 cap letters. Storm's understanding of the cap letter is reflected in the discussion notes: "the intent was probably not to trigger the Cap and transfer 100% of the excess cost to the retirees but to negotiate a lower retiree contribution." The notes further state, consistent with the 1996 cap letter, that "if don't reach settlement, the Cap will trigger based on the letter" and describe possible implementation of the cap. When viewed in context and read in full, Storm's notes reflect the understanding of the cap that Alcoa propounds – that the cap would trigger unless the parties negotiated a movement of the cap exclusive of interest arbitration.

137. At the conclusion of the September 2001 negotiations, the parties were able to each a new long-term agreement only after Alcoa agreed to withdraw its proposal of retiree premiums and to extend the cap letter to 2006, with an additional round of mandatory bargaining in the period before the cap would engage.

138. The parties did not negotiate an oral side agreement that the cap letter would never be enforced. Plaintiffs claim that notes taken by John Murphy of a conversation with Joe Quaglia on September 23, 2001, are evidence that Quaglia indicated to Murphy that the cap would never engage. In particular, the notes state "FASBY not intended as a $ issue but a 'paper transaction' not to transfer the cost or shift any of it." However, Murphy testified that Quaglia did not state in this conversation that the cap letter

was not intended to engage; Murphy testified instead that he read the statement in his notes to Quaglia. Moreover, Quaglia testified that he had no conversation with Murphy relating to the cap or to FASB on or around September 23, 2001. Quaglia testified that he never said or suggested to Murphy that the cap would never engage. Quaglia further testified that he would not have had the authority to talk with Murphy about when the cap would engage.

139. After negotiations, the Union prepared a document, which it disseminated to the local unions at each plant, containing highlights of the 2001 contract settlement but containing no mention of any side deal beyond the language of the cap agreement. To the contrary, the Union expressed the understanding that the cap was moved to the year following expiration of the 2001 agreement and that "current and future retirees will not be required to make any premium contributions towards their medical coverage until at least the year 2007."

### C.   2001 Written Plan Documents

140. In addition, the written plan documents in 2001 unambiguously allowed Alcoa to implement a retiree healthcare cap. Alcoa published the 2001 cap letter in its CBA. The 2001 cap letter provides: "In the event that the average per capita Company contribution exceeds the amount established [in the per capita formula] above in any calendar year, the excess shall be allotted to and paid by each covered person on a pro rate basis." The letter further provides: "The parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations prior to December 31, 2006, but no additional contributions shall be engaged before 2007."

141.  At least three SPDs distributed by Alcoa to its employees following the 2001 CBAs include clear and unambiguous language describing the cap that was negotiated in 2001.  For example, a Healthcare Benefits Agreement effective April 1, 2002, provides: "On January 1, 2007, Alcoa will cap the amount it pays for retiree healthcare coverage unless the parties reach an agreement before this date, exclusive of interest arbitration."

142.  Also, the SPDs are incorporated by reference into the 2001 CBA. Article XXII of the 2001 CBA between Alcoa and the USW provides: "Separate booklets describing these benefits are incorporated herein and made a part of this Agreement. Effective April 1, 2002, the agreed-upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets."  The SPDs provide: "The healthcare benefits described in this booklet are incorporated in and made part of the collective bargaining agreements between Alcoa Inc. and the unions listed under "Participating Unions on pages 44-45 of this booklet."  The list of participating unions includes the USW.

143.  Plaintiffs rely on an SPD distributed in 2001, which did not contain a reference to the cap agreement.  As an initial matter, the court notes that unlike the other SPDs issued during this period, this 2001 SPD was sent both to union employees (who were subject to a cap) as well as non-union employees (who were not all subject to the cap that Alcoa negotiated with the Union).  In addition, while the SPD does not state that a cap would go into effect after the term of the CBA, it has much stronger language concerning vesting: "Alcoa may change the level of benefits provided under the Employees' Group Benefits Plan of Alcoa inc., Plan II, at any time.  If a change is made, benefits for claims incurred after the date the adjustment takes effect will be paid according to the revised plan

provisions.  In other words, once an adjustment is made, there are no vested rights to benefits based on earlier plan provisions . . . .  The company expects that the plan described in this booklet will continue indefinitely.  However, the Board of Directors or Inside Director Committee of the company can amend, modify, suspend or terminate all or part of the plan at any time.  In any event, all cash investments must be devoted to the purposes of the plan, including payment of expenses of the plan."

144.  The 2002 Active Employee Healthcare SPD provided that retirees would receive retiree medical benefits on the <u>first day of their retirement</u> and they would last until the death of the retiree.  The 2002 Active Employee Healthcare SPD also provided retiree medical benefits to surviving spouses.

145.  Buck Consultants understood Alcoa's plan documents to create a valid cap, and Buck recognized Alcoa's healthcare plan as capped in Buck's actuarial valuations of Alcoa from 2001 to 2005.

## VI.   2005-2006 NEGOTIATIONS

### A.   Escalation of Healthcare Costs

146.   The conduct of Alcoa and the Union leading up to the 2005-2006 negotiations demonstrates that they believed the cap was real.  After the 2001 negotiations, Alcoa continued to monitor the rising costs of healthcare.   While the national rate of healthcare cost increases was only 4% for actives and pre-65 retirees in 1994, the rate was projected to reach 13% in 2002 and to remain above 11% until 2006.  Alcoa projected that its own healthcare costs would increase from $577 million in 2002 to over $867 million by

2006. Alcoa's movement of the cap in 2001 increased the Company's annual expense by approximately $10 million.

147. By early 2002, it became clear to Alcoa that it had not gone far enough in the 2001 negotiations with respect to curbing its healthcare liability. Employees' healthcare costs at Alcoa were charged back to each business unit, and spikes in costs led to huge expenses on the ledgers of the various business units. The IR Council, which in 2002 was renamed the Employee Relations Council (ERC) met with business unit presidents, who complained that the Company's failure to control the rising healthcare costs in the 2001 negotiations was making the U.S. operations noncompetitive.

148. Paul Thomas, Alcoa's President of North American Fabricated Products, expressed concern that Alcoa was underestimating the impact of escalating healthcare costs. Thomas cautioned that, at least with respect to Alcoa's North American Fabricators Division, Alcoa had to address these escalating costs, either through capping healthcare expenses or reducing employment drastically. Lauren McCullough, Alcoa's Director of Global Finance Development and Human Resource Finance, agreed with Thomas that Alcoa could not afford to defer the cap again. From 1995 to 2005, healthcare as a component of total hourly employment compensation increased from 16% to 28%. Of that 28%, approximately half was due to retiree healthcare costs.

149. Alcoa undertook comprehensive preparations for the 2005 negotiations. Internally, those preparations primarily involved Joe Quaglia, Alcoa's Director of Industrial Relations, Lauren McCullough, Tom Mordowanec, Alcoa's Director of Employee Benefits for North America, and Nick Storm, Senior Counsel for Alcoa.

150.   Alcoa's negotiators communicated to the Union the need for drastic measures to curb Alcoa's healthcare expenses, including implementation of premiums of some sort.  Alcoa's communication efforts included presentations detailing Alcoa smelters' worldwide competitive position.  Figures in one presentation demonstrated that (1) Alcoa's U.S. smelters were among the highest cost smelters in the world; (2) total hourly employment costs had risen drastically; and (3) Alcoa's retiree medical costs were projected to increase by 24% in 2003.  Quaglia conveyed to union negotiator Andrew Palm that the Company wanted to save the U.S. operations, but if the parties did not negotiate changes before 2006, more plants would become vulnerable.

151.   As part of negotiations between Alcoa and the USW involving a non-Master Agreement smelter in Washington in 2004, the Union promised Alcoa in writing that it would agree to cost-sharing during the next master negotiations.  Alcoa had shut down its smelter in Wenatchee, Washington around 2002, due to depressed aluminum prices and rising energy costs.  By 2004, aluminum prices had risen and energy prices had dropped, so Alcoa considered restarting the plant.  Alcoa approached the Union about the possibility of restarting the smelter and expressed reluctance to restart in the absence of certainty that the agreement with the Union would allow Alcoa to continue running the smelter in the long-term; to ensure that, Alcoa requested that the Union accept a healthcare plan that included employee contributions.  John Murphy was involved in these discussions.

152.   Alcoa negotiated with the Union for a long period of time without making real progress and eventually talks broke off.  However, at the last minute, the parties negotiated an agreement to allow the smelter to restart.  As part of the deal, the Union agreed to put into writing its promise that in the upcoming Master Agreement negotiations

the Union would "address the Company's concerns in [the healthcare] area, including the most efficient delivery of healthcare services, plan re-design and cost-sharing." The negotiations between Alcoa and the Union over this smelter demonstrate that the Union understood that Alcoa had the right to engage the cap during the 2006 negotiations.

153. As early as 2002, Alcoa began to make plans to implement the cap during the next negotiations. By 2004, Alcoa's position was that the cap had to be engaged during the 2005-2006 negotiations. Going into the 2005 negotiations, Alcoa determined that its "target" was to engage the retiree medical cap according to the terms of the 2001 agreement and eliminate retiree medical for new hires. Alcoa's "resistance point," the point at which it would take a strike if the Union did not agree, was engagement of the cap on retiree medical.

## B.   Re-Opener Negotiations in 2005

154. The parties met for re-opener negotiations in May 2005 and again in August 2005. The 2001 agreement provided for a five-year term, but the economics for the fifth year of the agreement were left open. The parties expected that, in 2005, they would bargain in an attempt to reach a successor agreement, and they would attempt to reach a deal on the economic terms for the fifth year. If the parties failed to agree on economic terms for the fifth year, they would arbitrate over the economic terms. The 2001 cap was to be implemented in 2007 in accordance with the 2001 cap agreement unless the parties agreed otherwise.

155. The top table negotiators in 2005 were Joe Quaglia, Alan Cransberg and Paul Thomas for Alcoa, and Jim Robinson, Terry Bonds and Connie Entrekin for the

Union. The Company took the position that the cap had to be engaged in 2007. The Union proposed that the cap be deferred.

156. During the 2005 negotiations, Tom Mordowanec was present at the benefits table on behalf of Alcoa, and he informed the union officials at the benefits table that it was the Company's intent to engage the cap. Following Mordowanec's statement, the union representatives stood in unison and walked out of the meeting.

157. Dan Henry, a local union official who was present at the May 2005 negotiations, testified that Mordowanec acknowledged to the benefits table in May 2005 that Alcoa had made a commitment never to implement the cap letter but that Alcoa was "not interested in honoring that commitment." However, Henry 's testimony conflicts with that of Brickey Beasley, another local union president at the time, who was present at the May 2005 negotiations and testified that no Alcoa representative ever told him that the Company and the Union had agreed the cap would never be implemented.

158. Mordowanec testified that he disagreed with the representations made by union officials that the cap was intended never to be implemented. Mordowanec believed that those representations were a negotiation tactic to gain leverage against the Company, and he recognized that none of the union officials were present at the top table in 1993 when the cap was negotiated.

159. The Union distributed a leaflet to its membership during the May 2005 negotiations shortly before the June 1 bargaining deadline. The leaflet conveyed the Union's position that simply sifting costs would not solve the problem. The Union believed that national healthcare was the solution to the healthcare cost problem.

160. During closing remarks at the May 2005 negotiations, Paul Thomas told the Union that while Alcoa's contributions toward retiree medical were capped at the end of 2006, Alcoa was willing to discuss plan changes to help limit or delay retiree contributions. The parties were unable to reach an agreement in the 2005 negotiations, partly due to the Company's insistence on immediate engagement of the cap.

161. During the August 2005 negotiations, USW top table negotiators Jim Robinson and Terry Bonds expressed to Alcoa that certain local union committee members had relayed to them their belief that the cap was a "cap with a wink," merely an "accounting gimmick," and was not intended to engage. Robinson and Bonds also conveyed that some union members told them that these statements were made during a company presentation. Robinson, the Union's corporate designee, explained that union representatives at the benefits table did make the argument that the cap was never intended to be implemented.

162. Joe Quaglia responded that in the 2001 top table negotiations, at which he was present, the parties clearly had negotiated over the cap, with Alcoa seeking premiums in exchange for moving the cap to 2006. He told the USW negotiators that he would review the 1993 negotiation files to confirm that the local representatives' assertions were incorrect.

163. While certain local union representatives made the argument at the benefits table that the cap was not intended to engage, Robinson testified that neither the Union's nor his personal understanding was that the cap was intended never to be implemented. Robinson believed that union members may have expected the cap to move and somehow that expectation had morphed into a belief or claim that the Company had

made a commitment not to engage the cap, when in fact that was not the case.  Robinson also suspected that union members probably had an expectation in 1993 that national healthcare would solve the healthcare cost problem at some point.

164.  Robinson did not believe Alcoa made a presentation in which it had promised the cap would not engage.  Robinson also did not believe the top table negotiators from 1993, on either the Company or Union side, ever would have entered into an agreement based on an unprovable oral commitment that the consequences of the written agreement would never occur.  In fact, Robinson testified that the Union believed the cap letter gave the Company the right to engage the cap if the Union was unsuccessful in bargaining something different.

165.  The Union's understanding was that the cap letter gave Alcoa the right to engage the cap subject to its mandatory bargaining provisions.  The Union's protection from implementation was its bargaining power under the mandatory bargaining provisions of the cap agreement.  However, Robinson testified that in 2005, the Union no longer believed it had the bargaining power either to force the Company to defer implementation of the cap or to eliminate the cap altogether.

166.  At some point around the time of the 2005 negotiations, John Murphy told Robinson that the cap was not intended to engage.  Robinson did not believe Murphy, but the Union still investigated Murphy's claims by reviewing documents, talking to negotiators and its legal department.  The Union also pressed John Murphy and other union representatives for details or evidence of the alleged side agreement they claimed existed, but no one ever was able to offer any such details or evidence.  Robinson testified that even if they had offered evidence of an oral side agreement, the Union would not have

been persuaded that such a side agreement could overcome the clear language of the cap agreement. The Union concluded that, as it had previously understood, the cap letter was a real agreement that was enforceable on the parties. Robinson further testified that the Union did not believe the cap was an accounting gimmick.

167. While the Union did not believe the cap was never intended to engage, it still resisted the company's efforts to implement the cap, and the 2005 re-opener negotiations failed again. The Union distributed a newsletter to its members after the failed 2005 negotiations. The Union also prepared a bargaining report following the negotiations with content similar to the newsletter. These documents conveyed to the members that the Union agreed to allow the companies to cap retiree healthcare in 1993, that the cap was addressed in 1996 and 2001, but that Alcoa had refused to defer the cap again during the 2005 negotiations.

168. After the 2005 negotiations, Alcoa began a comprehensive review of its 1993 negotiation files in an effort to dispel any rumors that the cap was not intended to engage. Joe Quaglia reviewed Ron Hoffman's comprehensive notes from the 1993 negotiations. Quaglia also reviewed the Unions' May 31, 1993, 7:30 p.m. proposal for a deferred cap and the Companies' June 1, 1993, 1:30 a.m. response to the Unions' proposal. In addition to personally reviewing the 1993 negotiation files, Quaglia asked certain other Alcoa employees, including Tom Mordowanec, to review files regarding the 1993 negotiations. Mordowanec confirmed that his review indicated that the cap plainly was real.

169. Quaglia informed HR directors and business unit presidents at Alcoa that the 1993 negotiation files, specifically Ron Hoffman's notes, demonstrated clear

bargaining over and agreement by the Unions to the cap. Quaglia notified Jim Robinson, Terry Bonds and Connie Entrekin that the 1993 files demonstrated the cap was real and not an "accounting scheme." Following Quaglia's confirmation to the Union that his review of the 1993 files demonstrated the cap was real, no one from the Union ever told Quaglia that they did not believe him or not take his word for what he reported. Three days after confirming to the Union, as well as to business unit presidents and HR directors, that the cap was real, Alcoa sent retirees and surviving spouses a letter explaining the cap as well as how engagement of the cap would impact them.

170. In advance of the 2006 negotiations, the parties continued to discuss healthcare and, in particular, the cap. By early 2006, senior leaders from both Alcoa and the Union were concerned that the 2006 negotiations would fail. As a result of this concern, additional union leaders became involved in the negotiations. Tom Conway and Ron Bloom became negotiators for the USW and Paul Thomas, Joe Quaglia and Alan Cransberg continued to negotiate on behalf of Alcoa. Jim Robinson was also involved in the bargaining. This group met in Pittsburgh informally before the 2006 negotiations began in St. Louis, Missouri. In addition to these principal negotiators, Cary Burnell, a union technician, and Tom Mordowanec and Lauren McCullough from Alcoa, participated in discussions over the cap.

171. Alcoa opened its books to the Union and the parties' actuaries in order to facilitate an accurate understanding of Alcoa's numbers. The Union consulted with actuaries at the Segal firm. Alcoa worked with Hewitt Associates, an actuarial consulting firm. Hewitt consultant Paul Boutin projected what the 2006 cap would be, based on the definition of the cap, and what the contributions would be, based on the costs of the plan.

Hewitt also projected the per capita cost based on data Alcoa provided going into the 2006 negotiations. Hewitt calculated Alcoa's per capita contributions at $7,767 per year for pre-Medicare retirees and $3,389 for post-Medicare retirees based on Alcoa's projected costs as of May 31, 2006.

172. During these pre-2006 discussions, Alcoa remained insistent that the cap be implemented. Alcoa also made clear that it believed it was contractually entitled to implement the cap as of January 1, 2007. No one at the Union suggested to Bloom that Alcoa did not have the right to engage the cap.

173. By this time, Bloom had concluded that the parties would not be able to reach an agreement to alter the implementation date, and that the Unions lacked the bargaining power they once had to achieve deferral of the cap. Bloom also had concluded that the Union was not in a position to successfully strike over the issue of the implementation date of the cap. Bloom understood that absent bargaining otherwise, the 2001 cap agreement would be implemented, and retirees would likely face significant premiums to reflect Alcoa's capped obligation. Because of those conclusions, the Union decided to focus on working towards a modification of the cap agreement to lessen the burden of implementation.

### C. 2006 Contract Negotiations

174. During the 2006 negotiations, Alcoa and the Union ultimately agreed to engage the cap. The Union understood that Alcoa had the authority to engage the cap in 2006, subject to the requirement of mandatory bargaining. Ron Bloom testified that the Union did not understand the prior cap letters to be shams, accounting gimmicks, tricks, or fraudulent. The Union similarly understood that there was nothing in the collectively

bargained SPDs that suggested the cap letter was an accounting gimmick, a trick, or that it could never be implemented.

175.  Bloom further testified that his understanding going into the 2006 negotiations was that the parties had negotiated a cap in prior negotiations, that the company's obligation to provide retiree medical benefits to those employees who had retired during those prior negotiations would be limited to the amount of money Alcoa spent on a per capita basis, and that the cap would engage on January 1, 2007, subject to mandatory bargaining.  Bloom derived this understanding by reading the cap agreement and discussing the cap with union officials.  He was familiar with caps because of his work with other union contracts with similar agreements and his personal experience in negotiating cap agreements.  Bloom understood that if the parties did not bargain something different, the 2001 cap would be implemented according to its terms.  Bloom understood that this likely meant Alcoa would increase retirees' premiums to reflect its capped obligation.

176.  At the top table, the parties agreed to engage the cap but implement mechanisms to lessen the financial burden of the cap on retirees.  Bloom understood Alcoa's position going into the 2006 negotiations was that it felt strongly that it needed to implement the cap but was prepared to bargain over the mechanics of implementation. During the 2006 negotiations, the cap was discussed only at the top table.

177.  While initially in 2005, the Union had taken the position that it would not accept cost-shifting, ultimately it agreed to a compromise which involved implementation of the cap along with other mechanisms put into place, such as a notional account, that minimized the financial burden on retirees over time.

178.   The parties agreed to institute premiums for retirees, varying in amount based on whether the retiree was Medicare-eligible or not, and single or married.   The Union requested that these premiums remain flat over the course of the CBA.   Non-Medicare-eligible participants would pay $75 each, or $150 for the retiree and spouse, per month.   Medicare-eligible participants would pay $40 each, or $80 for the retiree and spouse, per month.   The parties agreed that retirees would continue to receive the benefit of the government's Medicare Part D reimbursement to Alcoa.

179.   The parties also agreed to create a special "notional" account to help relieve the burden on retirees.   The notional account was proposed by Ron Bloom of the USW.  Each year the company notionally contributed the capped amount into the account.  Medicare Part D reimbursements and retiree premiums were also added to the account.  This notional account would include a one-time fixed contribution from Alcoa to help offset the cost of the plan.   Additionally, Alcoa agreed to contribute a variable amount to the notional account dependent on the price of aluminum on the London Metal Exchange.  The account was to be used to pay for healthcare costs.

180.   The Union concluded that inflows into the notional account would exceed outflows.  Alcoa's calculations demonstrated that there would be money remaining in the notional account at the end of 2010 and that amount would be carried forward.  The Union expected to use its credit balance during bargaining and persuade Alcoa to put more money into the account.

181.   Buck valued Alcoa's retiree healthcare account and determined that it increased Alcoa's liability.   Buck also determined, after performing calculations and examining data and assumptions, that the notional account would likely be exhausted on

or after 2020. A more recent estimate by Buck is that the notional account will be exhausted in 2017.

182. Alcoa also agreed to make two special payments of $1,500 each to surviving spouses. Bloom testified that none of those concessions would have been made if the 2001 cap agreement had simply been implemented according to its terms.

183. The new cap letter, dated June 1, 2006, detailed the limitations on contributions by the Company as well as the notional account. Under the 2006 cap agreement, Alcoa's per capita contributions were set at $7,767 per year for pre-Medicare retirees, a number reached after extensive negotiations by Alcoa and the Union. Lauren McCullough testified that under no scenario would Alcoa pay less than this per capita amount. The 2006 cap letter also specified the date of implementation and set forth a method for calculating what the dollar amount of the cap would be.

184. Following the 2006 negotiations, union members ratified the proposed CBA, including the cap agreement. In June 2006, after the parties had reached a tentative agreement, the Union prepared a summary and distributed it to the union membership. The summary provided: "The May 31, 1993 Labor Agreement placed a cap on the Company's retiree healthcare costs for employees who retired after May 31, 1993 . . . . The Union fully expected to move the effective date of the cap back in each subsequent set of negotiations. In fact, the cap was adjusted in negotiations in 1996 and again in 2001 . . . . However, during the 2005 negotiations the Company took the position that it could not adjust the effective date of the retiree cost cap and that retirees would be required to pay the cost of all healthcare cost increases beginning in 2007 . . . . The retiree cost cap was first negotiated as a way to lower the Company's long-term obligation for retiree

healthcare, while preserving benefits . . . .  The Union's top bargainers were initially undeterred, but after months of discussions ultimately concluded that the Company would not adjust the cap without a long and bruising labor dispute.  Instead of a high-stakes, all-or-nothing strategy, the Union sought an alternative approach which would allow the Company to retain its cost cap without requiring retirees to bear the brunt of healthcare inflation . . . .  These changes will not be painless, but together they enabled your Bargaining Committee to maintain high-quality retiree healthcare benefits at premiums that retirees could afford."

185.  In July 2006, the Union distributed a letter to post-May 31, 1993 Master Agreement retirees, explaining why the Union agreed to engagement of the cap.  The Union's corporate representatives confirmed that this letter accurately reflected the Union's understanding of the history of the cap agreement and the results of the 2006 negotiations.

186.  The union members ratified the proposed 2006 agreement.

187.  As of January 2009, Alcoa's total contribution into the notional account was over $45 million and the total available balance credited to the notional account was $80 million.

188.  The terms of the 2006 agreement apply through May 31, 2010.  In 2010, the cap agreement will again be a mandatory subject of bargaining.

189.  The 2006 cap was set at $7,767 for pre-65 /non-Medicare eligible retirees, which were the expected 2006 costs, by agreement of the parties.

190.  Ian Altman, plaintiffs' actuarial expert testified that in his opinion, the cap was set too low and should have been set at $8,282 to reflect 2006 costs.  However, that opinion is not contained in either his original expert report or in his supplemental report.

In addition, the "measuring year" specified in the 2001 CBA is June 1, 2006. As a result, Alcoa used the measuring period of June 1, 2005 to May 31, 2006 in order to calculate expected 2006 costs of $7,787. Altman's opinion that Alcoa should have used the measuring period of January 1, 2006 to December 31, 2006 to calculate a cap of $8,282 improperly uses a later period that increases the cap level.

191. Altman testified that he used the information in Alcoa's 2007 actuarial valuation report to determine that the cap should be set at $8,282. However, that report was not published by Alcoa's actuary until January 2008, and would not have been available for Alcoa to use in setting the cap level in 2006. Moreover, the 2007 valuation report explicitly states that the $8,282 figure is a 2007 per capita cost, not a 2006 per capita cost.

192. Even if Altman's reliance on the 2007 valuation report to determine 2006 costs is correct, $8,282 represents the expected cost for only pre-65 retirees, when in fact the cap should be a weighted average of Alcoa and Reynolds retirees. Because the Reynolds retirees' expected cost is $7,454, a cap based on the 2007 report should be a weighted average between $8,282 and $7,454. Further, even if Altman's reliance on the 2007 valuation report to determine 2006 costs is correct, the 2007 valuation report shows that of the four groups subject to the cap (the pre-65 Alcoa retirees, the post-65 Alcoa retirees, the pre-65 Reynolds' retirees and the post-65 Reynolds' retirees), only the actual costs for the pre-65 Alcoa retirees exceeded the cap level set in the 2006 CBA. The costs for the three other groups remained below the cap.

193.  Under the 2006 CBA, if plan costs exceed the cap during the period of the 2006 CBA, the excess cost is to be borne by the plan participants, and participant premiums will be increased to cover the excess cost.

194.  The notional account is structured to reduce retiree contributions when plan costs rise above the cap set in the 2006 CBA, so that retirees will not have to pay additional costs during the period of the 2006 CBA and their contributions remain at the level set in the CBA.  If the plan costs are below the cap, Alcoa still pays up to the per capita cost set in the 2006 CBA.  The excess over the plan costs is put into the notional account to offset any future costs of the plan and thereby to reduce retiree contributions. The balance of the notional account is to be applied toward participant plan costs until it is exhausted.

195.  The Union communicated to its members that Alcoa's plan would require employees to contribute about 12%-14% of the plan costs, which Hilko found is better than what other comparable employers' plans require, which on average is 39% of plan costs.   Plan design changes agreed to during the 2006 negotiations are commensurate with other plan design changes Alcoa made to the benefits of current employees.  The Union's proposed agreement informed members that certain proposed changes to the healthcare plan were the same changes being made to the healthcare plan covering active employees.

196.  Alcoa and the Union negotiated premiums that would remain stable from year to year.   Altman testified that the Union believed that the plan design changes permitted retirees to maintain high quality benefits at affordable premiums.  Hilko testified that in his experience in union negotiations, unions typically prefer premiums to stay

constant over the period of the contract, and will negotiate to have retirees pay more than the cost of the plan in earlier years and pay less in later years to keep contributions flat.

197. Alcoa agreed as part of the 2006 CBA to contribute at least $50 million to the notional account, which will be used to pay for retiree healthcare costs until the balance of the account is exhausted. Buck subsequently stated in its actuarial report for 2008 that the notional account could be expected to keep retiree contributions constant through 2020. Buck currently predicts that the notional account could be expected to keep retiree contributions constant through 2017.

198. Alcoa continues to pay at least as much as it paid on a per capita basis prior to the 2006 CBA. Alcoa currently pays an average per capita amount of $7,767 per pre-Medicare retiree, which is significantly more than Alcoa paid previously.

199. Plaintiffs always had some level of cost-sharing; in fact, they paid deductibles and co-pays under pre-1993 CBAs. Co-pays and deductibles were also required in the years preceding the 2006 CBA. For example, with respect to co-insurance, prior to 1993, the plan paid 80% of any non-hospital related costs. In 1993, with the change to managed care, employees paid co-insurance if they went out of network, with the plan paying 80%. With respect to deductibles, prior to 1993, employees paid the first $75. After 1993, employees paid deductibles for out-of-network visits. With respect to prescriptions drugs, prior to 1993, employees paid a $75 deductible. After 1993, the deductible changed to $50 and additional charges for drugs have increased over time. With respect to office visits, prior to 1993, the plan paid 80%. After 1993, employees paid a co-pay, which has increased over time. Premiums under the 2006 agreement are lower

than the premiums that would have been imposed had Alcoa implemented the 2001 agreement.

## CONCLUSIONS OF LAW

## VII.   GOVERNING LAW

200.    Plaintiffs contend that when Alcoa implemented a cap on retiree healthcare benefits on January 1, 2007, it violated two federal laws.  The first law that plaintiffs claim Alcoa violated is the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* Plaintiffs claim that Alcoa violated Section 502(a) of ERISA, which provides, in relevant part, as follows:

> A civil action may be brought (1) by a participant or beneficiary (A) for the relief provided in subsection (c) of this section, or (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a).

201.  The second law that plaintiffs claim Alcoa violated is the National Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 141 *et seq.*  Plaintiffs claim that Alcoa violated Section 301 of the LMRA, 29 U.S.C. § 185 by breaching its contract with plaintiffs by instituting reductions to their vested retiree healthcare benefits on January 1, 2007.

202.   Under ERISA, participants in an employee welfare benefit plan can bring a lawsuit to recover benefits they are due under that plan and to enforce their rights

as to future benefits under the plan.  29 U.S.C. § 1132(a).  The plan at issue in this case is the Employees' Group Benefits Plan of Alcoa, Group II (the "Plan"), and the plaintiffs are all members of the Plan.  Plaintiffs claim that in 2007, Alcoa unlawfully modified the Plan by implementing a cap on the amount that it would pay for healthcare for its retirees.

203.  There are two distinct types of employee benefit plans – pension plans and welfare-benefit plans.  *Noe v. PolyOne Corp.,* 520 F.3d 548, 552 (6th Cir. 2008).  Although pension plans are subject to mandatory vesting under ERISA, welfare-benefit plans are not.  *Id.*  Retiree healthcare benefit plans, such as those involved here, are welfare benefit plans; vesting only occurs if the parties so intended when they executed the applicable labor agreements.  *Id.*  "A court may find vested rights under a CBA even if the intent to vest has not been explicitly set out in the agreement."  *Id.*  If the rights to healthcare coverage have vested, then the unilateral termination of coverage violates § 301 of the LMRA.  *Id.*  Employers are free, on the other hand, to terminate any unvested welfare benefits upon the expiration of the relevant CBA.  *Id.*

204.  To prevail on their ERISA claim, plaintiffs must prove, by a preponderance of the evidence, that it was a term of the Plan that plaintiffs would, for the rest of their lives, if and when they became vested,  receive healthcare benefits without a requirement that they pay any premium or other costs associated with Alcoa's implementation of a cap on January 1, 2007.  Plaintiffs must prove, by a preponderance of the evidence, that by implementing a cap on retiree health benefits on January 1, 2007, Alcoa violated plaintiff's vested rights under the plan.

205.  Plaintiffs also claim that by implementing a retiree healthcare cap in 2007, Alcoa breached its CBA with the USW, in violation of the LMRA.  Alcoa and the

Unions in which plaintiffs were members until retirement entered into CBAs in 1993, 1996, 2001 and 2006. Reynolds and the Unions in which plaintiffs were members until retirement entered into CBAs in 1993 and 1996.

206.    To prevail on their LMRA claim, plaintiffs must prove, by a preponderance of the evidence, that it was a term of the CBAs under which plaintiffs retired that Alcoa would provide them with health benefits without a requirement that they pay health premiums or other costs associated with Alcoa's implementation of a cap on January 1, 2007. Plaintiffs must prove, by a preponderance of the evidence, that by implementing a cap on retiree health benefits on January 1, 2007, Alcoa violated its CBAs with the Unions.

207.  Plaintiffs contend that the retiree health cap that Alcoa implemented in 2007 violated the welfare benefit plans that were part of the CBAs negotiated by Alcoa, Reynolds and the Unions in 1993, 1996 and 2001. The written terms of those CBAs are contained in (1) the CBAs themselves, (2) the letters of understanding negotiated and agreed upon at the same time as the CBAs, and (3) the Summary Plan Descriptions, which are incorporated by reference into the CBAs.

208.  ERISA requires that the welfare benefit plan negotiated by an employer and the union representing its employees be in writing. 29 U.S.C. § 1102(a)(1). Under ERISA, and contract law generally, the clear written terms of the plan supersede all oral negotiations or agreements concerning the plan that preceded or accompanied its execution. *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 402-03 (6th Cir. 1998); *Musto v. Am. Gen. Corp.,* 861 F.2d 897, 910 (6th Cir. 1988).

209.  Where, as here, a contract is reduced to writing, and the writing is itself clear, the intention of the parties is to be ascertained from the writing alone.  *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.,* 210 F.3d 672, 683-84 (6th Cir. 2000); *Schachner v. Blue Cross & Blue Shield of Ohio,* 77 F.3d 889, 893 (6th Cir. 1996).  The whole of the contract, including the CBA, the letters of understanding, and the SPDs, is taken together so as to give effect to every part.  *Int'l Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1480 (6th Cir. 1983).

210.  Parties are presumed not to insert meaningless phrases into their contracts, and therefore no part of a contract should be interpreted as meaningless or empty language.  *Id.* at 1480.  Likewise, parties are presumed not to insert language in their contracts that have absurd results, and no part of a contract should be interpreted in an absurd fashion.  *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.,* 511 F.3d 535, 545 (6th Cir. 2007).  When ambiguities exist, courts may look to other provisions of the documents and other extrinsic evidence.  *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th cir. 2006).  With these rules in mind, the court now turns to the question of whether the plaintiffs' health benefits are vested.

## VIII.   PLAINTIFFS' RETIREE MEDICAL BENEFITS VESTED AT RETIREMENT

211.  According to plaintiffs, their right to retiree medical benefits is vested, meaning the benefits cannot be changed without plaintiffs' consent.  But plaintiffs retired after the 1993 cap agreement, so the court must decide whether the controlling document language demonstrates the parties' intent for retiree health benefits to vest before plaintiffs retired.

212. In order to prove by a preponderance of the evidence that Alcoa and the Union's implementation of the cap in 2006 was impermissible, plaintiffs had to demonstrate both that their retiree health benefits vested prior to retirement and that their benefits vested uncapped.

213. Medical benefits, unlike pension benefits, are not subject to mandatory vesting under ERISA. *Noe,* 520 F.3d at 552. Accordingly, "employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *see also Yolton,* 435 F.3d at 578 ("If a welfare benefit has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA").

214. Whether retiree insurance benefits continue beyond the expiration of the CBA depends upon the intent of the parties. *Yard-Man*, 716 F.2d at 1479. *Yard-Man* instructs that basic rules of contract interpretation apply, meaning that the courts must first examine the CBA language to see if clear manifestations of an intent to vest are present. *Id.* Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the so-called "*Yard-Man* inference," later decisions of the Sixth Circuit have held that *Yard-Man* does not create a legal presumption that retiree benefits are vested for life. *Yolton*, 435 F.

3d at 579. *Yard-Man* is instead "properly understood as creating such an inference only if the context and other available evidence indicate an intent to vest." *Noe*, 520 F.3d at 552.

215. The *Yard-Man* court's reasoning for ruling in favor of the plaintiffs in that case was based on two principles: (1) that retiree benefits are "status" benefits that continue to apply so long as the beneficiaries are retirees; and (2) that because retiree benefits are "permissive" subjects of bargaining, meaning that the union had no obligation to retirees to negotiate over such benefits, parties to a CBA likely would not intend to leave these benefits open to future modification. *Yard-Man*, 716 F.2d at 1482.

216. In the context of collective bargaining, there is a fundamental difference between future retirees and actual retirees that flows from the fact that active employees are represented by a union, while retired workers are not. When a particular collective bargaining agreement is about to expire, eligible workers are free to decide whether to continue to earn income or to accept the retirement benefits offered to them under the particular agreement. In *Yolton,* the Sixth Circuit observed that "the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself." 435 F.3d at 581. Plaintiffs here were not retired, they were "contemplating retirement," when the 1993 cap agreement was entered into by the parties, and they retired under a CBA with a cap agreement in place.

217. The distinction between active and retired workers explains why the *Yard-Man* inference is inapplicable in this case, and does not apply to plaintiffs. Plaintiffs

here were all active employees when the Unions agreed to a cap, and thus were all represented by one of the Unions at the time the Companies and the Unions agreed to include the cap in each of the CBAs under which plaintiffs retired.  In each of those CBAs, the Companies and the Unions further agreed to make the cap a "mandatory" subject of bargaining in the next negotiations.

218.   The Sixth Circuit has specifically refused to extend the *Yard-Man* inference to plaintiffs who were active employees under the CBA that allegedly created the vested rights, holding that there is a "fundamental difference between future retirees and actual retirees that flows from the fact that active employees are represented by a union, while retired workers are usually not," and that "it makes little sense to apply *Yard-Man* to a contract that expired while workers were still represented by their union."  *Winnett v. Caterpillar, Inc.,* 553 F.3d 1000, 1010-11 (6th Cir. 2009).

219.   Sixth Circuit law is clear that in the absence of explicit contractual language demonstrating vesting, retiree medical benefits do not vest prior to retirement. In *Winnett*, the Sixth Circuit held that in order to find vesting prior to retirement, there must be "explicit contractual language" to that effect.  *Id.* at 1008-09.  Plaintiffs in *Winnett,* like plaintiffs here, retired after their former company adopted a cap on retiree medical benefits but before that cap went into effect.  *Id.* at 1003.  Plaintiffs in *Winnett* argued that statements in plan documents that benefits are to be provided "without cost" indicated that their medical benefits vested prior to retirement.  *Id.* at 1009.  *Winnett* further clarified the *Yard-Man* inference, holding that such an inference does not result in the vesting of retiree health benefits at the point of retirement eligibility or at any point before retirement.  *Id.* at 1011.  The *Winnett* court observed that "in each of [the Sixth Circuit's prior] cases [applying

the *Yard-Man* inference], we found the link between pension and welfare benefits to support the conclusion that retiree medical benefits vested upon <u>actual</u> retirement, not when a worker attains retirement eligibility." *Id.* at 1010 (emphasis in original).

220.  Plaintiffs argue that health benefits were promised to last for a lifetime, or past the expiration of the CBA, and this fact demonstrates that their health benefits vested at the same time that their pension benefits vested.  Plaintiffs assert that language in the CBAs and SPDs which say that Alcoa will pay the cost of the retiree healthcare benefits program demonstrate that healthcare benefits are lifetime benefits, and this is indicative of vesting.

221.  In support of their position, plaintiffs cite the District Court decision in *Winnett*, which held that retiree medical benefits vested when the employees attained retirement or pension eligibility.  *Winnett*, 496 F.supp.2d 904, 922 (M.D.Tenn. 2007). However, on appeal, the Sixth Circuit reversed the district court decision, rejecting plaintiff's argument, and holding that the language in the Caterpillar SPD, which provided that an employee would be eligible for retiree health benefits at no cost if that employee was eligible for immediate receipt of a pension upon retirement, could not "be reasonably interpreted to explicitly state that benefits vested as soon as a worker became eligible for a pension or to retire."  Instead, the court found that "eligibility for retiree medical benefits is assessed at [the worker's] retirement, and coverage takes effect on his retirement date." *Winnett,* 553 F.3d at 1009.

222.  Plaintiffs claim that "further proof that their benefits are vested is promises for benefits after Medicare eligibility and Medicare premium reimbursements which would be illusory if the benefits were not vested."  In support of that claim, they cite

portions of cases which demonstrate only that, in certain cases, promises for future benefits would be illusory if the benefits did not vest <u>at retirement</u>.  Plaintiffs' citations do not support a conclusion that their health benefits vested <u>prior to retirement</u>.  Under *Winnett,* unless the contract expressly provides for vesting (or, in the case of ambiguous contract language, extrinsic evidence indicating intent to vest), retiree benefits will not vest before retirement. *Id.* at 1008.

223.  Plaintiffs next assert that the 1993 implementation of managed care resulted in an improvement of the previous plan because before managed care, plan members had difficulty getting reimbursed in the event they lost their bills.  Despite plaintiffs' assertion to the contrary, managed care was a change in the benefits of existing retirees.  Managed care restricted healthcare choices for all members, and for those members who opted to continue using doctors and other healthcare services no longer covered under the managed care program, they faced additional costs.

224.  The Sixth Circuit observed in *Reese v. CNH Am. LLC,* 574 F.3d 315, 319 (6th Cir. 2009), that the imposition of managed care "represented a reduction in the effective choices of coverage available for all retirees and the coverage actually provided to many, if not most, of them . . . . [The plaintiffs] thus saw their coverage downgraded in at least one respect: Unlike the prior plan, under which they could choose any doctor without suffering a financial penalty, they generally had to pay more for choosing an out-of-plan doctor." *Id.* at 325.  The court further noted, "Given the realities of managed care, in which a new plan may fail to cover providers or services that an old plan had covered, the retirees had no basis for assuming that each replacement plan would at best improve, or at worst precisely maintain, the level of care provided to each individual retiree.  A plan that

permits the substitution of managed care providers is one that envisions making tradeoffs in the future that may negatively impact some retirees, if not all retirees, and one that is inconsistent with unalterable and irreducible health benefits – particularly those analogized to vested pension benefits." *Id.* at 325-26.

225. The cases on which plaintiffs have relied for their argument that health benefits vested at the same time as pension benefits are not on point, as they all involved attempts by an employer to modify health benefits of retirees after the point of retirement. Here, on the other hand, the cap was included in each of the CBAs under which plaintiff's retired, so plaintiffs all retired with the cap agreement already in place.

226. The CBAs and SPDs do not support plaintiffs' contention that their retiree health benefits vested with their pension benefits. Plaintiffs have not offered any support for their assertion that "active vested employees," a phrase contained in several SPDs, refers to active employees who are vested in retiree health benefits, versus active employees who are vested in their pensions. All of the SPDs containing the "active vested" language to which plaintiffs have pointed also either explicitly disclose the cap or explicitly provide that benefits do not vest. Further, the CBAs at issue explain that those who are receiving a pension will be eligible for retiree health benefits. Contrary to plaintiffs' position, the CBAs do not provide that those who are eligible for pension benefits will also be eligible for retiree health benefits.

227. In an attempt to demonstrate that their healthcare benefits vested prior to retirement, plaintiffs point to the portions of the 1986, 1988 and 1993 Alcoa CBAs that provide: "In addition, the Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired

employees (and eligible dependents) who are receiving a pension under the Pension Agreement." Contrary to plaintiffs' argument that this language indicates that their healthcare benefits vested at the same time that pension benefits vested, the record shows that Alcoa retirees do not receive benefits based on the plan that was in place at the time their pensions vested. Instead, Alcoa retirees (or their surviving spouses) receive benefits under the plan that was in place at the time of their retirement, (or in the case of a surviving spouse, at the time of the employee's death), and those benefits were subject to change based on future contract negotiations. Plaintiffs have offered no credible support for their conclusion that an employee becomes vested in his retiree medical benefits at the same time he becomes vested in his pension benefits.

228. Plaintiffs also contend that the fact that Alcoa pays benefits to a surviving spouse for the surviving spouse's lifetime "show that there is an intent to vest," and "shows that benefits continue for life." However, the cases plaintiffs cite in support of this contention are not on point. In fact, one case plaintiffs cite in support of this contention is the District Court opinion in *Winnett*, 496 F.Supp. 2d 904, which was reversed by the Sixth Circuit. The SPDs in *Winnett* extended healthcare coverage to the surviving spouse of an "active employee" who was "eligible to retire." The Sixth Circuit held that "this language cannot be reasonably interpreted to explicitly state that benefits vested as soon as a worker became eligible for a pension or to retire." *Winnett*, 553 F.3d at 1009.

229. Moreover, none of the cases relied upon by plaintiffs support a claim that surviving spouse coverage indicates an intent to vest benefits for active employees prior to their retirement, or that such coverage indicates an intent to vest benefits for surviving spouses prior to the employee's death. Rather, those cases suggest only that

where plan documents provide for surviving spouse benefits upon the death of the employee, there may be an indication of vesting upon the employee's death, but not prior to death.

230.  Plaintiffs claim that "because the retiree benefits are stated in the plan documents to continue until death and the receipt of benefits are linked to pension benefits," these documents show vesting at the time of eligibility for a pension.  The court finds this claim without merit.  That plan documents provide benefits to retirees until their death does not indicate vesting at the time of vesting for pension benefits; instead, it reflects a bargained, contractual obligation to provide some level of benefits for the lifetime of the retiree.

231.  Plaintiffs rely on *Pringle v. Continental Tire North America Inc.,* 541 F.Supp.2d 924   (N.D. Ohio 2007), for their argument that a union may not bargain away vested benefits for retirees.  However, *Pringle* involved a company that, after failed bargaining attempts with the union, unilaterally implemented a reduced cap on employees who had already retired.  *Id.* at 927.  The defendant employer argued that the mandatory bargaining provisions in the cap agreements allowed for such unilateral action, but the court disagreed.  *Id.* at 932.  In this case, on the other hand, the plaintiffs all agreed to a cap that would be implemented at a future date, subject to mandatory bargaining, and Alcoa implemented the cap with the agreement of the Union in 2006.

232.  Plaintiffs also advance the argument that Alcoa promised that their healthcare benefits would never be reduced, relying on the following provision, "No employee covered by this Article shall suffer any reduction in the level of any of the several healthcare benefits of this Article."  However, this provision appears in a paragraph that

describes the potential effects on Alcoa's health plan in the event that a government healthcare program is enacted. It does not support plaintiffs' argument that changes to their medical benefits were prohibited under the CBAs.

233. The court concludes that plaintiffs did not sustain their burden of proving that the parties intended that health benefits vest prior to retirement. Testimony by plaintiffs' own witnesses contradicted plaintiffs' argument that retiree medical benefits vested with pension benefits. Those witnesses testified that a retiree vested with the benefit package he had on the date of his retirement, not an earlier date. Further, the testimony of plaintiffs' own witnesses demonstrates that they understood that medical benefits could change prior to their retirement, and the parties negotiated to modify medical benefits both for active employees (including those who had already become vested in their pensions) and for current retirees.

234. For example, Ernie LaBaff, Russ Pruitt and Larry Fountaine (all Union officials) testified that an employee's retirement benefits can change prior to the employee's retirement. Despite plaintiffs' assertions that the witnesses testified that they believed health benefits vested with pension benefits, it is clear from the weight of the testimony and the evidence that all three understood that health benefits did not vest prior to retirement. Dan Henry also testified that it was permissible for Alcoa and the Unions to negotiate a change in retiree benefits that could apply to current retirees. Pruitt conceded that the SPD describing his retiree medical benefits provided that his benefits would be capped at 1997 levels.

235. The extrinsic evidence shows that the Unions and the Companies negotiated over health benefits during each successive round of collective bargaining,

demonstrating to the court the parties' understanding that such benefits could be changed or reduced. Thus, the court finds that the written agreements between the Union and the Companies, in particular, the cap letter, gave the Companies the right to modify benefits in the future.

236. The CBAs linked eligibility for retiree health benefits to eligibility for a pension. The retiree health benefits provided by the CBAs included benefits to a surviving spouse, and a Medicare Supplement plan. The SPDs provided that retirees would receive retiree health benefits on the first day of their retirement and they would last until the death of the retiree.

237. Since retirees are eligible to receive pension benefits for life, the act of tying retiree health benefits to pension eligibility indicates that the parties intended that the company provide lifetime health benefits as well. In determining vesting, the question is not whether or not there is a cap – benefits can still be vested at a capped level – but whether whatever benefit levels which were promised by the healthcare plan were promised to last past the expiration of a particular CBA. *Yard-Man*, 716 F.2d at 1479. The language of the CBAs and SPDs show that plaintiffs' health benefits are lifetime benefits. Further proof that plaintiffs' health benefits are vested is promises for benefits after Medicare eligibility and Medicare premium reimbursements, which would be illusory if the benefits were not vested. Accordingly, the court finds that plaintiffs health benefits vested at time of their retirement, subject to the cap.

## IX.  PLAINTIFFS' BENEFITS VESTED WITH THE CAP IN PLACE

238.   Plaintiffs argue that although the parties agreed to place the cap agreement letter in the back of the Alcoa CBAs, the Unions never agreed to any cap on retiree health benefits until 2006, after the plaintiffs retired.

239.   Contracts are interpreted according to their written terms; only if the written language of a contract is ambiguous may courts consider parol evidence to resolve that ambiguity.  *Schachner*, 77 F.3d at 893 ("Courts may not . . . use extrinsic evidence to create an ambiguity.  Rather, the ambiguity must be patent; that is, apparent on the face of the contract . . . .   Thus, in this circuit, before a district court can consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract").

240.   Contracts are not to be interpreted in a manner that creates absurd results.  *See Tenke Corp.,* 511 F.3d at 545 ("Contracts must be construed consistent with common sense and in a manner that avoids absurd results").  As with the interpretation of written contracts generally, interpretation of a CBA requires that "the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent."  *Yard-Man*, 716 F.2d at 1479.  The written language of a CBA is to be understood "in light of the context which gave rise to its inclusion," and the written terms must "be construed so as to render none nugatory."  *Id.* at 1479-80.

241.   The "letters of understanding" that often go along with a CBA are fully enforceable contractual provisions.  *See Reese v. CNH Am. LLC,* 574 F.3d 315, 319 (6th Cir. 2009) (construing a letter of understanding concerning the cost of healthcare coverage to be binding on the parties); *United Steelworkers of Amer. v. Cooper Tire & Rubber Co.,* 474 F.3d 271, 273-76 (6th Cir. 2007) (implementing a cap agreement memorialized in a

letter of understanding appended to the parties' collective bargaining agreement); *Cent. States SE. & SW. Areas Pension Fund v. Kraftco*, 799 F.2d 1098, 1112-14 (6th Cir. 1986) (deeming a letter of understanding to be a binding part of the CBA, even though the letter was not included in the CBA package).

242.  Here, effective June 1, 1993, the Companies and the Unions agreed to a cap letter, which set a cap on the companies expenditures for retiree healthcare costs with an implementation date of January 1, 1998 (past the end of the negotiated CBA). Further, the parties agreed that the cap letter would be a mandatory subject of bargaining in the next labor negotiations.  The 1993 CBAs were set to expire on June 1, 1996.  Under the terms of the 1993 cap letter, the cap would engage if the parties did not reach a new agreement on healthcare benefits in 1996.  In the 1996 labor negotiations, the parties agreed that the cap letter would remain in the labor contracts, and the implementation date would be extended until after the expiration of the 1996 CBAs.  The unions retained the right to require the companies to bargain over the cap for retirees in future negotiations. In the 2001 negotiations, the parties agreed to extend implementation of the cap letter to January 1, 2007.  Again, the cap letter was made a mandatory subject of bargaining prior to December 31, 2006.  The new contract reached by the parties in May 2006, included a provision implementing the cap agreement.  Alcoa and the Union agreed that Alcoa would implement an annual cap on its contributions to the benefits provided to all post-May 31, 1993 retirees (and their spouses and eligible dependents).

243.  The court finds instructive the reasoning of the Sixth Circuit in the recent case of *Wood v. Detroit Diesel Corp.*, 607 F. 3d 427 (6th Cir. 2010).  In *Wood*, the parties entered into a series of agreements purporting to cap Detroit Diesel's contributions to

retiree healthcare benefits for workers who retired between 1993 and 2004. Both Detroit Diesel and the union intended this agreement to reduce Detroit Diesel's balance sheet liability in accordance with FASB. The parties did not renew the agreements capping benefits in the 2004 bargaining cycle, instead implementing a new retiree health care program for post-2004 retirees. The plaintiffs who retired after the effective date of the 1993 cap agreement argued that they were entitled to fully funded, lifetime healthcare benefits. The Sixth Circuit found that a CBA promise of "fully funded, lifetime healthcare benefits" must be read along with the series of "cap agreements" between the plaintiffs' union and the employer, which limited the employer's yearly per-retiree expenditures. *Id.* at 428-31. Taking all of the agreements together, the "only coherent reading" was that the plaintiffs "are entitled to lifetime, capped healthcare benefits." *Id.* at 431.

244. Here, as in *Wood*, the only coherent reading of the cap agreements establishes that Alcoa retirees are entitled to lifetime, capped healthcare benefits. In the 1993 cap letter, the parties agreed to limit the Companies' contribution toward retiree healthcare benefits without providing for an expiration date for the limitation. This indicates the shift made by the cap agreements, "which was from an entitlement of a defined benefit – fully funded, lifetime healthcare benefits – to a defined contribution, the capped dollar amount." *Id.* at 432. The vested rights of an employee who retired under one of the cap agreements were restricted by the parties' agreement to limit the Companies' contribution, and thus that employee could not have been entitled, at the point of that employee's retirement, to vested, lifetime, unlimited healthcare benefits. *Id.*

245. This conclusion is supported by the fact that a vested right to fully funded, lifetime healthcare benefits would be inconsistent with this court's obligation to

interpret the provisions of the cap agreements "as part of the integrated whole" and "consistently with the entire document and the relative positions and purposes of the parties." *Yolton*, 453 F.3d at 579 (quoting *Yard-Man*, 716 F.2d at 1479). Thus, retiree healthcare benefits are vested at the point of retirement because "the union owes no obligation to bargain for continued benefits for retirees" and because it would be unfair to allow future agreements between the employer and the union to reduce the health benefits of retirees when neither the union nor the employer is required to represent those retirees. *See Wood* 607 F.3d at 434 (quoting *Yard-Man*, 716 F.2d at 1479). Workers who retired after the cap agreements were effective received vested rights subject to the cap. The parties might have agreed in later years to provide greater benefits to the retirees, as they did in this case, but the vested rights were only to the capped contributions.

246. Contrary to the plaintiffs' argument, the cap agreements cannot be regarded as sham agreements intended only to disguise the nature of the Companies' retiree obligations for accounting purposes. As in *Wood,* the Companies substantially reduced the financial liability they reported under FAS-106 on the basis of the cap agreements. If those agreements had no binding effect, then this was deceptive accounting. FAS-106's presumption rules would not allow the Companies to report capped future liabilities if retirees were entitled to vested uncapped benefits. The parties entered into the agreement with the joint purpose of reducing the Companies' reported liabilities under FAS-106, and the court interprets the cap agreements "consistently with . . . the purpose of the parties," *Yolton*, 435 F.3d at 579. The court finds it incredulous that the sophisticated parties in this case entered into an agreement that was inconsistent with the applicable accounting standards. Additionally, the interpretation of the cap agreements as

meaningless or "caps with a wink," finds no grounding in the text of the parties' agreement, as the cap agreements specifically delineate the caps for the Companies' obligations and states that the Companies will not have to pay any amounts above those caps. The parties clearly hoped that they would be able to provide sufficient funds for retiree healthcare benefits, and they relied upon future negotiations over the cap agreements to reach that result. However, to accomplish the parties' agreement to reduce the Companies reported liabilities under FAS-106, it was necessary to shift the risk of above-cap costs off the Companies by capping retirees' vested healthcare benefits. If lifetime fully funded benefits remained in place, then reporting a reduced liability level to investors would not have been consistent with the Companies' accounting responsibilities.

247. Plaintiffs assert that the CBAs and SPDs between 1993 and 2006 provided for retiree medical benefits "without cost" to plaintiffs. However, the terms of the CBAs and SPDs do not provide that retirees will never pay any of the costs of their medical benefits but instead that employees and retirees will pay no costs "except as otherwise provided."

248. Plaintiffs accurately state that each of the cap letters required that the Companies and the Unions bargain over the caps prior to the caps' engagement on the dates set forth in each respective cap letter. That fact, does not, however, support plaintiffs' conclusion that the parties "never agreed to any cap." That conclusion flies in the face of the written agreements and renders the cap letters nugatory. The cap letters provided that retiree medical costs would be capped for employees who retired during the term of that CBA unless the parties bargained otherwise in subsequent negotiations; the

fact that the Companies granted the Unions a right to future bargaining does not negate the fact that the parties negotiated and agreed upon a cap.

249. Plaintiffs claim that Gary MacDonald interpreted the cap letters not to restrict the benefits provided by the Companies. Plaintiffs mischaracterize that testimony. MacDonald testified that he understood the cap letter to require retiree contributions unless the Companies and the Unions negotiated otherwise. Likewise, Doug Root testified that the parties had negotiated the engagement date of the cap so as to allow an opportunity for additional negotiation before the cap engaged, but that testimony does not support plaintiffs' conclusion that the cap was never intended to engage. Root further testified that the Companies knew the cap would ultimately have to be engaged.

250. Plaintiffs argue that the cap letter should not be interpreted to allow for future engagement of the cap because employees would not "leave their retiree medical benefits up to future negotiators over whom they have no control." That argument mischaracterizes the cap letter, which the Unions negotiated while plaintiffs were active employees and which set a cap to go into effect in the future at a set rate after a period of mandatory bargaining. The Unions' right to bargain over the cap in subsequent negotiations was not inconsistent with the Companies' right to engage the cap as provided in the cap letter.

251. Plaintiffs improperly rely on *Yolton v. El Paso Tenn. Pipeline Company*, 2008 WL 2566861, to support their conclusion that the cap letter should be interpreted so as not to provide a cap on Alcoa's retiree medical costs. The *Yolton* court stated that it did "not have to believe that there was a 'secret' or 'side' agreement between the [union] and the [defendant] to disregard the terms of the FAS 106 Letter" because the letter did not

address what would happen on the "trigger" date during the following CBA period.  *Id.* at

*13.  Here, the cap letters all made clear that, absent negotiation to the contrary, the cap

<u>would</u> engage during the following CBA period – Alcoa's costs "shall be limited" by the cap,

and costs in excess of the cap "shall be allotted to and paid by each covered person on a

pro rata basis."   The *Yolton* court relied on the fact that "for four and a half years after the

FAS 106 Letter went into effect," the cap was never communicated in any SPD distributed

to the plaintiffs.  *Id.* at *10.  Here, the SPDs issued between 1993 and 1996, immediately

after the cap letter was negotiated, explicitly disclosed the cap agreement.   Unlike the

defendant in *Yolton,* which implemented the cap unilaterally, Alcoa implemented the cap

in accordance with its terms and in agreement with the Union.

251.  Plaintiffs also assert that the cap letter "conflicts with the totality of the

agreements which would render the benefits illusory," relying on strained interpretations of

the CBAs, the SPDs, and the evidentiary record.  As discussed previously, the CBAs state

that benefits will be provided "without cost to employees and retirees <u>except as otherwise</u>

<u>provided</u>," and that limiting phrase allows for retirees to assume the costs of their benefits,

including co-pays and deductibles, which retirees have paid since at least 1993, as well as

the payment of costs in excess of the cap.

253.  The real bargaining that took place over the cap is evidence that the

parties understood the cap was real.  Plaintiffs assert that the Unions fought the caps in the

1992-1993 negotiations and continued to resist implementation of the caps in subsequent

bargaining sessions.  That fact does not support plaintiffs' position that the Unions never

agreed to a cap, or never believed the cap to be real.  On the contrary, it supports the fact

that the parties understood the caps to be real, because the Unions would have had no

reason to resist the caps unless they understood the caps to be real.  Moreover, the fact that the Companies and the Unions were conflicted on the issue of the caps undermines plaintiffs' argument that the Companies would have offered, and that the Unions would have accepted, an unwritten "side agreement" directly contrary to the explicit terms of the signed cap letters.

254.  Plaintiffs assert that the cap letter "was merely an agreement to discuss the matter in the future," but plaintiffs ignore the explicit language of the cap letter providing that Alcoa's retiree medical costs "shall be limited" to a set amount and that plaintiffs "shall" pay costs in excess of that amount, unless the parties agree otherwise through mandatory bargaining in the future.  Because the cap was made a mandatory subject of bargaining, the Unions had the right to strike in the event that future bargaining did not result in a movement of the cap and the cap was implemented as provided in the cap letter.

255.  Plaintiffs assert that "regardless of the negotiations over the letter, the parties never agreed to place a cap on the amount the defendant would contribute towards the plaintiffs' retiree medical benefits until 2006."  Plaintiffs confuse the implementation of the cap, which occurred in 2006, with the negotiation of the cap, which occurred in 1993, 1996 and 2001.

256.  Plaintiffs assert that because they retired before June 1, 2006, plaintiffs were not represented by the Union at the time the cap was implemented.  Plaintiffs fail to address, however, the fact that each member of the class was represented by the Unions when the cap letters were negotiated, and each member of the class retired under a CBA that included a cap.  When Alcoa implemented the cap in 2006, it did so at higher levels

and under more generous terms to plaintiffs than those provided in the 1993, 1996 and 2001 cap letters.

257.  Statements by Alcoa Human Resources personnel do not contravene the express language of the cap agreements.  Plaintiffs rely on the testimony of various witnesses who testified that they were told by benefits representatives that they would have their benefits "for life" when they retired.  However, none of the benefits administrators on whose alleged statements plaintiffs rely were present at the CBA negotiations, and none of those administrators indicated that plaintiffs would never have to pay premiums for their retiree medical benefits or that the cap letter would never be implemented.  Plaintiffs fail to acknowledge that the benefits that plaintiffs allege were promised "for life" included medical benefits at a capped level, as plaintiffs all retired after the cap was negotiated and therefore subject to the cap for which the CBAs and SPDs that were distributed to union members clearly and unambiguously provided.  Plaintiffs claim that such testimony is indicative that there are uncapped benefits in place.  In *Reese*, however, the Sixth Circuit found that nearly identical statements by benefits representatives were "consistent with lifetime benefits subject to reasonable changes."  *Id.* at 326.

258.  Plaintiffs assert that Carol Story, a former Alcoa benefits administrator in Alcoa, Tennessee, testified that she had told employees that Alcoa would always fund their retiree medical benefits in full.  However, Story instead testified that no employees ever asked her about the cap letters and that if they had done so, she would have gone to Alcoa's legal department because she had no knowledge of whether retirees would be required in the future to pay contributions for their medical benefits.  Story further testified that she never told anyone that such payments would <u>not</u> be required.

259.  The court concludes that the clear terms of the written cap agreements indicate that the parties intended to create a real cap.  Alcoa's authority to cap the plaintiffs' retiree healthcare benefits is clearly set forth in the cap agreements of 1993, 1996 and 2001.  The cap was disclosed in numerous SPDs since 1993, each of which is incorporated by reference into the CBA.  This court has previously held that "the cap letters unambiguously allowed Alcoa to implement healthcare caps as early as 1997, ten years before their actual implementation" [Doc. 392]; *see also Curtis v. Alcoa*, 2007 WL 3047123 (E.D.Tenn. Oct. 17, 2007) ("All of the FAS-106 letters attached to the collective bargaining agreements beginning with the 1993 agreement appear to clearly permit Alcoa to put a cap on its contribution as early as 1997").

260.  The court concludes that the cap letters should be interpreted to cap the Companies' retiree healthcare costs at the per capita levels described in the letters. Plaintiffs argue that the cap agreement, read literally, provides for a cap of millions of dollars, set at the aggregate cost for all covered retirees, per covered individual each year. Plaintiffs' proffered interpretation of the cap letters creates an absurd result and renders the cap letter nugatory, thus running afoul of well-established principles of contract interpretation.  *See Yard-Man,* 716 F.2d at 1479-80.; *Tenke Corp.,* 511 F.3d at 545. Moreover, the SPDs, which are incorporated by reference into the CBAs, clearly state that Alcoa will implement a cap.  That language belies plaintiffs' interpretation of the cap letter, which renders implementation of the cap mathematically impossible.

261.  The court finds that the evidence presented at trial overwhelmingly supports the conclusion that the parties understood the cap to be real.  The Sixth Circuit has explained that "the retirement package available to someone contemplating retirement

will change with the expiration and adoption of CBAs." *Yolton*, 435 F.3d at 581.  Even if retiree health benefits are vested, then the vested plan is the one applicable at the time of an employee's retirement.  There are three separate negotiated cap agreements at issue before the court.  Accordingly, the court must consider the enforceability of each of the 1993, 1996 and 2001 cap agreements.

262.  The court concludes that plaintiffs did not sustain their burden of proving that the 1993 cap agreement was not intended to be enforced.  As discussed above, the clear language of the written agreements supports the conclusion that the parties understood the 1993 cap letters to be real.  There is no dispute between the parties to the 1993 cap agreements – the Companies and the Unions – that the cap agreements were real.  Union communications, as well as deposition testimony by union negotiators, express an understanding that the cap agreements were genuine agreements and were binding on the parties.  Entering into the 1993 negotiations, Alcoa understood that it needed a real cap on retiree healthcare costs, which were sharply increasing and were soon to be subject to new accounting treatment under FAS-106.   The parties engaged in hard-fought negotiations over the 1993 cap agreements and ultimately agreed to the 1993 cap letters during the last hours of CBA negotiations and only after exchanging conflicting proposals for the cap language.

263.  Plaintiffs rely on the testimony of a single top-table union negotiator, John Murphy of the ABG, who alleges that Alcoa and Reynolds' representatives used certain terminology to refer to the cap letter during the 1993 negotiations.  Murphy points to no statement that could support the existence of an actual "side" agreement.  His testimony, even if accepted as true, does not describe an offer, acceptance, or any

consideration between the parties to establish that the cap was never to be implemented in accordance with the explicit terms of the cap letter. The parties understood that the 1993 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented.

264. Plaintiffs assert that the Unions' initial refusal to accept a cap demonstrates that the parties always understood that the cap was not real. However, the fact that the Companies and the Unions were unable initially to agree on a cap, coupled with the Companies' subsequent attempts to negotiate a cap, demonstrates that the parties engaged in real bargaining over the cap through the 1992-1993 negotiations. Moreover, that bargaining undermines plaintiff's argument that the Companies would have offered, and that the Unions would have accepted, an unwritten "side deal" contrary to the explicit terms of the signed cap letter.

265. The court further concludes that plaintiffs did not sustain their burden of proving that the 1996 cap agreement was not intended to be enforced. As discussed above, the clear language of the written agreements supports the conclusion that the parties understood the 1996 cap letter to be real. In advance of the 1996 negotiations, the Companies knew that the cap would be a subject of bargaining and determined that they would be willing to move the cap if negotiated with the Unions. Alcoa viewed movement of the cap as a real cost to be counted as part of the overall economic package that it was able to offer to the Unions. The Companies and the Unions negotiated over the cap in the May 1996 collective bargaining session, ultimately agreeing to defer the cap until 2003, with mandatory bargaining over the cap in the 2001 CBA negotiations. The parties understood

that the 1996 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented.

266.  Plaintiffs assert that because some individuals used the phrase "caps with a wink" in notes of certain pre-negotiation meetings in 1995, the Companies understood the caps were intended never to engage.  However, plaintiffs' position ignores testimony by the individuals actually present at the pre-negotiation meetings that they understood the phrase "caps with a wink" to mean caps that would not engage <u>during the term of the agreement</u> and that they understood the caps to be real.

267.  Plaintiffs assert that the 1993 and 1996 Reynolds' CBAs did not contain cap letters.  However, as part of the 1993 and 1996 CBA negotiations, Reynolds and the Unions entered into the same signed, written cap agreements as Alcoa did with the Unions. On June 1, 1993, the Unions informed their local representatives that the parties had agreed to a cap during negotiations.  Further, the memoranda of settlement in 1993 among the Companies and the Unions disclosed the cap agreement. The memoranda of settlement related to the 1993 CBA disclosed "Plan costs capped at expected 1997 levels." The memoranda of settlement in 1996 among the Companies and the Unions disclosed the cap agreement, and a union presentation given to the membership prior to ratification of the 1996 CBA disclosed the cap agreements and indicated the cap agreements would "reflect actual costs in effect the year the bargaining agreement expires."

268.  Further, the court concludes that plaintiffs did not sustain their burden of proving that the 2001 cap agreement was not intended to be enforced.  Alcoa and the Union negotiated over the cap in the May 2001 collective bargaining session, and the parties were unable to reach an agreement in part because of Alcoa's insistence that the

Union accept premiums on retiree medical benefits in exchange for Alcoa agreeing to defer implementation of the cap. Alcoa and the Union continued to negotiate over the cap in the September 2001 negotiations, and the parties were able to each an agreement only after Alcoa granted the Union a deferral of the cap. The parties understood that the 2001 cap letter provided for a real cap, and the parties did not enter into any "side deal" that the cap would never be implemented. Plaintiffs have not provided any plausible explanation why the Union proposed to delete the caps and bargained over their terms if the caps were not real. In conclusion, the court finds, that the cap letters were part of the CBAs between the Companies and the Unions that were ratified in 1993, 1996 and 2001. The cap letters unambiguously allowed defendant to implement healthcare caps as early as 1997.

269. Plaintiffs' argument relies on the supposed existence of an oral side agreement between the Companies and the Unions that supersedes the clear, unambiguous language of the cap letters. However, plaintiffs failed to provide any credible evidence of such an agreement. Rather, the evidence demonstrates that the Companies and the Unions understood that the cap agreements were real and that the actions of the Companies and the Unions during negotiations is inconsistent with the existence of a side agreement.

270. In addition to the explanation of the cap provided in the cap letters themselves, the caps were explicitly disclosed to plaintiffs in the SPDs that were distributed pursuant to the 1993, 1996 and 2001 CBAs and that were incorporated by reference into the CBAs. The Unions reviewed and approved the language in those SPDs before they were disseminated to union members.

271. Plaintiffs' argument ignores these SPDs and relies instead on two SPDs that contain no explicit reference to the cap letter, but instead explicitly provide that medical benefits do not vest and can be changed by Alcoa in the future. Moreover, the SPDs plaintiffs rely on were not incorporated into the relevant CBAs and were addressed not only to union members but also to non-union employees, to whom the cap letters did not apply. The caps were included in the memoranda of settlement signed by the Companies and the Unions after the CBA negotiations, and those memoranda contain no mention of any "side agreement" that the caps would never be implemented. The Unions disclosed the caps to their membership in presentations given prior to ratification of the CBAs and in negotiation highlights sent after negotiations. The cap was also disclosed in a clarification letter sent to union members after union representatives had agreed to its language.

272. Plaintiffs also contend that "no language in the 2001 CBA includes any clause purporting to reserve to Alcoa any right to change or modify the retiree healthcare benefits plan." However, the 2001 CBA contains a cap letter. The cap letter on its face unambiguously provides that retiree benefits will be capped at 2006 levels on January 1, 2007, unless the parties otherwise agree through collective bargaining. Thus, the cap itself is a provision of the 2001 CBA that reserves Alcoa's right to modify retiree medical benefits as of January 1, 2007.

273. Plaintiffs also contend that "there was no evidence presented by the defendant that any bargaining occurred in 1993, 1996 or 2001 regarding the lifetime nature of the benefits to be provided" and that 'there has been no evidence presented by the defendant that the FAS-106 letter attached to the back of the Alcoa CBAs intended to

defeat the plaintiffs' right to lifetime vested retiree medical benefits." The court finds these contentions simply wrong.

274.  As the proof at trial showed, Alcoa demonstrated that the Unions and the Companies engaged in hard fought arm's length bargaining over the cap during the 1993, 1996 and 2001 negotiations.  Moreover, the SPDs sent to each plaintiff, which were reviewed by the Unions before being mailed, clearly provide that the Companies had the right to implement a cap after the expiration of the current CBA, contradicting plaintiff's assertion that the Companies and the Unions did not address the lifetime nature of retiree medical benefits.

275.  In conclusion, the court finds that the CBAs promise of lifetime healthcare benefits must be read along with the cap agreements.  Taking all of the agreements together, the only coherent reading is that plaintiffs are entitled to lifetime, capped healthcare benefits.


## X.  THE 2006 CBA PROPERLY IMPLEMENTED THE 2001 CAP

276.  Finally, the court concludes that the 2006 CBA properly implemented the 2001 cap at $7,767 for pre-65/non-Medicare eligible retirees and at $3,389 for post-65/Medicare eligible retirees.  Though plaintiffs claim that Alcoa should have set the cap at costs for calendar year 2006, that claim conflicts with language in the 2001 cap letter providing that the cap should be set at costs "as of June 1, 2006 (measuring year)."  The amount at which plaintiffs claim that Alcoa should have implemented the cap, $8,282, is not only based on an incorrect measuring year (January 1, 2006 to December 31, 2006), but is also an inaccurate reflection of costs in the year plaintiffs purport to measure.

277. The court concludes that pursuant to the 1993, 1996 and 2001 cap agreements, Alcoa's 2006 plan design was negotiated to benefit retirees and to mitigate the effects of the implementation of the cap. The 1993, 1996 and 2001 cap agreements required that there be mandatory collective bargaining before any actual implementation of a cap. Alcoa negotiated the 1993, 1996 and 2001 cap agreements with the intention of shifting costs to retirees in such a way that retirees would not face sudden or sharp increases in their payments. As a concession to the Union, Alcoa negotiated a plan design that would ensure that retiree premiums remained constant from year to year rather than fluctuating with the cost of healthcare. Accordingly, any premiums paid while annual costs are below the cap will boost the notional account and will prevent premiums from rising sporadically when costs exceed the cap by greater margins in the future.

278. Plaintiffs contend that their benefits were cut below the cap because they were required to pay premiums in the early years of the 2006 CBA when plan costs were not expected to exceed the cap. However, Lauren McCullough testified that the Union insisted and Alcoa agreed that rather than have increasing premiums to match the rising costs of healthcare, retirees would pay flat premiums over the term of the CBA. Those premiums are credited to the notional account, which will be used to pay for costs that do exceed the cap in the future until the account is exhausted.

279. Plaintiff's expert's opinion that the notional account should not be valued because it is an unfunded account is without merit. David Hilko, Alcoa's actuarial expert witness, testified that whether it is funded or not, the notional account is part of Alcoa's written plan, and therefore must be valued as part of it, and is valued as part of Alcoa's liability by its auditors. Alcoa is self-insured, and the benefits that Alcoa has provided to

its retirees since 1993 are likewise unfunded benefits, but are nonetheless valued. Hilko has valued similar unfunded accounts for other clients, and he has never heard any actuary express the opinion that the account should not be valued because it is unfunded.

280.  The 2006 package was more favorable to the retirees than a package that simply implemented the 2001 cap would have been. Alcoa and the Union negotiated a plan design that reduced overall healthcare costs and kept retiree contributions consistent with past levels. Plan design changes agreed to during the 2006 negotiations reduced the overall costs of the plan. Specifically, the Union estimated that absent the 2006 negotiated agreement, a non-Medicare retiree and spouse would have to pay over $500 per month in five years and as much as $1,000 per month in eight years, with premiums increasing every year.

281.  Plan design changes included a change to a 90/10 co-insurance plan, with out-of-pocket maximums and deductibles. The 2006 deductibles are $250 per person/$500 per family, compared to $75/$150 before 1993. Co-pays for prescription drugs have reverted to pre-1993 levels to 80/20 co-insurance, with maximum and minimum payments. Hilko testified that Alcoa's plan is consistent with the plans that other employers have negotiated with the USW.

282.  Plaintiffs also contend that their benefits were cut below the cap because the plan costs Alcoa less than its 2006 costs. Plaintiffs' contention is without merit. The evidence established that Alcoa has been paying at least the level of the cap and continues to pay at least as much paid on a per capita basis before 2006. Plaintiffs' actuarial expert witness, Ian Altman, recognized that Alcoa agreed to make guaranteed contributions to the notional account, in excess of the 2006 per capita costs, and

acknowledged that those amounts were being credited to the account. The notional account ledgers on which plaintiffs rely for the proposition that Alcoa is paying less than the cap indicate in fact that Alcoa is crediting many millions more to the notional account to be applied against future healthcare costs than the amount of the participant premiums. David Hilko testified that in his expert opinion, the 2006 CBA was a better plan and provided greater benefits than what was provided for in the 2001 CBA. That opinion was shared by Ron Bloom of the USW.

283.   The court concludes that in light of the 2006 plan design features negotiated by the parties for the benefit of retirees, Alcoa's 2006 plan design was reasonable and permissible. Plaintiffs claim that Alcoa's implementation of the cap in 2006 departed from the terms of the 2001 cap letter, but this claim is belied by the fact that the 2001 cap letter required that the parties bargain over the cap prior to its implementation. As discussed above, the Union negotiated with Alcoa in 2006 to soften the impact of implementing the cap by providing retirees with benefits that the cap letter did not obligate Alcoa to provide, such as keeping retiree premiums constant from year to year and providing additional payments to widows covered under Alcoa's benefits plan. The 2006 plan design changes imposed additional costs on Alcoa that Alcoa was not required to pay under the 2001 cap agreement, including the money set aside for the notional account and the lump sum payments to surviving spouses. Thus, to the extent that the plan design negotiated by Alcoa and the Union in 2006 differs from the 2001 cap agreement, those variations are clearly reasonable under *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009).

284.  The court concludes that the benefits plaintiffs receive under the 2006 CBA are reasonably commensurate with the benefits they received before.  Alcoa currently pays an average per capita amount of $7,767 per pre-Medicare retiree, which is significantly more than Alcoa has paid previously.  Thus, there is no reduction in the benefits provided by Alcoa to the plaintiffs because Alcoa's retiree medical costs under the new plan design remain above the per capita dollar amount that Alcoa has paid for plaintiffs' retiree medical benefits since 1993.

285.  The court concludes that Alcoa and the Union agreed to the reasonable modifications put in place in the 2006 CBA.  Alcoa and the Union worked together in 2006 to reduce the overall cost of Alcoa's healthcare plan while also minimizing the burden placed on Alcoa's retirees.  The parties were able to agree to plan design changes that, like the switch to managed care in 1993, reduced the overall cost of the healthcare plan.

286.  The court concludes that the changes that Alcoa implemented in 2007 to its managed care program are reasonably commensurate with the benefits provided in prior Alcoa CBAs, reasonable in light of changes in healthcare and roughly consistent with the benefits of active Alcoa employees.  The plan design changes reduced the overall costs of the plan.  Despite the fact that the costs of the plan were below the cap, Alcoa agreed to pay up to the cost of the cap.  The difference between the cost of the plan and the cap is credited to the notional account, which will be used to reduce plan costs when costs exceed the cap.  Plaintiffs continue to pay modest co-pays and deductibles, as they have since 1993 and as is expected in any managed care program.  Like the change to managed care in *Reese* and in this case, the changes set forth in the 2006 CBA do not simply shift costs to the retirees but reduce the overall cost of the plan.  The changes set forth in the

2006 CBA are consistent with changes in healthcare benefits that other companies have put in place. The changes set forth in the 2006 CBA are consistent with changes that Alcoa has made in its benefits program for current active employees; in fact, plaintiffs' benefits are more generous than those of Alcoa's active employees.

287. The court concludes that the premiums that Alcoa implemented in 2007 are reasonable in light of the negotiated changes made in prior Alcoa CBAs, the healthcare benefits provided by other employers, and the benefits that Alcoa provides to active employees. Under the negotiated 2006 CBA, a pre-Medicare retiree pays $150 per month for himself and his spouse ($75 per person), a post-Medicare retiree pays $80 per month for himself and his spouse ($40 per person), and those premiums are expected to stay flat until 2017. Plaintiff's healthcare premiums were linked to the enhanced pensions that they received in the 1993 negotiations. Precisely because a cap was to be implemented at some point in the future, plaintiffs have since 1993 received higher pensions from Alcoa than they otherwise would. In light of the fact that plaintiffs continue to receive enhanced pension benefits, as negotiated in 1993, in conjunction with their healthcare premiums, those premiums are eminently reasonable. Companies generally require retirees to pay significantly higher premiums for their healthcare than those paid by Alcoa's retirees since January 1, 2007. Alcoa's current active employees also pay premiums for their healthcare benefits.

288. The plan design changes set forth in the 2006 CBA will ensure that no further plan design changes will be necessary until 2017. Under the 2006 CBA, Alcoa has agreed to contribute at least $50 million to the notional account, which will be used to pay for retiree healthcare costs until the balance of the account is exhausted. According to the

periodic updates sent by Alcoa to the Union, there was approximately $80 million in the notional account as of January 2009. Alcoa's actuaries currently estimate that the notional account should allow retiree premiums to remain constant until 2017, at which point Alcoa expects that virtually all of plaintiffs will be eligible for Medicare and subject only to very modest supplementary plan costs.

289. In conclusion, the court finds that under the cap agreements, and pursuant to the directives set forth by the Sixth Court in *Wood*, that plaintiffs are entitled to lifetime, capped healthcare benefits. Plaintiffs who retired after the effective date of a cap agreement were vested in their healthcare benefits subject to the limitations imposed by the cap. To the extent that the 2006 plan design differs from the cap agreements, those variations are clearly reasonable under *Reese*. Accordingly, the court finds that Alcoa did not breach its contracts with the plaintiffs, and this action will be dismissed.

## XI.   ALCOA'S MOTION TO EXCLUDE TESTIMONY BY PLAINTIFFS

290. The court took under advisement Alcoa's motion to exclude testimony by plaintiffs about their individualized financial and medical conditions [Doc. 467]. In light of the court's ruling, denying plaintiffs' claims and finding in favor of defendant Alcoa, the motion to exclude this testimony by plaintiffs is **GRANTED**.

## XII.   ALCOA'S MOTION TO EXCLUDE TESTIMONY BY IAN ALTMAN

291. Prior to trial, Alcoa filed a motion to strike the supplemental expert report of Ian Altman [Doc. 470]. The court denied the motion and allowed Altman to testify

as to mixed questions of liability and damages.  Following Altman's testimony, Alcoa filed a letter supplementing its objections to portions of Altman's testimony [Doc. 478]. Inasmuch as plaintiff's claims have been denied,  the portions of Altman's supplemental expert report and testimony that pertain to plaintiff's damages are not relevant and are hereby **STRICKEN FROM THE RECORD.**  As set out above, the portions of Altman's supplemental report and testimony that pertain to the issue of Alcoa's liability for healthcare benefits to the plaintiff retirees were admitted and considered by the court in its ruling. Accordingly, Alcoa's motion to preclude testimony by Ian Altman is **GRANTED IN PART AND DENIED IN PART,** as set out in this Memorandum Opinion.

An order consistent with these findings of fact and conclusions of law will be entered.

**ENTER:**

_____ s/ Thomas W. Phillips _____
United States District Judge